# Bloomberg

RECEIVED
IN THE CHAMBERS OF
MARVIN J. GARBIS
NOV 0 3 2003
UNITED STATES DISTRICT COURT

October 31, 2003

**VIA OVERNIGHT COURIER**

The Honorable Marvin J. Garbis
United States District Court For The District Of Maryland
Baltimore Division
101 West Lombard Street
Baltimore, Maryland 21201

Re: *United States Securities and Exchange Commission v. Agora, Inc., et al.*,
    Case No. MJG 03-1042

Dear Judge Garbis:

I am Media Counsel for Bloomberg News. Pursuant to the Court's October 10, 2003, Order inviting submission of *amicus* briefs, I respectfully submit this letter-brief on behalf of Bloomberg News, as *amicus curiae*, with the hope of assisting the Court in its consideration of certain issues raised by the confluence of securities fraud and First Amendment principles in the above-referenced case.

## INTEREST IN THIS CASE

Bloomberg News ("Bloomberg") is a 24-hour global news service based in New York with more than 1600 reporters and editors stationed in more than 87 news bureaus around the world. Bloomberg provides news, information, and commentary on legal and financial events electronically via a proprietary global computer network, as well as on the Internet through its <Bloomberg.com> website. Bloomberg also serves as a wire service, supplying news stories to more than 400 newspapers worldwide. Bloomberg publishes more than 5,000 news stories each day, is distributed to a radio network of more than 200 stations, and is also distributed to the general public through several

499 Park Ave N.Y. 10022

televised formats worldwide, including a 24-hour cable television outlet, the Public Broadcasting System, via cable over the USA Network, and also through the DirectTV satellite broadcasting system. Bloomberg also publishes two monthly magazines and more than 3 dozen books each year. In all, Bloomberg distributes news, information and commentary to millions of readers and listeners each day.

Bloomberg is particularly concerned about the potential consequences of a decision suggesting that securities fraud liability can flow from the publication of news reports and opinions upon which readers may rely, in part, in making their investment decisions. In particular, Bloomberg urges this Court to remain mindful of the chilling effect that would likely flow from a ruling that could be read to extend 10b-5 liability to *bona fide*, disinterested publishers who publish allegedly inaccurate news stories, whether due to carelessness or honest mistakes. To avoid that chilling effect, Bloomberg respectfully submits that the Court should view this case through the lenses of our cherished First Amendment protections.

## INTRODUCTION

The United States Securities and Exchange Commission (the "SEC") alleges that the defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder by "disseminating false information in several Internet newsletters . . . claim[ing] to have inside information about certain public companies." Complaint at ¶ 1. The SEC further alleges that the Defendants falsely promised "inside information" regarding USEC, Inc., a publicly-traded company, to potential subscribers to its newsletters.

The facts alleged by the SEC are unusual, if not unique, and Bloomberg takes no position on the accuracy of the SEC's allegations or the extent to which such conduct is actionable. Bloomberg operates a newsroom founded upon the principles of full, fair and transparent disclosure of financial information, and believes that the kinds of allegations presented here deserve close judicial scrutiny. At the same time, Bloomberg stresses to this Court that any decision overextending the jurisdictional reach of the securities laws would stifle good-faith and timely reporting by the financial newsgathering community, thus creating the "chilling effect" that the Constitution forbids and reducing the amount of information available to investors.

## ARGUMENT

I. **AN OVER-EXTENSION OF SECURITIES-LAW LIABILITY UPON BONA FIDE, DISINTERESTED PUBLISHERS WOULD CREATE A CHILLING EFFECT PROHIBITED BY THE FIRST AMENDMENT.**

The First Amendment favors a free and unfettered press, restrained only at the very periphery. Anything short of this would chill speech in a manner incompatible with the First Amendment. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court explained why the Constitution is so tolerant:

> Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate. As James



> Madison pointed out in the Report on the Virginia Resolutions of 1798: "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." 4 J. Elliot, Debates on the Federal Constitution of 1787, p. 571 (1876). And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties. As the Court stated in *New York Times Co. v. Sullivan*, . . . "Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred." The First Amendment requires that we protect some falsehood in order to protect speech that matters.

*Gertz v. Robert Welch, Inc.*, 418 U.S at 340-41.

The formula of free speech is intuitive. Self-censorship, brought about by fear of liability for providing speech of vital import to the public, constitutes the forbidden chilling effect. A ruling allowing *bona fide* news reporting to be subject to the same standard of liability as naked transactional fraud or stock manipulation under 10(b) would create this chilling effect because no financial publisher could take the risk of being wrong -- precisely the concern voiced by the *Gertz* Court.

This problem is heightened in the modern world of electronic communications. Investors rely upon instantaneous news, much of which cannot be fully verified as it breaks. No matter what good-faith efforts modern financial publishers take to provide accurate information to their readers, error or incompleteness is inevitable in any human enterprise.[1] Allowing liability, whether under the securities laws or elsewhere, for inaccurate financial information must comport with the First Amendment. Failure to keep the Constitutional compass aligned would invariably deprive the investing public of contemporaneous information. As Justice Brennan wrote:

> Fear of large verdicts in damage suits for innocent or merely negligent misstatement, *even fear of the expense involved in their defense*, must inevitably cause publishers to steer wider of the unlawful zone.

*Time, Inc. v. Hill*, 385 U.S. 374, 387-88 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)) (emphasis added).

Avoiding the chilling effect is not a proscription envisioned for the convenience of publishers. It is ultimately a doctrine of protecting the citizenry, including the investing public. Holding *bona fide*

---

[1] The news marketplace also places considerable self-regulation on financial publishers. News organizations can only survive on a long-term, well-established reputation for accuracy and credibility. Otherwise, readers will inevitably go elsewhere.

publishers liable to readers for securities fraud when they make erroneous reports about a public company would surely lead to the issuance of far fewer reports, thereby either wholly depriving the investing public of a large body of useful and accurate information, or making it much more costly to obtain that information. As an imminent First Amendment scholar and Judge of the Court of Appeals for the Second Circuit have observed:

> A society that rendered a newspaper, selling for fifty cents or a dollar, responsible for the results of every possible reliance on information in the publication would either have no newspapers, no newspapers selling for fifty cents or a dollar, or no newspapers containing information worth having. If a misplaced decimal point in a news wire service's corporate earnings table could result in millions of dollars of liability to an investor who bought stock thinking the company's earnings had evidently jumped tenfold, newspapers' reports of corporate earnings would be slow and expensive. . . . Courts will not permit those results. They look to either the standard tort doctrine of duty *or constitutional protections of freedom of expression consistently to avoid them.*

P. Cameron DeVore and Robert D. Sack, ADVERTISING AND COMMERCIAL SPEECH, § 10:2.2 (2001 ed.) (emphasis added) (citation omitted); *see also Pacific Gas & Elec. v. Public Utils. Comm'n*, 475 U.S. 1, 7 (1986) (The constitutional guarantee of free speech, "[b]y protecting those who wish to enter the marketplace of ideas," also "protects the public's interest in receiving information.").

Others have previously noted the potential chilling effect of overbroad application of securities laws. Justice White observed, with respect to the securities laws, that, "[a]t some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, *the statute must survive the level of scrutiny demanded by the First Amendment.*" *Lowe v. SEC*, 472 U.S. 181, 230 (1985) (White, J., concurring) (emphasis added). *See also Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1353 (S.D.N.Y. 1977) ("The securities laws, and particularly Rule 10b-5, were not developed with the intention of overlapping or reinforcing the law of libel, nor to inhibit the exercise of freedom of the press.").

Bloomberg recognizes, of course, that Congress, the SEC and this Court have a legitimate and important interest in protecting the investing public from fraudsters. However, Bloomberg urges this Court to take care that its decision does not go too far, lest future plaintiffs (or other courts) interpret it as stripping *bona fide*, disinterested financial publishers of the protections guaranteed them by the First Amendment to maintain a fair and honest marketplace.

## II. THE COURT SHOULD NOT ALLOW CLAIMS TO PROCEED AGAINST THE PRESS FOR INACCURACIES IN FINANCIAL REPORTING UNLESS THE PLAINTIFF SHOWS ACTUAL MALICE.

### A. The First Amendment Requires A Plaintiff To Surmount The High Legal Hurdle Of "Actual Malice" In Order To Proceed Against A Financial Publisher.

Bloomberg does not suggest that members of the press are immune from all forms of civil action, let alone securities laws. However a wide array of courts -- including this one -- have recognized that the press should not be held accountable for misstatements in financial news without a showing of actual malice (discussed below). *See, e.g., Ginsberg v. Agora, Inc.*, 915 F. Supp. 733, 738-40 (D. Md. 1995) (granting motion to dismiss in part because imposing liability on publisher for negligently erroneous investment advice would contravene the First Amendment's actual malice requirement). This strict standard is well-established and has been applied to other claims based upon inaccurate financial news reporting. For example, in *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256 (S.D.N.Y. 1988), investors brought claims alleging that they relied upon a publisher's erroneous description of corporate bonds their detriment. The court rejected the claims, holding that First Amendment principles require a plaintiff to demonstrate actual malice when seeking to impose liability on a newspaper for publication of a non-defamatory misstatement. *See id.* at 258.

The Ohio Supreme Court recognized the chilling effect of applying anything but the highest standard of liability in *Gutter v. Dow Jones, Inc.*, 490 N.E.2d 898, (Ohio 1986). There, the plaintiff relied to his detriment on an inaccurate news report about a stock. The court held that, though accuracy in news reports is important:

> [T]he chilling effect of imposing a high duty of care on those in the business of news dissemination and making that duty run to a wide range of readers or TV viewers would have a chilling effect which is unacceptable under our Constitution.

*Gutter* at 901 (quoting *Tumminello v. Bergen Evening Record, Inc.*, 454 F. Supp. 1156, 60 (D.N.J. 1978)). Attempts to apply anything resembling a negligence standard to erroneous financial news were disallowed as long ago as 1923, when, in *Jaillet v. Cashman*, 235 N.Y. 511 (1923), New York's highest court rejected negligence liability for an erroneously published stock report.[2]

The actual malice standard, made famous in the libel case of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), is defined as a "statement[] made with . . . knowledge that it was false or with reckless disregard [of the truth]." *Id.* at 279-80. While *Times v. Sullivan* was a libel case, the actual malice standard applies to a variety of cases in which the plaintiff seeks to impose liability for publication damages. The Supreme Court has repeatedly applied the actual malice standard to a variety of causes of action arising from the publication of false facts concerning matters of public

---

[2] Indeed, Justice Rehnquist noted a similar chilling effect in non-media securities law cases, observing that a securities fraud "which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975).

interest. *See, e.g., Time, Inc. v. Hill*, 385 U.S. 374, 387-88 (1967) ("constitutional protections for speech and press preclude [imposition of liability] to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of its truth"); *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (applying actual malice standard to an intentional infliction of emotional distress claim). *See also Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186, 1189 (9th Cir. 2001) (false endorsement claim under Lanham Act against publisher barred by First Amendment absent clear and convincing evidence of actual malice).

The actual malice standard means that a plaintiff who seeks publication damages cannot survive a motion to dismiss merely by pleading conclusory allegations. It requires a threshold showing of "clear and convincing" evidence that a publisher "in fact entertained serious doubts as to the truth of his publication" for liability to attach. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The Supreme Court has held fast to this standard, even though "[i]t may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendants testimony that he published the statement in good faith and unaware of its probable falsity." *Id.* Indeed, a publisher is explicitly protected where he remains ignorant as to the truth of his statement. *See id.* at 723 ("Failure to investigate does not in itself establish bad faith").

Bloomberg respectfully submits that actual malice is the lowest permissible fault standard upon which a securities fraud based on news reporting may be maintained.[3] As discussed next, this means that, whatever 10(b)'s scienter requirement may mean in other contexts, its application to *bona fide* disinterested publishers must comport with the First Amendment, or else the application of that statute to such publishers would be unconstitutional.

**B.   The Scienter Requirement of Rule 10(b) And Section 10b-5 Must Comport With The First Amendment's Actual Malice Mandate.**

In addition to the First Amendment's requirement that any suit against a publisher demonstrate actual malice, no "private cause of action for damages will lie under 10(b) and Rule 10b-5 in the absence of any allegation of 'scienter' -- intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The various Courts of Appeals have stated that "recklessness" may satisfy the scienter standard, but a precise definition of "recklessness" has proven elusive. Whatever "recklessness" means in the typical 10b-5 case, this Court should take care to ensure that, at least insofar as *bona fide* publishers are concerned, 10b-5 "recklessness" does not fall below the actual malice standard. Indeed, the various circuits, in addressing "recklessness," have made clear that it requires *deliberate* recklessness, *conscious* misconduct or *conscious* disregard. *See, e.g., Press v. Chemical Inv. Servs. Corp*, 166 F.3d 529, 537 (2d Cir. 1999); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3d Cir. 1999); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999);

---

[3] The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78-4(b)(2) requires a Section 10(b) complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. Notably, the requirement that, in order to hold a publisher liable, a plaintiff must present *clear and convincing* evidence of *actual fraud* presents an even higher hurdle than that articulated in the PSLRA.



*In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550-51 (6th Cir. 1999); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999). This comports with the Supreme Court's observation that "Section 10(b) is aptly described as a catchall provision, *but what it catches must be fraud.*" *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994) (quoting *Chiarella v. United States*, 445 U.S. 222, 234 (1980)) (holding that even aiding and abetting liability is not available for violations of Section 10(b) or Rule 10b-5). Nonetheless, Bloomberg is concerned that a court may, in cases based upon erroneous publication, construe the "recklessness" prong of the scienter requirement so broadly that it falls below the standard of actual malice imposed by the First Amendment. Bloomberg submits that the First Amendment does not allow such a result where the defendant is a *bona fide*, disinterested publisher.

### III. DISINTERESTED PUBLICATION OF INFORMATION ABOUT A SECURITY DOES NOT SATISFY 10B-5'S REQUIREMENTS THAT THE FRAUDULENT STATEMENT BE MADE IN CONNECTION WITH THE PURCHASE OR SALE OF A SECURITY.

Section 10(b) and Rule 10b-5 require that the fraudulent conduct complained of be "in connection with the purchase or sale of any security." The publication of news by a disinterested, *bona fide* publisher concerning a publicly-held company or its securities -- even if that news is erroneous -- does not satisfy the "in connection with" requirement. *SEC v. Wall Street Publ'g Inst. Inc.*, 664 F. Supp. 554 (D.D.C. 1986), *rev'd in part on other grounds*, 851 F.2d 365 (D.C. Cir. 1988).

In *Wall Street Publishing*, the SEC brought a civil action against the publisher of *Stock Market Magazine*, alleging violations of the Investment Advisors Act of 1940 and Sections 17(b) and 10(b) of the 1934 Act. Initially, the district court held for the SEC, finding that because the magazine's statements were false and misleading, they must have met the "in connection with" requirement. During the pendency of an appeal, the Supreme Court decided *Lowe v. SEC*, 472 U.S. 181 (1985), holding that disinterested, *bona fide* publishers were exempt from application of the Investment Advisors Act of 1940. *See Lowe*, 472 U.S. at 211. On remand, in light of the *Lowe* decision, the *Wall Street Publishing* District Court held that such a publisher could not be liable under Section 10(b), either:

> After *Lowe*, because Defendant is a bona fide publication with a general and regular circulation and is excepted from the Investment Advisor's Act, this reasoning [finding a "connection"] no longer applies. *Stock Market Magazine*'s representations are not "in connection with the purchase or sale of a security" and therefore Defendant has not violated section 10(b) of the Securities Exchange Act of 1934.

*Wall Street Publishing*, 664 F. Supp. at 556.

For purposes of Congressional intent, the difference between the Investment Advisor's Act and the '34 Act is of no moment. The *Wall Street Publishing* court's reasoning applies equally to all

disinterested financial publishers.[4] If the courts allow the "in connection with" standard to be so expansive that it includes any news article an investor considered in making his or her investment decision, *bona fide* financial publishers could find themselves the frequent subjects of strike suits by plaintiffs or investigations by overzealous SEC staffers. Indeed, not only will financial publication be chilled in a Constitutionally-impermissible manner, but liability, and thus the chilling effect, could be logically extended as far as casual conversation -- friends would no longer be able to talk to one another about their thoughts about the stock market or public companies without potentially incurring liability under Section 10(b) or Rule 10b-5.

## IV. CONCLUSION

Almost every article that Bloomberg publishes (and, for that matter, most articles published by the *Wall Street Journal*, *Barrons*, and countless other financial publishers) disseminates information about a publicly traded company. Furthermore, most of Bloomberg's readers, indeed, most readers of financial publications, are either investors, investment advisors, or others who rely, at least in part, on these financial publications in deciding whether to buy or sell securities. This Court should seek to avoid a decision that could be misread by future plaintiffs as holding that anything less than an actual malice standard applies to allegations of securities fraud against *bona fide*, disinterested publishers, and this Court should avoid a ruling that could be misread to mean that every publication of information by every financial publisher is a statement made "in connection with the purchase or sale of any security."

Respectfully submitted,

Charles Glasser
Media Counsel
Bloomberg News

cc: Matthew Winkler, Editor-in-Chief, Bloomberg News
Matthew J. Turner, Esq.
Bruce W. Sanford, Esq.
Karen L. Martinez, Esq.

---

[4] The determination of whether a financial publisher is "disinterested" turns not on circulation or sales, but whether that publisher has any direct interest in the underlying purchase or sale of securities, i.e., whether it or its fiduciaries traded the securities in order to take advantage of a statement it knew to be false. For example, in *Carpenter v. United States*, 484 U.S. 19 (1987), the Supreme Court affirmed the convictions of a Wall Street Journal reporter and stockbroker for, among other things, violations of Section 10(b) and Rule 10b-5, where the defendants had conspired to trade securities themselves on the basis of the probable impact of the reporter's upcoming columns on the market. There, the reporter was not "disinterested" because he participated in and directly profited from trades of the securities at the heart of the matter.