UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br>v.<br><br>AGORA, INC., PIRATE INVESTOR, LLC and FRANK PORTER STANSBERRY,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. MJG 03-1042<br>)<br>)<br>)<br>)<br>)<br>) |

**PHILLIPS INVESTMENT RESOURCES, LLC'S
UNOPPOSED MOTION FOR LEAVE TO FILE A BRIEF AS
<u>*AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

Pursuant to this Court's October 10, 2003 Order, Phillips Investment Resources, LLC ("Phillips") respectfully requests leave to file the annexed brief as *amicus curiae* in support of Defendants' Motion to Dismiss. As one of the nation's largest publishers of investment newsletters, Phillips, which is headquartered in Rockville, Maryland, is well-suited to provide the Court insight into the newsletter publishing industry, the chilling effect that the SEC's attempted content-based regulation of the newsletter press would have on the industry, and generally to assist this Court in its consideration of the issues raised by the Motion to Dismiss. Counsel for all parties have consented to the submission of the accompanying brief.

-2-

Dated: November 5, 2003                    Respectfully submitted,

                                           By: /s/ Ross D. Cooper

                                               Ross D. Cooper, Bar No. 14373
                                               SHULMAN, ROGERS, GANDAL,
                                               PORDY & ECKER, P.A.
                                               11921 Rockville Pike
                                               Rockville, MD  20852-2743
                                               Telephone: 301-230-5200
                                               Facsimile: 301-230-2891

                                               Counsel to Phillips Investment
                                               Resources, LLC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Case No. MJG 03-1042 |
| AGORA, INC., PIRATE INVESTOR, LLC and FRANK PORTER STANSBERRY, | ) ) ) ) | |
| Defendants. | ) ) | |

### *AMICUS CURIAE* BRIEF OF PHILLIPS INVESTMENT RESOURCES, LLC IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

#### Preliminary Statement

Having been thwarted from censoring the investment newsletter press under the Investment Advisers Act of 1940 ("Advisers Act") by the Supreme Court's decision *Lowe v. SEC*, 472 U.S. 181 (1985), the Securities and Exchange Commission ("SEC") now turns to a strained and already-rejected interpretation of the Securities Exchange Act of 1934 ("Exchange Act") to support the censorship it again seeks to impose upon the investment newsletter press. The last seventy years of Exchange Act jurisprudence, however, teaches that the Exchange Act does not reach alleged misstatements by editors, authors and publishers of *bona fide* newsletters of the type at issue in the instant case and of the type published by *amicus curiae*. So held the only published decision to address the issue, *SEC v. Wall Street Publishing Inst., Inc.*, 664 F. Supp 554 (D.D.C. 1986), *rev'd on other grounds*, 851 F.2d 365 (D.C. Cir. 1988), a District Court decision conspicuously absent from the SEC's brief. Because the Exchange Act does not

empower the SEC to regulate the content of the *bona fide* newsletter press, the motion to dismiss should be granted.

## Interest of the *Amicus Curiae*

Phillips Investment Resources, LLC ("Phillips"), headquartered in Rockville, Maryland, is one of the nation's largest publishers of newsletters on investment topics. Phillips currently publishes over a dozen investment newsletters, including *Lou Dobbs' Money Letter, John Dessauer's Investor's World, Richard E. Band's Profitable Investing, The Motley Fool Stock Advisor, Louis Navellier's Blue Chip Growth Letter* and *Tobin Smith's ChangeWave Investing*. Phillips also operates Investorplace.com, a free website where Internet users can sample Phillips' newsletters and review current stock recommendations. Phillips' investment newsletters have over 230,000 active subscribers. As a long-time publisher of investment commentary and stock market advice, Phillips has a clear interest in the SEC's attempt to apply the Exchange Act to the investment newsletter press.

Phillips also is uniquely aware of the SEC's long-standing desire to regulate the investment newsletter press, having been forced to defend a lawsuit in this very Court in the company's earliest days, when the SEC sought an injunction to prevent Phillips from publishing unless it publicly disclosed its financial condition. *See SEC v. Phillips Publ'g, Inc.*, No. N-75-1108, 1975 U.S. Dist. LEXIS 15038 (D. Md. Dec. 2, 1975). Finding Phillips to be a "young expanding company merely following the widely-adopted financing practices employed in the contemporary publishing industry," the Honorable Edward S. Northrop wrote that he was "loathe to order the relief requested" by the SEC because it would "in effect, be ordering bankruptcy by injunction." *Id.* at *2.

Phillips also is on the front line of the SEC's latest effort to bring the investment newsletter press under its jurisdiction. During the pendency of this case, Phillips was contacted by counsel for the SEC who claimed that the content of a promotional e-mail sent to potential subscribers of one of its newsletters was "troubling." If the SEC is permitted to expand the reach of the Exchange Act to reach *bona fide* publishers such as Phillips and Defendants, this kind of inquiry will almost certainly become commonplace, and publishers will be routinely compelled to submit to editorial second-guessing under the threat of monetary sanctions and injunctions, and possibly criminal indictment. The Exchange Act does not endow the SEC with the power to punish and enjoin *bona fide* publishers in this manner. Indeed, if the SEC is permitted to seek damages and injunctions against *bona fide* publishers each time it finds editorial commentary on publicly traded companies "troubling," it will chill not only Phillips' publishing activities and the entire investment newsletter industry, but the publishing industry at large.

## Argument

### A. The SEC Has No Jurisdiction Under § 10(b) Of The Exchange Act To Prosecute A *Bona Fide* Publisher Of Stock Advice

In the mid-1980's, the SEC first attacked the investment newsletter press under the Investment Advisers Act of 1940, 15 U.S.C. § 80-b ("Advisers Act"). *See Lowe v. SEC*, 472 U.S. 181 (1985). In *Lowe*, the Supreme Court struck down this attack, holding that the *bona fide* press expressly was excluded from the reach of the Advisers Act. In so holding, the Court recognized that Congress, "plainly sensitive to First Amendment concerns, wanted to make clear that it did not seek to regulate the press through the licensing of non-personalized publishing activities." *Id.* at 204.

Thwarted by *Lowe*, the SEC now tries the Exchange Act, which predates the Advisers Act by six years. The Exchange Act's legislative history, however, is devoid of any reference to

regulating the *bona fide* financial press under § 10(b), and the SEC's brief cites no authority even remotely suggesting that Congress intended § 10(b) of the Exchange Act to reach the investment news and analysis industry.

Indeed, the prerequisites of § 10(b) of the Exchange Act and Rule 10b-5 thereunder are clear: the SEC must show a false statement of a material fact (or the omission of material fact) made with scienter and "in connection with the purchase or sale of a security." *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(c). The only published decision to rule on the "in connection with" requirement in the context of an action against a publisher *rejected* the position the SEC advocates in this case. In *SEC v. Wall Street Publishing Inst., Inc.*, 664 F. Supp. 554 (D.D.C. 1986), *rev'd on other grounds*, 851 F.2d 365 (D.C. Cir. 1988), the U.S. District Court for the District of Columbia held that alleged misstatements in *Stock Market Magazine* could not serve as the basis for a prosecution under § 10(b) and Rule 10b-5 because "the requisite connection to the purchase or sale of a security" was missing. *Id.* at 555. Having no answer to *Wall Street Publishing*, the SEC simply ignores it. The court in *Wall Street Publishing* refused to accept the SEC's arguments 17 years ago, and the SEC has provided this Court no reason to accept it now.

Moreover, although § 10(b) and Rule 10b-5 are laws of general applicability and are content-neutral on their face, they nonetheless must be given heightened scrutiny when their application to publishers would have a substantial impact on expression. *See Lowe*, 472 U.S. at 204. Thus, in *Lowe*, the U.S. Supreme Court crafted a "broad reading" of the statutory exemption from the Advisers Act for *bona fide* publishers, therefore establishing that the law itself could only be applied narrowly to them. *Lowe*, 472 U.S. at 205. Two courts that have rejected § 10(b) and Rule 10b-5 claims against disinterested publishers have highlighted the incongruity of applying these provisions against the *bona fide* press. *See Hart v. Internet Wire,*

-4-

*Inc.*, No. 01-9259, 2002 U.S. App. LEXIS 21310, at *5 (2d Cir. Oct 10, 2002) ("[P]laintiffs allege a kind of deception . . . that is separated from the statutory mooring of § 10(b)."); *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1353 (S.D.N.Y. 1977) ("The securities laws, and particularly Rule 10b-5, were not developed with the intention of . . . inhibit[ing] the exercise of freedom of the press.").

That the plaintiffs in *Hart* and *Reliance Insurance Co.* were private litigants lays bare for this Court another concern about the SEC's approach in this case. If the SEC is permitted to sue disinterested publishers under § 10(b) and Rule 10b-5, there is nothing to prevent private litigants from following in the SEC's footsteps as long as they traded in the securities about which the publisher wrote. *See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) (confirming that an implied private right of action exists under § 10(b) and Rule 10b-5); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 749 (1975) (holding that the implied private right of action under § 10(b) and Rule 10b-5 is limited to purchasers and sellers of the underlying security). Thus, if the doors are thrown open for the SEC, they will also be thrown open for private parties, even class actions. Shareholders unhappy over poorly-performing investments who presumably would not even have to purchase a publication, just claim to have relied upon it, will have a new target, and all publishers will be faced with new threats of litigation that will chill their coverage of the financial markets and corporate America.

Therefore, in considering the scope of the "in connection with" language of § 10(b) and Rule 10b-5, Phillips asks this Court to be mindful of the well-established rule of statutory interpretation that "'where an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *United States v. Deaton*, 332 F.3d

698, 705 (4th Cir. 2003) (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)); *see also ETW v. Jireh Publ'g, Inc.*, 332 F.3d 915, 926 (6th Cir. 2003) ("[B]ecause overextension of Lanham Act restrictions . . . might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict.") (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d. Cir. 1989)); Norman J. Singer, 2B *Sutherland Statutory Construction* § 51.06, at 311 (5th Ed. 1992) ("Constitutional policy can provide a valuable aid in determining the legitimate boundaries of statutory meaning. Public policy which has a constitutional source can provide the basis for a . . . narrow interpretation of a statute.").

There simply is no evidence that the intent of Congress in passing § 10(b) was to regulate the speech of publishers. The SEC has not provided this Court with any legislative history to the contrary, nor will it be able to do so because none exists. Indeed, Congress statutorily excluded publishers when it addressed the regulation of the publications by investment advisers in the Advisers Act six years after passing the Exchange Act. Reading the two statutes together leads to the conclusion that Congress did not intend to tread upon First Amendment rights. For the Court to rule otherwise will open a Pandora's box of constitutional problems. *See Lowe*, 472 U.S. at 204.

Phillips' concern over constitutionally-prohibited censorship is not merely speculative. During the pendency of this case, Phillips was contacted by SEC counsel claiming that the SEC found certain content in a particular Phillips publication to be "troubling." Allowing the SEC to

proceed with its case here clearly would empower it to become the content police of the investment press – an activity that could not be more constitutionally repugnant.[1]

If the SEC is authorized under § 10(b) and Rule 10b-5 to choose which publications it will attack as false, and which it will leave untouched, it will invite unprecedented intrusions into the judging and evaluation of protected expression. This task is wholly inappropriate for government officials, especially when, as here, the loose, vague wording of § 10(b) and Rule 10b-5 would enable them to operate with "unbridled discretion." *See City of Lakewood v. Plain*

---

[1]   Were the Court to find that the SEC has stated a valid cause of action – an outcome that Phillips believes would be unsupportable by the existing precedent – the protections of the actual malice rule of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) would assert themselves. Under *New York Times*, a publisher cannot be held liable for a defamatory falsehood in the absence of proof that the publisher acted with "serious doubts as to the truth of [the] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The actual malice standard protects expression in many contexts other than libel when penalties are sought for allegedly false statements. *See Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) (intentional infliction of emotional distress); *Time, Inc. v. Hill*, 385 U.S. 374 (1967) (false light); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) (right of publicity); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 258 (S.D.N.Y. 1988) (fraud), *aff'd on other grounds*, 869 F.2d 175 (2d Cir. 1989). It would be incongruous for the actual malice rules to apply in all these circumstances but not to § 10(b) and Rule 10b-5 actions against *bona fide* publishers.

The scienter requirement of § 10(b) and Rule 10b-5 and the actual malice rule plainly overlap in some respect. For example, both require intentional, not merely negligent, conduct. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976); *St. Amant*, 390 U.S. at 731. But the crucial distinction between them for purposes of this case is that, although scienter must only be shown by a preponderance of the evidence, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-91 (1983), clear and convincing evidence is required for actual malice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). This distinction is critical here insofar as the alleged misstatement by the defendants boils down to a disagreement or difference in memories between the defendant Frank Porter Stansberry and USEC's spokesman Steven A. Wingfield as to what was said in their telephone conversation. It is hardly unusual in the publishing business for a reporter's source to deny what the reporter reported the source said. That should not be allowed to become the basis of §10(b) and Rule 10b-5 actions by the SEC. Nor should newsletters and other publications have to rise to the level of a Registration Statement, with all of its required disclaimers and "subject to" language to avoid liability.

*Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) (invalidating ordinance requiring newspapers to apply for annual newsrack permit).

*Lakewood* presents a compelling analogy. In striking down a local ordinance regulating newsrack permits, the Court in *Lakewood* articulated its concern over the presence of arbitrary government decision-making processes when free speech rights hang in the balance:

> At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. . . . [T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.

*Id.* at 757. Such a regulatory scheme enables government to accomplish through indirect means what it cannot do overtly – control the content and viewpoint of protected speech. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115-16 (1991) (noting presumptive invalidity of laws discriminating on the basis of the content or viewpoint of expression). As the Court in *Lakewood* continued, "a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." 486 U.S. at 763.

It may be that § 10(b) and Rule 10b-5 are not, technically, licensing provisions. But if the SEC is permitted to use these laws to prosecute any publisher for any statement involving a public company that in hindsight is attacked as false, it is all but inevitable that § 10(b) and Rule 10b-5 would become *de facto* and *ex post facto* licensing tools, with certain favored mainstream publications receiving a pass from regulators, while disfavored ones would be routinely harassed. The SEC will deter much protected expression by the threat of damages alone, but it has taken

the extraordinary step of requesting an injunction in this case against future alleged false speech by Defendants, despite the clear presumption against such relief under the First Amendment. *See Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (dissolving injunction against union from making allegedly defamatory statements and noting the long-held rule that "equity will not enjoin a libel"); *Tilton v. Capital Cities/ABC, Inc.*, 827 F. Supp. 674, 681-82 (N.D. Okla. 1993), *aff'd*, 95 F.3d 32 (10th Cir. 1996) (denying motion for preliminary injunction to prohibit television network from broadcasting news segment that plaintiff contended was libelous). *See also New York Times Co. v. United States*, 403 U.S. 713 (1971) (rejecting application of the federal government to enjoin publication of the Pentagon Papers). Thus, the fear that a prior restraint may "intimidate parties into censoring their own speech," a key factor in the Court's decision to invalidate the ordinance in *Lakewood*, hovers over this case as well. *Lakewood* 486 U.S. at 757.

The SEC justifies its action by arguing that the Exchange Act should be interpreted "broadly" even though *Lowe* establishes just the opposite: that the securities law must be construed *narrowly* if a broad reading would impinge upon the right to free expression. Such a narrow reading of the Exchange Act is necessary here. When the minimal government interest in prosecuting financially disinterested publishers under § 10(b) and Rule 10b-5 is weighed against the substantial First Amendment interests at stake in permitting the free flow of information, there is no contest. The Complaint should be dismissed.

## Conclusion

For the foregoing reasons, Phillips respectfully requests that this Court grant the motion to dismiss.

Dated:  November 5, 2003           Respectfully submitted,


                                                By: /s/ Ross D. Cooper

                                                Ross D. Cooper, Bar No. 14373
                                                SHULMAN, ROGERS, GANDAL,
                                                PORDY & ECKER, P.A.
                                                11921 Rockville Pike
                                                Rockville, MD  20852-2743
                                                Telephone: 301-230-5239
                                                Facsimile: 301-230-2891