## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 03 CV 01042 MJG |
| AGORA, INC. et al. | ) ) | |
| Defendants. | ) ) | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL

Pursuant to Rule 37(a) of the Federal Rules of Civil Procedure and District of Maryland local rule 104.8, Plaintiff Securities and Exchange Commission ("Commission") hereby submits this Memorandum in Support of Plaintiff's Motion to Compel.

### INTRODUCTION

In April 2003, the Commission filed a Complaint against the Defendants. In the Complaint the Commission alleges that Agora Inc., Pirate Investor, LLC and Frank Porter Stansberry (collectively the "Defendants") engaged in fraud in the offer and sale of securities in connection with a stock tip by making false representations regarding "insider information". At the heart of the allegations is an e-mail offering for sale a report (the "USEC report") which allegedly contained inside information (" Insider Tip Email").

On March 25, 2004 the Commission served on the Defendants Plaintiff's First Set of Interrogatories as allowed by Federal Rule of Civil Procedure 33(a). On April 27,

2004, Defendants answered Plaintiff's First Set of Interrogatories.  Interrogatories 2, 4 and 5 requested identifying information on persons who requested or received a refund after purchasing the USEC report, persons who received a copy of the Insider Tip Email and persons who purchased a copy of the USEC report (collectively the "Interrogatories").  Defendants objected to the Interrogatories arguing that the Interrogatories were not relevant, were cumulative and burdensome, and that the Interrogatories were privileged and/or protected by the First Amendment of the U.S. Constitution.  Specifically the interrogatories objected to and the Defendants objections are:

INTERROGATORY 2:  Identify each person, including email addresses, who requested or received a refund of any amount paid to you for the USEC Report attached to the Complaint as exhibit B ("USEC Report")[1].

OBJECTION:  The defendants object to this interrogatory on the grounds that it is not relevant to the claim or defense of any party.  The defendants further object on the grounds that the interrogatory is unreasonable cumulative, burdensome, seeks information that is privileged, confidential and proprietary, and represents an unreasonable governmental intrusion into activities protected by the First Amendment to the U.S. Constitution.

INTERROGATORY NO. 4:  Identify each person, including email address, who received a copy of the Super Insider Tip email attached to the Complaint as exhibit A ("Insider Tip Email")[2].

---

[1] Defendants produced copies of documents relating to the complaints Defendants received regarding the USEC report and documents relating to refunds give by Defendants to purchasers of the USEC report, however all information regarding the identity of the individuals who complained or received refunds was redacted by Defendants.

OBJECTION: The defendants object to this interrogatory on the grounds that it is not relevant to the claim or defense of any party. The defendants further object on the grounds that the interrogatory is unreasonable cumulative, burdensome, seeks information that is privileged, confidential and proprietary, and represents an unreasonable governmental intrusion into activities protected by the First Amendment to the U.S. Constitution.

INTERROGATORY NO. 5: Identify each person, including email address, who purchased a copy of the USEC Report.

OBJECTION: The defendants object to this interrogatory on the grounds that it is not relevant to the claim or defense of any party. The defendants further object on the grounds that the interrogatory is unreasonable cumulative, burdensome, seeks information that is privileged, confidential and proprietary, and represents an unreasonable governmental intrusion into activities protected by the First Amendment to the U.S. Constitution.

## CERTIFICATION

Pursuant to Rule 31(a)(2)(A), I, Karen M. Martinez, counsel of record for Plaintiff, Securities and Exchange Commission, hereby certify that I conferred with Defendants' counsel in a good faith effort to obtain the discovery which is the subject of the Motion to Compel. On May 4, 2004 I meet in person with Bruce Brown at the offices of Baker and Hostetter, LLP in Washington D.C. Subsequent to the meeting with Mr. Brown I corresponded with Mr. Brown by email and had several telephone discussions

---

[2] The Commission offered to accept from the Defendants the number of persons who received a copy of the Insider Tip Email rather then the identity of each person who received the Insider Tip Email. This information is important in the determination of the appropriate amount of civil penalties that should be imposed should the Commission prevail on its claims against the Defendants.

with him regarding the Interrogatory responses. I was unable to persuade the Defendants

that the objections made to certain interrogatories were improper. The Defendants'

refusal to answer certain interrogatories based on improper objections necessitated the

filing of the Plaintiff's Motion to Compel Discovery.

## ARGUMENT

The Interrogatories, which request limited subscriber information from

Defendants, including information regarding those persons to whom Defendants sent the

Insider Tip Email and the USEC Report, are relevant to the Commission's case and are

not protected from disclosure based on privilege and therefore should be answered.

### I.    The Interrogatories are Relevant to the Claims of the Commission

The information the Commission requested in the Interrogatories is relevant to the

claims of the Commission and therefore, should be supplied by the Defendants. In its

Complaint the Commission alleges that Defendants violated Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder. In order to

prevail on its claim that Defendants violated Section 10(b) of the Exchange Act and Rule

10b-5 thereunder, the Commission must, among other things, show that "*material

misstatements or omissions* …were made either in the offer or sale of any securities, or in

connection with the sale or purchase of any securities." (emphasis added). The antifraud

provisions are "to be construed 'not technically and restrictively,' but flexibly to

effectuate [the provisions'] remedial purposes.'" Affiliated Ute Citizens v. United States,

406 U.S. 128, 151 (1972) (internal citation omitted). Superintendent of Ins. of New York

v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971)[3].

---

[3] Investors regularly testify in securities fraud cases. See SEC v. Hasho, 784 F. Supp. 1059, 1109
(S.D.N.Y. 1992) (investor testified regarding importance of information.); SEC v. The Infinity Group, 993

Materiality has been defined by the Supreme Court as a fact that a reasonable investor would consider important in his or her decision-making. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Having the identity of each person who purchased a copy of the USEC report will allow the Commission to speak to investors and to learn their perceptions regarding the information that was communicated, and to explore the nature of any services communicated to investors in a non-published format. This information from individual investors goes directly to an element of the Commission's case, the materiality of the untrue statements or omitted facts and is therefore relevant to the Commission's case. Materiality of the untrue statements "is typically a question of fact for the jury." Jackson v. Hartford Life and Annuity Insurance Co., 201 F. Supp. 2d 506, 513 (D. Md. 2002). See also, Cox v. Collins, 7 F.3d 394, 396 (4th Cir. 1993) (finding that materiality of false statements in a securities fraud was a question of fact for the jury because of conflicting evidence presented.); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999) ("Materiality is a mixed question of law and fact"). The information also will assist the Commission in determining the extent to which investors relied upon Defendants' financial advice and suffered consequential harm.

In addition, purchasers of the Insider Tip Email contacted USEC, Inc. regarding the announcement identified in the USEC Report. See Deposition of Mari Major-Sosias dated October 2, 2002 at 14-15 ("Major-Sosias Dep.") relevant portions attached hereto

---

F. Supp. 324, 329 (D. Pa. 1998) ( investors testified regarding reviewing information); SEC v. Shapiro, 349 F. Supp. 46, 54 (S.D.N.Y. 1972); Meadows v. SEC, 119 F.3d 1219, 1225 n.11 (5th Cir. 1997) (investor testified regarding reliance on investment suggestions); SEC v. Goldfield Deep Mines Co. of Nevada, 758 F.2d 459, 464 (9th Cir. 1985) (investors testified regaring investement contract.); SEC v. Hansen, No. 83 Civ. 3692, 1984 U.S. Dist. LEXIS 17835 at *11 (S.D.N.Y. April 6, 1984); SEC v. Southwest Coal and Energy Co., 439 F. Supp. 820, 823 (W.D. La. 1977) (investor testified regarding oral representations.

as Exhibit A; Deposition of Steven Wingfield dated October 2, 2002 at 51-52, 59

("Wingfield Dep.") relevant portions attached hereto as Exhibit B.  USEC, Inc. testified

that they did not make a record of each query it received because the complaints were too

numerous.  See Major-Sosias Dep. at 15; Wingfield Dep. at 59.  The information

communicated with investors by USEC is relevant to the falsity of the USEC report and

therefore is discoverable by the Commission.

Investors also communicated with Defendants regarding the USEC report.  See,

Deposition of Porter Stansberry, dated August 27, 2002 at 16, 86, relevant portions

attached hereto as Exhibit C.  The Commission is entitled to discover what Defendants

told these investors.  This information not only goes to the falsity of the USEC report but

also addresses the likelihood of future violations, an element of the Commission's case.

Finally, should the Commission prevail in its claims against the Defendants' any

disgorgement or civil penalties paid by the Defendants will most likely be paid to

defrauded investors, therefore it is also important to know the identity of each investor

who purchased the report and those who requested and received a refund in order to

facilitate a refund of monies to defrauded investors.

## II.    Defendants Failed to Specifically Plead Their Objections

In addition to objecting to the Interrogatories based on relevance, the Defendants

asserted blanket objections to the Interrogatories "on the grounds that the interrogatory is

unreasonably cumulative, burdensome, seeks information that is privileged, confidential

and proprietary and represents an unreasonable governmental intrusion into activities

protected by the First Amendment."  Rule 26(b)(5) of the Federal Rules of Civil

Procedure and Discovery Guideline 9(c) of the District of Maryland Local Rules "impose

6

an affirmative duty on the objecting party to particularize with facts, not conclusory statements, the basis for . . . objections." Marens v. Carrabba's Intalian Grill, Inc., 196 F.R.D. 35, 38 (D. Md. 2000). The objecting party, therefore, must "demonstrate, e.g. through an affidavit, why furnishing a particular answer would be burdensome" or is protected by some other privilege. Blades v. Woods, 107 Md. App. 178, 184; 667 A.2d 917, 920 (Md. Ct. Spec. App. 1995). "Whether a responding party states a general objection to an entire discovery document on the basis of privilege, or generally assets a privilege objection within an individual discovery response, the resulting blanket objection is decidedly improper." Willemijn Houdstermaatshaapij BV v. Apollo Computer, Inc., 707 F. Supp. 1429, 1439-40 (D. Del 1989). Defendants failed to set out specifically the basis of their objections or to cite to any authority in support of their objections as required by District of Maryland local Rule 104.6.

Defendants' objections to the Interrogatories simply state that the Defendants object to the Interrogatories on the ground that the Interrogatories are unreasonably cumulative, burdensome, confidential, proprietary and protected by the First Amendment without specific information as to what the basis of the objections are or any applicable authority citations. Defendants' failure to demonstrate the applicability of the claimed privileges fails to properly preserve the privilege. Marens, 196 F.R.D. at 38. Because the Defendants have failed to plead their objections with particularity the Defendants have failed to preserve any of privileges they assert and therefore, they must answer the Interrogatories.

Even if Defendants had specifically plead their objections that the Interrogatories are unreasonably cumulative and burdensome, the appropriate remedy would be to be for

the trial court to restrict the scope of discovery to prevent abuse, by granting a motion for

a protective order. Blades, 170 Md. App. at 184; 667 A.2d 917 at 920. Therefore, the

Defendants objections to answering the Interrogatories based on Defendants claim that

the Interrogatories are unreasonably cumulative and burdensome fails for that reason

also.

> III.    **The Interrogatories Seek Information that is Relevant and Therefore
> Cannot be Withheld Based on Claims of Privilege, Confidentiality and
> Proprietary**

Defendants' refusal to answer the Interrogatories because the Interrogatories

"seek information that is privileged, confidential and proprietary" is improper.  There is

no absolute privilege that protects confidential commercial information.  Louis Weinberg

Assoc., Inc. v. Monte Christi Corp., 15 F.R.D. 193, 495 (S.D.N.Y. 1954); Russ Stonier,

Inc. v. Droz Wood Co., 52 F.R.D. 232, 234 (D. Pa.1971); Harrington Mfg. Co., Inc. v.

Powell Mfg .Co., Inc., 26 N.C. App. 414, 417, 216 S.E.2d 379,381 (N.C. Ct. App. 1975).

Disclosure of confidential and proprietary information will be required "where the

information sought is relevant and necessary for preparation of the case for trial."  Russ

Stonier, 52 F.R.D. at 234.  As outlined above, the information the Commission seeks to

gain from the Interrogatories is relevant and necessary for preparation of the case for

trail.  See supra part I.  Therefore, the Defendants should be required to answer the

Interrogatories.  If the Court feels the information is of such a nature as to warrant

safeguards the Court can issue a protective order.  See Russ Stonier, 52 F.R.D. at 234

(ordering plaintiff to utilize the information sought by the interrogatories solely for the

purposes of the litigation).

8

IV.    **The Interrogatories do not Represent an Unreasonable Governmental Intrusion Into Activities Protected by the First Amendment to the U.S. Constitution.**

Finally, the Defendants object to the Interrogatories as an unreasonable governmental intrusion into activities protected by the First Amendment of the U. S. Constitution.  The First Amendment does not afford Defendants any basis for refusing to answer relevant interrogatories.  See, e.g., Wall Street Transcript, 422 F.2d 1371, 1380 (rejecting a publisher's argument that compliance with an S.E.C. subpoena demanding subscriber information would chill its exercise of constitutionally protected rights of expression.)

"Clearly, the First Amendment does not prohibit all regulation of the press," for "[i]t is beyond dispute that the States and the Federal Government can subject newspapers to generally applicable economic regulation without creating constitutional problems."  Minneapolis Star and Tribune Co. v. Minnesota, 460 U.S. 575, 582-83 (1983).  "[O]therwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed."  Branzburg v. Hayes, 408 U.S. 665, 682 (1972) (enforcing subpoenas compelling reporters to testify before a grand jury about information gleaned from confidential informants).  "The publisher of a newspaper has no special immunity from the application of general laws" and "has no special privilege to invade the rights and liberties of others.'"  Id. (citation omitted).  It is only where government "has singled out the press for special treatment" that the First Amendment is implicated, and even then, a regulatory burden may be placed upon the exercise of First Amendment rights if "the

burden is necessary to achieve an overriding governmental interest." <u>Minneapolis Star</u>
<u>and Tribune</u>, 460 U.S. at 582-83 (holding that a paper use tax specifically targeting
newspapers impermissibly discriminated against the press in violation of the First
Amendment).  The Exchange Act constitutes "generally applicable economic regulation"
that does not impose upon the press or publishers any special restrictions or burdens not
applicable to others engaged in similar activities.  <u>See</u> <u>Id</u>. at 582.  The Commission has a
substantial interest in enforcement of those laws.

Defendants object to answering the Interrogatories arguing that the First
Amendment provides a basis for preventing the Commission from discovering the
identities and other information pertaining to Defendants' customers, who are victims of
securities fraud.  There is no such First Amendment right to prevent the identification of
fraud victims, and even if there were some arguable basis for such an interest, it would
have to yield to the overriding interest of protecting investors from securities fraud.  The
Interrogatories do not implicate any of the most compelling concerns associated with the
First Amendment, since they "involve no intrusions upon speech or assembly, no prior
restraint or restriction on what the press may publish, and no express or implied
command that the press publish what it prefers to withhold."  Branzburg, 408 U.S. at
681-82.  <u>See also</u> <u>Wall Street Transcript</u>, 422 F.2d 1371, 1378-79.  The Interrogatories do
not involve any "exaction of tax for the privilege of publishing."  <u>Branzburg</u>, 408 U.S. at
681-82.  Nor does answering the Interrogatories impose any "penalty, civil or criminal,
related to the content of published material . . . ." <u>Id</u>.  Therefore, Defendants have no
legitimate First Amendment interest that would be affected by the answering of the
Interrogatories.

At most, the solicitations in this matter constitute commercial expression directed solely to Defendants' economic interest, and Defendants' First Amendment rights are not implicated by the regulation sought to be enforced.  A four-prong analysis, has been set out by the Supreme Court in Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557 (1980), to determine whether First Amendment protections apply: (i) the commercial speech must concern lawful activity and not be misleading; (ii) the asserted governmental interest must be substantial; and if both of those prongs can be answered affirmatively, then the Court considers (iii) whether the regulation directly advances the government's asserted interest; and (iv) whether the regulation is more extensive than is necessary to serve the interest asserted.  Central Hudson, 447 U.S at 564.  See also Jakanna Woodworks, Inc. v. Montgomery Co., 344 Md. 584, 596 (1997) (Court of Appeals applied the Central Hudson test in a case involving a liquidation sale advertisement).  Here the commercial speech involved was misleading and therefore, First Amendment protections do not apply.

While Defendants seek to shield information from production by claiming that it is protected by the First Amendment, the regulation that is sought in this matter – answering of interrogatories – does not impinge upon or restrict Defendants' publishing activities, does not place an unreasonable burden upon Defendants and, moreover, it furthers the important governmental interest of allowing the Commission to enforce the securities laws of the United States, and therefore the First Amendment offers no basis for Defendants' failure to answer the Interrogatories.

11

**V.     The Commission Respectfully Requests an Extension of Time to the Discovery Cutoff Date.**

The Commission, respectfully requests that, should this Court find in favor of the Commission on the merits of this Motion to Compel, the Court extend the discovery deadline sixty-days from the date the Defendants provide the requested information to the Commission.  The current discovery cutoff date is August 2, 2004.

The Commission has diligently pursued getting the requested information from the Defendants in order to complete discovery within the current schedule set by the Court.  However, the Defendants refusal to provide the information has now made it impossible for the Commission to complete the discovery process within the guidelines set out by the Court.

In order to complete the discovery process the Commission needs sufficient time to contact investors, depose investors and determine which investors would be good witnesses for the Commission.  The number of investors is in the hundreds and therefore, this process could be lengthy.  Therefore, the Commission requests a sixty-day extension to the current discovery cut off from the time the Defendants provide the requested information

## **CONCLUSION**

Defendants' failure to answer the Interrogatories based upon objections of

relevance, privilege and protection under the First Amendment are baseless for the

foregoing reasons and this Court should order Defendants to answer the Interrogatories.

Dated this ___13th___ day of May 2004.


Karen L. Martinez
Thomas M. Melton
Attorneys for the Plaintiff
Securities and Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, UT 84144
Tele: (801) 524-5796
FAX: (801) 524-3558

# EXHIBIT A

Page 3

**Page 1**

```
 1   UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 2
 3   In the Matter of:          )
 4                              )  File No. SL-02368
 5   PIRATE INVESTOR.COM        )
 6   WITNESS:  Mari Angeles Major-Sosias
 7   PAGES:   1 through 24
 8   PLACE:   Skadden, Arps, Slate, Meagher & Flom
 9            1440 New York Avenue, N.W.
10            Washington, D.C.  20005-2111
11   DATE:    Wednesday, October 2, 2002
12
13        The above-entitled matter came on for hearing, pursuant
14   to notice, at 2:00 p.m.
15
16
17
18
19
20
21
22
23
24            Diversified Reporting Services, Inc.
25                     (202) 467-9200
```

**Page 3**

```
 1                      C O N T E N T S
 2
 3   WITNESSES:                               EXAMINATION
 4   Mari Angeles Major-Sosias                     4
 5
 6   EXHIBITS:   DESCRIPTION                   IDENTIFIED
 7   Previously marked exhibits:
 8   18          Note file by S. Wingfield         15
 9   19          Article from Investor Relations Compliance
10               Report                            19
11   26          E-mail from P. Stansberry         14
12   36          Notes of M. Major-Sosias April-May 2002   09
13
14
15
16
17
18
19
20
21
22
23
24
25
```

RECEIVED

OCT 1 1 2002

Securities & Exchange Commission
Salt Lake District Office

**Page 2**

```
 1   APPEARANCES:
 2
 3   On behalf of the Securities and Exchange Commission:
 4        BRENT R. BAKER, ESQ.
 5        Securities and Exchange Commission
 6        50 South Main Street, Suite 500
 7        Salt Lake City, UT 84144-0402
 8        (801) 524-5796
 9
10   On behalf of the Witness:
11        RICHARD L. BRUSCA, ESQ.
12        MELISSA GOLDSTEIN, ESQ.
13        Skadden Arps Slate Meagher & Flom LLP
14        1440 New York Avenue, N.W.
15        Washington, D.C.  20005-2111
16        (202) 371-7000
17
18        ALLEN LEAR, ESQ.
19        6903 Rockledge Drive
20        Bethesda, MD 20817
21
22
23
24
25
```

Page 4

```
 1                   P R O C E E D I N G S
 2        MR. BAKER:  On the record on October 2, 2002 at
 3   approximately 2:00 p.m.
 4   Whereupon,
 5             MARI ANGELES MAJOR-SOSIAS
 6   was called as a witness and, having been first duly sworn,
 7   was examined and testified as follows:
 8             EXAMINATION
 9   BY MR. BAKER:
10        Q  My next comment was going to be you need to speak
11   up because this is being recorded electronically and, in
12   addition, it will only pick up audible responses, so nodding
13   of the head and other hand gestures won't be picked up on the
14   record.
15        Would you state and spell your full name for the
16   record, please?
17        A  Mari Angeles Major-Sosias, and I'll spell it. M-a-
18   r-i A-n-g-e-l-e-s M-a-j-o-r hyphen S-o-s-i-a-s.
19        Q  Thank you.  As you know, I'm Brent Baker and I am
20   an officer of the Commission for purposes of this proceeding.
21   This is an investigation by the United States Securities and
22   Exchange Commission in the matter of Pirate Investor.com,
23   file number SL-02368, to determine whether there have been
24   violations of certain provisions of the federal securities
25   laws.  However, the facts developed in this investigation
```

Page 13

1 significantly on May 22?

2    A No.

3    Q Did he indicate that he was going to write a

4 recommendation about USEC?

5    A No.

6    Q Did he say that he was not going to?

7    A Yes.

8    Q Did he explain why?

9    A It's written in my notes. If I recall, he said

10 something like USEC did not fit in the type of company that

11 he was looking at to write about.

12    Q Did he ever mention the name Jay McDaniel?

13    A Not during the call, no.

14    Q When did you first hear that name?

15    A When we looked at a Yahoo! message and there was a

16 signature, I believe, by Jay McDaniel.

17    Q Let me show you a document we've marked here as

18 Exhibit No. 26, ask you if you have ever seen that.

19    A Yes.

20    Q What is that?

21    A This is what Porter Stansberry, or whatever his

22 name really is, sent to investors I think worldwide, perhaps,

23 explaining what he believed to be was a great deal.

24    Q And how did you come to see this document?

25    A Actually, Mr. Wingfield printed it out for me when

Page 14

1 I first saw it.

2    Q This document contains an e-mail that is dated May

3 13 and it says double your money on May 22 with this super

4 insider tip. Do you know of anything in USEC's dealings with

5 TENEX that was to occur on May 22?

6    A No.

7    Q Did you have any personal conversations with Porter

8 Stansberry apart from this initial phone call that you were

9 listening in on?

10    A The only other time I think I spoke to him directly

11 is when he called, and I don't remember the date, asking for

12 Mr. Wingfield, who was not available and that was the extent

13 of the conversation.

14    Q Let me show you a document we've marked as Exhibit

15 No. 18. It's a note file by Mr. Wingfield on May 14.

16    A Uh-huh.

17    Q Did you have any discussions with Mr. Wingfield to

18 refresh his recollection about that initial conversation

19 prior to him drafting this document?

20    A No.

21    Q Did he review your notes before he drafted that

22 document?

23    A No.

24    Q Did you receive, either electronically or on the

25 telephone, complaints from investors indicating that they had

Page 15

1 purchased on a tip from Porter Stansberry or Pirate Investor?

2    A Yes.

3    Q Did you keep a running list of those complaints or

4 were there just too many?

5    A I might have recorded some on my notebook but

6 perhaps not all. There were quite a few. I cannot tell you

7 how many.

8    Q Did any of those investors ever indicate they were

9 going to go to the SEC with this matter?

10    A Yes.

11    Q More than one?

12    A One or two mentioned SEC.

13    Q Let me ask you about a particular notation here on

14 June 10, simply because I can't read it. This is a note from

15 George --

16    A Albino.

17    Q -- Albino at something TV --

18    A CAN TV.

19    Q What is CAN TV? Do you know?

20    A Yeah. I found out that they are a communications

21 firm in Venezuela, TV or radio or phone.

22    Q It indicates that they received the Pirate Investor

23 memo.

24    A Yes.

25    Q So it made its way to Venezuela.

Page 16

1    A Yes.

2    Q Did you receive many other calls from international

3 investors?

4    A Yes.

5    Q Can you give me a ballpark? More than 10?

6    A No.

7    Q More than five?

8    A Around that.

9    MR. BRUSCA: I think it's important for USEC's

10 counsel to be present at any Venezuelan deposition.

11    MR. LEAR: It should probably be done in the winter

12 as well.

13    MR. BRUSCA: Yes.

14    BY MR. BAKER:

15    Q Let me refer you to another section of your notes

16 here. Looks like it's June 18 is the -- at least the -- it

17 says MOA announcement Tuesday, June 18, 2002, and then the

18 next page is undated but there's a private to Porter

19 Stansberry at the top. I can't tell if that's blink or link.

20    A Link. Yes.

21    Q What does that mean?

22    A The link question is a discussion we had

23 internally, whether now that the MOA was signed and also our

24 HEU agreement was signed and also additional discussions

25 between the two governments about additional HEU material

# EXHIBIT B

Page 3

| | | | | |
|---|---|---|---|---|
1 UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:          )

4                            ) File No. SL-02368

5 PIRATE INVESTOR.COM        )

6 WITNESS: Steven A. Wingfield

7 PAGES:   1 through 68

8 PLACE:   1440 New York Avenue, N.W.

9          Washington, D.C.  20005-2111

10 DATE:   Wednesday, October 2, 2002

11

12       The above-entitled matter came on for hearing, pursuant

13 to notice, at 10:20 a.m.

14

15

16

RECEIVED

OCT 1 1 2002

Securities & Exchange Commission
Salt Lake District Office

24       Diversified Reporting Services, Inc.

25            (202) 467-9200

---

**CONTENTS**

3 WITNESSES:                                    EXAMINATION

4 Steven A. Wingfield                                5

5

6 EXHIBITS:      DESCRIPTION                      IDENTIFIED

7  12      8-K pricing amendment to original

8          contracted dated 6/19/02              8

9  13      10-Q for period ended 3/31/02         8

10 14      10-K for period ended 6/30/01         8

11 15      Printout of Outlook calendar 5/02 to

12         9/02                                  8

13 16      Organizational charts

14 17      Company policy re trading of stock and

15         insider information                   8

16 18      Note to file from P. Wingfield re phone

17         call from Stansberry                  8

18 19      Page from IR compliance report        8

19 20      USEC memo from Timbers to Shelton     8

20 21      E-mail to Wingfield from Stansberry

21         dated 5/30/02                         8

22 22      USEC report                           8

23 23      Update of USEC report dated 5/17/02   8

24 24      Status update re USEC dated 5/30/02   8

25 25      Copy of newsletter sent by P. Stansberry  8

Page 4

1 EXHIBITS:      DESCRIPTION                      IDENTIFIED

2  26      E-mail from P. Stansberry             8

3  27      E-mail                                8

4  28      Subpoena dated 9/3/02                 8

5  29      Chronology of USEC discussions with TENEX  8

6  30      Newspaper articles                    8

7  31      Kunert, Kristian e-mail dated 5/13/02 8

8  32      USEC news release dated 2/26/02       8

9  33      Russian agreement dated 6/19/02       8

10 34      (Not identified on the record)        8

11 35      E-mail from P. Stansberry to S. Wingfield

12         dated 6/18/02                         8

13 36      Notes of M. Major-Sosias April-May 2002  8

14 37      Notes of S. Wingfield                 8

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     BRENT R. BAKER, ESQ.

5     Securities and Exchange Commission

6     50 South Main Street, Suite 500

7     Salt Lake City, UT 84144-0402

8     (801) 524-5796

9

10 On behalf of the Witness:

11    RICHARD L. BRUSCA, ESQ.

12    MELISSA GOLDSTEIN, ESQ.

13    Skadden Arps Slate Meagher & Flom LLP

14    1440 New York Avenue, N.W.

15    Washington, D.C.  20005-2111

16    (202) 371-7000

17

18    ALLEN LEAR, ESQ.

19    6903 Rockledge Drive

20    Bethesda, MD 20817

Page 49

1   Q Did the agreement get approved on the 22nd?

2   A No, it did not.

3   Q What happened with the price of the stock after the

4 22nd?

5   A It began to decline.

6   Q And did it decline rapidly?

7   A Over the course of a two-week period, yes. It went

8 back down to near the level of where it was before this

9 started.

10   Q And when you say this, you're referring to the

11 Pirate --

12   A To the Pirate Inves -- to the initial runup from

13 the 14th to the 23rd.

14   Q Now, in Exhibit No. 21 here, in the e-mail, he says

15 thanks for your help, Steve, and sorry for any trouble I

16 caused you. What is he referring to there?

17   A When I said in the middle of June, I think this was

18 closer to the date. I was doing it off the top of my head

19 without a calendar here.

20   MR. BRUSCA: Is it all right if I just point to the

21 witness to something to help him with --

22   MR. BAKER: You bet.

23   MR. BRUSCA: Right there.

24   THE WITNESS: Okay. Thank you. Yes. According to

25 my phone log -- I appreciate that -- I did talk with him on

Page 50

1 May 30, so that's when I received the call and I told him

2 that we weren't very happy -- or I wasn't very happy with him

3 and got advice of counsel and had a member of OGC in the room

4 when I called him back.

5   BY MR. BAKER:

6   Q And OGC is your office of general counsel?

7   A Office of general counsel. Thank you.

8   Q And you're referring to your notations in Exhibit

9 No. 37.

10   A That's correct. And he asked seven questions and

11 we provided him an answer.

12   Q How do you know he asked seven questions?

13   A According to my notation on that exhibit, it says

14 seven fairly straightforward questions. Returned call with

15 Tim -- that would be Tim Hansen -- in the room.

16   Q And do you recall what those questions were? I

17 know this is a test of your memory but --

18   A No, I don't. I think I -- what I do recall is I

19 was surprised at their simplicity. He -- I believe the point

20 of this is to say that USEC was going to begin a fresh

21 dialogue with Pirate Investor, which would be quite a

22 stretch.

23   Q So --

24   MR. BRUSCA: When you say this? The record --

25   THE WITNESS: Oh. I'm sorry. I'm looking at page

Page 51

1 USEC 171 and it said however, investor relations director

2 Steve Wingfield did agree to begin a fresh dialogue with me.

3   BY MR. BAKER:

4   Q So you didn't agree to begin fresh dialogue with

5 him. Is that what you're saying?

6   A That's correct.

7   Q I'm referring to Exhibit 21 now. Did you send e-

8 mails to -- or did you receive e-mail inquiries or complaints

9 from investors?

10   A Yes.

11   Q And I should have said this. Did you receive e-

12 mail inquiries or complaints from investors or from

13 recipients of the Porter Stansberry e-mail?

14   A Yes.

15   Q Shortly after the 14th?

16   A Beginning on the 14th.

17   Q Beginning on the 14th. Did you respond

18 electronically to those e-mails?

19   A Yes, but in general what I would do would be to

20 request that they call me, that this was a more complex story

21 that I had time to write out.

22   Q Did you respond either electronically or in a

23 subsequent telephone conversation to any of these individuals

24 indicating that no insider at USEC had told Porter Stansberry

25 that the agreement would be approved on the 22nd? Not the

Page 52

1 treaty but the agreement.

2   A Yes.

3   Q Did you ever see yourself quoted on the Yahoo!

4 message boards?

5   A Yes.

6   Q Isn't that a fun thing? I've had that before

7 myself. Do you recall any specific instances of being quoted

8 on the Yahoo! message boards?

9   A I don't have the exact language but I think I was

10 quoted a number of times as saying this is -- that there is

11 no Jay McDaniels or he never spoke to a Jay McDaniel and that

12 there is no news pending.

13   Q Did you ever tell any investors that the statements

14 attributed to the senior executive in the Porter Stansberry

15 e-mail is false?

16   A I don't think I was as direct as that.

17   Q Did you ever tell anybody that there is no news

18 pending regarding USEC and there is a great deal of

19 misinformation regarding our company making the rounds on the

20 Internet?

21   A Yes. I'm sure I said I'm not aware of any senior

22 executive who has talked with Jay McDaniel.

23   Q How about Porter Stansberry?

24   A Or -- I mean, I -- I'm not aware of any senior

25 executive that talked to Porter Stansberry.

Page 49 - Page 52

Page 57

1    Q  Now, let me show you a document we ' ve marked as
2  Exhibit No. 24. It is a status update regarding USEC. That
3  could be the same status update, although it seems shorter
4  than the one he sent you. So have you seen that status
5  report?
6    A  Yes. I saw it that day and I haven ' t read it
7  closely recently.
8    Q  Okay. So he has -- as far as you know, Porter
9  Stansberry has written at least two status updates since the
10  report that was solicited and sent out on May 14.
11    A  Three.
12    Q  Three.
13    A  The 17th of May, the 30th of May and this one on
the 18th.
14    Q  Okay. The 17th of May -- that ' s right. We talked
about that. And that effectively repeated what was said in
the 14th e-mail. One thing I wanted to ask you about this
exhibit here, Exhibit No. 24, is on page 190 -- USEC Bates
stamp No. 190, he begins talking about our power as
shareholders. And I ' m not sure if you as the investor
relations director would know but he claims that Fidelity
Asset Management owns 9.9 percent of the stock of USEC, which
is the largest block outstanding. Is that accurate?
    A  Within a half a percent, that ' s correct. That
would be available to him -- 13F filing. They had not

Page 58

changed their holdings in some time.
    Q  And he claims that ' s about $60 million worth of
    Do you have any idea what he bases this next comment
where he says I ' m almost certain that we own more shares
than all of management, which holds around 2 percent. Do you
any idea how he would know that?
    He could know what management held through looking
at the statement. His knowledge of how many shares his
investors or people who had purchased the investment
from him, the recommendation from him, he might know
shares but only he would know that.

    Q  Now, it looks like there are some duplicates
00136 and 00137 appear to be the same.
    think so. I mentioned that at the start.
pages that were in Mari-Angeles were then
up so.
    Now, though that ' s unlined paper, it ' s still the
same as the --
    It 's just the clarity of the Xerox machine.
little darker than they made that one.

Page 59

1    Actually, it looks like this one was faxed perhaps.
2    Q  All right. I just want to make sure we didn ' t have
3  two different people taking notes.
4    A  No.
5    Q  Did you keep notations of each investor who
6  contacted you, either electronically or on the telephone,
7  about the Pirate Investor report?
8    A  Probably the vast majority but I couldn ' t say
9  absolutely that I didn ' t when I was doing my voice mail write
10  it on another piece of paper beyond my usual notepad. The
11  calls were coming in at a substantially faster clip during
12  those days than on a typical day.
13    Q  On the 22nd, did you get complaints or contact from
14  individuals or investors who are perhaps purchasers of the
15  report who were expecting an announcement and did not see an
16  announcement? I mean, I only see one on the 22nd where
17  they ' re angry that the report -- or that no announcement came
18  out as they represented, it says in parentheses.
19    A  As far as I was actually noting it, yes, but I think
20  some of these others that were just the telephone number,
21  after having repeated it several times, I didn ' t necessarily
22  write it down every time. I mean, here ' s one where --
23  depending on how angry they were, you know, there was no
24  announcement, quote, they promised --
25       MR. LEAR:  You might cite the page on that.

Page 60

1       THE WITNESS:  Page 145, USEC 145. Phone call from
2  Roy Koons. And one -- above it that he had gone through two
3  stop loss -- why so volatile, when is it coming...
4       BY MR. BAKER:
5    Q  But you do remember more than a couple of phone
6  calls.
7    A  Yes. And I may not have written -- and the ones
8  that I actually took, I may or may not have actually written
9  down every call.
10    Q  How are calls referred -- now, when calls are
11  referred to your department, is it possible that Mari-Angeles
12  would receive those directly or would you screen those first?
13    A  Depends on how it came in. My telephone number is
14  on the Internet. If you go to the USEC site, it says
15  director of investor relations and my phone number is right
16  there. If you went into the company switchboard, they would
17  probably send it to me first but if my number was busy,
18  they ' d probably send it to Mari-Angeles. Or if it came in --
19  we have multiple lines. If she saw that I was on the phone,
20  she might have taken the call herself.
21    Q  Now, on some of the message boards, Porter
22  Stansberry refers to some sort of slander on the part of ex-
23  USEC employees.
24    A  I don ' t have any knowledge of that.
25    Q  You don ' t know any disgruntled ex-USEC --

Page 57 - Page 60

# EXHIBIT C

Page 5796

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                )

                                 )   File No. SL-02368

PIRATEINVESTOR.COM               )

WITNESS:  Porter Stansberry

PAGES:    1 through 114

PLACE:    101 West Lombard Street

          Baltimore, Maryland

DATE:     Tuesday, August 27, 2002

     The above-entitled matter came on for hearing, pursuant

to notice, at 10:30 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

     BRENT R. BAKER, ESQUIRE

     United States Securities and Exchange Commission

     500 Key Bank Tower

     50 South Main Street

     Salt Lake City, Utah 84144-0402

On behalf of the Witness:

     MATTHEW T. TURNER, ESQUIRE

     CECE ANNA LEE, LEGAL ASSISTANT (left at lunch)

     Agora Incorporated

     14 West Mount Vernon Place

     Baltimore, Maryland 21201

     410-895-7997

---

Page 2

| 1  | Form 1662 | 3 |
| 2  | 08/13/02 Letter to Porter Stansberry/ Subpoena with attachments (7 pages) | 3 |
| 3  | "Super Insider" document (7 pages) | 3 |
| 4  | "Buy USEC (NYSE: USU, $6.50)" document (4 pages) | 3 |
| 5  | 05/22/02 letter to Brent Baker from Matthew T. Turner, Agora, Inc. with attachment (6 pages) | 3 |
| 6  | "Yahoo! Message Boards:  USU" document (4 pages) | 3 |
| 7  | "Lycos Finance" USEC (NYSE: USU) document (9 pages) | 3 |
| 8  | "Lycos Finance" USEC (NYSE: USU) document (2 pages) | 3 |
| 9  | "Author:  Porter Stansberry (porter@pirateinvestor.com) Subject: dare" document (9 pages) | 3 |
| 10 | 08/26/02 letter to Brent R. Baker from Matthew T. Turner, Esquire (3 pages) | 3 |
| 11 | February 1996 memo to "All Employees and Associated Persons Re:  Securities Transactions and Legal Matters (2 pages) | 3 |
| 12 | Global Resource Investments Ltd., account statement of Agora Inc., attention Myles Norton, 06/01/02- 06/30/02 (7 pages) | 3 |

**RECEIVED**

SEP 1 2 2002

Securities & Exchange Commission
Salt Lake District Office

---

Page 3

1         P R O C E E D I N G S

2         (SEC Exhibit Nos. 1 through 12 were

3    marked for identification.)

4         MR. BAKER:  All right.  We are on the record at

5    approximately 10:30 a.m. on August the 27th, the year 2002.

6         I will swear you in.

7    Whereupon,

8         PORTER STANSBERRY

9    was called as a witness and, having been first duly sworn,

10   was examined and testified as follows:

11            EXAMINATION

12       BY MR. BAKER:

13       Q  Okay.  Would you state and spell your full name,

14   for the record, please.

15       A  Yes.

16       Q  You may do that now.

17       A  My name is Frank Porter Stansberry.  Frank is

18   spelled the regular way, F-r-a-n-k, Porter also as it would

19   seem, P-o-r-t-e-r, and Stansberry, S-t-a-n-s-b-e-r-r-y.

20       Q  As you know, I'm Brent Baker, and I am an officer

21   of the Commission for purposes of this proceeding.

22            This is an investigation by the United States

23   Securities and Exchange Commission in the matter of

24   PirateInvestor.com, File Number SL-02368, you would think

25   after 12 years I could read the upside down writing, to

---

Page 4

1    determine whether there have been certain violations of the

2    federal securities laws.  However, the facts developed in

3    this investigation might constitute violations of other

4    federal or state, civil or criminal laws.

5         Prior to opening the record, I provided you with a

6    copy of the Commission's formal order of investigation in

7    this matter.  It will be available for your view and your

8    counsel's review during the course of this proceeding.  Have

9    you had an opportunity to review the formal order?

10       A  Yes.

11       Q  Okay.  Also prior to opening the record, you were

12   provided with a copy of the Commission's supplemental

13   information form.  A copy of that form has been marked as

14   Exhibit 2.  Have you had an opportunity to read Exhibit No.

15   2?

16       A  Yes.

17       Q  Do you have any questions about that exhibit?

18       A  No, I don't.

19       Q  Are you represented by counsel today?

20       A  Yes, I am.

21         MR. BAKER:  Would counsel identify himself, please.

22         MR. TURNER:  Matthew Turner.

23         MR. BAKER:  And do you represent Mr. Stansberry

24   personally here today?

25         MR. TURNER:  Yes.

Page 13

1    A   It's an Ameritrade account.

2    Q   Ameritrade. Got it. Let me ask you, apart from
3  this account, do you have any other securities brokerage
4  accounts?

5    A   No, I don't.

6    Q   Where do you bank, your personal bank account?

7    A   My personal bank account is Bank of America and
8  it's a Florida account.

9    Q   Where in Florida, which branch?

10   A   I think -- I really can't remember 'cause I opened
11 it so long ago, but I believe it's out of the Gainesville
12 office. I think I opened that account originally in college.

13   Q   And you still use that account as your primary
14 checking or savings account?

15   A   That's right.

16   Q   And is it a checking account?

17   A   It's a checking account. That's all.

18   Q   Do you have a savings account?

19   A   No, I don't.

20   Q   Do you have any money market accounts?

21   A   The only other financial accounts I have would be a
22 401K account, that does contain bonds, money market funds,
23 equities, but not of my own selection, you know.

24   Q   Where is that held?

25   A   I think that we do our -- our retirement account is

Page 14

1  now with Fidelity, but we've switched several times, and I
2  don't -- it's not something that I watch.

3    Q   And that's not something that's self-directed;
4  that's something that's --

5    A   No.

6    Q   -- handled by a third party?

7    A   That's right. Yeah.

8        MR. BAKER: Now, again, I'll refer back to the
9  subpoena we've marked as Exhibit 2, a request for production,
10 and the documents relating to evidence in compensation paid
11 to Agora to purchase copies of the report that we've marked
12 as Exhibit No. 4. And you objected again, the same objection
13 that you had to item "C."

14       MR. TURNER: That is correct.

15       MR. BAKER: All right. So are you also objecting
16 to producing a list of individuals who purchased that report?

17       MR. TURNER: Yes.

18       MR. BAKER: And what basis?

19       MR. TURNER: As stated in response to paragraph
20 "C."

21       MR. BAKER: Okay. You also object to producing --

22       BY MR. BAKER:

23   Q   Well, let me just ask you how many individuals
24 purchased that report?

25       MR. TURNER: And I object and instruct you not to

Page 15

1  answer, based on the reasons stated in the response to
2  production of document request "C."

3        MR. BAKER: Okay. I'm not asking for the names.
4  I'm just asking for the number of individuals that purchased
5  that report.

6        MR. TURNER: I still object, again, based on our
7  reasons stated in "C." I just don't see it being relevant or
8  to lead to relevant information at this time.

9        MR. BAKER: Okay. Let me ask the witness then.

10       BY MR. BAKER:

11   Q   Did you sell any reports that we've marked as
12 Exhibit No. 4, any of those reports to any subscribers of any
13 Agora publication?

14       MR. TURNER: Did he personally?

15       MR. BAKER: Well, he drafted the e-mail that
16 solicited the purchase of that report.

17       MR. TURNER: Correct.

18       MR. BAKER: I'm wondering if he knows if any
19 reports were sold.

20       MR. TURNER: You can answer that question.

21       THE WITNESS: I do know that we did sell at least
22 one copy of this report.

23       BY MR. BAKER:

24   Q   Okay. Exhibit K, you have not received any
25 complaints, either orally or in writing, regarding the

Page 16

1  documents which we have marked today as Exhibits 3 and 4?

2    A   Can I confer with counsel?

3    Q   Certainly.

4        MR. BAKER: We'll go off the record for a moment.

5        (A brief recess was taken.)

6        MR. BAKER: After taking a short break at the
7  witness' request, while we were off the record, we had no
8  substantive conversations about this matter, other than what
9  your counsel just told me about the existence of oral
10 complaints --

11       BY MR. BAKER:

12   Q   -- is that correct?

13   A   Yes. Absolutely.

14   Q   Okay. Now let me ask you: The complaints that
15 were received orally, you do not keep any notes of those
16 conversations?

17   A   They were not delivered to me personally.

18   Q   Who were they delivered to?

19   A   My customer service relations employee.

20   Q   What is that person's name?

21   A   Elyssa Goldman.

22   Q   And she is your customer service employee, is that
23 what you called her?

24   A   Well, my customer service representative is what we
25 call her.

Page 85

1 accurately, and, you know, I don't see any reason why you
2 wouldn't talk to me any longer." And he said that he was
3 going to check with his higher ups. Then he did call me
4 back, which indicated to me that, you know, there was some
5 agreement on the part of USEC that my reporting was accurate
6 enough to continue a dialogue with me.
7    Q  Did anybody representing USEC ever indicate to you,
8 in any manner, that your report was inaccurate?
9    A  No.
10   Q  Have you ever seen any written statements issued by
11 any representative of USEC that your report contained
12 inaccuracies?
13   A  No. USEC has never communicated to me through any
14 medium that any part of my reporting was inaccurate.
15   Q  Have they ever communicated to the public that your
16 report was inaccurate?
17   A  I couldn't possibly know that.
18   Q  Well, you have access to the same information that
19 the general public does. I'm just asking if you have ever
20 seen --
21   A  That's a different question. I have never seen
22 them communicate publicly that my information was incorrect.
23   Q  Never seen a press release saying that your
24 information was incorrect?
25   A  I never have.

Page 86

1    Q  Okay. Have you ever been contacted by any
2 shareholders who indicated to you that they had been
3 contacted or been in contact with USEC and USEC had indicated
4 that your report was inaccurate?
5    A  I can't answer that question, because I don't know
6 who is a shareholder of USEC and who is not.
7    Q  All right. Did any of the complainants that we
8 discussed earlier indicate that they had contacted USEC and
9 that USEC maintained that your report was inaccurate?
10   A  Who are the complainants?
11   Q  I don't know. You won't identify them. You
12 indicated that there were at least a dozen individuals who
13 called and complained about Exhibits 3 and 4.
14   A  Yeah. I do recall that some of the people who
15 purchased the report contacted me via message board, via e-
16 mail, saying that they doubted the validity of the report.
17 And one of the things that they would claim is that they had
18 spoken to Steve Wingfield and that he had denied my
19 reporting.
20   Q  But --
21      MR. TURNER: You just interjected. I believe you
22 also testified earlier that some of them confirmed.
23      THE WITNESS: That's true. I also spoke to people
24 who claimed to have spoken with Steve Wingfield and that he
25 had, you know, what is the right word I'm looking for, that

Page 87

1 he had said nothing to repudiate my report and that he had
2 confirmed various aspects of it. But, you know, I think it's
3 -- I mean you have your own reasons for asking questions, but
4 I -- you know, I didn't treat very seriously any of those
5 claims or reports, because, for the most part, they're pretty
6 much anonymous, and, you know, I didn't speak to Steve about
7 it, so I don't have any verification who spoke to him and
8 what he said or things like that.
9      BY MR. BAKER:
10   Q  Okay. In part two of your reply, posted on the
11 Yahoo message board, which we've identified as Exhibit No. 6,
12 paragraph -- your numbered paragraph five, you indicate the
13 reasons for believing that the share price of USEC would pop
14 on or before May the 22nd. First reason -- well, you
15 indicate here that "The gist of this is that a USEC senior
16 executive confided to us during a conference call that the
17 Russian treaty would be finalized on May the 22nd." His
18 direct quote was "Watch the stock on May the 22nd."
19      MR. TURNER: Do you have the exhibits there?
20      MR. BAKER: Sure.
21      BY MR. BAKER:
22   Q  Was that --
23   A  Yes, it was.
24   Q  Okay. And what conference call was that?
25   A  It was the conversation that I had with Steve, and

Page 88

1 I called it a conference call because Steve's phone was
2 actually a speaker phone, and there were people in the room
3 besides Steve.
4    Q  Were there people in the room on your end as well?
5    A  No. Just me.
6    Q  Okay. Did those people in the room with Steve
7 identify themselves?
8    A  Yes. The people in the room, to my knowledge,
9 included Steve's female assistance, whose name,
10 unfortunately, I can't recall.
11   Q  Anybody else?
12   A  Not that was introduced to me.
13   Q  In I guess your second paragraph, numbered as
14 paragraph number five, it's still part of Exhibit 6, you
15 indicate that "Trading on the information that USEC gave us
16 would have probably been against the law, although it's not
17 clear that USEC's disclosure about the treaty finalization
18 date was a violation of Regulation FB, because we are
19 journalists."
20   A  Uh-huh.
21   Q  Did you have a discussion with anybody about that
22 legal conclusion, apart from counsel?
23   A  No. And I don't believe that characterizing it as
24 a legal conclusion is accurate, so I don't -- you know, I
25 don't -- by answering your question, I'm not agreeing to your