UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Northern Division

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. MJG 03-1042 |
| AGORA, INC. et al. | ) ) ) |
| Defendants. | ) ) ) |

## DEFENDANTS' OPPOSITION TO MOTION TO COMPEL

### Preliminary Statement

In this action, the SEC has alleged a single count of securities fraud based on the defendant publishers' recommendations concerning the stock of United States Enrichment Corporation ("USEC"). In this motion to compel, the SEC seeks the identities of all subscribers who purchased a report published by the defendants on USEC ("the USEC report") as well as the identities of all subscribers who received an e-mail published by the defendants ("the USEC e-mail") offering to sell the USEC report. Because the USEC e-mail was made available to readers of over a dozen of defendants' financial newsletters, the SEC demands the identities of virtually all of defendants' investment newsletter subscribers. The defendants served objections on the basis of relevancy, cumulativeness, burdensomeness, and privilege, asserting that the requested discovery represented an unreasonable intrusion into activities protected by the First Amendment. The dispute now before this Court – in which a publisher sued over a single stock recommendation is asked to surrender what it believes will amount to the

names of approximately 800,000 subscribers – reflects all the constitutional dangers brought out by the SEC's

underlying objective in this case of expanding the reach of the securities laws into the realm of free expression.

The Circuit Court for Baltimore City rejected similar demands for the defendants' subscriber lists from

the Securities Commissioner for the State of Maryland, finding that such an overly broad request was "an

attempt to erode the fundamental principle" of the First Amendment, which "courts must be very

zealous in guarding . . . and not allow any erosion thereof." See October 16, 2003 Transcript of Hearing

in Lubin v. Agora, Inc., No. 24-C-03-003540, attached as Ex. A, at 56. The circuit court recognized, as

this Court did 14 years ago in a libel case cited below, that readers are a publisher's lifeblood.

Publishing could not exist as a viable enterprise without them. The First Amendment therefore

privileges the subscriber lists of publishers from compelled disclosure. The SEC must show a

compelling need for the names it seeks and evidence that the information it wants cannot be obtained

through means that do not encroach on constitutional freedoms. The SEC has failed to meet this

heightened standard, and its Motion to Compel must be denied.

Argument

1.    Defendants' Subscriber Lists Are Protected By The First Amendment And Are
      Shielded From Forced Disclosure Absent A Compelling State Interest.

The United States Supreme Court has long recognized that First Amendment freedoms

encompass much more than the right to publish. These freedoms range from the right to gather news

and information to the process of editorial creation to the receipt of published material by readers. See

Griswold v. Connecticut, 381 U.S. 479, 482 (1965) ("The right of freedom of speech and press includes

not only the right to utter or to print, but the right to distribute, the right to receive, the right to read . . .

and freedom of inquiry . . . ."). The relationship between publishers and readers is an essential link in

this chain. The SEC defies common sense – and case law to the contrary – when it argues that

intrusions into this protected area do not implicate any of the "compelling concerns" associated with the

2

First Amendment. See SEC Memorandum at 10. As Justice Douglas wrote, "Once the government can demand of a publisher the names of purchasers of his publications, the free press as we know it disappears." United States v. Rumely, 345 U.S. 41, 57 (1953) (Douglas, J., concurring).

Governmental efforts to seize subscriber lists thus represent a lunge at the "jugular" of any publisher. SEC v. Wall St. Transcript Corp., 422 F.2d 1371, 1381 (2d Cir. 1970). As the named plaintiff testified in Taucher v. Born, 53 F. Supp. 2d 464 (D.D.C. 1999), a successful action by publishers for exemption from registration as commodity trading advisers, if regulators confiscated his subscriber list and contacted his readers, they would "automatically assume that he had engaged in some sort of unlawful activity." Id. at 472. "Devastating financial damage" might follow because readers "would be extremely angry with him if he had to turn over his subscribers list." Id. Another plaintiff in the case offered similar testimony. Id. at 469.

Numerous courts in addition to the Second Circuit in Wall Street Transcript, including this Court, have recognized that a publisher's subscription list is a fundamental component of free press and First Amendment rights. India Abroad Publ'ns, Inc. v. United States Postal Serv., No. 93 Civ. 5270, 1995 U.S. Dist. LEXIS 8169, at *5 (S.D.N.Y. June 14, 1995) (noting that subpoena enforced by the court did not include a subscriber or mailing list and specifically requiring any such subscriber information to be redacted from all produced documents); Nat'l Life Ins. Co. v. Phillips Publ'g, Inc., Case No. N-90-1374, 1990 U.S. Dist. LEXIS 16232, at *3 (D. Md. June 20, 1990) (denying discovery of subscriber lists in libel action); SEC v. Hirsch Org., Inc., No. M-18-304, 1982 U.S. Dist. LEXIS 15625, at **2-3 (S.D.N.Y. Oct. 25, 1982) (denying enforcement of a SEC investigative subpoena requesting a subscription list); see also California Intelligence Bureau v. Cunningham, 188 P.2d 303, 307 (Cal. Ct. App. 1948) (recognizing in an unfair trade practices action that a subscriber list is a confidential trade secret).

In <u>Hirsch</u>, the SEC sought subscription lists from <u>Smart Money</u>, a financial newsletter, pursuant to an investigation into whether the newsletter published misstatements concerning the stock of public companies – i.e., the same factual predicate that underlies the SEC's lawsuit against the defendants. In assessing the constitutional issues at stake, the court recognized the privileged nature of subscriber lists, referring to the "<u>strong First Amendment interest</u> that protects against compelled disclosure of the information sought here." <u>Hirsch</u>, 1982 U.S. Dist. LEXIS 15625, at *2 (emphasis added). The court held that the SEC's subpoena enforcement action was <u>not</u> an "ordinary case" in which proof of relevance would be enough to compel production. <u>Id.</u> at *3. Relevancy is not sufficient when "First Amendment interests are implicated" – the SEC "must demonstrate that the need for the information <u>outweighs</u> the First Amendment protection accorded it." <u>Id.</u> (emphasis added).[1]

The SEC's discovery requests also implicate the First Amendment associational rights of Agora and its readers, yet another trigger for heightened review.[2] This connection between subscriber lists and associational freedoms was recognized by the Second Circuit in <u>Wall Street Transcript</u>, where the court cited <u>NAACP v. Alabama ex rel. Patterson</u>, 357 U.S. 449 (1958) in expressing its concern should a "dragnet" have been cast by the SEC in that case for "lists of all subscribers." <u>Wall Street Transcript</u>,

---

[1]  The privilege that attaches to the relationship between publishers and readers under the First Amendment is a natural companion to the privilege that runs between reporters and sources of news, a connection recognized by <u>Hirsch</u> in its citation to <u>Branzburg v. Hayes</u>, 408 U.S. 665, 709-10 (1972) (Powell, J., concurring). <u>Hirsch</u>, 1982 U.S. Dist. LEXIS 15625, at *2. The law of reporter's privilege, much of which descends from Justice Powell's concurrence in <u>Branzburg</u>, creates a heightened standard for compelled testimony from journalists about their sources or newsgathering activities. <u>See</u> LaRouche <u>v. National Broadcasting Co.</u>, 780 F.2d 1134, 1139 (4th Cir. 1986) (applying privilege). The privilege reflects the acknowledgment that unjustified interference in this area will diminish the amount of information disseminated to the public. The decisions blocking enforcement of subpoenas or discovery requests seeking subscriber lists arise from the analogous recognition that intrusions into the publisher-reader relationship will also have a harmful effect on the flow of information and that any such intrusions must be justified by a compelling or overriding need and proof that the party seeking disclosure has tried all other available means of obtaining the information sought.

[2]  Agora has standing to assert both its constitutional rights and the rights of its readers and subscribers. <u>See</u> <u>Virginia v. American Bookseller's Ass'n</u>, 484 U.S. 383, 392-93 (1988).

4

422 F.2d at 1381. In NAACP and subsequent cases, the Supreme Court held that when government

seeks compelled disclosure of membership lists in any private organization, its purported interests "must

survive exacting scrutiny." Buckley v. Valeo, 424 U.S. 1, 64 (1976). See also Gibson v. Florida

Legislative Investigative Comm., 372 U.S. 539, 546 (1963) ("[It] is an essential prerequisite to the

validity of an investigation which intrudes into the area of constitutionally protected rights of speech,

press, association and petition that the State convincingly show a substantial relation between the

information sought and a subject of overriding and compelling state interest.").

    The touchstone of associational rights cases is typically concern about harassment or other

governmental action that punishes members of a group or causes them to disassociate from an

organization. In the subscriber list context, as implicitly recognized by Wall Street Transcript, if the

names of readers were disclosed to the government, they would be subjected indiscriminately to probing

questioning from regulators about their reading habits. Such interrogation will undoubtedly discourage

these readers from maintaining a relationship with the publisher in question, even if they are told that,

individually, they are not under investigation. The defendants' concerns that any approach to its readers

by the SEC would be particularly one-sided are well-grounded in fact, as the SEC has already had to

retract certain allegations in its Complaint as "immaterial, impertinent, scandalous and false" when it

filed an Amended Complaint. See Order of October 16, 2003. Government regulators have no business

asking members of the public about their reading habits absent a compelling and narrowly-tailored

interest. The SEC has shown no such interest here, and its Motion to Compel should be denied.[3]

---

[3]    The SEC's argument that the USEC e-mail marketing the USEC Report is not entitled to full
First Amendment protection because it is "commercial speech," see SEC Memorandum at 11, is belied
by the protection courts have always provided to promotional materials that publicize books,
newsletters, and newspapers – that is, products that are themselves protected by the First Amendment.
Thus, in Lane v. Random House, Inc., 985 F. Supp. 141, 152 (D.D.C. 1995), the court rejected
arguments that a newspaper advertisement announcing the publication of a book on the assassination of
President Kennedy was commercial speech: "As Random House fittingly observed, the challenged
(continue)

2.      The SEC Has Not Availed Itself Of Other Avenues Of Discovery.

The SEC argues that it must obtain the defendants' subscriber lists in order to "learn their

perceptions regarding the information that was communicated" in the publications and to "explore the

nature of any services" offered to them in a non-published format. SEC Memorandum at 5 (emphasis

added). The SEC further states that the subscriber lists will assist it in determining the extent to which

readers "relied upon" the publications and "suffered consequential harm." Id. None of these articulated

needs is sufficient to compel production of the names of virtually all of defendants' subscribers, as the

SEC demands.

Enforcement actions brought by the SEC under Section 10(b) and Rule 10b-5 do not require the

government to show reliance or injury on the part of individuals who traded in stocks. See Gemen v.

SEC, 334 F.3d 1183, 1191 (10th Cir. 2003); SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985); SEC v.

North American Research & Dev. Corp., 424 F.2d 63, 84 (2d Cir. 1970). Thus, the Commissioner has

no relevant, let alone compelling, need for Agora's subscriber list to investigate alleged reader reliance

or damages. The defendants have produced detailed data to the SEC showing the exact number of

---

(continued)

advertisement is not about laundry detergent; it cannot be divorced from the book . . . and the book is
protected speech." See also Lacoff v. Buena Vista Publishing, Inc., 705 N.Y.S.2d 183, 190 (N.Y. Sup.
2000) (finding promotional statements on the cover and flyleaf of The Beardstown Ladies' Common-
Sense Investment Guide fully protected speech and noting that "advertising that promotes
noncommercial speech, such as a book, is accorded the same constitutional protection as the speech it
advertises"); National Life Ins. Co. v. Phillips Publ'g, Inc., 793 F. Supp. 627, 643-45 (D. Md. 1992)
(observing in a libel action involving a newsletter and related promotion that "[p]laintiff's complaint is
over the fact that the statements were made, not over where they happen to appear"). The rule that flows
from these cases demonstrates that the USEC e-mail cannot be artificially severed from the USEC report
it promotes. Both publications are entitled to the full protections of the First Amendment. Moreover,
the government's overbroad conception of commercial speech would have far-reaching implications.
Under its theory, a single promotion for a new editorial product would transform a longstanding
publisher into nothing more than a purveyor of commercial speech and its loyal readers into mere
recipients of advertising. Because all publishers advertise their own publications from time to time, the
SEC's approach would leave the marketplace with nothing but publishers of commercial speech. The
government could then seize any subscriber list on the premise that a single advertisement made
available to readers was allegedly false.

USEC reports sold and refunds made, see Ex. B, refuting the government's argument (and a premature one at that) that it needs to "facilitate" any refund of monies. The SEC has no filed no claim against the defendants under the Investment Advisers Act of 1940, which regulates personalized investment advising activities. The government thus has no need for discovery into any alleged "services" provided to Agora subscribers relating to the USEC e-mail or the USEC report (of which it has brought forward no evidence anyway).

As for materiality, none of the citations provided by the SEC reflect cases in which the government has succeeded in forcibly disclosing a publisher's subscription list in order for prosecutors to locate witnesses who might testify regarding the materiality of an allegedly false statement. Indeed, the SEC cites no cases in which the disclosure of a subscriber list has been compelled pursuant to any securities claim filed by any party, public or private. In the one case that is exactly on point, the court in Hirsch held that the SEC had failed to meet the heightened showing required for the disclosure of Smart Money's subscriber lists because the government had access to Smart Money readers through channels that did not implicate protections under the First Amendment. Similarly, discovery in this case has revealed that the SEC is already in possession of the identities of dozens of individuals who were either recipients of the USEC e-mail or purchasers of the USEC report. These sources include:

- Postings by readers on the Daily Reckoning message board who indicated that they were familiar with the USEC e-mail or the USEC report. Threads from this board in unredacted format have been in the custody of the SEC since at least September 2002 and were produced by the government in its initial disclosures. See Ex. C.

- Individuals who contacted the SEC directly about the USEC report or the USEC e-mail. Evidence of many such contacts was produced by the government both in its initial disclosures as well as pursuant to the defendants' written discovery of the SEC. For examples of such contacts, see Ex. D. These individuals provided the SEC with information on how to reach them.

- Postings on public bulletin boards, such as Yahoo, Motley Fool, and Raging Bull. These sites contain scores of postings by individuals regarding the USEC report and the USEC e-mail. For examples of lists of such postings on Yahoo over the course of a few hours,

7

see Ex. E. There is no evidence that the SEC has tried to contact persons who identified
themselves on these services. The government has, however, served a subpoena on
Yahoo for information relating to defendant Frank Porter Stansberry. See Ex. F.
Yahoo's cooperation shows that these boards are a ready source of contact information
for the government.

- The notes and telephone logs of Steven Wingfield and Mari Major-Sosias produced to the
  SEC by USEC prior to the instigation of this action. See Ex. G. While Mr. Wingfield
  and Ms. Major-Sosias may not have recorded every telephone call they received from
  investors or USEC report readers during the relevant time period in May 2002, their notes
  provide numerous names of individuals and telephone numbers that the SEC has at its
  disposal. See, e.g., id. at USEC 00081, 00086, 00089, 00091, 00139, 00144, and 00146.

- Finally, in Hirsch, the SEC had acquired a list of purchasers of the stocks at issue.
  Hirsch, 1982 U.S. Dist. LEXIS 15625, at *3. The SEC is required to take such steps here
  to obtain similar data about buyers of USEC's stock during the relevant time period,
  which is a relatively short one. This data will undoubtedly lead it to some purchasers of
  the USEC report.

The individuals identified in bulletin board postings or through their own contacts with the

government or USEC were known to the SEC prior to the filing of this case. In its initial disclosures,

however, the SEC did not list any of these persons. See Ex. H at 2. It only referred in a generic way to

purchasers of the USEC report with "contact information unknown."[4] Id. As demonstrated above,

however, in many cases contact information was known. The SEC's failure to name such persons in its

initial disclosures undermines the government's argument that such individuals are relevant to its claims.

Before the SEC can be said to have exhausted alternative means of discovery, it must first pursue

the numerous avenues available to it to obtain information about defendants' subscribers. Furthermore,

since the testimony the SEC seeks for materiality is not targeted to any specific reader – the SEC wants

to know, in general, reader "perceptions" regarding the USEC e-mail and the USEC report, see SEC

Memorandum at 5, forced disclosure of all recipients of the USEC e-mail and all purchasers of the

USEC report would be cumulative. It would also be harmful to First Amendment interests, as a

---

[4]     The SEC's initial disclosures did not refer to persons who merely received the USEC e-mail,
though the SEC asks for such information in its Motion to Compel.

wholesale demand for the names of literally every reader signed up for Agora's publications is precisely

the sort of sweeping "dragnet" for subscribers that concerned the Second Circuit in <u>Wall Street</u>

<u>Transcript</u>. 422 F.2d at 1381. Any reader of defendants' publications with a complaint was free to

contact the government, which discredits the SEC's argument that its investigatory need to locate

alleged victims of fraud trumps the First Amendment interests of both the publisher and all of its

readers. <u>See</u> SEC Memorandum at 10.

Finally, the SEC argues that certain subscribers may have contacted USEC and the defendants

after publication of the USEC e-mail and the USEC report and therefore may have information relative

to the alleged falsity of the publications. (This is not a case, of course, where any reader testimony is

needed to place the allegedly false statements on the record because they were widely-published and are

undisputed.) Some individuals who contacted USEC regarding the defendants' publications identified

themselves on bulletin boards. For examples of just a few of these many postings, <u>see</u> Ex. I. Why

hasn't the SEC exhausted this avenue of information before asking the publisher to surrender its

protected subscribers lists? Why hasn't the SEC sought out other readers also identified on bulletin

boards who may have contacted the defendants? Furthermore, the SEC failed to narrowly tailor its

discovery to this subset of defendants' subscribers; instead, it asked for the identities of virtually all of

the defendants' readers.[5]

### 3.   Plaintiff Has Been On Notice Of The Precise Nature of This Discovery Dispute Since Its Pre-filing Investigation.

The SEC has been on notice of the defendants' First Amendment objections to compelled

production of their subscriber lists for almost two years. The SEC sought this same information in

---

[5]      That the defendants, like most publishers in the newspaper, magazine, and newsletter industries, rent some subscriber lists to other publishers does not change the nature of the First Amendment interests implicated by the SEC's overreaching discovery requests. Forced disclosure to the government is coercive and bears no resemblance to industry practices relating to list rental, which is entirely voluntary.

subpoena requests to the defendants dated August 13, 2002. See Ex. J. The defendants objected on First

Amendment grounds at the time in two letters to the SEC, dated August 26, 2002 and September 23,

2002, respectively. See Ex. K. In the November 18, 2003 hearing before this Court concerning the

defendants' Motion to Dismiss, the near certainty of a discovery dispute over the First Amendment

protections accorded to subscriber lists, if the case went forward, was discussed on the record:

> Mr. Ellis:     If what we are really talking about is subscriber list[s], they are
> going to go there. I mean we litigated. It was over in front of Judge
> Hammerman in the State of Maryland and the Securit[ies] Commissioner
> tried to get those lists and we fought that and we won. And the First
> Amendment is alive and well over in the Circuit Court and so if that is
> where we are going, I think there is going to be fighting over that, too.

> Ms. Martinez: And Your Honor –

> The Court:    That is fine.

> Ms. Martinez: As counsel just indicated one of their positions is going to be there was no
> contemporaneous purchasing. We can't get the identities of the people
> that actually purchased the stock. How are we going to establish that
> although that's for another day.

> The Court: This sounds to me you will have a discovery dispute.

Transcript of November 18, 2003 hearing at 69:16-70:9, attached as Ex. L.

The objections the defendants made to the Interrogatories served by the SEC were therefore

preceded by specific notice, including notice given to the SEC in oral argument before this Court,

regarding the nature of the defendants' concerns about the compelled production of a publisher's

subscriber lists. Counsel for the defendants also explained the basis of the defendants' objections in

conversations with counsel for the SEC on May 4, 2004 and thereafter. The SEC is very much aware of

the Maryland case on this very issue and the defendants' assertion of First Amendment privilege in those

proceedings. The government's argument that the defendants failed to state their objections with

specificity flies in the face of nearly two years of ongoing notice of the nature of their concerns and is therefore without merit.

## Conclusion

For the foregoing reasons, the plaintiff's Motion to Compel should be denied.

BAKER & HOSTETLER LLP

By: /s/ *Lee T. Ellis, Jr.*
Bruce W. Sanford (11928)
Lee T. Ellis, Jr. (1372)
Bruce D. Brown (14895)
1050 Connecticut Ave., NW, Suite 1100
Washington, DC 20036
Telephone: 202-861-1500
Facsimile: 202-861-1783

Matthew J. Turner (22319)
General Counsel
Agora, Inc.
14 West Mt. Vernon Place
Baltimore, Maryland 21201
Telephone: 410-783-8410
Facsimile: 410-783-8409
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants' Opposition To Motion To Compel was sent by first class mail, postage prepaid, on this the 1st of June 2004, to the following:

Karen L. Martinez, Esq. (and by facsimile)
United States Securities and Exchange Commission
50 South Main Street
Suite 500
Salt Lake City, Utah 84144

/s/ *Lee T. Ellis, Jr.*
Lee T. Ellis, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Northern Division

UNITED STATES SECURITIES AND                )
EXCHANGE COMMISSION,                         )
                                             )
            Plaintiff,                       )
                                             )
v.                                           )        Case No. MJG 03-1042
                                             )
AGORA, INC. et al.                           )
                                             )
            Defendants.                      )
_____)

## EXHIBITS TO DEFENDANTS' OPPOSITION TO MOTION TO COMPEL

# EXHIBIT A

IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

MELANIE SENTER LUBIN,
SECURITIES COMMISSIONER FOR THE
STATE OF MARYLAND

                      PLAINTIFF,

   VS.                        Case Number:
                               24-C-03-003540

AGORA INC.,

                  DEFENDANT.
       —————————————————————/

REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
(Motion's Hearing)

Baltimore, Maryland

Thursday, October 16, 2003

BEFORE:

HONORABLE ROBERT I.H. HAMMERMAN, Associate Judge

APPEARANCES:

      For the Plaintiff:

          JULIE L. TEWEY, ESQUIRE

      For the Defendant:

          LEE T. ELLIS, ESQUIRE
          WILLIAM J. CONTI, ESQUIRE
          MATTHEW TURNER, ESQUIRE

Proceedings recorded by videotape

Transcribed by:
PATRICIA A. TRIKERIOTIS, CVR
Official Court Reporter
111 North Calvert Street
Suite 515, Courthouse East
Baltimore, Maryland 21202

# T A B L E   O F   C O N T E N T S

P A G E

Plaintiff's Motion to Enforce
the Subpoena                                4

The Court's Ruling (Denied)                56

1        P R O C E E D I N G S

2                    (9:40 a.m.)

3              THE COURT:  We have before the Court this

4    morning in the case of Melanie Senter Lubin, Securities

5    Commissioner for the State of Maryland, versus Agora --

6    is that the correct pronunciation?

7              MR. ELLIS:  Agora?  Yes, Your Honor.

8              THE COURT:  -- Agora, Inc.

9              Would counsel kindly identified themselves for

10   the record at this time?

11             MS. TEWEY:  Your Honor, on behalf of the

12   Maryland Division of Securities, I'm Julie Tewey.

13             THE COURT:  Thank you.

14             MR. ELLIS:  May it please the Court, my name is

15   Lee Ellis, representing Agora, Inc.  Along with me is

16   Bill Conti, my partner; and Matthew Turner, who is the

17   general counsel of the company, Your Honor.

18             THE COURT:  Thank you very much.  I would like

19   to clarify just what matter or matters are before the

20   Court today.

21             There was hand-delivered yesterday afternoon a

22   reply of Agora, Inc. to Maryland Securities

23   Commissioner's response to Agora's memorandum of law

24   opposing the Commissioner's Motion to Enforce

25   Administrative Subpoenas.  That's quite a title.

                           3

1    There is also the complaint that has been filed

2    by the Securities Commissioner for the State of Maryland.

3    And there has been, I know, a Motion to Dismiss the

4    Complaint. I've read all of those documents as well.

5    And I want to know just what this hearing is for, what it

6    is to cover this morning; everything or just a narrow

7    aspect of the case?

8            MS. TEWEY: Your Honor, it is to basically

9    address the motion that was made by the Securities

10   Division to enforce the subpoena. Ordinarily, we file

11   the motion to enforce the subpoena along with the

12   complaint, and we have a hearing on that. Because,

13   really, it's basically an issue of law --

14           THE COURT: I beg your pardon?

15           MS. TEWEY: It's basically an issue of law with

16   respect to the enforcement --

17           THE COURT: Basically what?

18           MS. TEWEY: An issue of law with respect to the

19   enforcement of the subpoena, which we will be addressing

20   today.

21           THE COURT: So that's the only matter before

22   the Court this morning?

23           MS. TEWEY: That's correct. I mean, it may

24   incorporate some of the arguments that were made by

25   counsel for Agora, but it's not that we would be

1    expecting to have any kind of trial today.  Basically --

2         THE COURT:  Well, the motion -- when you say no

3    trial today, motions or hearings, in a sense, is not a

4    trial.  That's what I wanted to determine.  The Motion to

5    Dismiss the Complaint, for example, is not a matter

6    before the Court today, is what you're saying; is that .

7    correct?

8         MS. TEWEY:  I think that it's -- I think that

9    it's part of the issue.  I think we're basically arguing

10   that the subpoena should be enforced, and they are

11   arguing that it should not be enforced, based on First

12   Amendment grounds.

13        THE COURT:  You mean the subpoena --

14        MS. TEWEY:  That's correct, the subpoena.

15        THE COURT:  -- should not be enforced.  The

16   subpoena for the rather narrow issue of subscribers list;

17   is that what you're referring to?

18        MS. TEWEY:  That's correct.  Subscriber list

19   and anything that would reveal subscriber --

20        THE COURT:  All right, well --

21        MS. TEWEY:  -- or marketing list information.

22        THE COURT:  Okay.  But now you seem to be

23   indicating that will touch upon the motion to dismiss.

24   That's what I want to clarify.  What is the scope of the

25   hearing today?  All the files were presented to me; and

5

1    but for the reply of Agora that was filed late yesterday

2    afternoon, I would have thought maybe it was the Motion

3    to Dismiss that was before the Court.  But I'm here to

4    hear whatever is supposed to be heard.

5             Yes?

6             MR. ELLIS:  Your Honor, the way the defense

7    views it is that the complaint was filed together with a

8    Motion to Compel.  The subpoenas have many things

9    requested.  We've worked with the State, and I believe

10   that we've supplied everything to the State except the

11   subscriber list.  So that the only thing left under the

12   subpoenas to fight over is the subscriber list, and that

13   that is before the Court on their motion, the State's

14   Motion to Compel.

15            Now, Your Honor refers to a Motion to Dismiss.

16   We did not make a Motion to Dismiss in this case.  We

17   attached to our papers a copy of a Motion to Dismiss that

18   we have filed in the Federal Court in opposition to the

19   SEC's action against Agora in the Federal Court.  We

20   filed that in this court to show the Court for several

21   reasons.

22            One is all the legal issues, but also basically

23   that enforcement agencies like the SEC or the Maryland

24   Securities Commissioner have the information that they

25   need to bring complaints against Agora if they want to do

6

1        that, and so they don't need subscriber lists to bring

2        that -- to bring those things.  It goes to several

3        issues.

4               But what's before this Court, we believe, the

5        only thing that raises an issue now, is the State's

6        request to the Court to enforce the subpoena for

7        subscriber list.  That's the only thing that's left out

8        of the action.  And our view is that if the Court finds

9        that the State's Motion to Compel should be granted, then

10       that's the end of the case, and they'll be a --

11              THE COURT:  That's the end of the case until

12       the appeal.

13              MR. ELLIS:  That's right, until the appeal.

14       That's very true.  And because you've seen that these

15       issues tend to get appellate review.  But as a practical

16       matter, I think that's what it is.  But I don't want

17       to -- there's no -- we didn't move to dismiss this.

18       We're just opposing the State, that's all.

19              THE COURT:  All right.  The original complaint

20       that has been filed in this case, the body of that

21       complaint is not before the Court today.

22              MR. ELLIS:  That's right.  What it turned out

23       to be is an amended complaint in May of 2003.  And we

24       filed an answer to that.

25              THE COURT:  Yes, I know.  There had been an

7

1    amended complaint.

2              MR. ELLIS:  And an answer.  And an answer to

3    that so that's at issue, but as a practical matter, the

4    only thing left is the subscriber list.

5              THE COURT:  Well, I knew that -- it seemed from

6    my reading of the file, and I read all of that, that it

7    was still outstanding, the complaint -- the amended

8    complaint.  I do know there was an amended complaint, and

9    there was an answer filed to the amended complaint.

10             MR. ELLIS:  Right.  And our view would be that

11   this motion will be dispositive of the only issues left

12   under the amended complaint.

13             THE COURT:  All right, fine.

14             MS. TEWEY:  Because, Your Honor, the only count

15   in the complaint was basically the failure to comply --

16             THE COURT:  Do you want to stand when you

17   address the Court, please?

18             MS. TEWEY:  The only count included within the

19   complaint was the failure to comply with the subpoena --

20             THE COURT:  I'm sorry.  I couldn't hear you.

21   The only what?

22             MS. TEWEY:  The only count that was included

23   within the complaint was the failure to comply with the

24   administrative subpoena.  So, yes --

25             THE COURT:  Yes, all right.

8

1           MS. TEWEY:  -- I agree that this issue as to

2     our Motion to Enforce will be dispositive of the

3     complaint.

4           THE COURT:  All right.  Do you wish to be heard

5     at this time --

6           MS. TEWEY:  Yes, Your Honor.

7           THE COURT:  -- on your subpoena request?

8           MS. TEWEY:  Okay.  Your honor, this case arose

9     out of a -- the subpoena enforcement matter arose out of

10    a stock tip that was published by Agora.  It was a

11    communication that was sent out to people on its

12    marketing list and, also, very likely subscribers to its

13    other publications.

14          And it was one that solicited individuals to

15    purchase information that would give them the name of a

16    company.  In exchange for a thousand dollars, they would

17    provide the name of a particular company that they

18    suggested very strongly was a very good investment.

19          In fact, they used very strong language that

20    they had quote, unquote, "inside information" regarding

21    this particular stock.  And that, very likely, by

22    investing in this company, people would triple their

23    money, and it would be a very successful tip.  And this

24    is a little out of the ordinary for a newsletter type of

25    publication.  It was a one-shot type thing where people

9

1    were paying a thousand dollars for this information that

2    would be revealed once they made the payment.

3          The SEC began investigating the situation after

4    receiving information about it, as well as the Securities

5    Division for Maryland because we did receive complaints.

6    Basically, the people who acted on the tip did not find

7    the information to lead to profits as were expected from

8    the information that was included within tip.

9          And Agora, basically, they're located here in

10   Maryland.  They are in the Mount Vernon area.  They have

11   many, many publications that they are responsible for,

12   including financial publications, but also other

13   publications as well.  And they have been on our radar

14   screen for quite a while, even before we received

15   information about this stock tip.  But we're very

16   concerned with the stock tip because it implicated a

17   number of things.          Number one, because it wasn't

18   the nature of a traditional type of newsletter.  It

19   wasn't of general and regular circulation et cetera.  It

20   seemed to have required that the firm be registered to

21   engage in the activities that they were engaging; and,

22   also, the suggestion that there was inside information;

23   and references within the advertisement to pass

24   recommendations that had led to significant profits was,

25   we think, misleading to the public.

10

1          So, basically, in June of 2002, we issued a

2     subpoena to Agora and requested information mostly

3     pertaining to that particular stock tip.  And we also

4     requested information about the subscribership or the

5     marketing list that was used in sending out that stock

6     tip solicitation, which was, we believe, sent via e-mail

7     to various individuals.

8          Later, we issued another subpoena in March of

9     2003, which was more expansive, and requested additional

10    information.  Basically, we demanded information

11    regarding other publications and other advertisements

12    that had been made by Agora.  So, again, it implicated

13    providing information about subscribership or marketing

14    lists, but it related not just to the stock tip but to

15    other newsletters or publications or services that Agora

16    was providing.

17         And, basically, Agora has refused to comply

18    with producing documents which would implicate --

19              THE COURT:  I'm sorry.  Agora what?

20              MS. TEWEY:  Has refused to provide documents

21    that would implicate providing information about their

22    marketing lists, the people on those lists, their

23    identifying information, as well as anything relating to

24    their subscribership, actual subscribership files.

25              We had also asked for information about some of

11

1    the other services they provide, including, for example,

2    a hotline number that one of their newsletters

3    advertises.

4         THE COURT:  Well, is that an issue here.  I

5    thought just a matter of subscribers was at issue.  Now

6    you're talking about a hotline number that they did not

7    reveal.

8         MS. TEWEY:  Well, the thing is that anything

9    that would relate to providing identifying information

10   for its customers or subscribers, including the files

11   relating to people who might have called into the

12   hotline, we haven't gotten any of that information, as

13   well.  So it's all tied in together.  That's the

14   information that is still yet to be produced.

15        Now, I think -- I know we have provided

16   attachments to our complaint showing the different --

17   various examples of the advertisements that Agora has

18   made, and most of them tend to be fairly sensational

19   types of advertisements to get people interested in

20   subscribing to their publications.

21        They tend to speak about doubling or tripling

22   money.  And they tend to cherry pick information about

23   past recommendations that the company has made in one or

24   more of its newsletters that were profitable rather than

25   giving information that actually identifies the

12

1    performance based on other recommendations that may not

2    have been so successful.  It's really just focusing on

3    the successful recommendations rather than the results of

4    all of their  recommendations or a more broadly based

5    view of what the recommendations have lead to, whether

6    profits or losses for individual investors.

7         Agora is disputing that we have the right to

8    obtain their marketing lists or subscribership

9    information, claiming that its in violation --

10        THE COURT:  The right to obtain what, please?

11        MS. TEWEY:  Their subscribership information

12   and marketing lists, claiming that those documents or

13   that information is protected by the First Amendment, and

14   that their activities are protected speech.  And we would

15   dispute that.

16        First of all, for example, the stock tip that

17   led to the Division's inquiry here, is basically

18   advertising that the company is doing, advertising for

19   their services, attempting to get people to purchase a

20   tip and also many of the many of the advertisements that

21   we have -- each of the advertisements that we have

22   attached to our complaint and to our other filings that

23   we had made here reflects advertisements marketed to the

24   public to entice those individuals to subscribe to a

25   particular service by Agora, whether it be the newsletter

13

1    or one of their other services.

2         THE COURT:  Don't you know of any subscriber.

3         MS. TEWEY:  We know of the ones who -- there

4    are a number of them who have complained to us, yes, we

5    do --

6         THE COURT:  That's what I'm assuming is that

7    you have gone into this investigation because you've

8    undoubtedly received complaints from certain individuals,

9    including certain subscribers; is that right?

10        MS. TEWEY:  We've received a -- with respect to

11   the stock tip, we received one complaint, I think.  But

12   we haven't received a huge number of complaints from

13   individual investors, but that doesn't mean that we don't

14   believe that there are a significant number of people who

15   have complained.

16        THE COURT:  I understand, but you have spoken

17   to some subscribers; is that correct?

18        MS. TEWEY:  Yes, and we've spoken to --

19        THE COURT:  About how many would you say that

20   you have spoken to, that you have been able to identify

21   on your own initiative, about how many subscribers?

22        MS. TEWEY:  The one that we received the

23   complaint from, the one individual that we received the

24   complaint from is the person that we had spoken to, and

25   he had great concerns about the representations that were

14

1    made within the marketing materials.  But other than

2    that, we had to rely on people who might, you know,

3    complain to our office, but we don't think that's giving

4    us full information about, obviously, other individuals

5    who may have complained.

6            And the other thing is that, obviously, Agora

7    has not been forthcoming about that and doesn't have an

8    interest in turning over that information.  But we do

9    think that it would be very useful to us to be able to

10   talk to those people and to --

11           THE COURT:  Well, you're saying it would be

12   very useful to you.  Undoubtedly, it would be in the

13   sense of maybe opening some doors for you, facilitating

14   the investigation that you may be making.  But is that a

15   criterium upon which this Court should order Agora Inc.

16   to turn over all their subscriber's list to you because

17   it would be very useful to you?

18           MS. TEWEY:  Well, Your Honor, it actually goes

19   beyond that because we want to explore, as well, other

20   types of activities that they may be engaged in because

21   we don't believe that all of their activities that

22   they're engaged in qualify as bona fide newsletter

23   activities.  They have some services that are very

24   untraditional for a publishing company or a newsletter.

25           THE COURT:  You say very untraditional; is that

15

1      what you said?

2                  MS. TEWEY:  Untraditional for a newsletter

3      format.         THE COURT:  Yes, well, does that suggest

4      that it's illegal in any way because it's not

5      traditional?

6                  MS. TEWEY:  It does because of the fact that

7      the types of activities that I'm talking about we believe

8      may be going on, may be activities for which they need to

9      be registered as an investment adviser.

10                  At this time, they are  engaged in recommending

11      advice, but they're engaged in recommending investments

12      to the public, but they're not registered as an

13      investment adviser with our office because they claim

14      that they are a bona fide newsletter.

15                  However, in order to be a bona fide newsletter,

16      you have to meet certain criteria, and you cannot provide

17      personalized investment advice, and the Division is

18      concerned that Agora may be providing individualized

19      investment advice to people because of various things

20      that we've seen in some of their  advertisements.

21                  For example, they hold workshops with

22      investors, people who subscribe to their newsletters.

23      They have these symposiums they hold in various places

24      resources around the world, and people are allowed to

25      come to those and to meet with the people who write these

16

1    financial columns and ask information.

2         They also have a service where -- this was in

3    some of their marketing materials.  They charge $5,000 in

4    advance for 12 oral reports delivered by an Agora stock

5    analyst by a prescheduled conference call that would

6    provide investors with access to principles of the

7    recommended firm who will be there to answer your

8    questions, which is something where they would be

9    actually speaking directly with principals of the firm

10   that they might be investing with and also with

11   representatives of Agora.

12        They also have this hotline that I referred to

13   where people can call in and supposedly ask questions.  I

14   imagine that would be the purpose of it, but we don't

15   really know because we haven't really gotten any specific

16   information or been able to obtain more specific

17   information about that.  And they also --

18        THE COURT:  That's the point, perhaps, that you

19   haven't gotten the specific information.  You have reason

20   to believe that Agora is involved in hanky-panky, that

21   they are going beyond the bounds of what they should be

22   able to do, and that they would be subject to regulation

23   because of that.  And you want to learn all you can about

24   that.  This is the sum and substance of what the

25   Commissioner's

17

1   Office -- the Securities Commissioner's Office is all

2   about right now with respect to Agora; is that correct?

3            MS. TEWEY:  That's right.  We want to learn

4   more about their activities, and we think that it's

5   important for us to speak directly to the subscribers or

6   the people who --

7            THE COURT:  Well, that's not responding to my

8   question.  You're saying that it's important for you to

9   be able to talk to subscribers.  My question is, this is

10  the subject matter about which you're investigating and

11  want to get as much information is possible concerning;

12  correct?

13           MS. TEWEY:  That's correct.  We want to --

14           THE COURT:  All right.  So what you're

15  suggesting it is that in order to be able to have the

16  most exhaustive and complete and thorough investigation

17  of the activities of Agora, which you suspect may be

18  beyond proper bounds, that having the list of subscribers

19  would be a substantial aid to the Security Commissioner's

20  Office in order to achieve your investigative results; is

21  that correct?

22           MS. TEWEY:  That's correct, Your Honor, yes.

23           THE COURT:  Okay.  You may continue now.

24           MS. TEWEY:  And I also wanted to mention, too,

25  that we had spoken to Agora representatives about

18

1    limiting the request and narrowing it down to say, for

2    example, only Maryland subscribers, to be accommodating

3    in that regard, so that we would start with that.  And

4    then if we felt that we needed additional information --

5             THE COURT:  Well, does the fact that you have

6    narrowed it down to Maryland subscribers to make it

7    easier for Agora to comply, does that make any difference

8    as far as the legal principles that may be involved --

9             MS. TEWEY:  I don't think --

10             THE COURT:  If I may finish my question,

11   please?

12             MS. TEWEY:  Sure.  I'm sorry.

13             THE COURT:  -- are concerned whether you're

14   talking about subscribers who just lived in the State of

15   Maryland or subscribers who live in the 50 states and the

16   150 countries?

17             MS. TEWEY:  I don't think, Your Honor, that it

18   is -- I think that it actually touches upon the issues

19   relating to our authority to obtain the subpoenaed

20   information just generally, not necessarily to the First

21   Amendment issues, but one of the things that was

22   discussed in the Sheck (phonetic) case, which is Sheck

23   versus Maryland Securities Commissioner, which addressed

24   the issue of our authority to obtain subpoenaed

25   information, was whether or not -- number one, the

19

1    question was whether or not we had the authority to issue

2    subpoenas and obtain documents pursuant to our

3    investigations, and the answer to that was yes.

4         And one of the things the Court looked at was,

5    was it overly burdensome.  And here we don't feel that

6    it's burdensome because, number one, Agora does much of

7    its business via electronic communications.  No doubt the

8    information that they have relating to subscribers or

9    marketing materials -- or marketing customers, customers

10   that they solicit to -- is included in a computerized

11   format, electronic format, and could be provided easily

12   in that fashion.

13        So, you know, as far as the burdensome issue is

14   concerned with respect to subpoena enforcement, I think

15   it's important to know that we, number one, have offered

16   to --

17        THE COURT:  But that is only one criterium that

18   is to be looked at; is that correct?

19        MS. TEWEY:  In that --

20        THE COURT:  The burdensome aspect?

21        MS. TEWEY:  That's right.  The issue with

22   respect to Sheck was whether or not we had the authority

23   to obtain the information under our statute.  And, yes,

24   we did, according to the Court of Special Appeals under

25   11-701 of our statute.

1           And one of the things in that regard that Agora

2      has alleged is that we have to show a compelling need for

3      the information, but that was not discussed in Sheck.  It

4      was simply whether or not we had the authority and

5      whether it would be -- whether the information was being

6      subpoenaed in the course of an investigation, and that

7      the information would be useful to that investigation.

8      But there was nothing addressing that there had to be a

9      showing of compelling need to obtain the information.

10          Although we do feel that this information would

11     be very useful to our inquiry and, certainly, with

12     respect to exploring further the precise activities that

13     Agora is engaged in.  And we also have concerns about

14     whether or not Agora is actually -- whether or not they

15     are actually a bona fide newsletter with respect to --

16               THE COURT:  I'm sorry, what?

17               MS. TEWEY:  Whether they're a bona fide

18     newsletter with respect to many of their publications.

19     As I said, with respect to the stock tip, that was a one-

20     time kind of solicitation.  It was not of general and

21     regular circulation, which is one of the criteria for

22     being a bona fide newsletter, and that was just something

23     that was sent out.  In return for the $1,000 payment, the

24     people could get the information.  And it's not like a

25     regular weekly or monthly subscription that people would

21

1    have.

2         So between that and then the other activities

3    that I mentioned, such as the hotline and the conference

4    call kind of service, all of those things are things that

5    we wish to further explore, and we think that by speaking

6    with subscribers that that would be very helpful.  And

7    that would be really our only way of getting that

8    information unless we happen to receive a complaint from

9    a member of the public.

10        And when we conduct investigations, it's

11   regularly the situation that we will ask for information

12   regarding customers or investors, and we think that it's

13   similarly appropriate here.  And we think that our need

14   for the information outweighs any First Amendment

15   interests that Agora may have because, as I said, there's

16   no alternative way of us obtaining the information, and

17   we don't feel that we can rely on Agora, obviously, to

18   provide that information.

19        And the other thing that Agora has -- one of

20   the other things that may be implicated here --

21             THE COURT:  I beg your pardon?

22             MS. TEWEY:  One of the other things that may be

23   implicated here is violation of not just the registration

24   statute for investment advisors, in that Agora may be

25   required to be an investment advisor for the types of

22

1    activities it's engaged in.  But, in addition, we have

2    concerns, as the SEC obviously did by filing their

3    complaint, that Agora may be in violation of the anti-

4    fraud provisions of the Securities Act because --

5              THE COURT:  Of the anti-trust provisions, you

6    say?

7              MS. TEWEY:  The anti-fraud provisions, Your

8    Honor.

9              THE COURT:  The what?

10             MS. TEWEY:  Anti-fraud provisions of the

11   Securities Act.

12             THE COURT:  Oh, anti-fraud.

13             MS. TEWEY:  Yes, which are contained within our

14   Maryland Securities Act.  And those make it a violation

15   to engage in any device, scheme, or artifice to defraud.

16   There are basically three subsections to each of those

17   statutes, and they apply to any person.

18             They're not limited to any one class of persons

19   or just to registrants.  They're not limited, that is, to

20   those who fit neatly within the definition of investment

21   advisor.  And we believe that those provisions apply even

22   to non-registered persons.  And, basically, those

23   provisions make it illegal for anyone to distribute false

24   and misleading investment-related information.

25             And we do have concerns about, as I said, the

23

1    advertising materials, the way that they cherry pick

2    information about successful recommendations and do not

3    give information about other recommendations that have

4    not been profitable or successful.

5           THE COURT:  Well, you have copies of various

6    items of literature which Agora has sent to its

7    subscribers; is that correct?

8           MS. TEWEY:  We do have copies of that between

9    what Agora has provided as well as what we have received

10   from the regulators.  We do have that information, yes,

11   Your Honor.  And I think we could obtain, certainly,

12   additional information in that regard if need be.

13          And the issue here is whether or not the

14   content of those materials, the newsletters and other

15   publications, is violative of 11-301 or 11-302.  And we

16   also have concerns that it may violate one of our

17   regulations, which prohibits publishing an ad that

18   doesn't comply with --

19          THE COURT:  Well, can't you determine that from

20   examining the documents themselves?

21          MS. TEWEY:  We do have access to the documents,

22   Your Honor, but it's important also to connect that with

23   if investors have relied on that information and speak to

24   them about whether or not they have actually made

25   investments in these particular -- the recommendations

24

1    that have been made, have they invested in those

2    companies, and what their damages were.

3         That kind of information is also very useful,

4    too. And we think that would be, also, one of the

5    important reasons for obtaining further information about

6    their subscribership and marketing materials, because we

7    simply don't otherwise have access to that information.

8         We haven't received copies of any complaints

9    from Agora.  They claim that once a complaint is resolved

10   that

11   it --

12        THE COURT:  So you see no complaints from

13   Agora?

14        MS. TEWEY:  That's right.  I mean they admit

15   they have received complaints from subscribers, but they

16   claim that they don't have that information.

17        THE COURT:  When you say no complaints from

18   Agora, you mean no complaints that Agora has from some of

19   their subscribers?

20        MS. TEWEY:  That's correct, yes.  And they

21   claim that they don't maintain that information once they

22   receive a complaint and resolve it with a customer by way

23   of a refund or in some other fashion, that they no longer

24   retain that information.

25        So we have not been able to obtain anything in

25

1    that regard, and that's also a very important tool that

2    we use to read the complaints that customers have filed

3    or that investors have filed with a particular company.

4    It gives us more information about what damages they've

5    suffered and what violations have occurred.  So we think

6    that's very important as well.

7         We do feel strongly that the information that

8    we're speaking about here, Agora's advertisements, really

9    is more in the nature of commercial speech, that it is,

10   though it may relate to --

11        THE COURT:  What is in the nature of commercial

12   speech?

13        MS. TEWEY:  Well, there's a test, Your Honor,

14   and that is basically espoused by this case, Bolder

15   versus Youngs Drug Products Company (phonetic), that

16   seems to be used in many of the cases, in fact, that

17   Agora has cited to.  And it's whether the speech relates

18   to the economic interest

19   of the audience and the speaker, whether the speech

20   refers to the product, does the speaker have an economic

21   motivation for the speech?

22        THE COURT:  I know what the definition of it

23   is, but what -- in the context of this case, where does

24   that come into play?

25        MS. TEWEY:  Whether or not -- it comes into

26

1    play because Agora is arguing that the First Amendment

2    protects them from having to produce this information

3    relating to their subscribership and their marketing

4    materials, and we don't feel that that information is

5    protected.  For example, the stock tip was directed to

6    prospective subscribers.  It was basically sent to a list

7    of individuals on a marketing list, and it's information

8    that we think we should be able to obtain because it

9    relates to their marketing activities, not necessarily to

10    what's contained in their newsletters.

11          THE COURT:  Well, if you want to determine what

12    is being sent to the subscribers, can you not obtain that

13    and, perhaps, have you not obtained that directly from

14    other modalities you have used in the legal system

15    directly from the company without having to talk to the

16    subscribers?

17          MS. TEWEY:  That part of it, yes, Your Honor,

18    we have got advertising materials from the company.  As

19    I've indicated, they --

20          THE COURT:  Advertising materials which they

21    have sent to their subscribers?

22          MS. TEWEY:  That's correct, yes.  That, we have

23    received.  Now, what I'm referring to as the access to

24    the marketing lists containing the individuals' names,

25    identifying information, we believe that we should be

1    able to obtain that information because --

2            THE COURT:  I thought you said you had seen

3    that information.  Well, you've seen the information that

4    the people are giving.  You're talking about the

5    information meaning the subscribers who've received this?

6            MS. TEWEY:  That's right, yes, because that

7    information is relating to their advertising.  Their

8    advertising is going out to these people.  These are not

9    necessarily all subscribers.

10           THE COURT:  Well, let us say you get a list of

11   all of their subscribers.  If the subscriber says, "Well,

12   yes, here's what I've received from the company," you

13   have that already, don't you, what's been sent out to the

14   subscribers?

15           MS. TEWEY:  We do have what's been sent out to

16   the subscribers.  As I said, we want to speak to the

17   subscribers or the individuals who received solicitations

18   to find out more --

19           THE COURT:  You want to see what personal

20   communications there may have been between Agora and the

21   subscribers, beyond just sending them written material?

22           MS. TEWEY:  That's correct, which may implicate

23   the registration requirements for the Maryland Securities

24   Act.  That's correct, Your Honor.

25           THE COURT:  Yes, I understand.

                              28

1           MS. TEWEY:  And we feel that -- we feel

2      strongly that the information would be useful.  As I

3      said, it's information that we regularly obtain in the

4      course of our inquiry, and it's information that unlike

5      some of the cases that we have seen.  There's a case, SEC

6      versus Hirsch, where the Court denied the SEC's demand

7      that a printing company or publishing company turn over

8      information because the SEC already had another way of

9      obtaining that information.  But here we don't really

10     have another way of obtaining that information.  We have

11     to rely upon Agora to obtain it.

12          So for that reason, we feel strongly that that,

13     combined with the other arguments that I've made today,

14     that we should be allowed to obtain the information and

15     that the First Amendment doesn't limit our ability to

16     obtain that information.  Thank you, Your Honor.

17          THE COURT:  Thank you, Ms. Tewey.

18          Mr. Ellis?

19          MR. ELLIS:  Yes, sir.  May it please the Court,

20     I think our -- the Court has seen that this area of the

21     law -- in other words, when the government tries to get

22     subscriber lists, is an area that there's litigation

23     over.  And the reason is because there is a First

24     Amendment interest, and I think that's been established.

25          So the way we approach it is that Agora, which

1    is a publisher of many, many newsletters, many things,

2    receives a subpoena from an investigative body like the

3    Commissioner.  It complies with the subpoena.  And in

4    this particular case, there's no -- they complied with

5    everything except the subscriber list.  All the arguments

6    that counsel made, all come back to the subscriber list.

7    That's what they want.  They have everything else.  They

8    want the subscriber list.

9         Okay.  Well, that's where we are now.  What

10   does Agora say in response to that?  It says that for

11   several reasons, the State is not appropriately allowed

12   to get those in this case.

13        What's the first -- and there's a lot of ways

14   you could do it.  What's the first argument?  It depends.

15        For example, you could approach it, well, when

16   they say that they want things to investigate about

17   Section

18   11-101(H)(2)(D) of the Securities Act in Maryland, we

19   say, well, wait a minute, there's an exclusion in there

20   for bona fide publishers.  And there's not just an

21   exclusion, but the Supreme Court in Lowe versus SEC has

22   looked at that and has made a decision as to how you have

23   to read those kinds of statutes.

24        So, we believe we're excluded, and we've argued

25   that in our papers, and there are technical arguments,

30

1   very real arguments, and they're real all the way up to

2   the Supreme Court of the United States, where the Supreme

3   Court limited what under the SEC and what the states can

4   do under the Act.  And so you could look at it from that

5   way, you could take it through the technical statute.

6          And, for example, counsel mentioned 11-3-01,

7   and one of the problems they have is that we're not

8   trading in securities.  This is a publishing company.

9   We're not trading in securities; so, therefore, we

10  believe that that section of the law doesn't apply.  And,

11  obviously, you couldn't have a subpoena to get

12  information that would lead to enforcement because it

13  doesn't apply to us.  That's one way you could look at

14  it.

15         But, basically, as the Court has seen in the

16  cases, I'm sure, the way that generally it's looked at is

17  that there's competing interests here.  There's the

18  interest of the State in enforcement of the laws, and

19  then there's the First Amendment and Maryland Declaration

20  of Rights' interest in protecting those First Amendment

21  rights.  And so we believe that the appropriate approach

22  is to determine whether there -- when you weigh these

23  interests, whether one outweighs the other, and that's

24  basically what the courts have been doing.

25         And what you have in the cases is a remarkable

31

1      thing you see in the cases, which we point out in our

2      papers, that nobody's enforcing these things.  This is

3      not -- there are no cases out there where they get

4      enforced.  And the reason is because -- and then you look

5      to particular facts of a particular case; and, basically,

6      the First Amendment interests outweigh the interests of

7      the Securities Commissioner in these kinds of things.

8             And we think that's important because,

9      basically, nobody's enforcing these, and so then -- but

10     you can look at each individual case, and that's what

11     we're done in our papers, and I'm not going to go over

12     each case, but we've gone through all the cases, and

13     we've distinguished them, and printed out.  But the State

14     really has no case where somebody has enforced a

15     subscriber list request like this.

16             Okay.  Now, why isn't it being enforced?  Okay.

17     Well, what you have to do, we believe, under the Oklahoma

18     class versus Willing (phonetic), you have to look -- and

19     then the Maryland cases that deal with that.  Benach

20     (phonetic) versus the State Commission on Human Relations

21     and the Sheck (phonetic) case that counsel cited.

22             You have to look at that, and you have to say,

23     "Is this inquiry authorized by statute?  Is the

24     information relevant to the inquiry?  Is the demand too

25     indefinite or too burdensome to be considered?

32

```
 1                 And then if you go through those things and you

 2       determine, yes, well, the State is proceeding

 3       appropriately, then you have to figure out whether the

 4       actual interest that's being protected, that should be

 5       protected, the First Amendment interest is affected by

 6       what the State wants.  And is it done in a -- is it done

 7       to meet a necessary need?

 8                 Counsel has given us a laundry list, the State

 9       has given us a laundry list of, "Well, we'd like to look

10       at this; we'd like to look at that; we'd like to look at

11.      this. It may help us to talk to these people."  The

12       correct legal determination, is it necessary to the

13       enforcement of the Maryland Securities law?

14                 And as I said when I first started talking,

15       Your Honor, one of the things that just stands out here

16       is that the SEC didn't think it was necessary.  The SEC

17       made the same kind of request as we point out in the

18       papers that we supplied to the Court.  They made the same

19       kind of request for subscriber lists, but they never

20       moved to compel, but yet they did file a complaint.

21                 So they were able -- the SEC is certainly a

22       sophisticated organization was able to file a complaint

23       in Federal Court a couple of blocks from here, and they

24       were able to do this without the subscriber lists, even

25       though they had asked for them, and we had refused to
```

33

1    give them on First Amendment grounds, and they didn't

2    move to compel.

3              THE COURT:  In all the forums that you have

4    addressed about these matters, do you always refer to the

5    SEC as sophisticated agency or just here today?

6              MR. ELLIS:  Sure, we do, because they have fine

7    lawyers, and they have --

8              THE COURT:  But they may be wrong sometimes.

9              MR. ELLIS:  Well, they're wrong when they come

10   after us.  No, but, basically, I don't take it -- in

11   other words, I don't think -- the point I want to make is

12   that our client takes serious -- it's in the business --

13   this is one of its businesses, and so it takes seriously

14   the SEC asks for things.  It takes it seriously when the

15   Maryland Securities Commissioner asks for it, and it

16   supplies all the information except the subscriber list.

17             The SEC evaluates the situation, and it decides

18   that it can do a complaint, and it does the complaint.

19   The Maryland Securities Commissioner has decided to seek

20   enforcement.  Why is there a difference?

21             We believe -- and it's important because the

22   Maryland Securities Commissioner has to show that it's

23   necessary, not that they'd like it, because they're

24   competing, there's a Constitutional issue, a

25   Constitutional principle at stake here, and that is the

1   First Amendment.  So, they have to do more than just want

2   it.  They have to show that it's necessary.

3          And that leads to what all the courts require

4   is a particularized showing, not a laundry list, but why

5   do you need a particular thing?  And counsel gave an

6   example, that there's a mailing that goes out, and

7   there's going to be a meeting, and people come to that

8   meeting.

9          Now, do you need -- to find out about that

10  meeting, you certainly need the materials.  In other

11  words, what was given to the people to get them to come

12  to the meeting?  And counsel rightly says that they have

13  that material.

14         So then they want to know who was at the

15  meeting.  Well, how do you get that information?  We view

16  it under the First Amendment that you would have to make

17  a particularized showing, and you have to do a narrow

18  view of how you get that information.  Do you make a

19  request for all the subscribers, or do you ask who

20  attended the meeting?

21         Well, obviously, you don't ask for all the

22  subscribers, you ask for who attended the meeting.  Well,

23  that's not what the commissioner is doing here.  The

24  commissioner is saying, "Give me all your lists."

25  They're not saying, "Who attended the meeting?"  They

35

1    don't ask that question.  They want to know everybody

2    that received the material.

3           They don't want to know who attended the

4    meeting, and that's the kind of particularized showing

5    that the Court would require to meet the requirement that

6    the states show that what they're asking for in

7    contravention of the First Amendment is necessary.  It's

8    necessary for their enforcement function.  And that's --

9    no showing has been made in this case about that, and so

10   that's another reason why when you go through the test

11   that we've outlined in the papers -- and I don't think

12   that there's -- I would say that the State of Maryland

13   agrees to some of the test, but it doesn't agree that the

14   First Amendment's involved.

15          Our position is that's an extreme position, and

16   that's why they can't show any case where subscriber list

17   requests were enforced.  And that's all we're talking

18   about here is subscriber lists.  We're not talking about

19   who attended a meeting.  They want a list of everybody

20   that got the mailing.  Well, that's a different thing,

21   and that's why we're fighting it.

22          Now, the First Amendment test, our position is

23   that when you're asking for subscriber lists, the First

24   Amendment's implicated, and that it's showing that it's

25   relevant to the inquiry, and that's what the State is

1    showing here.  That's not enough.  That you need to show

2    that the interest of the State outweighs the First

3    Amendment protection that's accorded to subscriber lists.

4    And we believe the State's made no showing.

5            And, as I said, we outlined the cases that

6    they've cited.  We've gone through the cases, and they're

7    all before Your Honor.  We felt that the reply is

8    important here.  Just to lay out why the reply is

9    particularly important, what we originally did, we got

10   the motion to compel.  And the Court, I'm sure, has read

11   that.  And they're vague.  You really can't tell.  You

12   can see some of the things that they're interested in,

13   but you don't know why.

14           And so when we file our original opposition to

15   the motion to compel, we don't know the specific

16   arguments that the State's going to make.  We know the

17   general things that they say in their complaint, and the

18   very general things they say in the motion.  I mean the

19   motion basically says, "We have the power to do this and

20   we want it."  It doesn't tell you why.

21           And so when we file our opposition, we are

22   basically throwing our precedents in the water, but we

23   don't know what their specific arguments are, but then

24   they come back with their reply.  And they're saying, you

25   know, why our opposition is wrong, and that's why the

37

1    issues are really joined by the reply.

2           And in the reply, we go through the main point,

3    which are that the subscribers lists are confidential and

4    proprietary, and that they fail to make the showing of

5    necessary, that it's necessary for the enforcement of the

6    law, and that their interests outweigh the First

7    Amendment protections.

8           We make the point that the commissioner's not

9    cited a single case where the court ever ordered

10   production of subscriber lists in the broad context here.

11   We've shown that the SEC didn't move to enforce, and we

12   think that's a telling situation.  The argument about

13   promotional content receiving no First Amendment

14   protection.  Frankly, we go through the cases and show

15   that's not correct, that promotional content is

16   appropriate for First Amendment protection and we lay out

17   in the reply that.

18          We indicate that the information already

19   produced by Agora more than adequately provides the

20   commissioner with the power to investigate.  It certainly

21   provided everything that the SEC needed in order to file

22   a complaint that's pending over in front of Judge Garbis.

23

24          And then, finally, we show that the

25   commissioner is not even taking the first step to try to

38

1    narrow this to really get at things like if you want to

2    know who attended the meeting, I mean do we have any

3    documents that show who attended the meeting?  I mean you

4    don't ask for all the subscriber lists.  And you do those

5    things before you seek court intervention like is here.

6         So, Your Honor, I said I wasn't going to go

7    through each of the arguments, but they're there.  This

8    is very serious to the company.

9         THE COURT:  But you're a lawyer, which means

10   you do go through all of the arguments.

11        MR. ELLIS:  That's right, I do.  That's why I

12   have it all written down.  But the point is that I think

13   we've treated the cases, and that's what had to be done.

14        And then you move back to the other arguments,

15   which I started out with, which is that you really

16   shouldn't get to this because there's no jurisdiction

17   here because we're talking about a publisher.

18        The State indicates that they're not really

19   sure that we're a bona fide publisher.  The problem with

20   that is that courts have held that we are.  I mean -- and

21   we've cited that.  So it isn't like we're making that up.

22   It's been held in court.  Judge Nickerson and the Fourth

23   Circuit have indicated that.

24        So, we're not writing on a completely clean

25   slate where they've never heard of us and we're coming

39

1      in.  There are litigating cases, and that has been held.

2              There's no showing that we have any financial

3      interest in this.  We're a publisher.  We're not a

4      broker.  We're not making money on trades and sales and

5      those things.  We're not selling securities.  There's no

6      showing.  There's no basis.  It would have to be if a

7      regulator is making broad requests for subscription

8      lists, it's going to have to make a particularized

9      showing as to why it's necessary and why there's some

10     basis to believe in fact that we are selling securities.

11             Well, there's absolutely none.  There's no

12     evidence to show we are.  We're a publisher, and courts

13     have held that that's what we are.  We're a publisher.

14     We're disinterested.  We have no financial interest, and

15     that gives us the First Amendment protection that we

16     asked for.

17             The idea of individual investor advice.  They

18     have a complaint.  I mean, if they want to file it, they

19     can act under that.  They can act on a complaint.  So,

20     are they saying that we're giving individual advice?

21             Well, we've provided the Court and we've

22     provided counsel with the documents that shows that we

23     tell people we're not doing that.  So it isn't -- what

24     more do they have?  Is that person who complained, is he

25     saying he got -- or he or she saying they got individual

40

1    advice?  Well, if it was, well, then that's in the face

2    of documents that show we're not giving individual

3    advice.

4         And so that's why this needs to be a lot

5    tighter by the State before this Court should do

6    something that no other court has done, which is say,

7    "Turn over your subscriber lists on this kind of

8    investigation to the Maryland Securities Commissioner.

9         Thank you, Your Honor.

10        THE COURT:  Thank you, Mr. Ellis.

11        Ms. Tewey, do you wish to be heard in response?

12        MS. TEWEY:  Yes, Your Honor.

13        Your Honor, I have this Sheck versus Maryland

14   Securities Commissioner before me, and we agree that that

15   case is important in addressing what is required by the

16   Securities Division in order to obtain documents pursuant

17   to subpoena.  And I disagree with opposing counsel as far

18   as the necessity of showing particularized need for

19   information beyond what we have already done.

20        The three criteria, as stated in this case, are

21   whether the inquiry is authorized by statute, the

22   information sought is relevant to the inquiry, and the

23   demand is not too indefinite or overbroad.  And we

24   certainly believe that the information that we are

25   seeking is relevant, as I explained earlier, because of

1        wanting to know more about the activities that Agora is

2        engaged in that we believe are personalized type of

3        activities, and that relate to activities that may

4        require the registration as an investment advisor.

5              So I think that the Sheck case is certainly

6        dispositive, but I don't think it has -- it contains the

7        requirement that opposing counsel is suggesting.

8              And as far as what the SEC has done in their

9        case, the SEC's case, as I mentioned, is focusing on,

10       specifically, the stock tip that was made in May of 2002,

11       the solicitation to individuals to purchase information

12       about a particular company.  And they were not focusing

13       on registration as an investment advisor as we would like

14       to include in our investigation or are including in our

15       investigation.

16             So the fact that the SEC might not have taken

17       them to court in order to enforce a subpoena, I don't

18       think should be dispositive of our issue here and whether

19       or not we should be entitled to obtain the information.

20       We don't know what the SEC's reasoning is behind their

21       decision not to pursue before bringing an action.  There

22       could be many, many reasons why they didn't do that,

23       strategically and otherwise, and it may be that they've

24       decided that they wouldn't want to wait until discovery

25       to obtain that information.  But I think it's important

                              42

1        to understand that they don't have the registration issue

2        as part of their case.

3                Agora has indicated that they have supply us

4        with all of the information, other than the

5        subscribership information and the marketing lists, and

6        generally that's true.  But we did just receive new

7        additional materials in Friday.  There were some things

8        that we hadn't received before.

9                THE COURT:  You received what on Friday?

10               MS. TEWEY:  We received some additional

11       materials on Friday that we hadn't seen before.  That was

12       what Your Honor, I think, referred to having received

13       just yesterday, so there is -- well, we have gotten

14       documentation from Agora.  Some of it has been late in

15       coming, and certainly the information about the

16       subscribership and the marketing lists has not been

17       forthcoming, and it really is an important part,

18       particularly for us to explore precisely what their

19       activities are.

20               And as I've said, we'd be willing to work with

21       them to narrow down the information that we need.  If we

22       need additional information, we could let them know, but

23       we could narrow it down initially to, for example,

24       Maryland investors.

25               I have not heard from opposing counsel before

                                43

1    about that if we had characterized our requests or

2    demands in terms of who attended a certain meeting, that

3    they would provide us with information about who those

4    people were, if they were actually subscribers to one of

5    their services.

6         My understanding earlier had been that if it

7    had anything to -- if the information that we were

8    seeking had anything to do with subscribers and

9    identifying those people or if it had anything to do with

10   their marketing, those who were on their marketing lists,

11   that they would not be willing to turn over the

12   information.

13        It sounds as though they're saying, to me, that

14   they'd be willing to provide it, but on a much narrower

15   basis.  And if they're willing to do it in that respect,

16   then I think that's kind of letting go of the First

17   Amendment issue.

18        We think it's important to obtain more broadly

19   because they have many types of services that they're

20   providing.  And while we're willing to work with them so

21   that the production is not burdensome, we don't know what

22   all of their services are, so we can't necessarily

23   particularize it in the fashion that they are suggesting.

24        And as far as Agora's claim that the courts

25   have held that they are a publisher, the two cases that

44

1    I've seen with -- one of them was a CFTC case that was

2    cited to in

3    our --

4              THE COURT:  Well, they're not disputing the

5    fact they are a publisher and some of what they do, are

6    they?

7              MS. TEWEY:  No, they're claiming -- Agora is

8    claiming that they are a publisher, a bona fide

9    publisher, and we're saying that we believe that they may

10   not be a bona fide publisher with respect to all of their

11   activities.

12             THE COURT:  Oh, that they may not be a bona

13   fide publisher?

14             MS. TEWEY:  Yes, because they may not be a bona

15   fide newsletter because of what I had discussed earlier -

16   -

17             THE COURT:  Well, let's assume that they are

18   not a bona fide publisher, but they still send out a

19   newsletter to their clients, but they're not a bona fide

20   publisher.  Does that mean that their mailing lists of

21   people who are only interested in what they sent in the

22   mail.  They may not be investors, but they may be ones

23   who want their publications.  Does that make it more

24   available to you in that situation?

25             MS. TEWEY:  Yes, I think it certainly would

45

1    make it more available to us because if they were not a

2    bona fide publisher then the First Amendment protections

3    do not apply to their activities or to the information

4    that they're providing.  And, also, the bona fide

5    publisher exclusion from the definition of investment

6    advisor is important here too.  And there is an

7    exclusion, as I mentioned before, from registration under

8    the Securities Act for advisors who act as a bona fide

9    publisher of a newsletter of general and regular

10   circulation.

11            THE COURT:  Is a company that's -- a commercial

12   company, if they send a periodic newsletter to their

13   customers.  Customers don't subscribe to the newsletter

14   per se; they are customers.  And they send out a

15   newsletter to their customers offering their views,

16   whatever it may be, does that open the flood gates for

17   you?  In other words, they wouldn't have any immunity

18   with respect to their newsletters is what you're

19   suggesting.

20            MS. TEWEY:  Well, if we're just talking about

21   any publisher, then we might not even have jurisdiction

22   over their activities.  Here we're interested with Agora

23   as a publisher, alleged publisher, because of the fact

24   that they are in the business of giving financial advice

25   pursuant to those newsletters, and that's how we have

46

1    jurisdiction over the activities of anyone who gives

2    advice regarding financial information is --

3        THE COURT:  So, even if it's a newsletter, and

4    there's no charge to the customers of this particular

5    company.  This company does business -- it's a commercial

6    company in whatever field it may be.  They have

7    customers, and as a service to their customers, they send

8    a newsletter, and they advise their customers of what

9    they think are good deals and good investments to make in

10   certain -- not necessarily stocks, but I don't see the

11   difference in a sense, other than what the regulatory

12   structure may be.  I don't see much difference in a

13   company sending a newsletter or suggesting to the people

14   who do business with them, and it's a non-paid

15   newsletter, to say, "We think these products on the

16   market are the greatest thing since the printing press,

17   and we think they're good things for you to buy."

18       MS. TEWEY:  I do think that's a little

19   different from what we're talking about in this case

20   because Agora is in the business of issuing publications

21   and providing services that relate to investment advice.

22       THE COURT:  Well, you say, "the business," but

23   isn't the example I cite -- is not the company that I'm

24   citing, the hypothetical company I'm citing, in the

25   business --

47

1              MS. TEWEY:  Well, you --

2              THE COURT:  If I may finish my question,

3        please?

4              MS. TEWEY:  I'm sorry.

5              THE COURT:  -- in the business of sending

6        periodic publications to their customers?  In the example

7        I cite, that they send a monthly newsletter or quarterly

8        newsletter, whatever it may be, but a regularly scheduled

9        newsletter to all their customers?  And they give advice

10        to their customers on the commercial world, as they see

11        it, within the ambit of what that company's involved in

12        and what their customers are interested in.  Isn't that

13        the same thing?

14              MS. TEWEY:  You had said that the newsletter

15        was free, and I do think that that's a distinction to be

16        made here because --

17              THE COURT:  Well, it's free and not free.

18        Whatever charge is -- it's just like saying you go into a

19        restaurant and get a free napkin.  They don't charge you

20        for the napkin.  But they do charge you for the napkin.

21        It's part of the overhead, you know.

22              MS. TEWEY:  Well, I think it's distinguishable

23        from the Agora newsletters because they are charging a

24        significant amount of money for the publications that

25        they are offering to people.  And, also, for situations

48

1    like the stock tip that they are soliciting.  That stock

2    tip was a thousand dollars if you wanted to obtain that

3    information.  And some of these services are as much as

4    $5,000 per year.

5          THE COURT:  Are you saying that a publication

6    that the consumer has to pay for occupies a different

7    posture than a publication that a customer gets from the

8    company he's dealing with and doesn't have to pay any

9    apparent fee, but just a hidden fee?

10          MS. TEWEY:  Well, I think that in the context

11    of the Investment Advisors Act and in the context of the

12    Maryland Securities Act, which regulates investment

13    advisors, that it is an important distinction to be made

14    because it does refer to giving investment advice for

15    compensation, so that's an element of it.

16          As far as whether or not that company --

17    whether or not the newsletter that that company that

18    you're saying in your hypothetical is providing financial

19    advice would qualify as a publisher for First Amendment

20    purposes, it would depend on a number of different

21    things, I think.  And that would be whether or not -- I

22    think it would depend

23    upon whether or not they were in the business of being a

24    publisher.  I don't know what their exact business is as

25    part of your hypothetical, but I think that in order for

49

1      them to qualify as a publisher deserving of First

2      Amendment --

3              THE COURT:  Well, they are a publisher.  They

4      publish that newsletter once a month.

5              MS. TEWEY:  But their main business sounds like

6      it's something different than the publication of

7      financial advice or information.

8              THE COURT:  No, it's not their main business,

9      but they feel it's an important component of their

10     business.  It enhances their business.  It helps bring in

11     clients.  It helps satisfy clients.

12             MS. TEWEY:  Well, I think the important thing

13     here is that the activities that Agora is engaged in with

14     respect to its financial publications and its services

15     that it's marketing is for compensation.  And there is

16     some question, we believe, as to whether or not they

17     qualify as a bona fide newsletter for purposes of the

18     registration as investment advisor.

19             We don't believe necessarily that all of the

20     information that they're providing is impersonal advice

21     to customers or investors, and I've given examples of why

22     that is.  They've even gone to the extent in many of

23     their publications of recommending brokers to customers,

24     which is not part of the usual investment newsletter.

25             And we've also seen suggestions that one of

50

1          their principals may have an interest in a brokerage

2          firm.  And whether or not, in fact, any investors have

3          used that brokerage firm, that's something that we don't

4          know, but that's something that we also would like to

5          find out additional information about.

6                   But we think that the inquiry here is important

7          as to whether or not they're a bona fide publisher for

8          purposes of First Amendment.

9                   Because if they are not a bona fide publisher,

10         then the First Amendment protections are either minimal

11         or not as significant as if they were a bona fide

12         publisher, and also in the context of the Investment

13         Advisors Act.

14                  Because if they're not a bona fide newsletter,

15         then they would need to be registered to engage in the

16         types of activities that they are engaged in without

17         question.  That is the Lowe case, that opposing counsel

18         has cited to, which is the Supreme Court case and speaks

19         to the issue of registration as an investment advisor for

20         newsletters.

21                  The other thing that comes into that play is

22         whether there is disinterested commentary as part of the

23         newsletter.  And we feel that, in this particular case,

24         that may be another issue that we would need to look at

25         because Agora has a trading policy with respect to the

51

1    people who write their newsletter articles that really

2    puts it into question whether or not the authors do not

3    have conflicts of interests when they're recommending a

4    particular security.  They may actually be permitted to

5    hold that security at the time they make the

6    recommendation and profit by it.  So that's another

7    reason why they may not be a bona fide newsletter.

8           Certainly, when we file a complaint, as with

9    any case within the Attorney General's Office, it's not

10   something that we take lightly, and we feel it's

11   important to obtain as much information as possible

12   that's useful to our investigation before we bring an

13   action.  So while the SEC may have chosen not to pursue a

14   subpoena enforcement action in their case, we think that

15   because we want to include other possible causes of

16   action, that it's important for us to obtain this

17   information in the first instance and to draft our

18   complaint accordingly based on the information that we

19   find.

20          Thank you, Your Honor.

21          THE COURT:  Thank you, Ms. Tewey.

22          MR. ELLIS:  Your Honor, could I reply just -- I

23   know it's outside of what would normally happen, but I've

24   got two points that I wanted to make.

25          THE COURT:  All right.

1           MR. ELLIS:  I just wanted to say I'm sure the

2      Court -- we're all interested in the Sheck case that

3      counsel -- we've all cited because it's from the Maryland

4      Court of Special Appeals.  But I wanted to point out

5      that's not a list for subscriber list case, number one.

6           Number two, it was a default.  The appellant

7      didn't appear, or the respondent didn't appear at the

8      show cause hearing; and that limited, obviously, what

9      they could argue on appeal.  But still the Court of

10     Special Appeals said, "The subpoena on its face is not

11     unduly burdensome or oppressive.  And as appellant has

12     failed to appear at the show cause hearing, he has

13     presented no evidence showing that compliance would place

14     an undue burden on him," and then the citation.  "The

15     information subpoena is relevant to the Commissioner's

16     investigation and the Commissioner's demands are not

17     indefinite, unduly burdensome, or overbroad.  The

18     Commission has not exceeded his regulatory power."

19          But in our case, we did appear.  We did contest

20     it.  We are showing and we believe we've made a good

21     showing that there's a First Amendment interest at stake,

22     and we are contending that counsel's fine statements

23     that, "Well, this -- we would like to look at this, and

24     we would like to look at that, and we would like to look

25     at all those things," but there's no showing of how

53

1      getting our subscriber lists -- and these are broad

2      requests.

3              This is not narrow.  They want all the

4      subscribers.  How that goes to any of the things that

5      counsel said that they may want to investigate.  They

6      have to show a relationship, just as the Court of Special

7      Appeals said that they'd have to show that their demand

8      wasn't indefinite, unduly burdensome, or overbroad.  And

9      we think that's exactly what it is in the context of a

10     First Amendment case.

11             So the subscriber list thing, which is not in

12     the Sheck case, is very important because that's the

13     First Amendment.  That's what brings a First Amendment

14     interest.  Okay.

15             The second thing is, again, as I alluded to,

16     the final thing, counsel has given a list of things that

17     they may want to do.  Well, you have to connect what they

18     may want to do to the subscriber list, and there's no

19     showing.  The papers speak for themselves.  I'm not going

20     to go through it again.

21             But they don't show how -- "they," meaning the

22     Securities Commissioner, doesn't show how these

23     subscriber lists relate to the investigations that they

24     may want to do.  And that's required in a First Amendment

25     case because the First Amendment interest can only be

1   outweighed by specific showings that the State makes that

2   they need in their regulatory scheme.

3           I would urge the Court -- and I know the Court

4   will -- sees the seriousness to both sides.  The case

5   is -- the Lowe case itself is a good, you know, morning

6   of reading because -- but it shows how seriously the

7   Supreme Court took the interest of the newsletter

8   publishers, people who comment on the securities market,

9   and the securities laws, the interplay between those, how

10  serious that is.

11          And I don't know how anybody could read the

12  case, other than to say that the First Amendment

13  interests are not outweighed by even the strong

14  regulatory needs of the SEC.  And in Lowe, that

15  relationship leads to a big, long, thick opinion.

16          But I think in the bottom line is, as Judge

17  Audrey Robinson said in the Securities and Exchange

18  versus Wall Street Publishing, where he had to reconsider

19  what he had done.  He had enforced the subpoena in the

20  first instance.  And then after Lowe, had to come back

21  and redo it and decided not to enforce the subpoena after

22  Lowe because Lowe changed the law.  And I think that's

23  why reading the cases is important.

24          Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Ellis.

55

1          I'm going to grant the Defendant's motion to

2     deny the motion of the Plaintiff, the Securities

3     Commissioner for the State of Maryland.

4          I do not believe that in our Bill of Rights

5     that there is any provision that has higher priority than

6     the First Amendment, and I think courts must be very

7     zealous in guarding that most fundamental of all rights

8     and not allow any erosion thereof.

9          And I do believe that what the Commissioner is

10    attempting to do here is, in its own relatively small

11    way, an attempt to erode the fundamental principle.  I do

12    not believe that the Commissioner has made out any

13    compelling showing why Agora, Inc., must release its

14    subscriber list.

15         In counsel's opening argument, she said it

16    would be very helpful, and perhaps it would be.  And even

17    assuming it would be, that doesn't win the ball game.

18    That's not what the Commissioner has to show.  Counsel

19    has argued it would be very useful to us.  More than

20    once, she said it would be very useful to us to show what

21    the actions of Agora may have been.

22         Counsel has argued that by seeing these

23    subscriber lists it may implicate Agora by talking to the

24    subscribers, a fishing expedition is what this is called.

25    You know, we'd like to talk to subscribers and maybe

56

1   we'll find something to implicate Agora.  Maybe so.

2   Maybe you would, but that is no basis for this.

3          There is no attempt to zero in on certain

4   subscribers or a certain class of subscribers, but all

5   subscribers.  Not that a narrowing of the list would be

6   permissible either, but at least we're not at that point.

7   It's a shotgun approach.

8          Counsel has argued, well it's relevant to the

9   inquiry.  Well, a million things can be relevant to an

10  inquiry.  And particularly when you are beginning an

11  inquiry, one never knows what might be relevant.  And to

12  simply say to the Court well, this is relevant to an

13  inquiry, which means a very broad-based pursuit, looking

14  for whatever you might be able to find, that's not

15  enough.

16         I think there are other avenues that might well

17  be available to the Commissioner to obtain the identity

18  of certain subscribers, be able to talk to certain

19  subscribers.  There is no showing here at all that that

20  would not be possible.  There is no showing here at all

21  that the Commissioner has made any concentrated effort to

22  speak to subscribers, locate them, get the information

23  which the Commissioner is seeking.

24         And the fact that counsel has stated, well,

25  it's been narrowed down to Maryland subscribers is of no

57

1        moment.  I think it is definitely over broad.

2               As I've indicated, if it were particularized to

3        a certain group of subscribers only, I'm not sure whether

4        that would remedy it either.  But we don't have that

5        situation.  We have the situation here of all the

6        subscribers in the State of Maryland.

7               It is for these reasons that the Commissioner's

8        motion is denied.

9               Thank you, counsel, that will conclude the

10       hearing.

11              MR. ELLIS:  Thank you, Your Honor.

12              MR. TURNER:  Thank you, Your Honor.

13              MS. TEWEY:  Thank you.

14              THE COURT:  If there is any order which you

15       wish me to sign, I would be pleased to do so as long as

16       it has been approved as to form by Ms. Tewey or her

17       office.

18              MR. ELLIS:  Thank you, Your Honor.

19              THE COURT:  Thank you.

20              MS. TEWEY:  Thank you, Your Honor.

21              THE COURT:  Counsel may be excused.  Thank you.

22              (The matter was concluded at 11:03 p.m.)

23

24

25


                              58

## REPORTER'S CERTIFICATE

I, Patricia A. Trikeriotis, an Official Court Reporter of the Circuit Court for Baltimore City, do hereby certify that the proceedings in the matter of Melanie Senter Lubin, Securities Commissioner for the State of Maryland versus Agora, Inc., Case Number 24-C-03-003540, were duly recorded by means of videotape, on October 16, 2003, before the Honorable Robert I.H. Hammerman, Associate Judge.

I further certify that the page numbers 1 though 58 constitute the official transcript of an excerpt of the proceedings as transcribed by me from the videotape recording to the within typewritten matter in a complete and accurate manner.

In Witness Whereof, I have affixed my signature this 8th day of March, 2004.


_____
Patricia A. Trikeriotis, CVR
Official Court Reporter


59

# EXHIBIT B

| Source Code | Orders | Gross Revenue | List | Refunds Requested | Total Net Revenue | Total to PSI | Total to Host |
|---|---|---|---|---|---|---|---|
| Results for Special Insider Tip Report as of April 26, 2004 | | | | | | | |
| W350SSIT | 253 | $253,000 | Blast File | 36 | $217,000 | $217,000 | $0 |
| W350C502 | 123 | $123,000 | 24/7 Profits | 19 | $104,000 | $52,000 | $52,000 |
| W350C503 | 171 | $171,000 | DR Core | 47 | $124,000 | $62,000 | $62,000 |
| W350C504 | 67 | $67,000 | DR Web | 19 | $48,000 | $24,000 | $24,000 |
| W350C505 | 8 | $8,000 | DR SS | 1 | $7,000 | $3,500 | $3,500 |
| W350C506 | 25 | $25,000 | DR X pr | 3 | $22,000 | $11,000 | $11,000 |
| W350C507 | 21 | $21,000 | DR RC | 4 | $17,000 | $8,500 | $8,500 |
| W350C508 | 94 | $96,000 | Strategic Investments | 16 | $80,000 | $40,000 | $40,000 |
| W350C509 | 39 | $39,000 | 21st Century | 3 | $36,000 | $18,000 | $18,000 |
| W350C510 | 168 | $168,000 | Oxford Club | 31 | $137,000 | $68,500 | $68,500 |
| W350C511 | 68 | $68,000 | Outstanding Investments | 8 | $60,000 | $30,000 | $30,000 |
| W350C512 | 10 | $10,000 | Richebacher | 5 | $5,000 | $2,500 | $2,500 |
| W350C513 | 50 | $50,000 | Fleet Street | 14 | $36,000 | $18,000 | $18,000 |
| W350C514 | 0 | $0 | Early To Rise E-List | 0 | $0 | $0 | $0 |
| W350C515 | 20 | $20,000 | International Living | 2 | $18,000 | $9,000 | $9,000 |
| W350C516 | 7 | $7,000 | Strategic Opportunities | 0 | $7,000 | $3,500 | $3,500 |
| W350C517 | 24 | $24,000 | Sovereign Society | 1 | $23,000 | $11,500 | $11,500 |
| W350C518 | 2 | $2,000 | Early To Rise-Paid Subs | 0 | $2,000 | $1,000 | $1,000 |
| W350C519 | 0 | $0 | Early to Rise Outside Free | 0 | $0 | $0 | $0 |
| W350C520 | 0 | $0 | Early to Rise Free Fleet Subs | 0 | $0 | $0 | $0 |
| W350C521 | 1 | $1,000 | ETR-Free Highlander Subs. | 0 | $1,000 | $500 | $500 |
| W350C522 | 0 | $0 | ETR-Free Int'l Living Subs | 0 | $0 | $0 | $0 |
| W350C523 | 0 | $0 | ETR-Free Health Subs | 0 | $0 | $0 | $0 |
| W350C524 | 0 | $0 | ETR-Free CFM subs | 0 | $0 | $0 | $0 |
| W350C525 | 32 | $32,000 | Blast File-Dedicated Weekend | 1 | $31,000 | $31,000 | $0 |
| W350C526 | 10 | $11,000 | Penny Stock Fortunes | 0 | $11,000 | $5,500 | $5,500 |
| W350C527 | 24 | $24,000 | Vantage Point Investor | 5 | $19,000 | $9,500 | $9,500 |
| TOTALS | 1217 | $1,220,000 | | 215 | $1,005,000 | $626,500 | $378,500 |

AG 03473

# EXHIBIT C



● Back   ● Refresh   ● Options

**USU doubles**

| Topic | Author | Date |
|---|---|---|
| 🗎 USU Doubles | Bill Billings | 05/22/02 |
| ↳ 🗎 Actually, I'll give DR or somebody credit from Agora. They r... | Roger | 05/22/02 |
| ↳ 🗎 ok we lost on USU- now what about the "anything you read on ... | jean | 05/29/02 |
| ↳ 🗎 Info on USEC attempt at protection | MountainBiker | 05/29/02 |
| ↳ 🗎 Pirate Investor was right after all | USEC Hound | 06/18/02 |
| 🗎 It isn't over yet | Blackpox | 05/22/02 |
| ↳ 🗎 agree | w.p. | 05/23/02 |
| 🗎 Why are you all so ............... | Roz | 05/23/02 |
| 🗎 Where's the deal? | TSR | 05/23/02 |
| 🗎 A Word from Pirate Investor | John Possidente | 05/24/02 |
| ↳ 🗎 Report | Bayou Chemist | 05/24/02 |
| ↳ 🗎 usu | geff | 05/24/02 |
| ↳ 🗎 The Notice | John Possidente | 05/28/02 |
| 🗎 I'll Admit It - I Bought It | J. A. Novice | 05/25/02 |
| ↳ 🗎 I would guess a yield play | MountainBiker | 05/25/02 |
| 🗎 Thanks Mountainbiker | J.A. Novice | 05/25/02 |
| 🗎 USU Down | TSR | 05/26/02 |
| ↳ 🗎 Lower Cost SWU | PREDICTOR | 05/26/02 |
| ↳ 🗎 Hooked | TSR | 05/26/02 |
| ↳ 🗎 BTY | SeattleRedGirl | 05/26/02 |
| ↳ 🗎 SWU | MountainBiker | 05/26/02 |
| ↳ 🗎 Not by me, Jim................... | Roz | 05/27/02 |
| ↳ 🗎 Disclaimer | MountainBiker | 05/28/02 |
| ↳ 🗎 The need to sell! | OptionPlayer | 05/28/02 |
| ↳ 🗎 Sell Signal | TSR | 05/29/02 |
| 🗎 Not Me Either, Jim - Thank you | J.A. | 05/27/02 |
| 🗎 Does anyone still own this thing? | bewarethehype | 05/28/02 |
| ↳ 🗎 Fake Names | Bill Billings | 05/28/02 |
| ↳ 🗎 dare | Porter Stansberry | 05/28/02 |
| ↳ 🗎 THE REST OF THE JAY MCDANIEL PIECE | Porter Stansberry | 05/28/02 |
| ↳ 🗎 Porter's Post | James Kennedy | 05/28/02 |
| ↳ 🗎 USU | Porter Stansberry | 05/28/02 |
| ↳ 🗎 Someone spilled the beans | SeattleRedGirl | 05/28/02 |
| ↳ 🗎 That was me................... | Roz | 05/28/02 |
| ↳ 🗎 Hey,I never got to thank you for the Corvis recomendation, r... | Bill Billings | 05/28/02 |
| ↳ 🗎 my irate friend | Porter Stansberry | 05/28/02 |
| ↳ 🗎 returns | Bill Billings | 05/28/02 |
| 🗎 Porter Stansberry Post | JD Hithers | 05/28/02 |
| ↳ 🗎 Jay McDaniel in Hiding | TSR | 05/29/02 |
| ↳ 🗎 Could it be .... | Jeff | 05/29/02 |
| 🗎 Tecnically speaking USU | OptionPlayer | 05/28/02 |
| ↳ 🗎 Gaping down | TSR | 05/29/02 |
| 🗎 The pirates and Jay McDaniel | JD Hithers | 05/29/02 |
| ↳ 🗎 USU and our report | Porter Stansberry | 05/29/02 |

**SEC 02801**

| | | |
|---|---|---|
| ↳ 🖹 CONCLUSION | Porter Stansberry | 05/29/02 |
| ↳ 🖹 Porter's statements | JG Hithers | 05/29/02 |
| ↳ 🖹 One important point missing | AF | 05/29/02 |
| ↳ 🖹 AF, You raise an important question. Thanks for asking a... | Porter Stansberry | 05/29/02 |
| ↳ 🖹 Porter, Thanks for the reply. If your assumptions are ... | AF | 05/29/02 |
| ↳ 🖹 AF, Your questions have all been good ones and I don't mi... | Porter Stansberry | 05/29/02 |
| ↳ 🖹 Buy on the 21st, sell on the 23rd! | James Kennedy | 05/29/02 |
| ↳ 🖹 The Ad Campaign | SeattleRedGirl | 05/29/02 |
| ↳ 🖹 Ad Campaigns | Bill Billings | 05/29/02 |
| ↳ 🖹 Ad Campaigns | J Woodard | 05/29/02 |
| ↳ 🖹 Yeah, it is a free country, so I can say what I want, ... | Bill Billings | 05/29/02 |
| ↳ 🖹 pls go say it somewhere else...! | J Woodard | 05/29/02 |
| ↳ 🖹 Go to hell Jeff... | Bill Billings | 05/29/02 |
| ↳ 🖹 Come on guys... | James Kennedy | 05/29/02 |
| ↳ 🖹 Shift in Focus | SGR | 05/29/02 |
| ↳ 🖹 I am not saying that everything they say is bad or that all ... | Bill Billings | 05/29/02 |
| ↳ 🖹 now there's a mature reply. | J Woodard | 05/29/02 |
| ↳ 🖹 usu | ssgober | 05/29/02 |
| ↳ 🖹 there was a followup | J Woodard | 05/29/02 |
| ↳ 🖹 No it was not. There are many issues he refuses to address. ... | James Kennedy | 05/29/02 |
| ↳ 🖹 Why do u say tht? | J Woodard | 05/29/02 |
| ↳ 🖹 Because it is true... | James Kennedy | 05/29/02 |
| ↳ 🖹 Speculation as Truth | TSR | 05/29/02 |
| 🖹 A LOOK from another Angle. | OptionPlayer | 05/30/02 |
| ↳ 🖹 Screaming Sell | TSR | 05/30/02 |
| ↳ 🖹 A P&D by any other name... | J Taylor | 05/30/02 |
| ↳ 🖹 you all amaze me | Jeff W | 05/30/02 |
| ↳ 🖹 YOU AMAZE ME | James Kennedy | 05/30/02 |
| ↳ 🖹 Exactly | J Woodard | 05/30/02 |
| ↳ 🖹 Accountability | TSR | 05/30/02 |
| 🖹 SHORT-TERM Bottom? | OptionPlayer | 05/30/02 |
| ↳ 🖹 NOT! | James Kennedy | 05/30/02 |
| ↳ 🖹 USU | ssgober | 05/30/02 |
| ↳ 🖹 Was the wait worth it? | James Kennedy | 05/30/02 |
| ↳ 🖹 usu | ssgober | 05/30/02 |
| 🖹 New Porter Update | JG Hithers | 05/30/02 |
| ↳ 🖹 class action suit | afooladayandlamone | 05/30/02 |
| ↳ 🖹 A fool... | James Kennedy | 05/30/02 |
| ↳ 🖹 What company said ? | afool | 06/01/02 |
| 🖹 Porter's record... | JG Hithers | 05/30/02 |
| 🖹 Quesiton for Porter... | D Wright | 05/31/02 |
| 🖹 Do your own DD | Kelly Williams | 05/31/02 |
| ↳ 🖹 Question for Kelly.................. | Roz | 05/31/02 |
| ↳ 🖹 DD | Kelly Williams | 05/31/02 |
| ↳ 🖹 I apologize Kelly - I misread your post.................. | Roz | 06/01/02 |
| 🖹 buyer beware | pandelong | 05/31/02 |
| ↳ 🖹 Thank you! Good post. | J Woodard | 05/31/02 |
| ↳ 🖹 Buyer beware | Kelly Williams | 06/01/02 |
| ↳ 🖹 Nom de plum? | Brian Williams | 06/01/02 |
| 🖹 Buy LOW and SELL HIGH | OptionPlayer | 06/01/02 |
| 🖹 What company said to me | afool | 06/01/02 |
| 🖹 More on what USEC said from the Yahoo! Board... | JGHithers | 06/01/02 |
| 🖹 Porter post on Yahoo! Message Board | bewarethehype | 06/02/02 |
| ↳ 🖹 fraud | w.p. | 06/04/02 |
| ↳ 🖹 not fraud by definition | pandelong | 06/04/02 |
| ↳ 🖹 not true | w.p. | 06/04/02 |
| 🖹 USU | OptionPlayer | 06/03/02 |

**SEC 02802**

| | | |
|---|---|---|
| ↳ 🖹 USU! Up? | OptionPlayer | 06/04/02 |
| 🖹 I am not finished with you yet porter | afooladayandIamone | 06/04/02 |
| 🖹 USU Fundamentals | Judy | 06/04/02 |
| 🖹 USU Fundamentals | Judy | 06/04/02 |
| ↳ 🖹 What about USU fundamentals | OptionPlayer | 06/05/02 |
| 🖹 USU PUT/CALL RATIO | OptionPlayer | 06/05/02 |
| 🖹 re PUT/Call Ratio | Judy | 06/05/02 |
| ↳ 🖹 Well said... | JG Hithers | 05/30/02 |
|   ↳ 🖹 FYI - the update is posted on the Yahoo board.... | JG Hithers | 05/30/02 |

🖹 Post new message in this thread

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 22, 2002 04:02 PM
**Author:** Bill Billings (*wbull2002@excite.com*)
**Subject:** USU Doubles

USU doubled today, just like Agora said it would, OH NO, wait a minute, it was actually down 13% today, what a surprise. Just goes to show that the problem with Agora is that there is no accountability with their hot air blatherings and investment recommendations. Just like Enron, which OUtstanding Investments was pushing, most of their suggestions lose money, and then, they just never mention them again. Then they compile their track record from the winning positions and ignore all the losers, well done again guys. Yeah, You guys are the "smart Money".

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2005)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 22, 2002 06:56 PM
**Author:** Roger (*rdereu@netexpress.net*)

Actually, I'll give DR or somebody credit from Agora. They reco'd it when it was 17 on the way up. A "reasonable man" had about 2 years to make money, then sell realizing that it had gone far past what was expected. Bill Bonner also reco'd RJR when it was $16 and yielding 12%. (I think RJR is in the $60's now)

I don't seem to have the capacity to hold on to a stock much past a double anyway (which I would have easily gotten if I had bought) 'cause I'm always burned when I don't take the profit and run (no, I didn't by MSFT or WMT either).

But, like you, I do despise all the e-mails that rely on "perfect" timing to get the returns they tout. Many of us discussed the Franco-Nevada deal at the time. Turns out you had to buy the "Canadian" shares to get the returns they quoted - still made money though.

Regards.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2026)

SEC 02803

●Top   ●Previous   ●Next   ●Print   ●Reply

**Date:** May 29, 2002 11:57 AM
**Author:** jean (*JSThinkart@msn.com*)

ok we lost on USU- now what about the "anything you read on DR comes with a guar. on your $ back" Please advise on how exactly I do that???? Thanks

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2537)

●Top   ●Previous   ●Next   ●Print   ●Reply

**Date:** May 29, 2002 03:47 PM
**Author:** MountainBiker
**Subject:** Info on USEC attempt at protection

The following is a link to a news release from URENCO,Ltd. which is USEC's main competitor. USEC had alleged dumping which was rejected by the US Government. As I have noted, URENCO's technology is vastly more cost effective than USEC's. There has been talk for years of USEC adopting a laser based technology developed at Lawrence-Livermore labs but I don't see where the huge investment will come from unless the US Gov which is unlikely as it wasted several billion$ on failed centrifuge technology (contrary to URENCO). Laser technology also produces a U metal which is counter to the existing industry standard of uranium hexaflouride.

http://www.urenco.com/pdf/17_dec_2001.pdf

Jim

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2556)

●Top   ●Previous   ●Next   ●Print   ●Reply

**Date:** June 18, 2002 09:47 PM
**Author:** USEC Hound
**Subject:** Pirate Investor was right after all

DOE Inks Agreement To Ensure Domestic Uranium Enrichment Capacity Is Maintained

Nuclear Nonproliferation Programs in Russia To Benefit Washington, D.C. – The U.S. Department of Energy signed an agreement with the United States Enrichment Corporation (USEC, Inc.) late yesterday that will ensure America's domestic uranium enrichment capacity is maintained and that nuclear materials from Russia will be delivered to the U.S. thereby

SEC 02804

benefiting America's nonproliferation work in that country.

Energy Secretary Spencer Abraham said, "With this agreement America accomplishes two very important goals, ensuring our domestic capacity to produce fuel for our commercial nuclear reactors and meeting important nuclear nonproliferation goals by accepting enriched uranium from Russia."

The uranium delivered to the U.S. will be derived from highly enriched uranium from dismantled Russian nuclear weapons, thereby reducing the inventory of highly enriched uranium in that country.

"Our strong cooperation with Russia will help ensure that the important goals of protecting the world from the proliferation of nuclear materials continues," Abraham said. Last month, Abraham and Russian Atomic Energy Minister Alexander Rumyantsev worked out an agreement to accomplish nonproliferation work in Russia a full two years ahead of schedule.

"Not only is this agreement a win for national security, but it is also a win for the communities in Ohio and Kentucky that have provided a great service to the nation and a win to secure the future for domestic uranium enrichment," Abraham said.

The agreement establishes the future development viability and opportunity for both Portsmouth, Ohio and Paducah, Kentucky facilities, including as candidate sites for new technology enrichment capabilities as USEC must maintain any of its leased facilities in a manner that permits their future use as a site where new enrichment technology can be performed.

First, DOE's agreement with USEC will require the company to take delivery of Russian weapons-derived uranium. Second, USEC agrees to deploy a new advanced technology enrichment plant at Portsmouth (by 2010) or Paducah (by 2011). Third, USEC must maintain production of enriched uranium at the Paducah Gaseous Diffusion Plant at a level of 3.5 million SWU (the standard unit of measure for enriched uranium fuel) per year. This production level can be reduced only after USEC is within six months of completing deployments of new enrichment technology with a productive capacity of 3.5 million SWU.

Finally, the agreement calls for USEC to continue operating the Shipping and Transfer Facility located in Portsmouth for an additional 15 months to remove technetium from a portion of USEC's uranium inventory, thereby saving over half the jobs that could have been lost under USEC's corporate downsizing announced earlier.

Media Contact: Joe Davis, 202-586-4940

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=4266)

---

➜ Top   ➜ Previous   ➜ Next   ➜ Print   ➜ Reply

**Date:** May 22, 2002 09:40 PM
**Author:** Blackpox

SEC 02805

**Subject:** It isn't over yet

I think Bill Bonner and Dan Denning are some of the best researchers in their business. They are of laudible repute as far as I am concerned and they are straight shooters. I can't say that for 99.99% those out there touting financial advice.

I still think USU is going higher, strictly based on technical action, nothing else. Money flow is still strong on this stock.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2040)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 23, 2002 12:12 AM
**Author:** w.p. (*ws128@aol.com*)
**Subject:** agree

I agree on Dan and Bill but this reco came from Jay McDaniel

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2062)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 23, 2002 06:53 AM
**Author:** Roz (*rc.raque@fuse.net*)
**Subject:** Why are you all so .................

against this stock, since it does pay an almost 8% Dividend? Other than the way it was presented that is. I would really like to know. If it's am ongoing business with Gov. participation, and if Gov will continue to participate, wouldn't it be worth considering? R

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2072)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 23, 2002 06:31 PM
**Author:** TSR (*trehncy@comcast.net*)
**Subject:** Where's the deal?

Several Agora publishers provided this tip on the definitive approval by government of USU's deal with the Russians. The deal was to be finalized on May 22. It is now end of business May 23 and not a word from anyone. The problem is that the report about final government ratification of this deal prior to Bush's summit in Russia (May 23) were SWORN AS 100% TRUTH. Will the real truth please stand up?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2126)

● Top  ● Previous  ● Next  ● Print  ● Reply

SEC 02806

**Date:** May 24, 2002 11:23 AM
**Author:** John Possidente (*jpossidente@agora-inc.com*)
**Subject:** A Word from Pirate Investor

"An update to the special report from Jay McDaniel has been emailed to all of the special report buyers. If you have purchased the report and have not received your update, please contact our customer service department from 8am to 4pm EST M-F at 1-888-261-2693, or e-mail elyssa@pirateinvestor.com."

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2177)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 24, 2002 04:41 PM
**Author:** Bayou Chemist (*fnovak2893@aol.com*)
**Subject:** Report

What day was the email? Friday or next Monday?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2211)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 24, 2002 06:42 PM
**Author:** geff (*geffc@hotmail.com*)
**Subject:** usu

does anybody out there know whats the story with this? USU was downgraded to underperform today by some equities rating co. not that i'd read too much into that, probably a buy signal. The calls didn't drop today though shareprice dropped about 5%.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2221)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 09:30 AM
**Author:** John Possidente (*jpossidente@agora-inc.com*)
**Subject:** The Notice

I believe it had already mailed by the time I was notified on Friday.

John P.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2430)

SEC 02807

---

❯ Top   ❯ Previous   ❯ Next   ❯ Print   ❯ Reply

**Date:** May 25, 2002 08:54 PM
**Author:** J. A. Novice (*judyprety1@aol.com*)
**Subject:** I'll Admit It - I Bought It

OK, I'll admit it. I'm only human and don't have the answers to all the economic problems in the world. Like many of you seem to. However, I didn't pay the $1K to get the info. (I would never do that)

I bought two lots, 100 at $9.75 and 100 at 8.10. I will hold for a year and see what happens. With all the terrorist and energy problems in the world, a uranium manufacturer with ties to Russia doesn't sound too bad to me.

Also, the yield is acceptable. What a ride!!! Anyone have any positive comments about the prospects of USU? If so, it would make me feel better.

Judy

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2271)

---

❯ Top   ❯ Previous   ❯ Next   ❯ Print   ❯ Reply

**Date:** May 25, 2002 09:33 PM
**Author:** MountainBiker
**Subject:** I would guess a yield play

Judy: Not to sound like a "know-it-all" but.... USEC does not manufacture (or mine) uranium. Their place in the fuel cycle is to accept utility owned uranium and enrich (concentrate) the percentage of the U-235 isotope from 0.71% (naturally occuring) to the 3-5% required for reactors. For several years, USEC has replaced much of their production (and closed a plant in Ohio) by "retailing" Russian enriched U diluted from warheads. This replacement business is more profitable than new production given USEC's old technology. This business was drying up until the recent agreement and the declining stock price (and resulting increase in computed yield) PROBABLY reflected concern over the dividend. The recent stock price surge on the US/Russian agreement PROBABLY reflected a yield grab with profits more assured. The yield is not in the 6-7% range which is consistant with the comparable risk to a long bond. I would think the risk in this stock would be rising interest rates which would reduce the attraction of the dividend. I would (IMHO) treat USU as a utility stock.

Hope this helps.

Jim

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2273)

SEC 02808

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 25, 2002 10:54 PM
**Author:** J.A. Novice (*judyprety1@aol.com*)
**Subject:** Thanks Mountainbiker

I was under the impression that the newly signed agreement between Putin and Bush would allow USU to get the Uranium from Russia at a lower price now. Is that true? Thus, the profit margin would increase substantially. Oh well, I did not risk the whole bank on this play. And I've done dumber things, believe me.

The runup on a recent American mad cow scare had to be the dumbest. (what a "pump and dump") Bought Surebeam (SURE) on a runup "at the market". By the time I got in, this $5.20 stock was purchased by me at $7.15. I tried to cancel during the runup, but it was too late. But I do have a pretty annual report. LOL. BTW, I sold it many months ago.

I was surprised to see Gazprom (OGZPRF)finally lose money on Friday. Nice runup. With all the hipe on CNBC about Russia this weekend, the cat is probably out of the bag.

Sorry to be so long-winded.

Live and learn

Judy

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2286)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 26, 2002 03:51 PM
**Author:** TSR (*trehncy@comcast.net*)
**Subject:** USU Down

So can anyone explain why USU tanked to $8 from $10 this past week? Why would investors be selling out if positive news by the company is just around the corner? Does the Bush-Putin agreement even have anything to do with a lower cost Russian SWU?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2317)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 26, 2002 05:31 PM
**Author:** PREDICTOR (*judyprety1@aol.com*)
**Subject:** Lower Cost SWU

SEC 02809

I read the financial results (annual report) on the website for USU online and it did mention

that in 2003 the cost of the uranium will be lowered due to the agreement. They have given the USSR another year of market cost uranium as a concession.

I hope what I have read is true. As for the full explanation of what was in the recent agreement, I have no idea if what was proposed has been officially agreed to. News should be out soon.

Regarding the loss of value this week, it is not surprising. If you are not "an insider" and do not get in immediately prior to something important, you will usually get initially burned. It is called "pump and dump." Or "buy on the rumor, sell on the news."

The traders are on top of everything and ordinary investors with regular lives to live just can't keep up. That's why I give my stocks at least a six month period to prove that they can do something and an approx. 25% stop loss.

If your time frame is over one year, (lower capital gains) this should be a profitable play in my opinion. Short term, so far, it has not panned out. I hope you didn't pay the $1,000.

Regards, JA

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2322)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

Date: May 26, 2002 06:37 PM
Author: TSR (*trehncy@comcast.net*)
Subject: Hooked

Thanks for the info J.A. Yes I was hooked in by the hype from all the Agora Publishers pushing this stock and asking an additional $1K. After all, if the cost of SWU drops as much as they say, company profits will multiply several fold since general operating costs over the past 3 years have pretty much stabalized.

But like you say, much profits were already taken from OUR optimism, and we already know how Jay McDaniels and gang made their money.

However, in an update report Jay claims the stock will still jump when USU makes the "official" announcement on the ramifications of the Bush-Putin deal. When this will happen he doesn't say; it is anyone's guess. But being one of those optimists who bought June calls at inflated prices, it better happen soon.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2324)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

Date: May 26, 2002 10:52 PM
Author: SeattleRedGirl (*kerri38846@aol.com*)

SEC 02810

**Subject:** BTY

The DR commented this last week on this deal and he specifically stated that ALL products sold by Agora have a money back refund if you are not satisfied.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2338)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 26, 2002 11:16 PM
**Author:** MountainBiker
**Subject:** SWU

In case anyone's interested, SWU stands for "Separative Work Unit" and is the accounting "currency" by which an Enricher (ex: USEC) writes off costs (labor,depreciation,etc) and adds a profit. The quantity of SWU is computed by a log equation based on starting and ending enrichments (concentration of U-235 isotope) for a Kg of Uranium. The price/SWU is based on market conditions and has been declining for many years (a classic bear market).

I would guess this is more than anyone wants to know so... The End.

Jim

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2342)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 27, 2002 12:12 AM
**Author:** Roz (*rc.raque@fuse.net*)
**Subject:** Not by me, Jim....................

I thank you for the info, as I'd still considered a purchase when all the hype was flushed out, due to it's dividend. I have to work at the polls Tuesday, so will have to either call broker from the firehouse polling place or wait until Wed. for any buys/sells, Any or all information might be helpful to SOMEONE, and berrer too much than not enough, IMHO> Roz

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2348)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 12:05 PM
**Author:** MountainBiker

**SEC 02811**

**Subject:** Disclaimer

Roz: I have been out of the industry for about two years so am not up to date on current market forces affecting uranium and SWU prices (long -term and spot). If the US/Russian agreement locks in USEC margins, then the dividend looks attractive. Again, I sense that this whole shebang has been a dividend play. There is no growth potential that I can imagine but USEC does have government "sponsorship" (it was part of the DOE after all before privitization).

Jim

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2440)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 28, 2002 11:19 PM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** The need to sell!

Please go read the technically speaking USU at the bottom of these postings for a better explanation of the technical sell signal. It's a technical thing and also known as selling into a rally, alot of these institutions and traders which remain nameless do this for profits. The subcribers jump in at the opportunity to make profits also except that while buying is going on the selling increases. The game is simple The reco comes out by fax, e-mail, or however, the stock starts to move up because of volume increase, in the meantime the reco group starts to sell and dump as the stock is moving up, it also becomes a strong technical play. One needs to learn the technical side to put the probabilities always on the trade side. The knowledge of the technicals would give you a heads up on the selling strenght and one can preserve the profit and also sell into a rally or go short through PUTS as soon the technicalls give a screaming sell signals, such as USU did on 5/21/02. At the time of the reco one should have bought a CALL in the money or near the money a JULY 5 or July 7.50, than rode the sucker all the way to the sell signal of $10.20, than at the signal cash in on the CALL and opened a PUT for JULY 10.00 and rode the sucker to wherever it may go to. Remember this at the next reco.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2484)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 01:20 AM
**Author:** TSR (*trehncy@comcast.net*)
**Subject:** Sell Signal

SEC 02812

Only problem was, Porter and his gang of pirates were telling us to sell on the rally following the company press release, which has yet to come (will it ever?). But what excactly was it that screamed sell on Monday? Are you analyzing the shape of the trading

curve with the volume for that day, several days? Are you inputing values to a computer, filling a chart with X's and O's like Lynn Carpenter's system, or are you estimating in some other way.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2501)

---

⊚ Top   ⊚ Previous   ⊚ Next   ⊚ Print   ⊚ Reply

**Date:** May 27, 2002 11:40 AM
**Author:** J.A. (*judyprety1@aol.com*)
**Subject:** Not Me Either, Jim - Thank you

I want to learn all I can about energy production and anything else I can to help me grow my investment portfolio.

I really appreciate your messages and admire your knowledge of this industry. It is kind of you to take the time to impart your knowledge to those of us who are less informed.

Thanks again,

Judy

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2373)

⊚ Top   ⊚ Previous   ⊚ Next   ⊚ Print   ⊚ Reply

**Date:** May 28, 2002 10:44 AM
**Author:** bewarethehype (*bewarethehype@yahoo.com*)
**Subject:** Does anyone still own this thing?

Or has everyone moved on? Anyone short?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2434)

---

⊚ Top   ⊚ Previous   ⊚ Next   ⊚ Print   ⊚ Reply

**Date:** May 28, 2002 11:40 AM
**Author:** Bill Billings (*wbull2002@excite.com*)
**Subject:** Fake Names

I still own some, but hedged by selling a call, so I am ahead unless it goes below $6, and have capped my profit (my shares would be called away above $10).

the greatest thing about this whole scam, is that now Agora is issuing reports and recommendations from non-existent people, using fake names. THey call it a "nom-de-plume", but apparently there is no "Jay McDaniel."

**SEC 02813**

Now who is the scam artist, who is the huckster.

If they were a worthwhile investment organization: 1. they would be registered in the United States 2. they could provide audited historical investment returns 3. they wouldn't feel the need to make up the fake names of investment advisors and so called investment gurus who don't exist, except to perpetrate pump and dump schemes.

be wary of anything from Agora, be very wary.

and i dare anyone from agora to answer my charges.

This is just perfect, how could they possibly send out a mass email from a person that doesn't exist. Theres a name for that when it involves securities and/or money, and its called "FRAUD".

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2437)

---

⦿ Top    ⦿ Previous    ⦿ Next    ⦿ Print    ⦿ Reply

**Date:** May 28, 2002 01:12 PM
**Author:** Porter Stansberry (*porter@pirateinvestor.com*)
**Subject:** dare

Okay Bill...

First of all, there certainly is a person - who works for me - and uses the pen name Jay McDaniel.

What's so funny about all this uproar to me is that Jay's pen name is hardly a secret. In fact, Jay used to work for Bill Bonner. Anyone who subscribes to www.pirateinvestor.com can read all about Jay in his introduction to our group. You'll find the info in our BLAST archive. But, just to make it easy, I'll post the BLAST in which Jay introduces himself. (See below).

Bill Bonner writing that Jay is a pen name for the whole group was simply a misunderstanding. I was out of town all last week on vacation and Bill - working from Paris - doesn't monitor the day to day operations of all of Agora's far flung divisions. Who could?

Besides, all of this is hardly relevant to the issue at hand. I've said publicly in many places that I stand behind Jay's report. I found it excellent, highly credible and a very attractive speculation. Even Bill B. - who pretty much hates all stocks - says it looks like a good stock.

All of your other allegations and insults don't make much sense either, or stand up to any scrutiny. Pirate Investor is an American registered LLC. The SEC and the FTC are fully

SEC 02814

aware of our products and services.

Finally, if Agora wasn't a stand-up organization, why would we even offer people like you a chance to bash us on all of our message boards?

Agora is - and always has been - in the business of selling good ideas. I published Jay's report. I believed it was a good idea. No...perhaps the stock didn't go as high as we'd hoped...but that hardly makes the report a failure and certainly doesn't mean that I committed any fraud. The fact is, the stock price is higher than when we recommended it orginally, people who owned the stock last week will collect a nice dividend payment and there's still lots of oppportunity for larger profits ahead.

My guess is that the furor this generated is mostly related to people who don't appreciate us charging so much money for our research. I can understand that. But if you're against selling products that carry a premium price, why don't you go down and protest against your local Mercedes dealer?

Porter

THE BLAST: THE ERA OF UNCERTAINTY THE BLAST: THE ERA OF UNCERTAINTY

THE BLAST SATURDAY, SEPTEMBER 22, 2001 DATELINE: BALTIMORE

*********************************** HOW LONG WILL THIS NEW ERA OF UNCERTAINTY PREVAIL? *********************************** By Jay McDaniel

*** Allow me to begin with an introduction…and an explanation as to why I am writing you today in this space.

*** I've been in the financial newsletter business for over a decade now, and have had the privilege of working with some of the most intelligent and successful investment professionals in the world. I have published over a dozen newsletters, each with its own unique perspective on the markets and the world.

*** Of course, I've also seen significant changes in the landscape during the past ten years as well. I've seen plenty of publications come and go – both good ones and bad.

*** Recently, though, I have gradually backed away from the day-to-day grind of the publishing business and have opened my own consulting shop. (Simply put, I am now able to choose who I would like to work with and when.)

*** A few weeks ago Porter asked me if I wouldn't mind offering my insights and analysis to his readers via this email forum. Given my newfound freedom – and the respect I have for the folks involved in this franchise – I agreed to contribute to the Blast on a weekly basis.

*** A quick aside – I first met Porter Stansberry nearly four years ago. At that time, of

SEC 02815

course, he was the editor of the Fleet Street Letter. I watched with some amusement as Porter told anyone who would listen that the market was poised to move upward – this was near the end of 1998 – and clashed with his publisher who felt just as strongly that the opposite was true.

*** It has been a pleasure to watch him grow from that young, feisty, inexperienced writer to a more seasoned, well-rounded publisher in just a few short years. (And, yes, I'd still say that "feisty" is appropriate.)

*** One of the things I find most appealing about this "Pirate Investor" group – in fact, the primary reason I decided to join their team – is that there is no "molding" of the writers' individual opinions by anyone above them. What you see is what you get. These guys do their homework, form their opinions, and then share the information with their readers. And what's more, they do it in a timely fashion. This e-mail forum – as well as the web site, message board, etc. – shows me that Porter and his team are willing to "think outside the box" and do whatever it takes to help their readers profit. (Sadly, I have seen many publications go by the wayside because of their refusal to embrace technology and provide their readers with such a high level of service.)

*** A prime example of what I'm talking about is Steve Sjuggerud's new report "WHAT HAPPENS TO THE STOCK MARKET AFTER NATIONAL SECURITY IS THREATENED." This incredibly detailed report was made available – for free, no less – just two days after the tragic events of September 11, 2001.

*** Steve demonstrates in his excellent report that the period of uncertainty in the market following threats to national security has usually been brief. I hope that's the case here…we've seen some staggering losses this week.

*** I suspect, though, that we may have to wait a bit longer than usual for the "remarkable rally." Given the nature of the war our nation is about to launch – and the inherent fear associated with terrorism in general – this period of uncertainty may last longer than history might suggest.

*** That uncertainty, though, simply means that a more defensive investment strategy is in order. I feel just as strongly as Steve does about inflation-adjusted Treasury bonds. Any investment which yields almost 6% safely is worth looking into…especially in this new Era of Uncertainty.

*** Gold was trading at over $295 per ounce on Friday…the Dow looked like it might dip below 8000 for awhile…the NASDAQ continued to plummet. These are not exactly the kind of indicators that make one want to "back up the truck" and begin loading up on stocks.

*** That said, however, it is important to remember that once this period of uncertainty ends, there will be a tremendous buying opportunity. As Porter points out in his most recent issue (written September 13), "the biggest opportunity in the last several years will arise out of this crisis — especially if the market falls strongly next week."

*** Well, the market has certainly fallen strongly this week; there's no doubt about that.

SEC 02816

Now we wait for a rebound. What will trigger this? Positive news from the Middle East? Proof that Alan Greenspan's efforts are beginning to take hold? News of a capital gains tax cut? It's hard to say.

*** There really is no way to predict what will happen and how the market might react... especially in these unsettled times. In times such as these, smart investors proceed with caution...but they do PROCEED.

*** Adopting a more defensive stance with a portion of your portfolio does seem to make sense at the moment. But that doesn't mean it's time to sit on the sidelines. The smart investor will continue to be on the lookout for those investments which are strong enough to withstand – or even prosper during – a wartime economy.

*** I'm talking about investments like Applied Biosystems, Extreme Networks and Intermagnetics General. Porter and his colleague, Dan Ferris, have done some outstanding research on these companies. Research that is just as good – if not better – than any work I've seen in all my years in this business.

*** That's why I

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2444)

--------------------------------------------------

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 28, 2002 01:18 PM
**Author:** Porter Stansberry (_porter@pirateinvestor.com_)
**Subject:** THE REST OF THE JAY MCDANIEL PIECE

*** That said, however, it is important to remember that once this period of uncertainty ends, there will be a tremendous buying opportunity. As Porter points out in his most recent issue (written September 13), "the biggest opportunity in the last several years will arise out of this crisis — especially if the market falls strongly next week."

*** Well, the market has certainly fallen strongly this week; there's no doubt about that. Now we wait for a rebound. What will trigger this? Positive news from the Middle East? Proof that Alan Greenspan's efforts are beginning to take hold? News of a capital gains tax cut? It's hard to say.

*** There really is no way to predict what will happen and how the market might react...especially in these unsettled times. In times such as these, smart investors proceed with caution...but they do PROCEED.

*** Adopting a more defensive stance with a portion of your portfolio does seem to make sense at the moment. But that doesn't mean it's time to sit on the sidelines. The smart investor will continue to be on the lookout for those investments which are strong enough to withstand – or even prosper during – a wartime economy.

SEC 02817

\*\*\* I'm talking about investments like Applied Biosystems, Extreme Networks and Intermagnetics General. Porter and his colleague, Dan Ferris, have done some outstanding research on these companies. Research that is just as good – if not better – than any work I've seen in all my years in this business.

\*\*\* That's why I am happy to be on board. I look forward to speaking with you again in the days and weeks ahead.

Until next time,

Jay McDaniel

P.S. I should at some point confess, I suppose, that "Jay McDaniel" is a pen name. In order for me to continue my consulting work in the industry, it is best that I protect my privacy at this time. This is imperative for both my clients and for myself…but it is also in the best interest of the readers, as well. With my privacy intact, I can assure you that I will be able to express my thoughts and opinions without regard for how others in the publishing "establishment" may react.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2447)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 01:20 PM
**Author:** James Kennedy
**Subject:** Porter's Post

Porter-

I appreciate you posting on this board and defending the position of your staff. However, how do you address the issues that have come out of this whole USU debacle? I personally contacted USEC Investor Relations and talked to both Steven Wingfield and another woman (I did not get her name).

They both denied the accuracy of the Pirate report, and claimed the quote from the "Senior Executive" that appeared in the report was false. How do you respond to this?

The fact that Jay is not the real name of the writer only compounds the issue and makes it appear even worse.

I would like to hear your response to the IR denials. Again, not IR "no comments", IR DENIALS. And, I am not the only one who was told this - there are many, many more.

Thanks in advance.

**SEC 02818**

JK

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2448)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 01:52 PM
**Author:** Porter Stansberry (*porter@pirateinvestor.com*)
**Subject:** USU

James -

I can't explain the company's denials. The fact is, Steve Wingfield knows all too well that we've been right on the money with our reporting. He's told me as much and he saw our report the day we orginally sent it out without asking us to change a single letter.

Our USU source told us back in April about the upcoming U.S.-Soviet Treaty - long before it was in the news. And he told us the exact day it would be finalized - May 22nd.

Go check the news. That was indeed the day. So... were we just lucky? Or did someone at USU spill the beans?

On the other hand, did you expect Wingfield to say to you (and the SEC), yes, indeed, we've made an illegal disclosure....?

Porter

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2453)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 10:14 PM
**Author:** SeattleRedGirl (*kerri38846@aol.com*)
**Subject:** Someone spilled the beans

Under the original posting of this thread entitled "double your money" someone posted under the heading of "Well Guess what" approximately halfway down the list. The author of the post states that they saw the info on the evening news several days before the info was "supposed" to be announced according to Jay.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2476)

SEC 02819

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 06:14 AM
**Author:** Roz (_rc.raque@fuse.net_)
**Subject:** That was me....................

Kerri. It was on the Nightly Business Report on PBS, which I
try to watch nightly to keep up with the daily totals of the
Indexes, Metals, etc. How they acquired the news, I either don't
know or don't remember at this point. But there is was. R

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2507)

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 01:29 PM
**Author:** Bill Billings (_wbull2002@excite.com_)

Hey,I never got to thank you for the Corvis recomendation, remember that one, the
company was going to change the way the telecomm equipment business was run.
and it was a steal at $6. What a bargain it is now, I can buy all I want for $1.02.
Once again let me say, that if you fools bothered to calculate an investment return
percentage (thats counting both the winning and losing positions), you would have
one of the worst records available. Answer that, you may indeed be registered with
the FTC & SEC, but as we all know and you all love to point out, that is no vote of
confidence.

Again thanks, so glad to be listening to the "smart money" like you, and Jay, er
whatever he's calling himself today. Might I suggest a name, how about Oscar
Hartzell.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2450)

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 01:57 PM
**Author:** Porter Stansberry (_porter@pirateinvestor.com_)
**Subject:** my irate friend

Bill -

I can tout all my winners. You can tout all of my losers. This could go on for
some time.

**SEC 02820**

Nevertheless, the fact is, I publish my ENTIRE track record each August. So...anyone who'd like to can check the back issues on the website and see how well I've done overall. Not happy with the result? Just ask for a refund. Explain how that's fraud, again?

That's full disclosure, my irate friend. And, yes, you're exactly right, the last two years have not been kind to my track record. The NASDAQ -- the pool from whence I pick stocks - has been draining the whole time. Even so, my losses over the period are far, far less than the market as a whole. And, in the last good year, I made more - on average - than the market as a whole. That's about all anyone can do...

By the way, my current picks are up 12%, on average, despite the poor market.

Porter

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2455)

--------

● Top    ● Previous    ● Next    ● Print    ● Reply

**Date:** May 28, 2002 02:11 PM
**Author:** Bill Billings (*wbull2002@excite.com*)
**Subject:** returns

Well then you would be the only one who reports his performance record at Agora counting both winners and losers.

Prove it,

So why don't you just post a link with your performance #'s, and show us how you got to that number, and I am sure that Corvis will be on there, the recommendation was in a "blast" email around April 2001, so we would expect to see a loss on that one as part of your full disclosure.

giving someone their money back is not good enough when you mislead people, by then the damage is done and they have lost alot more than the petty subscription fee you charge.

you need to back up your claims, so lets start with your detailed performance record for 2001, including Corvis, posted for all to see, for free, or did you expect me to pay you $1000 to view your track record.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2457)

**SEC 02821**

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 28, 2002 01:31 PM
**Author:** JD Hithers (*jdhithers@aol.com*)
**Subject:** Porter Stansberry Post

"P.S. I should at some point confess, I suppose, that "Jay McDaniel" is a pen name. In order for me to continue my consulting work in the industry, it is best that I protect my privacy at this time. This is imperative for both my clients and for myself...but it is also in the best interest of the readers, as well. With my privacy intact, I can assure you that I will be able to express my thoughts and opinions without regard for how others in the publishing "establishment" may react. "

No offense, but this does nothing to establish credibility.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2452)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 12:25 AM
**Author:** TSR (*trehncy@comcast.net*)
**Subject:** Jay McDaniel in Hiding

Yeah, what Jay McDaniel is really saying is that no one will be able to find him when the shit hits the fan.

Although Jay still contends that USU will go higher when the company releases their report (realizing the benefits of the arms agreement), why haven't they done so yet? What happened to Jay's "special sources". Are they waiting for Mercury to come back around or what?

Then there's Porter Stansberry's consolation, saying that even though we were caught holding the bag, we should be happy to receive dividends and opportunity for the future. Problem is, this is NOT why we purchased the report. What Porter is describing is the old trickle-down theory, where the wealthy toss out a few crumbs to the poor in exchange for services that help keep them wealthy. In this case, "I'll give you the opportunity to make a dividend if you help me make a big profits on this stock now." Of course, he can't quite put it that way because we might not do it. Might as well dig gold for him at minimum wage.

But if this is not case, if we were not meant to hold the bag, then why didn't we receive the "special report" back in April when Pirate Investor first learned of the Russian agreement being finalized on May 22?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2496)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

SEC 02822

**Date:** May 29, 2002 01:20 PM
**Author:** Jeff
**Subject:** Could it be ....

Could it be that "Jay McDaniel" is an alias for none other than ...

# OSAMA BIN LADEN ????

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2545)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 28, 2002 09:16 PM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** Tecnically speaking USU

On 5/13/02 USU gave a buy signal on low volume closing the day @ $7.07. On 5/14/02 the stock gaps up at open preceeds to go to an intra day high of $8.50 and closing @ $7.85 on higher volume. On 5/15/02 another Gap up to an intra day high of $8.95 and closing at the high on extremely high volume of over 4+ million shares. Now there was no apperant news since APR 29, 02. The only possible thing that would be driving this stock is either insiders known something or it was a issue of a reco in a fax flash somewhere? On 5/16/02 the stock had an intraday of $10.10, but it closed @ $8.70 which would be a signal for a technical get out because of the overbought condition and a heavy sell off intra day. On 5/17/02 the stock made an intraday high of $9.44 and it closed at $9.34. On monday the 20th the stock GAPPED up out of the openning making a strong sell signal on the candlesticks closing @ $9.98 . On 5/21/02 a real confirmation and a beginning of a run down was formed known as a double top, with a intraday high of 10.20 on heavy 6 million shares closing at 9.54 a run of 34.94 % had come to an end, a good place to go short using PUTS. Someone, somewhere made a great deal of money on this run! Well Tuesday was waiting to happen the stocked GAPPED downon extremely high volume witha n intraday low of 7.80 and closing @ 8.20. On 05/23/02 the stock moved down to an intraday low of 7.51, closing at 8.50. On 5/24/02 the stock traded on 740k shares to close at 8.05. Technically it has formed a short - term base. It could try to make another run up, but chances are that it will fill the first gap and it could re-test the starting lows of $7.00+. Money stream got strong ad moved uo as the stock made the first gap on the open and it peaked and started haeding down after the double top was formed, on the 23, 24th it flattened. This stock has been trading sideways since March on a 3 year chart the stock and the technicals: stochastics, MACD, RSI are all pointing down. 5/28/02 another down day for the stock, looks like it will retest the lows. Read The need to sell above postings shows you how to have played.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2471)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 01:52 AM

**SEC 02823**

**Author:** TSR (_trehncy@comcast.net_)
**Subject:** Gaping down

So what causes a stock to gap up or down? Is it the marketmakers testing the waters or does it follow technicals? Why do you think USU gaped down last Wednesday from $9.54 to $9.10 even when volume was still strong?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2503)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 08:42 AM
**Author:** JD Hithers (_jdhithers@aol.com_)
**Subject:** The pirates and Jay McDaniel

I think it is obvious that this whole spectacle has caused an uproar among TDR readers, and from whay I understand, Pirateinvestor subscribers. The outrageous claims dragged many in, as they based their trust on the credibility of TDR. Now, that credibility is in question. The fact that the author does not use his real name and USEC IR claims the report and quotes were FALSE just serve as points to make one suspect this was some kind of pump and dump. I am not making accusations, it will be up to the SEC to determine if this debacle was a scam.

I am just saying that with all of the facts that have been exposed, Porter and TDR should not be blind to the fact that they have (by their own hand) suffered a big blow to their reputation.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2513)

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 10:30 AM
**Author:** Porter Stansberry (_porter@pirateinvestor.com_)
**Subject:** USU and our report

Dear Daily Reckoning Board,

I'm going to make one final post on this subject, as some people would consider my silence to be suspicious. However, I won't post here anymore because this medium is anonymous and not secure: I don't know who I'm responding to and I can't be sure that anyone is who they say they are in this medium.

First, I'd like to address the issue of what I sold, exactly, and how our research on USEC came about.

During the month of April, we became aware - via a confidential source inside USEC - that a new nuclear arms reduction treaty would be finalized prior to President Bush's trip to Russia in May. In fact, our source gave us the exact date that the deal would be finalized: May 22nd.

SEC 02824

http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2452                09/19/2002

At the time, we didn't believe our source because we didn't understand why he would volunteer such precise information to us. It's not clear that his disclosure was a violation of SEC Regulation FD because, as independent investment advisors, we do not manage money or "front-run" our reports: we're journalists and Reg FD explicitly does not apply to journalists. But, the disclosure was specific enough to be highly unusual. Rather than simply publish this information in our newsletters, we decided to watch and wait for some kind of verification that our source was telling us the truth.

Before I go any further, I need to make one major digression. Let me explain why a new arms deal could be so important to USEC.

USEC is the only authorized vender of LEU (low enriched uranium) derived from old nuclear warheads, which contain HEU (highly enriched uranium). In November 2001 the U.S. government authorized USEC to conclude contract negotiations with their Russian counterpart to implement a new pricing scheme that will be, by all accounts, highly advantageous for USEC. This new agreement on pricing mechanisms and delivery schedules lasts until 2013 and was concluded in February 2002.

Thus, a deal is in place for USEC to receive low-priced Russian LEU derived from its stockpile of nuclear weapons. Obviously, a radical increase in the size of that Russian stockpile would indicate a long-lasting and important benefit for USEC. USEC has already said publicly that the positive impact on earnings from this pricing arrangement will begin to be seen in the latter half of fiscal year 2003 and continue through 2013.

Prior to publishing our report and the announcement of the new U.S. and Russian arms deal – which will add about 10,000 more warheads to the available supply of HEU – USEC was trading for around $600 million dollars, even though it has NET ASSETS of at least $1.2 billion.

The reason the company was trading at such a discount was most likely because it's only going to breakeven this year. Its poor performance this year, according to company officials, relates to a compromise USEC had to agree to in order to close the deal with the Russians.

"USEC agreed to extend the existing higher, fixed-price methodology for one more year. Therefore, the calendar year 2001 purchase price of $90.42 will be applicable for calendar year 2002 (i.e., the last two quarters of fiscal year 2002, and the first two quarters of fiscal year 2003). This one-year concession should clearly benefit the Company in the mid- to long-term."

So...by early May we realized that we had potentially very valuable information on our hands. A new Russian arms deal should mean that the compromise that USEC made in order to secure the Russian supply through 2013 would result in even more HEU, and at the very least, should help the company to again post sizable profits. The best part was that even if nothing happened – even if our source was totally wrong - you still had a stock that was paying an 8% dividend and trading for around half of NET ASSETS. To me this seemed like a very low-risk speculation. After all, even if the company merely traded for book value you'd double your money.

Then, on The Wall Street Journal's May 8th front-page, we read: "the U.S. and Russia now

SEC 02825

appear on track to sign a nuclear arms reduction treaty at the Bush-Putin summit."

Our USEC source was apparently right. He'd told us about this arms deal almost a month before it appeared in the Journal.

At this point, we began to think seriously about publishing this information. Jay McDaniel – yes, he is a real person - and I worked for several days following May 8th to construct what we thought was a very compelling sales piece and a very accurate and comprehensive report. When the work was done we thought we had something very special.

There you have it. You know all I can tell you about why we wrote the report, why we believed the stock would double and the timing of the reports publication.

There's only one more thing I want to stress: believing that this stock would double was a very conservative price target. USEC went public in 1997 at $14 a share. All we were willing to publicly commit to was that the stock could, because of the new arms deal, reach book value and its original IPO price. When you consider how much money the company will likely make off its supply of cheap Russian LEU, predicting a $1 billion valuation for a company with $1.2 billion in assets is EXTREMELY CONSERVATIVE.

From here, I'd like to address the many criticisms people have made about this report and our efforts to sell it.

First, let's talk about pricing.

Pricing the report was a controversial issue. We debated selling it for $99, but we went for the higher price ($1,000) because we wanted to limit the number of people who would get our information. We didn't want to run the stock up with our report. We've been accused of trying to "pump and dump" this stock. That's a ludicrous accusation. If we were trying to do that, we certainly wouldn't have priced the report the way we did.

Now many of you object strongly to selling information at such a high price. I understand your objections. It was a very expensive report. But consider the quality of the information we had on our hands and the likely impact of that information in the marketplace. We had "Mercedes" information and so we charged a "Mercedes" price. At the end of the day, it's a free market. If you wanted our report, you had to pay our price. If you didn't want to buy it, you didn't have to.

Next let's talk about what happened.

Many people – those who bought the report – and those who didn't are upset that the stock didn't double or that they didn't make money on their trading in the shares. I can certainly understand this. I'm disappointed that, for whatever reason, when the Russian treaty was announced on May 22nd - exactly as our source told us to expect – the stock didn't pop. On the other hand, we went out of our way in our marketing letter to remind people that we couldn't guarantee the results of their investing or that the stock price would move at all.

"There's one more thing I have to remind you about. I can't guarantee that the stock will pop. Nobody can guarantee the actions of the stock market."

**SEC 02826**

I'LL CONCLUDE IN THE NEXT REPLY...

PORTER

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2519)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 10:35 AM
**Author:** Porter Stansberry (*porter@pirateinvestor.com*)
**Subject:** CONCLUSION

I publish several newsletters – my own, Steve Sjuggerud's True Wealth, The Dan Ferris Power Report. I also sell several high end information services: Diligence, which is a conference call service for investors looking to finance very early stage technology companies; and the True Wealth Trader, an options advisory that passes along trades as indicated by a proprietary market "indicator".

I stand behind all of our offerings and each of the garuantees we offer on each product. We sell high quality information, at a high quality price.

In this case, we sold a very speculative report on a very undervalued company that could have easily doubled your money in a very short about of time - without you having to put your capital at very much risk. I'm proud of the work we did and I still think that shares of USEC have outstanding potential.

Porter Stansberry

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2520)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 10:52 AM
**Author:** JG Hithers (*jghithers@aol.com*)
**Subject:** Porter's statements

Porter, you said: "Pricing the report was a controversial issue. We debated selling it for $99, but we went for the higher price ($1,000) because we wanted to limit the number of people who would get our information. We didn't want to run the stock up with our report. We've been accused of trying to "pump and dump" this stock. That's a ludicrous accusation. If we were trying to do that, we certainly wouldn't have priced the report the way we did."

If indeed you wanted to limit the number of people, if indeed you didn't want to run up the stock with your report, you would not have put enough information in it

SEC 02827

so that any person with access to Yahoo! could figure it out. Your claim of "if we were trying to "pump and dump", we certainly wouldn't have priced the report the way we did." is ludicrous. Anyone who got the DOUBLE YOUR MONEY EMAIL could figure out the company you were talking about.

You also said: "I'm disappointed that, for whatever reason, when the Russian treaty was announced on May 22nd - exactly as our source told us to expect – the stock didn't pop."

The reasons you give for the stock to pop are not all accurate. Many credible people on several message boards (and a message board poster is just as credible as the person who will not use his real name - Jay McDaniel) with industry and USEC backgrounds have detailed - ad nauseum - why this agreement would have NO impact on USEC. USU IR said the agreement would have little, if any, impact on their company and bottom line.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2523)

---

● Top ● Previous ● Next ● Print ● Reply

**Date:** May 29, 2002 11:09 AM
**Author:** AF (*awhf@usa.net*)
**Subject:** One important point missing

Porter,

Thanks for the detailed account but I think one important point is missing. According to my findings, the HEU deal between USEC and TENEX was signed in February but it still requires approval from both governments. This was stated in a USEC press release on 26 February 2002.

Below is an excerpt from a report in armscontrol.org (full text in http://www.armscontrol.org/act/2002_03/heumarch02.asp):

"Although the pricing agreement clears the way for shipments to begin, the governmental approval necessary for long-term implementation of the deal appears less than certain. Sources familiar with the issue indicated in late February that although approval by Washington and Moscow was possible within days or weeks, it could also be delayed substantially.

In an acrimonious exchange of letters with USEC head William Timbers, Energy Undersecretary Robert Card wrote January 8 that the administration "will not be able to provide approval of any long-term agreement until all other domestic issues have been resolved."

Card was referring to the government's concern that the United States is overly dependent on the HEU deal for nuclear fuel. To address that concern, the

SEC 02828

Department of Energy has been seeking an agreement with USEC that would require the company to maintain a domestic capacity to enrich uranium, prepare to construct a new enrichment facility, and allow the government to operate existing facilities if USEC ceases to do so.

In a January 10 response to Card, Timbers criticized the Energy Department's demands, saying, "No U.S. corporation could subject itself to such unprecedented and unnecessary government authority and remain accountable to its shareholders or remain in business."

Russian approval of the new contract terms appears uncertain as well, in part because the new contract will provide Moscow with considerably less revenue than the terms of the previous agreement. Russian Minister of Atomic Energy Alexander Rumyantsev wrote his U.S. counterpart January 15, calling USEC's pricing proposals "unacceptable" and requesting government-to-government meetings "as soon as possible," an overture that was apparently spurned by Energy Secretary Spencer Abraham."

If government approval is in doubt, how could the arms deal alone be viewed as directly beneficial to USEC? Have you taken this into account in your research?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2528)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 11:27 AM
**Author:** Porter Stansberry (*porter@pirateinvestor.com*)

AF,

You raise an important question. Thanks for asking about this...

Yes, we considered the impact of government approvals. These delays - in our view - are just posturing. The government wants what it can get out of USEC and USEC wants what it can get out of the government. The fact is, the government has approved all of the negotiations to date and refusing to approve the USEC - TENEX deal doesn't make any sense in the long run.

The solution will most likely be a compromise where the DOE grants USEC rights to its research on several new technologies and USEC promises to implement the long term construction of a new, modern enrichment facility.

But, the bottomline to me is pretty clear: all Russian HEU is going to pass through USEC.

Porter

SEC 02829

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2530)

---

⏴Top  ⏴Previous  ⏴Next  ⏴Print  ⏴Reply

**Date:** May 29, 2002 11:49 AM
**Author:** AF (*awhf@usa.net*)

Porter,

Thanks for the reply.

If your assumptions are true, then your research report is only partially correct in pointing out that USEC is a good intermediate to long term investment.

As the HEU deal was announced in February, that means it's already in the price of USU since then. Also consider that the arms deal was in the news as early as 14 May 2002, I think it was a big mistake to assume that the signing of the deal would cause a price pop since everything must have been in the price already. The thing that may cause a price pop on that day should be the press release of government approval of the HEU deal, but it seems that this is not the message of your USEC contact.

If the above are true, I think that your research report should not be sold as a short term speculation pick. Do you agree?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2532)

---

⏺Top  ⏺Previous  ⏺Next  ⏺Print  ⏺Reply

**Date:** May 29, 2002 12:43 PM
**Author:** Porter Stansberry (*porter@pirateinvestor.com*)

AF,

Your questions have all been good ones and I don't mind answering. It's a refreshing change from some of the lame-o bashing and nonsense that parades around here as "discussion."

(By the way, the problem with message boards is that no one with anything truly valuable to add has any incentive to participate. And, in fact, the more participants there are on any messageboard, the lower the quality of the content. It's entropy of information).

SEC 02830

http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2452                          09/19/2002

I have to retire from this thread. I can't answer everyone's questions about USEC each day...or even for one day. The explanation I've given here is thorough, can be verified with third party sources and is accurate.

Yes, an announcement of government approval of the USEC-TENEX agreement in conjunction with the arms treaty would have made a bigger impact on the stock. And, as I've said elsewhere, I wouldn't be surprised if such an approval was made in conjunction with the treaty - it only makes sense that a plan to use the warheads was included in the side deals made during Bush's visit. I know that USEC has very good reasons to delay making its announcment of this approval - in this way they can deny the accuracy of our reporting.

On the other hand, the company has said publicly that the treaty will effect their bottomline positively - how much they will not yet say.

However, all of this aside, I don't think it requires much faith to assume that we had a reasonable expectation that the stock would pop, given that we knew the precise date of the treaty being finalized and given that the stock was (and still is) so radically undervalued.

And that is my central point: our reporting was accurate, honest and well worth the price we were asking for it. Yes, far less people would be upset with us if the stock had doubled, which it may still do. But, whatever happens to the stock, I can only defend what we've written.

Porter

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2539)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 03:51 PM
**Author:** James Kennedy
**Subject:** Buy on the 21st, sell on the 23rd!

You failed to address her question about a short term vs. long term speculation, and how it should have been presented.

Lots of double talk, though!                     **SEC 02831**

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2557)

---

⚫Top  ⚫Previous  ⚫Next  ⚫Print  ⚫Reply

**Date:** May 29, 2002 10:49 AM
**Author:** SeattleRedGirl (_kerri38846@aol.com_)
**Subject:** The Ad Campaign

I don't think that anyone is upset that you recommended this stock. It is the WAY that you recommended this stock that has people upset. In the Ad (and I can't quote it as I did not save the ad) you wrote something to the effect of

if you have $10,000 life savings, should you risk all of it. I don't see why not!

and the ad continued on like this was a sure thing and there was no need to worry about losing money. Of course you cannot guarantee that a stock will do anything at all, but in this particular Ad it was so optimistic that it lead readers to believe that this was a "sure thing". I too was personally offended at receiving no less than 5 of these ads, one sent from each of your Agora partners.

Whether you want to admit it or not, you have lost credibility. With all the broker scandals out there, this was a bad time to push this product in that particular "sure thing" manner. Just admit that you blew it this time cause you did.

Kerri

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2522)

---

⚫Top  ⚫Previous  ⚫Next  ⚫Print  ⚫Reply

**Date:** May 29, 2002 11:43 AM
**Author:** Bill Billings (_wbull2002@excite.com_)
**Subject:** Ad Campaigns

I don't think anyone would argue with the fact that this stock is cheap, but that is not the point.

But, from Economics 101, we know that increased supply means lower prices, so intuitively more uranium= lower uranium prices= lower profits for USEC going forward, remember I said intuitively, which is why I think that the real "smart money" has stayed away.

Secondly, you now say you are a "journalist", which is it investment advisors or journalists, are you registered with the SEC or not, and I hardly believe your claim that no-one at your organization front ran this trade, How the hell would you

SEC 02832

know?, you are just a bunch of "journalists" and therefore you have no compliance department to answer to and no SEC disclosures that need to be made. Let me guess you took an informal pole around the cyber office......

thirdly, as far as i know the only US listed uranium company is USU, so when you sent your not so clever email, I knew immediately who you were referring to, and so did most people, which is what you were counting on. You charged $1000 to lend it a hint of credibility. Which is last word I would connect with Agora and the other "journalists" working for you, you people can dump on the whole securities industry all you want, but remember they have compliance people to answer to. and most importantly they have audited track records which are publicly available for free, no thanks I will pass on paying you $1000 for the right to view your inflated track record and read your "journalist" drivel that you pass off as recommendations. truth is that Agora is not "smart money" but some of the dumbest money I know of, with no-one to answer to and no public track record to show the world. And remember one thing, I still managed to eak out a profit from this whole USU debacle, so don't go insinuating that I am an irate customer because of actually investing money and losing some on USU. I just hate seeing gullible investors get sucked in by stock market charlatans who preach nothing but gloom and doom to line their own pockets.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2531)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 11:54 AM
**Author:** J Woodard (*jeffwoodard@attglobal.net*)
**Subject:** Ad Campaigns

If you don't like it then go away. Enough of this rant. It's a free country. If people want to pay and play, then let them.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2534)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 11:57 AM
**Author:** Bill Billings (*wbull2002@excite.com*)

Yeah, it is a free country, so I can say what I want.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2536)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**SEC 02833**

**Date:** May 29, 2002 11:58 AM
**Author:** J Woodard (*jeffwoodard@attglobal.net*)
**Subject:** pls go say it somewhere else...!

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2538)

---

● Top ● Previous ● Next ● Print ● Reply

**Date:** May 29, 2002 12:47 PM
**Author:** Bill Billings (*wbull2002@excite.com*)

Go to hell Jeff

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2540)

---

● Top ● Previous ● Next ● Print ● Reply

**Date:** May 29, 2002 01:14 PM
**Author:** James Kennedy
**Subject:** Come on guys...

Bill - you make some great points, don't stoop to
this. Jeff - it is a free country, you are right. So let
Bill make his arguments.

I am beginning to think that TDR is just a front that
adds credibility to the "pump and dump" ads from
Agora. I am starting to look at everything that
comes from them in a new light. Any one have any
comments on this?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2543)

---

● Top ● Previous ● Next ● Print ● Reply

**Date:** May 29, 2002 01:16 PM
**Author:** SGR (*sriggs@n-link.com*)
**Subject:** Shift in Focus

Change of subject, but has anyone noticed there is
some good news on Antigenics?

Same subject: I swallowed a lump on USU,

SEC 02834

however I have received much more good advice
and information from this newsletter than bad.

Everyone take a breather.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2544)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 01:40 PM
**Author:** Bill Billings
(*wbull2002@excite.com*)

I am not saying that everything they say is
bad or that all of their picks are horrible, or
even that they are always doing pump and
dump, but what i am saying is that they are
bad investment advisors, and a little
knowledge can be a dangerous thing, there'
whole modus operandi is contrarianism to an
extreme. I would take the WSJ dartboard
over their picks anyday, it will be roughly the
same and cost a lot less. All I am saying is
that they are incompetent, so are most
brokers, so be wary.... for the last time, you
either have audited returns or you don't, and
people and especially institutions with
serious money won't even consider people
and/or investment organizations without
audited returns, so why should you.

I am done on this subject.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2546)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 08:20 PM
**Author:** J Woodard (*jeffwoodard@attglobal.net*)
**Subject:** now there's a mature reply.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2582)

SEC 02835

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 05:39 PM
**Author:** ssgober (*ssgober@msn.com*)
**Subject:** usu

You can explain it away in a lot of ways, but it boils down to this. It was the most misleading letter that I have ever read!

I was alerted by reading this message board that a "follow-up letter" was sent to those that had paid. This is not true! I did not receive one, and when I called the number there was no answer. I have e-mailed Ellyse twice no response!

We need some real answers!

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2567)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 08:19 PM
**Author:** J Woodard (*jeffwoodard@attglobal.net*)
**Subject:** there was a followup

but Porter's explanation here is quite reasonable.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2581)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 08:23 PM
**Author:** James Kennedy

No it was not. There are many issues he refuses to address. Who is this? Jay McDaniel?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2583)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 29, 2002 08:35 PM
**Author:** J Woodard (*jeffwoodard@attglobal.net*)
**Subject:** Why do u say tht?

The letter was a SALES letter. That is what you should have expected. However, all the

SEC 02836

facts in it (except the 'tip' from the exec) are verifiable easily. So it didn't go up like you wanted? Does that make it misleading, or mean anything these guys did was wrong? Why not complain about NOK dropping, or CSCO? They've dropped a lot more than USU! You pays your money and you takes your chances. If you cannot deal w/it then I recommend you put you money in a mutual fund or the local bank. there are no guarantees in this life, or this mkt game.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2586)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 29, 2002 08:42 PM
**Author:** James Kennedy
**Subject:** Because it is true...

>>>However, all the facts in it (except the 'tip' from the exec) are verifiable easily. <<<

That is the point - I, as did many others, verified that the "facts" were not facts at all.

From Steven Wingfield, Director -- Investor Relations:

"There is no news pending regarding USEC. There is a great deal of misinformation regarding our company making the rounds on the Internet."

From my phone call with him:

"The statement attributed to the Senior Executive is false."

There is a big difference between speculating and losing your money and getting caught in an (alleged) pump and dump scam.

Porter, Jay, or J Woodard - you have said your peace, the damage to your credibility will be determined by the impact on your subscribers - current and future. And, by any action the SEC deems appropriate.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2588)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 30, 2002 12:28 AM
**Author:** TSR (*trehncy@comcast.net*)
**Subject:** Speculation as Truth

Not only is USU denying Pirate Investor's report, Porter himself is now

SEC 02837

calmly contradicting his report, and playing down his LIES because many of you didn't actually read the report.

The report repeatedly sells itself as FACT as opposed to the speculation found in other reports coming in via email and fax. The facts that were sold were the DEFINITIVE agreement to reduce Russian SWU cost by a specific amount yeilding a specific overall profit margin increase as CONFIRMED by a "company executive" (an additional 20%), and the specific day when the company was to share their improved bottom line with the world, May 22, from whence we could all start taking profits. The news never came and the company denies any definitive agreement.

Now that all the REAL FACTS are out, thanks to others on the thread, Porter is now saying that they were HOPING a validating announcement by the company would have coincided with the Bush-Putin Treaty; after all "it would have only made sense". And, of course, that they DID NOT know exactly HOW MUCH such a deal would have improved the bottom line, and that there will probably be COMPROMISES involved before the new proposal is accepted, with a now uknown time frame.

If such vague and speculative talk were part of the report, people would have reacted accordingly, and perhaps stayed away altogether. The real problem with Pirate Investor's report was it sold SPECULATION as TRUTH, and advised us to buy when we should have sold, May 21. Seems to me all that truth swearing should be held accountable, but I guess there are ways around it as demonstrated by Porter's double talk.

What's worse, Porter keeps reiterating that the stock has stayed in the $7-$10 range as if there is not much difference betweeen the two; and nevermind that the reco was at $9 and moving up quickly.

But equally as suspect are all the Agora affiliates for allowing such hype to be sold as truth. This is the first time I have seen such a report from Agora, and had it not come from here, I wouldn't have touched it, like the dozens of other urgent faxes and e-reports I receive boasting stock potential.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2617)

---

⊛Top  ⊛Previous  ⊛Next  ⊛Print  ⊛Reply

**Date:** May 30, 2002 12:05 AM
**Author:** OptionPlayer (_tereprises@hotmail.com_)
**Subject:** A LOOK from another Angle.

If you guys had a bit of a technical know how your losses would have been preserved. The knowledge of the technicals would give you a heads up on the selling strenght and one can preserve the profit and also sell into a rally or go short through PUTS as soon the technicals give a screaming sell signals, such as USU did on 5/21/02. At that time of reco one should have bought a CALL in the

SEC 02838

money or near the money a JULY 5 or July 7.50, than rode the sucker all the way to the sell signal of $10.20, at the signal cash in on the CALL and opened a PUT for JULY 10.00 and rode the sucker to wherever it may go to. Now this stock could play out reverse to a move up, where it goes is anyones guess, however if the technicals are strong than the play can go on.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2614)

---

●Top  ●Previous  ●Next  ●Print  ●Reply

Date: May 30, 2002 12:45 AM
Author: TSR (*trehncy@comcast.net*)
Subject: Screaming Sell

You bring up yet another point. Why didn't Pirate Investor attempt to warn us of this screaming sell on the May 21 to help preserve the profits or limit the losses of their most valued "Mercedes customers".

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2619)

---

●Top  ●Previous  ●Next  ●Print  ●Reply

Date: May 30, 2002 03:57 AM
Author: J Taylor (*jvtay@yahoo.com*)
Subject: A P&D by any other name...

Wow!!...that is what I call CYA...now I"ve lost even the little respect I had left for the "Pirates." All Stansberry cares about is protecting his apparently fragile ego, making excuses for himself. LOTS of people lost LOTS of money on this "Mercedes" information--obviously "Lemon Used Ford" information...can't you at least offer THEM your apologies??? And the points made about following the technicals is completely and utterly beside the point, whoever you are.

I know nothing about the uranium business and figured out the company just using Yahoo's basic search within ~15 min from the info given in the pump and dump email. If Pirates weren't part of the P&D...and I would love to know just how much they (ALL of them) made from this besides the obvious $1000 ripoff...then they were at best unwitting partners in a P&D by some in the know at USU...that's giving JayMc the benefit of the doubt. YOU WERE DEAD WRONG JAY MCDONTEXPECTMETOGIVEMYREALNAMESTANSBURY...AND YOU COST A LOT OF PEOPLE WHO WOULDN'T HAVE TOUCHED THIS WITH A TEN FOOT POLE EXCEPT IT WAS YOUR GROUP TOUTING IT A LOT OF MONEY!!!!!...at least have the balls to come out and say...WOW!!!...we screwed up and we're very sorry! Since you haven't, it's hard for me (and I am 100% sure I speak for MANY out here) to believe you had nothing to gain from this fiasco. You want to retain some rep among investors...I'd say a flatout no BS/excuses/rationalizations/specious argumentation WE'RE SORRY!! would go a long way...all the rest is just hot air making us out here even hotter.

SEC 02839

http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2452                    09/19/2002

jt

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2626)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 30, 2002 08:34 AM
**Author:** Jeff W (*kuching100@yahoo.com*)
**Subject:** you all amaze me

I just don't get it I guess. I don't think anyone forced any of you to -buy the report, or -buy the stock.

However, you'd think there was a requirement you run out and buy this. I thought one of the attributes of an adult is that he/she take Responsibility for his/her actions! With the mentality demonstrated in this set of posts (by many) is it any wonder we are all being "led" by our politicians (and others)? Get a life, and make your own decisions, good or bad, and then TAKE Responsibility, for crying out loud!

Nobody and that means no guru or otherwise knows what'll happen in the stock mkt. Thats' a fact. Get over it; there is no holy grail. The report said so. And even if it didn't, one would think a responsible person would have the intell to understand that - esp after the last 2 yrs of pain.

And yes I am in the red also. But I researched the stock and the news, and made MY decision to buy based on the facts I could glean (just as you could)! I don't blame anyone but myself. Am I happy? No. Will I be smarter next time? Hope so. Will I hold the stock for a while and see if -there is an announcement and it does move, and/or -enjoy the 7% div? You betcha. Now get over it.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2632)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 30, 2002 08:41 AM
**Author:** James Kennedy
**Subject:** YOU AMAZE ME

Jeff W - obviously you did not read my last response to your earlier post. I will re-print it here so you can understand why people are upset. The key point is:

There is a big difference between speculating and losing your money and getting caught in an (alleged) pump and dump scam.

SEC 02840

From you earlier post:

>>>However, all the facts in it (except the 'tip' from the exec) are verifiable easily. <<<

That is the point - I, as did many others, verified that the "facts" were not facts at all.

From Steven Wingfield, Director -- Investor Relations:

"There is no news pending regarding USEC. There is a great deal of misinformation regarding our company making the rounds on the Internet."

From my phone call with him:

"The statement attributed to the Senior Executive is false."

There is a big difference between speculating and losing your money and getting caught in an (alleged) pump and dump scam.

Porter, Jay, or J Woodard - you have said your peace, the damage to your credibility will be determined by the impact on your subscribers - current and future. And, by any action the SEC deems appropriate.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2634)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 30, 2002 12:54 PM
**Author:** J Woodard (*jeffwoodard@attglobal.net*)
**Subject:** Exactly

My point - run to the SEC. That'll do it!

What about your Responsibility? Or are you leaving it to the SEC???? Good luck sucker.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2665)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** May 30, 2002 09:28 AM
**Author:** TSR (*trehncy@comcast.net*)
**Subject:** Accountability

**SEC 02841**

The point of this whole fiasco is ACCOUNTABILITY. A hundred years ago Jay and Porter would have thought twice before selling false facts because they would have personally been held accountable and hanged by an outraged mob.

Now through the magic of modern law they can hide behind pen names, corporations, and LLCs and not be held personally accountable. They can now fabricate all the fiction they like and sell it as fact as long as they scribble a few disclaimers at the end.

We now know Jay and Porter spent at least a week carefully crafting a document full of PARTIAL-TRUTHS disguised as FACTS. They won't admit to any wrong-doing because they know they can get away with it LEGALLY. We just didn't expect this kind mischief from Agora who pride themselves for NOT listening to hype. We PAY them to uncover the WHOLE TRUTH before we can make an intelligent decision, because no matter what we are always banking on the accuracy of information.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2641)

● Top ● Previous ● Next ● Print ● Reply

**Date:** May 30, 2002 09:51 AM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** SHORT-TERM Bottom?

USU 0n 5/29/02 signaled a short term bottom reversal. On 5/30/02 15 minutes into the opening USU on 49,900 in volume is up a SAD 0.09 @ $7.44, where is the buying craze? after all USU is trading a bit above the lows of 5/13/02. we'll see what happens by closing. Maybe Porter and his group needs a technician?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2644)

● Top ● Previous ● Next ● Print ● Reply

**Date:** May 30, 2002 09:57 AM
**Author:** James Kennedy
**Subject:** NOT!

It appears that they are just taking it up on low volume in order to sell into it. There is some good analysis on the Yahoo board about intra-day action.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2645)

SEC 02842

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 30, 2002 10:53 AM
**Author:** ssgober (*ssgober@msn.com*)
**Subject:** USU

I Received the May 23RD update, this morning! I wrote on this board yesterday, May 29th, that I had not heard from Pirate Investors about an update. I received it, but with no explanation for not contacting me earlier. As a paying customer, I felt I was due at least, "a delay to inform you that we really screwed up, apology".

Is it worth $99 or $1,000.00 tip with the superior attitude, seems to me they really need an ego slamming!

This is wrong! This was handled inappropriately and I am very upset. These people gained my trust, and then offered to sell me something of value, (IF) I would just take the chance.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2653)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 30, 2002 10:54 AM
**Author:** James Kennedy
**Subject:** Was the wait worth it?

Anything useful in it? Or just more BS?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2654)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 30, 2002 01:13 PM
**Author:** ssgober (*ssgober@msn.com*)
**Subject:** usu

> Anything useful in it? Or just more BS?

Nothing that anyone that watches the news didn't already know! Hello! He referred to the fact that he didn't guarantee that it would POP! He still THINKS it will go up! yada, yada, yada!

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2670)

**SEC 02843**

Top  Previous  Next  Print  Reply

**Date:** May 30, 2002 08:51 PM
**Author:** JG Hithers (*jghithers@aol.com*)
**Subject:** New Porter Update

Did anyone read the new update? Interesting - I like the parts about taking a longer term view, and the stock could trade in a range from 6.50 - 10.00. I do recall being told to buy on the 21st, and sell on the 23rd. And, DOUBLE YOUR MONEY IN ONE DAY! My, how things change in a few days!!!

Here is a good post from Yahoo that sums up how I feel (hey, they are always stealing our posts and putting them there - turnabout is fair play!):

PORTER UPDATE - Long-Term Sentiment: Strong Sell 05/30/02 08:50 pm Msg: 16843 of 16843
You hit the nail on the head. I am sure someone has already threatened legal action, and this is the Pirates way of trying to make this a longer term "speculation". A far cry from the "buy on the 21st, sell on the 23rd" contained in the original email.

Here are the quotes I focused on:

"The second hold-up might take a bit longer to resolve. It's not as clear as it should be what's going to happen with those extra warheads."

and

"And, if any of the things we expect happen in the medium term (say one to two months) come about, this stock could easily trade for far higher than $14."

and

"This is not a fast moving situation - though a major breakthrough could come at any time. My plan is to update you on the stock following each quarterly conference call that USEC hosts. In addition to these regular updates..."

Medium term. This thing will go up medium term. Maybe long-term. WHATEVER! Oh, but sorry about that whole buy on the 21st, sell on the 23rd thing.

Is there any way to find out if anyone has filed legal action against these crooks (Pirates)?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2706)

Top  Previous  Next  Print  Reply

**Date:** May 30, 2002 09:52 PM
**Author:** afooladayandIamone (*sommestock@webtv.net*)
**Subject:** class action suit

I just joined the oxford club a couple of months ago and knew nothing about investing. In fact I

SEC 02844

just discovered these messages boards today. Maybe if I would have found you earlier I would not have lost $40,000. Anyone interested in a class action suit? Anyone know a good attorney? I will call the SEC and attorney general office to see if we have a case. I closed out my position yesterday after talking to the company.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2715)

---

● Top    ● Previous    ● Next    ● Print    ● Reply

Date: May 30, 2002 09:57 PM
Author: James Kennedy
Subject: A fool...

You talked to USU? Did they tell you the same thing that everyone else has said? Denials, etc. I would like to know what they said, as I have not talked to them since last week.

Also, check you the Yahoo message board for USU:

http://messages.yahoo.com/?action=q&board=USU

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2718)

---

● Top    ● Previous    ● Next    ● Print    ● Reply

Date: June 01, 2002 03:27 PM
Author: afool (*sommerstock@webtv.net*)
Subject: What company said ?

Basically they said to look under company web site and you will see that the figures are considerably different than McDaniels said. They also said that there small company does not get the attention of CNN or Bloomberg and that the figures they have already HAD the effects of treaty. I will have my attorney check it out.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2837)

---

● Top    ● Previous    ● Next    ● Print    ● Reply

Date: May 30, 2002 09:47 PM
Author: JG Hithers
Subject: Porter's record...

**SEC 02845**

One last post before I turn in - I remember conversation last week about Porter's record...did he ever

http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2452                    09/19/2002

provide that publicly? From Yahoo:

Re: PORTER STANSBERRY UPDATE by: thetradingmanual Long-Term Sentiment: Strong Sell 05/30/02 09:43 pm Msg: 16844 of 16844 You know, I think it is the little lies that kill you. Because, if you lie about the little things - or exaggerate - then who knows what you do with regard to the bigger things.

Porter said: "Shares in USEC are currently trading near $7.50. This is considerably higher than the price of the stock when we originally drafted our report, but vastly lower than our target price of $14."

Considerably higher? The original, DOUBLE YOUR MONEY email said the stock was trading in the $7's. That is how most of us found it! In fact, the day it was sent out - 5/14 - the stocks range was $7.61 - $8.50. Today it closed at $7.44.

That is NOT considerably higher. It is Porter trying to make himself look good! Does he have a public track record? I know he recommended GX (it is on the pirateinvestor site in his "sample" report), and we know that company went bankrupt! What is his track record, and why does he try to make himself look better by making statements like that?

Makes you wonder about the other things he says.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2714)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 31, 2002 07:57 AM
**Author:** D Wright
**Subject:** Quesiton for Porter...

I understand that you say you or no one in your organization owned USU (or any other stock) that you cover.

Do you, or your organization, ever get paid by any company that you cover, or highlight? Did USU pay any consideration to you, or your organization, or anyone in your organization?

Thanks for any respnse.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2743)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 31, 2002 09:02 AM
**Author:** Kelly Williams
**Subject:** Do your own DD

All I can say, is do your own DD. Many things in Porter's email update - just like the last one - may sound good, but you have to read this document like a lawyer.

I HAVE A DIALOGUE WITH IR, and so does anyone else who calls them. So, Porter has nothing

SEC 02846

special there. He makes it sound as if he and USEC are now "buddy buddy". Do you trust him? With everything that has come out in the last few weeks? Do your own DD.

This is a case of a "get rich quick scheme" gone bad, and an attempt to CYA. Or, CPA (cover Porter's a$$). I don't mean to be harsh, but if you do a little research yourself I think you will come to the same conclusion.

KW

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2752)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 31, 2002 09:53 AM
**Author:** Roz (*rc.raque@fuse.net*)
**Subject:** Question for Kelly...............

What is DD please.

To the poster before Kelly - It is doubtful that {orter wll see anything that you post on this board, as he has his own on Pirate Investing. His showing up here was only to explain the USU thing. Gotta run Roz

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2758)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 31, 2002 10:12 AM
**Author:** Kelly Williams
**Subject:** DD

due diligence, research.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2760)

---

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** June 01, 2002 11:48 AM
**Author:** Roz (*rc.raque@fuse.net*)
**Subject:** I apologize Kelly - I misread your post. ...............

I read it as "Dou YOU own DD", not the your. I knew DDis Due Dilligence. Thanks though. Roz

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2822)

SEC 02847

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 31, 2002 11:08 AM
**Author:** pandelong (*pandelong@yahoo.com*)
**Subject:** buyer beware

This is an enjoyable thread...

Who is to blame? The DR, Bonner, Porter, Jay? NO.

"A fool and his money are soon parted"

There should be no blame at all... some folks paid and got what they wanted... hope. You would think after the crash of the dot.coms people would learn. Nonetheless...now that the smoke has cleared... these folks own stock in a company that seems to have as good of a chance as any to make money for you.

So in other words, quit crying...

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2768)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** May 31, 2002 06:46 PM
**Author:** J Woodard (*jeffwoodard@attglobal.net*)
**Subject:** Thank you! Good post.

Finally someone here with a head on his shoulders! I've been saying these fools should take responsibility for their actions. I don't think anyone had a gun to their heads making them buy!

Running to the SEC isn't the answer. We don't need govt "protection" as we're getting plenty already!

Good to see there are others of the same opinion.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2794)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** June 01, 2002 08:12 AM
**Author:** Kelly Williams (*kwilliams1467@hotmail.com*)
**Subject:** Buyer beware

**SEC 02848**

I agree with you that we are all responsible for ourselves. But I also think that if you are given

false information and make a decision based on it, you have a right to complain. We were given false information, so I have made my complaint.

More important, I have tried to warn people. I am not asking to be reimbursed. I am not asking for money. I am simply trying to educate others that there are crooks and scam artists who will try to take your money, so beware.

No one is crying. This is a forum to express views and have conversation, and to learn. Those of you who come in here and tell people to quit crying should stop reading if you are bothered by people who want to get at the truth.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2812)

● Top ● Previous ● Next ● Print ● Reply

**Date:** June 01, 2002 09:09 AM
**Author:** Brian Williams (*stockguy 1441@yahoo.com*)
**Subject:** Nom de plum?

Isn't pandelong a nom de plum for Jay McDaniels? And isn't Jay Daniels a nom de plum for...

What is the actual definition of nom de plum, anyway? I heard it means "false name for questionable research"?

Anyone? Buller?

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2815)

● Top ● Previous ● Next ● Print ● Reply

**Date:** June 01, 2002 11:20 AM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** Buy LOW and SELL HIGH

If the reco for USU came out around May 13 or 14, That was the Buy LOW signal and the stock was at the $7.00 + range and there was no wrong doing. Now on May 21 when USU reached an overbought condition that would have been a SELL HIGH signal and if the reco came out around this time than that was totally a mis-guided-rep. Now, if the subscribers started pumping the stock up around the 20,21 telling others about USU than that was the subscribers lack of technical knowledge and their wrong doing. It looks to me that the majority of people that bought in on the reco had no technical knowledge and were not aware of the overbought condition and that a technical SELL signal had formed. It seems like you guys need a service that can tell you when to get in and when to get out.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2820)

SEC 02849

● Top ● Previous ● Next ● Print ● Reply

**Date:** June 01, 2002 03:38 PM
**Author:** afool (_sommerstock@webtv.net_)
**Subject:** What company said to me

Basically that the information Jay McDaniels gave us is different than figures on company web site. They said figures had already been calcuated with the Russian contract in mine and that the company was to small to get interest of CNN and bloomberg.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2839)

● Top ● Previous ● Next ● Print ● Reply

**Date:** June 01, 2002 05:51 PM
**Author:** JGHithers (_jghithers@aol.com_)
**Subject:** More on what USEC said from the Yahoo! Board...

Spoke to IR Friday by: respecting_the_bears (89/M) Long-Term Sentiment: Strong Sell 06/01/02 08:08 am Msg: 16914 of 16916 And, as always, I urge anyone who owns this stock or is thinking of buying this stock to call them.

The facts: IR read the update. IR laughed at my statement that it sounds like Porter and the Pirates have established a fresh dialogue with SW. According to them, if Porter calls, they pick up the phone. If you or I call, they pick up the phone. Porter gets no info beyond what you and I would get, and to be frank, I think you and I would get more as these people don't think too highly of Porter "Jay" Stansberry.

Regarding Porter's claims in the update, just a rehash of what was in the research, I was told basically what we have been told in the past: "Porter is taking a great leap with some of his assumptions. There is no news pending regarding USEC and the Bush-Putin agreement. There is a great deal of misinformation regarding our company making the rounds on the Internet. There is no substantial impact to USEC of the Bush-Putin signing."

Regarding Porter's BS about making a trip to USEC. "We occupy a few floors, and there is nothing to see if you visit. Further, it would be difficult to arrange any executive meetings. Porter asked if it would be possible, and we said not likely."

That is a far cry from wht Porter portrayed in his update.

USEC IR went on to say that they have confidence in the future of their company, and the long-term value (what IR person would not?). But that confidence has nothing to do with any information that Porter or the Pirates is pushing.

They also said that it appeared as if Porter was making these "new moves" to "cover his backside". I agree with them and others on this board who have said this, and that they probably lost a lot of subscribers and may be facing some legal problems.

So, in summary, if you want to own this company for reasons besides what the P&D from the Pirates

SEC 02850

was pushing, more power to you. Best of luck. If you own this company based on information from Porter and the Pirates, you should have your head examined.

This experience has taught me much - I have taken my name off of Agora's mailing list and The Daily Reckoning. I will miss TDR, but frankly I do not want to be associated with them and their advertising. If you look at what they have pushed over the past six months, you will see a pattern with them.

Good luck all. Do your own research and fact checking.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2841)

● Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** June 02, 2002 09:47 AM
**Author:** bewarethehype
**Subject:** Porter post on Yahoo! Message Board

All - I post on the Yahoo! message board as bewarethehype. I wanted to let you know that Porter Stansberry made a post on the Yahoo message board - see messages #16927 and #16928 for his messages in their entirety. I also wanted to call your attention to his threats of legal action against posters. I have encouraged eveyone there to re-post this message and I will compile those posts and send to Porter. I will do the same here, as we do not need the focus to shift from him to us, which is what he is trying to do.

"Anything I have ever said in relation to Porter Stansberry, Jay McDaniels, Pirateinvestor.com, or anyone associated with the above is my opinion only. And anything I have said about the research or postings of the above being a "scam", or a "pump and dump" are allegations and again my opinion."

Now, here is my response to some items in Porter's post (which, again you can find on the Yahoo message board as noted above):

Re: One reply (Part I) by: bewarethehype (38/M/Mount Clemens, MI) Long-Term Sentiment: Strong Sell 06/02/02 09:36 am Msg: 16932 of 16935 Some comments on your post:

"I publish a complete track record of my recommendation each August."

We have been told this complete track record is only available to subscribers. Why not make it avaiable to everyone to review before they sign up?

>>>I have absolutely no idea why our business decision to publish (and sell) a special report on USEC caused so much consternation.<<<

It has caused consternation because most people called USEC IR, and they said you took ALOT of liberties, the quote from the Senior Exec was not correct, the Bush-Putin treaty would not substantially affect their business, and there would be little - if any - impact on your bottom line. They also had things to say about your update, you can read those in previous posts here.

>>>No one associated with my company invests in the stocks we recommend until after our

SEC 02851

subscribers have had ample opportunity to invest.<<<

Wow - it used to be said no one associated with my company invests in the stocks we recommend, now it is no one associated with my company invests in the stocks we recommend until after our subscribers have had ample opportunity to invest. Enough said.

>>>which you've communicated your lie. Yahoo! message boards are not anonymous. Here's my recommendation: if you've represented as fact anything that you cannot back up with evidence, i.e. that we've been selling shares of USEC while promoting it to our readers, you had better get in touch with us and post a retraction here immediately.<<<

Any time I, personally have referred to this as a scam or a pump and dump, I have said "alleged". I have also said it is for the SEC to decide. I also have an email from Steve Wingfield, and multiple conversations with him and IR to back me up on my posts. Your threats are just trying to change the focus from you to us.

BUT, to be clear - until the SEC or some legal action proves it, all allegations are ALLEGED. And, you should also put that on your research about your facts, as many have been refuted.

>>>He implied that this treaty would have a big impact on the shares that day. We assumed that meant the company's new Russian contract would be finalized as part of the larger agreement to destroy around 10,000 warheads. Unfortunately, that's not exactly what happened.<<<

No, it is not exactly what happened. Who is the Senior Exec? Steve Wingfield sid it was him, and the quotes were not correct. BTW, who is Jay McDaniel? >>>There are lots of people who post here that IR says my reports are lies and etc. I don't know if they say that about my work or not. But, I send all of our reports to USEC before we publish and they've never once asked me to change a single letter of any report.<<<

When you and the pirates defended yourself, you made it clear that the company and IR WOULD NOT comment to us if we called (they did). But, if this is true, why would they comment on your third party research? I would not expect them to call you and ask you to change anything, because it is their policy not to comment. Confirmed by Wingfield.

>>>When Jay drafted that report (May 13th) USEC shares were trading in the $6.50-$7.00 range. The stock may not have doubled from there, but it went to $10.00 or more. And you can still sell your shares today for more than that price.<<<

Key word here is drafted. It could have been drafted anytime. When the DOUBLE YOUR MONEY IN ONE DAY EMAIL came out, the days range was ABOVE the closing price on Friday. So people who invested based on that email, and are still in, are now losing money (and have been for a week or so...).

>>>People screaming that the SEC is going to come get us, etc. don't understand how the First Amendment works (freedom of the press). Trading on the information that USEC gave us would have probably been against the law, although it's not clear that USEC's disclosure about the Treaty finalization date was a violation of Regulation FD, because we are journalists. Publishing USEC's disclosure along with our further analysis of the situation is not against any law. Nor is our publishing company regulated by the SEC. A 1985 Supreme Court case puts financial journalists beyond the

SEC 02852

jurisdiction of the SEC<<<

I like the way you point out the SEC cannot do anything to financial publications. You did that in a previous post here, many weeks ago (at the beginning of this fiasco). Porter, saying the SEC does not have jurisdiction does NOTHING to give you credibility.

And, I like the way you are focusing on book value and dividends. Someone else posted info about that last week - I will see if I can dig up the post.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2859)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 04, 2002 08:47 AM
**Author:** w.p.
**Subject:** fraud

Let's focus on the heart of the issue. What Jay McDaniel/Porter Stansbury/Agora did was wrong. Plain and simple. I didn't bite on the USU report for 2 reasons: 1. Ridiculous price

AND MORE IMPORTANTLY

2. It is illegal to SELL insider information which is exactly what the offer ADMITTED it was doing. Publishing the reco in the public domain is one thing - therefore available to all - but outright admitting that you are selling "inside information" and giving specific dates on when deals are going to be announced IS illegal.I was shocked to see such a stupid blunder on the part of Agora. What were they thinking? Not only did the endless hype on this reco annoy the hell out of me, it seriously jeopardized my faith in Pirate/Agora etc... and has me strongly considering dropping ALL my Agora subscriptions.This was a stupid and costly mistake for Agora as well as those who bought the hype.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2995)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 04, 2002 02:05 PM
**Author:** pandelong (_pandelong@yahoo.com_)
**Subject:** not fraud by definition

...the price was ridiculous. And the act of selling it can certainly be called stupid. (no argument here)

But the selling of the report was not illegal. It does not fall under the definition of insider trading nor fraud.

From his notes in the DR, Bonner seems to know this was a mistake... I would not drop everything yet. Unless, they make this routine. (But I believe this was the first time

SEC 02853

something like this has been attempted by them)

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3032)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 04, 2002 11:35 PM
**Author:** w.p.
**Subject:** not true

Sorry, but I disagree. It is illegal to sell information from an insider in a company that relates specifically to events such as USU's. Remember Jay said it came from an individual highly placed in USU. It would have been bad judgement to discuss at a cocktail party - and someone acting on this tip theoretically would be trading on inside information - but Jay acknowledged that this was wrong/dirty pool and then said "hey, I don't make the rules"- I think he knew it was wrong. It was a disapointment to see this coming from Agora.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3093)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 03, 2002 11:28 PM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** USU

USU FLAT...............................

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2976)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 04, 2002 09:49 AM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** USU Up?

DOW is down 50 points 20 minutes into trading, USU is up .23 on 31,100 shares. USU closed up just 3 pennies.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2999)

---

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 04, 2002 09:07 PM

SEC 02854

http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3452        00/10/2002

**Author:** afooladayandIamone (*sommestock@webtv.net*)
**Subject:** I am not finished with you yet porter

I have been busy porter, but you have not heard the last from me and when I get back to town I will have my attorney look into the figures you put in your report and compare to the figures on USEC.com web site under SEC as told by company that your figures are quite different. I not finished nor will I forget my $40,000. lost for you to profit.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3071)

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 04, 2002 10:15 PM
**Author:** Judy (*judyprety1@aol.com*)
**Subject:** USU Fundamentals

I wonder if anyone knows if this stock has options on it and if so, what the put/call ratio may be? Also, does anyone know what the short interest is? With so much bashing of this stock, it just MAY go up.

Also, does anyone think that a world on the brink of a nuclear war would make a company that enriches uranium more valuable? I know it sounds terrible, but if even a small nuclear war breaks out in India or somewhere else, would that effect this alleged monopoly (this is what I have been told.)

Just wondering about these things and if anyone has any answers.

Thanks

Judy

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3080)

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 04, 2002 10:15 PM
**Author:** Judy (*judyprety1@aol.com*)
**Subject:** USU Fundamentals

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3081)

● Top   ● Previous   ● Next   ● Print   ● Reply

**Date:** June 05, 2002 01:05 AM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** What about USU fundamentals

What about USU fundamentals? Are there any good fundamentals, last 3 earnings reporting were down.

**SEC  02855**

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3102)

●Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** June 05, 2002 12:57 AM
**Author:** OptionPlayer (*tereprises@hotmail.com*)
**Subject:** USU PUT/CALL RATIO

THe open interest on USU for the month of JUNE are as of 06/04/02: CALLS 5.00 166, 7.50 2,216, 10.00 10,216, 12.50 3,445, 15.00 874, PUTS 5.00 102, 7.50 1,507, 10.00 688, 12.50 110, 15.00 5,

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3101)

●Top  ● Previous  ● Next  ● Print  ● Reply

**Date:** June 05, 2002 02:37 AM
**Author:** Judy (*judyprety1@aol.com*)
**Subject:** re PUT/Call Ratio

Wow!

Thanks for the info on the put/call ratios. Doesn't look too bullish. According to the charts, it sounds like the next move should be down. I note that the stock has been basing lately, and thought it might actually go up soon. I'm still holding 200 shares, of course, at a loss.

See, I'm still not convinced that all you need to determine the direction of a stock's movement is technical analysis. Things happen that we don't expect and then everyone jumps in and either buys or sells a stock and the "support" or "resistance" is totally broken.

And I do believe sentiment analysis does play a roll in the future direction of a stock, thus the question about the put/call ratio.

As for the fundamentals, the market always looks ahead, at least six months. With the possibility of excellent fundamentals in the future, the stock may rise.

If they have a government sponsored agreement for cheap uranium that will last through the year 2013, I still see a good possibility that in the long run this stock will rise.

I held some stocks for months with EXCELLENT fundamentals and just lost money. LOW and FRX are examples. Six months of downward pressure is all I could take. I will be smarter in the future. I did get out ACDO with a good gain based on charting though, and recently got out of OHP recently with good gains using charting. I think the stock needs a good rest. Maybe I'll buy both in the future when they get to a support level and the economy is better for high PE stocks.

I think I can tell now when stocks are at resistance and go up on low volume. I think they call that a "blow-off top?" This is when I sold ACDO and OHP.

**SEC 02856**

Hey, I already lost more than a normal stop loss would be on USU. So I think I'll hang in for a while. I'll give it another 10% and that's it.

BTW, I have been watching your option recommendations, and they sound good. However, I always read NOT to buy expensive options and boy are they high. Totally different strategy than what I've been reading about. I think I'll try your COF recommendation.

Nice hearing from you.

Judy

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=3108)

⊛ Top    ⊛ Previous    ⊛ Next    ⊛ Print    ⊛ Reply

**Date:** May 30, 2002 02:56 PM
**Author:** JG Hithers
**Subject:** Well said...

good message.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2679)

⊛ Top    ⊛ Previous    ⊛ Next    ⊛ Print    ⊛ Reply

**Date:** May 30, 2002 08:55 PM
**Author:** JG Hithers (*jghithers@aol.com*)

FYI - the update is posted on the Yahoo board.

(http://65.88.90.51/forums/Index.cfm?CFApp=3&Message_ID=2707)

SEC 02857

# EXHIBIT D

**Baker, Brent R.**

| | |
|---|---|
| From: | Monticciolo, Michael |
| Sent: | Wednesday, May 29, 2002 11:13 AM |
| To: | Baker, Brent R. |
| Subject: | ECC/ Pirate Investor/ MSL-2368 |

Dear Brent--

## REDACTED

--Mike Monticcciolo, OIE

(202) 942-4774

-----Original Message-----
| | |
|---|---|
| From: | ENFORCEMENT |
| Sent: | Monday, May 20, 2002 9:31 AM |
| To: | OIE INTERNET ENFORCEMENT |
| Subject: | FW: enforcement complaint |

----- BEGIN SEC HEADER -----
Received: from secfw2.sec.gov ([162.138.246.3]) by opc-sec-mt1.SEC.GOV with SMTP (Microsoft Exchange Internet Mail
Service Version 5.5.2650.21)
    id LDHVDF1V; Sat, 18 May 2002 15:05:19 -0400
Received: by secfw2.sec.gov; id PAA27163; Sat, 18 May 2002 15:05:21 -0400
Received: from clone2.sec.gov.(204.192.28.52) by secfw2.sec.gov via smap
    id xma027150; Sat, 18 May 02 15:04:59 -0400
Received: (from httpd@localhost)
    by clone2.sec.GOV (8.10.2/8.10.2) id g4IJ4wN23933;
    Sat, 18 May 2002 15:04:58 -0400
Date: Sat, 18 May 2002 15:04:58 -0400
Message-Id: <200205181904.g4IJ4wN23933@clone2.sec.GOV>
to: mdb@sec.gov, enforcement@sec.gov
subject: enforcement complaint
from: nobody@secfw2.sec.gov

----- END SEC HEADER -----

ENFORCEMENT COMPLAINT FORM
5-18-102  15:4:58
- - - - - - - - - - - - - - - - -
Information About You:
Name:  Clay Kemper
Email:  claykemper@ail.com
Address:  1425 West Smith St. #543
Phone:  253-520-4829

Information About the Complaint
Type:
Entity Name:
Names, Addresses, Telephone number etc:
The forwarded email contained language that seemed to indicate that there was an opportunity to profit from illegal activity.
Rather than simply ignore it, and thereby letting it fester, I decided to forward it to you.
How you learned about the transaction or other activity:

1

**PI-00131**

Who contacted you:

Sales material in your possession:

Details about the transaction:
Dear International Living Reader,

Last week, a colleague of mine who focuses on special situation stocks told me about an unusual investment opportunity that will take place this week, Wednesday, May 22nd.

He believes that he is onto something that could double a particular shares price in a single day--and hes selling the details to interested investors.

Keep in mind that this is highly speculative...and that you should not risk any more money than you can reasonably afford to lose.

It goes without saying that this is not for most people--but I wanted to pass it along to you in case you are the type of investor who finds this type of thing attractive.

Sincerely,

Kathleen Peddicord
Publisher, International Living


MAKE 55 BY MAY 22ND
WITH THIS SUPER INSIDER TIP


MAY 18, 2002

Dear Investor,

On Monday--just five days ago--I learned the details of a major international agreement between the United States and Russia that will create more than 2.5 billion in profits for one small U.S. company.

Investors in this company are going to make a fortune--for reasons that I can detail for you here. And, best of all, because of my source--a senior company executive--I can even tell you EXACTLY WHEN the deal will be finalized and announced to the public.

The deal will close on May 22nd, only a few days from now.

The company involved is publicly traded--on the New York Stock Exchange--and its currently paying a 7 annual dividend. Although the company has a billion dollars in net assets, it has been forgotten by Wall Street and today its valued for only 700 million.

Meanwhile, reasonable projections see the upcoming deal adding at least 2.5 BILLION in profits to the companys bottomline. Although the market value of the stock could soar by four or five times its only a 9.00 stock, Im conservatively estimating that the shares will double.

**PI-00132**

Let me show you why.

On May 23rd the United States and the Russian government will sign a new arms reduction agreement that will reduce the number of nuclear warheads around the world by around 10,000. Thousands of investors watching CNN or CNBC will see the ceremony, with all its pomp and circumstance, live from St. Petersburg, Russia. But only a handful of investors will have already profited on the behind-the-scenes-maneuvering that put one company in a position to make an outrageous profit on the new treaty.

If you follow politics closely, the upcoming U.S.-Russian summit probably isnt news to you. Details are already leaking out to the media. For example, on The Wall Street Journals May 8th front-page: the U.S. and Russia now appear on track to sign a nuclear arms reduction treaty at the Bush-Putin summit. What you havent read in the papers yet is how this deal will mean hundreds of millions of dollars in windfall profits for one company. In fact, on May 22nd--the day before the summit begins--shares in this stock should more than DOUBLE, as the new agreement with the Russians will mean fat profits through the year 2013.

A high-level corporate executive--someone definitely in a position to know--passed along the details to me. He explained how the deal would benefit his company--raising its profit margins by 20 percentage points. He even told me the precise day the deal would be announced.

This is the kind of insider information that could make you a lot of money. And you wont have to risk much either...

In fact, the company in question is already a terrific bargain. Its valued by the stock market for around two-thirds of net assets. It pays a 7 dividend annually. In each of the last four years it sold over a billion dollars worth of product. This year alone it will have over 150 million in cash flow thanks to excess inventory reductions. This is a profitable business, with or without a treaty with the Russians. Despite its assets, sales and terrific strategic position, the market values the entire company for only 700 million because this is an old-economy stock.

In other words, you could probably DOUBLE your money on this stock as the stock market recovers--with or without the sweetheart deal the company has negotiated as part of the upcoming nuclear arms agreement. And, with the information Im prepared to give you, you wont have to wait for the stock market to recover. This stock will probably double--and could even triple or more--on the news I know will be announced in a few days.

Make no mistake--my plan to double your money is extremely low risk. This is a billion dollar corporation in sales thats currently valued today at 700 million and that pays a 7 annual dividend. Im not even recommending the options on this stock--just the regular shares. If you can double your money in one day on a low risk speculation, why get greedy

But, for just a moment, forget about the blue chip description, the 7 dividend, the Russian presidential

**PI-00133**

3

summit--Ill fill in the details as v. _ go.

Focus on doubling your investment dollar SAFELY on the back
of an insider tip. I can even tell you exactly which day
the pop in the stock should happen. Like I told you, its a
Wednesday later this month--May 22nd. The news will be all
over CNN. The President of the United States will be
involved. And one company--just one company--stands to gain
at least 250 million in income each year for the
foreseeable future at least through 2013. Considering
that the stock in question is only valued at 700 million
today...well, Im conservatively estimating that the stock
will double. But it could certainly go up a lot more than
that...

Again--this tip is for a single stock. It trades on the New
York Stock Exchange. It pays a 7 dividend. It has a
virtual monopoly on its business in the U.S. And I can tell
you precisely when, why and how its shares should double
later this month. Downside if Im wrong Most likely zero.
After all, the stock is already trading at less than net
assets and its paying a 7 annual
dividend.

This could be the simplest, safest and easiest way youll
ever double or even triple your money. Ever. And Im going
to give you a summary of the opportunity, right here in
this email.

HOW TO MAKE A LOT OF MONEY, WITHOUT RISKING ANY
HINT: POLITICS

Im sure youre wondering--how is it possible to double
your money on a safe stock in one day How can you double
or triple your money--in less than a month--without buying
a speculative stock or stock options How can you make a
killing without putting much at risk

In a word, politics.

Thats right. Living in the greater Washington D.C.
metropolitan area has its distinct advantages. Recessions
never hit this part of the country because the government
never stops growing. And, the insider tips you get at the
country clubs here have nothing to do with something as
risky as venture capital. Instead, I hear about the dirty,
but sometimes very profitable, world of politics.

Maybe you havent heard about it yet, but the upcoming
U.S.-Russia summit is big news here in D.C. President Putin
will host President Bush for three days in Russia.
According to my source--and backed up by rumors that have
been reported in the mainstream press--the major
announcement of this summit will be an important new
strategic alliance between the United States and Russia,
relating to nuclear stockpiles and a new strategic defense
system to protect both our countries from nuclear
missiles...

The company Im passing along to you will be a direct
beneficiary of this agreement, to the tune of billions of
dollars in profits.

See how this works Its a total insider deal. Money and

**PI-00134**

4

favors in exchange for a fat de.    .th the Russians. Hey, I
know its dirty. But I dont make the rules and I dont run
the company or involve myself in politics. On the other
hand, I see nothing wrong with profiting from my insider
knowledge of this deal and I dont think you should be
ashamed to do so either.

Its a great opportunity. Let me give you a few of the
details now.

THE DETAILS YOU NEED TO MAKE A QUICK AND HUGE PROFIT

First, the company that will profit at the expense of the
Russians is well known and obviously well connected.

In fact, the company was spun out of the U.S. government in
1993, which helps to explain why it has so much access to
the government corporate welfare trough. Let me reiterate:
this is a major company, not some penny stock. On the
balance sheet youll find over 200 million in cash and
over 800 million in inventory some of which was just
liquidated for over 150 million. Net assets are valued at
more than 950 million. But--get this--today the stock
trades for only 700 million--despite paying a 7 dividend
this year.

This is a major company that sells a critically important
commodity all over the world. It has had over a billion
dollars in sales for the last four years and positive
earnings per share each of the last four years too.

So...whats wrong with this picture If this is such a
great company, why is the stock so undervalued

Because without the upcoming deal with the Russians and the
support it gets from the U.S. government protective
tariffs, its costs match its sales revenue. In other
words, this company--absent its upcoming deal with the
Russians--would probably only breakeven this year.

So...the market is a down on the company. But I know the
deal with the Russians is about to go through... Once the
deal with the Russians goes through, the companys net
margins should exceed 20--netting it around 250 million
per year, even if you assume its market doesnt grow at
all

And guess what The deal with the Russians has ALREADY BEEN
SIGNED. Thats right. Its all done, locked up. Finished.
The only thing that both sides are waiting on is the proper
media event to announce this commercial cooperation between
the Ruskies and us. Its a feel good thing. Its PR for the
politicians. You know how the game works. The important
work is done in advance, so that when the cameras are
rolling, everything comes off without a hitch.

Who is my source Well...I cant tell you, except to say
that he is a senior executive inside the company. He is
definitely in a position to know the intimate deals of this
agreement.

Wait a minute you say...isnt this insider trading

Well, it might be except because Im willing to give you

**PI-00135**

5

all of the details, its now public    .rmation. You dont
have to wonder why Im bringing you this information. I
cant make money with this idea unless I make it public
first.

Why havent the other investment newsletter writers at
www.pirateinvestor.com told you about this opportunity .

Frankly, they probably wouldnt touch this stock. Theyre
free-market guys. They loathe the fact that this stock has
a monopoly on its commodity product in the United States.
And Porter Stansberry or Dan Ferris would tell you that
this companys technology isnt cutting edge.

But, to me, that hardly matters, because--right or
wrong--the company operates in the United States with a
VIRTUAL MONOPOLY. It has persuaded Washington to slap a
huge tariff on its foreign competition--a tariff that
ensures it will operate profitably in the United States for
at least the next five years. Furthermore, the company has
landed a deal with the Russians for the raw materials it
needs to reduce its production cost by 20 or more. All
thats left is the government approval for the
contract--which is coming on May 22nd, just in time for the
Bush-Putin summit.

ARE YOU INTERESTED WANT TO ROLL THE LOADED DICE WITH ME
THIS MONTH

Now...before I ask you if youre interested in this
information, I have to make one thing perfectly, crystal
clear. Im not a Merrill Lynch stock analyst. Im not
hyping this thing to you because Im trying to raise money
for an IPO. No. Im in the business of selling independent
investment research...and frankly this is the best tip Ive
ever come across. And, because I make my living as a
provider of unbiased information...Im willing to sell you
this information before I even establish a position in the
stock myself. What could be fairer

Unfortunately, theres one more thing I have to remind you
about. I cant guarantee that the stock will pop. Nobody
can guarantee the actions of the stock market. But, I can
guarantee you and Porter Stansberry has agreed to vouch
for me and stand behind my guarantee that everything Ive
told you here about the company is true and accurate. In
fact, if youre interested in getting in on this deal, Ill
provide you with a report IMMEDIATELY that proves
everything Ive said above. By that I mean:

#1. The financial position, history of the company and the
balance sheet information is 100 correct.

#2. The companys future financial situation has been
accurately represented here.

#3. The company has historically paid a dividend. Currently
its paying 0.1375 per quarter, which judging by the
current share price of 9.00 would equal a 7 yield for
investors this year. I cant guarantee that the company
will continue to pay the dividend--only the board of
directors could do that--but I can show you that the
company has a solid history of paying dividends and the
financial resources to continue to pay them.

6

**PI-00136**

#4. The deal I allude to here--with a Russian company--for
a new, cheaper supply of raw materials, is, according to
public company documents, finalized.

#5. U.S. government officials have said in public that a
deal of the nature Ive represented here will be announced
at the upcoming Bush-Putin summit.

Now, assuming for the moment that everything Im able to
guarantee is correct, how much would confirmation from a
company insider be worth to you Well, that depends on how
much you have to invest, doesnt it

Lets say that youve got a small investment portfolio.
Just 10,000. Could you stake all of it on a deal like
this I dont see why not. The company is trading for less
than net current assets. It has plenty of cash and is
paying a 7 dividend. The stock, by the way, is trending
higher, from a low of around 4. Yes, the stock has jumped
this week and looks poised to go much higher. But, this is
no penny stock either: it does over a billion a year in
sales.

Im not asking you to bet the farm on a new drug or a new
widget. This is a bricks and mortar company, selling a
widely used industrial commodity. This is a Warren Buffett
kind of stock. Only I can tell you exactly when it should
spike higher based on a major international news event...

How much is information like this worth to you

A REPORT THAT COULD DOUBLE YOUR INVESTMENT DOLLAR
IN A SINGLE DAY

Im going to make this very easy for you. Im not asking
you to subscribe to my newsletter in exchange for this
information. I dont even write a newsletter. Im not
asking you to follow a trading system. I dont have one.
Im not going to bother you with subsequent emails or
follow-up phone calls. Nope. This is a simple, one-shot
deal. Ill simply give you immediate access to a full
report on the opportunity, including all of the back up
information youd need to verify everything Ive told you
here.

If youre interested, and you think the price is fair, all
you have to do is buy one four-page report. You can verify
all of the details Ill provide with documents available
via public records. Ill even give you an Internet link to
the companys most recent financial data.

And you can buy the report through a link at the bottom of
this page. Youll have INSTANT ACCESS to the report. I
cant make it any easier.

Let me repeat my offer: This blue chip, undervalued stock,
which pays a 7 dividend, should double on May 22nd because
of a key new commercial arrangement between the United
States government and Russia. All the insiders are
preparing to take profits...and you can join them.

7

**PI-00137**

So...what is this information wc

Lets say you take my advice and Im right on the money. Lets say--just for the sake of argument--that the stock hits a new all-time high. It goes to 14. Youd make 55 on your money--more than 50 in a week--even after trading costs. And thats a very conservative estimate of potential share price.

Now look, I know that a lot of you can afford to put a lot more than 10,000 on this kind of safe, high return play. Its not an option play. Its not a growth stock. Its not even a tech stock. Nope. Its a high dividend paying commodity company. But, even if you only have 10,000 to invest, I could help make you make 50 or more on that 10,000 in a few days.

So...what price do you think is fair for this kind of information How much would you pay

Lots of people spend 10,000 or more for solid, profitable investment advice. After all, if youre making money with the information, its worth it. But these services all require lots of trading...and lots of risk taking. With the deal Im offering you today, all you have to do is buy one stock. And, as Ive shown you, its a low-risk stock.

Other services charge 5,000 or more for so-called insider connections. Conference call services, angel investment clubs and the like. And the deals always entail super high-risk bets that take YEARS to mature--if they ever do.

What Im offering you today is far superior to both of these kinds of offers. Its low risk and it will come to fruition--one way or the other--this month. If the deal doesnt hit big, your capital wont be tied up forever and theres almost no chance youll lose money because the company pays such a big dividend and is so undervalued relative to assets. Plus, its just one stock. Theres not all of the work required to follow an investment system.

So...whats a fair price Honestly, I have no idea. It really depends on how much money you have to invest. If youre going to put a million dollars on this--and you could--then the information is probably worth 50,000 or more. But I know most of you dont have that kind of money to play with though some of you do. No matter how much you decide to invest, Ill give instant access to the information to anyone who cares to pay 1,000 for it. Its not cheap--but if we double our money this month--its easily worth it.

And, by the way, I might not recommend stocks all that often, but Ive been in and around the investment publishing business longer than Porter Stansberry, Steve Sjuggerud and Dan Ferris combined. From time to time--as you see here--I come across very solid information.

I hope youll use this lead to your best advantage. Your friends wont understand your newfound interest in politics...and they wont know where you got the money for you new house, boat, car, and vacation either.

8

**PI-00138**

Sincerely,
Jay McDaniel

P.S. To buy this special INSIDER TIP report, just click here:
www.pirateinvestor.comReports350SSITILW350C515.cfm

FYI NOTICE

All sales of this report are final. We cannot guarantee any future financial result, however, the information contained within this report is accurate, as of 9:00 AM May 15th, according to publicly available documents.

Our publishing offices are located at 105 W. Monument Street, Third Floor Baltimore Maryland 21201. Pirate Investor is a subsidiary of Agora Inc. Pirate Investor does not act as a professional investment advisor. Pirate Investor LLC, its officers, directors, employees and associated individuals may own or have positions long or short in the recommended securities discussed in this report and we may add or dispose of the same. Finally, Pirate Investor LLC does not recommend positions in unregulated securities.

To REMOVE yourself from this list, send an email to: ILDAD1_unsub@agoramail.net or go to our web interface at: http:www.agoramail.nethome.cfmlist=ILDAD1

If on the Internet, all relevant Internet addresses:

Any additional information:

Server protocol: HTTP1.1
Remote host:
Remote IP address: 63.226.197.192
User Agent: Mozilla4.0 compatible MSIE 6.0 Windows NT 5.1
- - - - - - - - - - - - - - - - - -

PI-00139

**Baker, Brent R.**

| | |
|---|---|
| From: | Gionfriddo, David |
| Sent: | Friday, May 17, 2002 3:25 PM |
| To: | Baker, Brent R. |
| | FW: enforcement complaint |

**REDACTED**

-----Original Message-----

| | |
|---|---|
| From: | ENFORCEMENT |
| Sent: | Friday, May 17, 2002 9:21 AM |
| To: | OIE INTERNET ENFORCEMENT |
| Subject: | FW: enforcement complaint |

----- BEGIN SEC HEADER -----
Received: from secfw2.sec.gov ([162.138.246.3]) by opc-sec-mt1.SEC.GOV with SMTP (Microsoft Exchange Internet Mail
Service Version 5.5.2650.21)
     id JWVTWNQ1; Thu, 16 May 2002 14:07:32 -0400
Received: by secfw2.sec.gov; id OAA05018; Thu, 16 May 2002 14:07:32 -0400
Received: from clone1.sec.gov.(204.192.28.51) by secfw2.sec.gov via smap
     id xma004727; Thu, 16 May 02 14:06:37 -0400
Received: (from httpd@localhost)
     by clone1.sec.GOV (8.10.2/8.10.2) id g4Gl6aO15924;
     Thu, 16 May 2002 14:06:36 -0400
Date: Thu, 16 May 2002 14:06:36 -0400
Message-Id: <200205161806.g4Gl6aO15924@clone1.sec.GOV>
to: mdb@sec.gov, enforcement@sec.gov
subject: enforcement complaint
from: nobody@secfw2.sec.gov

----- END SEC HEADER -----

ENFORCEMENT COMPLAINT FORM
5-16-102  14:6:36
- - - - - - - - - - - - - - - - - -
Information About You:
Name:  Daniel Grill
Email:  daniel.grill@fmr.com
Address:  8593 Coran Dr. Cincinnati, Oh 45255
Phone:  513-480-0661

Information About the Complaint
Type: Common stock NYSE:USU
Entity Name: Jay McDaniel allegedly
Names, Addresses, Telephone number etc:
scam email sent to me from mail@email8.net, which is a mailing list.
How you learned about the transaction or other activity:
unsolicited email
Who contacted you:
Jay McDaniel again, unconfirmed name
Sales material in your possession:
Email
Details about the transaction:
I didnt fall for this trick.  I am writing to warn you of the scam.

SUMMARY:
Unsolicited email claims that one company will be a huge benefactor of the Bush-Putin summit meeting.  It details market
cap, sales, share price, etc, but of course not the name of the company.

1

**PI-00217**

I am a good stock researcher,       found the company to be NYSE:USU.  Tod.      e stock is trading at a high of 10, up from 7 a few days ago.

To learn the name of the company, you have to buy the special report for 1,000.  When the susceptable customer buys the report, and finds out that the stock already popped up to 10, they will be upset.  On the other hand, a real novice will buy the stock, just as others are selling.  A classic pump and dump.

I replied to the email, but it was returned, as the address is a mailing list.


If on the Internet, all relevant Internet addresses:
original link in the email:  http:www.pirateinvestor.comReports350SSITDGW350C509.cfm

link is redirected to:  https:www.agora-inc.comsecureFORM1.CFMPUBCODE=350SSITPCODE=W350C509ALIAS=all
Any additional information:
As stated, I did not fall for this scam, and Im not even sure its illegal.  I think it must be.  Please contact me if you would like the full text of the email.  Its pretty long, but in plain text.
Server protocol: HTTP1.1
Remote host:
Remote IP address: 192.223.163.6
User Agent: Mozilla4.0 compatible MSIE 6.0 Windows NT 4.0 T312461 .NET CLR 1.0.3705
- - - - - - - - - - - - - - - - - -

PI-00218

# EXHIBIT E

Yahoo!  My Yahoo!  Mail

 **FINANCE**  **Sign In**
Message Boards   New User? Sign Up

Search the web    [ Search ]

Message Boards Home - Help



Let Per tell you why your global email is so good.  Y! MAIL

Top > Business & Finance > Investments > Sectors > Basic Materials > Non-Metallic Mining > USU (USEC Inc.)

Options - Edit Public Profile - Sign In

## Yahoo! Message Boards: USU

Add to My Yahoo

**Previous 40** | **Next 40** [ First | Last ] Msg #: [_____] [Go] 📝 **Post New Message**

**Boards Search**

[_____] [ Get Msgs ]

| # | Subject | Author | Sentiment | Recs | Date/Time (ET) |
|---|---------|--------|-----------|------|----------------|
| 15249 | stockup | bienhoa70 | | | 05/15/02 09:52 pm |
| 15248 | Re: Amazing | lasting21474 | | | 05/15/02 09:41 pm |
| 15247 | Amazing | olechiller | | 2 | 05/15/02 08:51 pm |
| 15246 | AH trading at 9.40 best bid | sailingbrz2000 | | | 05/15/02 08:38 pm |
| 15245 | Re: stock price report | lovethemnukes | | 2 | 05/15/02 08:30 pm |
| 15244 | Re: stock price report | CBS_cynic | | | 05/15/02 07:40 pm |
| 15243 | Re: The board is not active because | castaneda1289 | | 3 | 05/15/02 07:31 pm |
| 15242 | stock price report | splanton | | | 05/15/02 07:27 pm |
| 15241 | Fiscal Year update | Killjoy4u_98 | | 3 | 05/15/02 06:18 pm |
| 15240 | The board is not active because | lovethemnukes | | | 05/15/02 06:09 pm |
| 15239 | Re: Here is the story to USU... | Killjoy4u_98 | | 3 | 05/15/02 06:09 pm |
| 15238 | Re: A buy on the chart alone... | sailingbrz2000 | | | 05/15/02 05:05 pm |
| 15237 | Re: All aboard? | sailingbrz2000 | | 3 | 05/15/02 04:50 pm |
| 15236 | Re: Anyone out there? | littletonlizard | | 2 | 05/15/02 04:24 pm |
| 15235 | Anyone out there? | littletonlizard | | | 05/15/02 04:23 pm |
| 15234 | Re: All aboard? | thetradingmanual | | 2 | 05/15/02 04:22 pm |

**USU Quote**

USU 1–Jun @ 2:00pm (C)

8.00
7.95
7.90
7.85
7.80
10am   12pm   2pm

USU  7.92  +0.09  +1.1%

[ Get Quotes ]

quotes delayed 20 mins
disclaimer
Symbol Lookup
Quote data provided by Reu
Get Streaming Real-Time Q
with Yahoo! Finance

**USU More Info**

Chart, Financials, Historical Prices, Industry, Insider, Messages, News, Options, Pr Reports, Research, SEC Filin more...

**USU Company News**

· USEC Inc. Financials

· USEC CEO Cites Nuclear Nonproliferation Challenges Successes

· USEC Reports to Sharehold 2003 Performance

· USEC Inc. Board of Directo Declares Quarterly Dividend

USEC Inc. Earnings Call

| | | | | | |
|---|---|---|---|---|---|
| 15233 | USU worth $100.00 share????? | nvtl_wireless | | 05/15/02 04:16 pm | · scheduled for 8:30 am ET tc<br>N |
| 15232 | All aboard? | sailingbrz2000 | 2 | 05/15/02 04:11 pm | |
| 15231 | 22 ON 5/22?????? WHY NOT! | sailingbrz2000 | | 05/15/02 04:09 pm | |
| 15230 | MUSIC at the close | sailingbrz2000 | 2 | 05/15/02 04:03 pm | |
| 15229 | NEW HIGHS !!!!! GO MO...EOM | sailingbrz2000 | | 05/15/02 04:00 pm | |
| 15228 | Nice close... | thetradingmanual | 2 | 05/15/02 03:56 pm | |
| 15227 | 10% up per day to 20's..BIG GAP UP..... | sailingbrz2000 | | 05/15/02 03:55 pm | |
| 15226 | GO Usec!! LETS C MID 20's GO BIG MO-MO | sailingbrz2000 | 2 | 05/15/02 03:53 pm | |
| 15225 | Closing at the high of the day... | lovethemnukes | | 05/15/02 03:40 pm | |
| 15224 | Re: Why the volume here? | whatthehype | 2 | 05/15/02 03:36 pm | |
| 15223 | Re: Why the volume here? | dlr504 | | 05/15/02 03:34 pm | |
| 15222 | Re: Why the volume here? | gabeh73 | 2 | 05/15/02 03:32 pm | |
| 15221 | Why the volume here? | whatthehype | | 05/15/02 03:26 pm | |
| 15220 | A buy on the chart alone... | lasting21474 | 2 | 05/15/02 03:23 pm | |
| 15219 | Re: Here is the story to USU... | eupman | | 05/15/02 03:11 pm | |
| 15218 | More Goat Entrails | nuclearpoombah | 2 | 05/15/02 02:59 pm | |
| 15217 | Re: Still moving up... | gabeh73 | | 05/15/02 02:48 pm | |
| 15216 | Re: Here is the story to USU... | nukefollower | 1 | 05/15/02 02:42 pm | |
| 15215 | Re: USEC IS ANOTHER ENRON!!! | commoncents_2002 | | 05/15/02 02:39 pm | |
| 15214 | Still moving up... | thetradingmanual | | 05/15/02 02:39 pm | |
| 15213 | Nice move | lasting21474 | | 05/15/02 02:33 pm | |

| | | | | |
|---|---|---|---|---|
| | today... | | | |
| 15212 | <u>Re: Goat Entrails, Options, and Fun</u> | nuclearpoombah | | 05/15/02 02:33 pm |
| 15211 | <u>Re: Goat Entrails, Options, and Fun</u> | nuclearpoombah | 1 | 05/15/02 02:26 pm |
| 15210 | <u>Here is the story to USU...</u> | insttrader2001 | 6 | 05/15/02 02:06 pm |

Ignore Filter is Off [ **Turn ON** ] | Profanity Filter is Off [ **Turn ON** ] - <u>Options</u> - <u>Help</u>

**Previous 40** | **Next 40** [ <u>First</u> | <u>Last</u> ]  Msg #: [＿＿＿] Go ▤✎ **Post New Message**

[ Search ]

◉ All   ○ Subject   ○ Message Text   ○ Author

**Reminder:** This board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified by your posts. Please read our <u>Terms of Service</u>. For more information regarding investments and the Internet, please visit the <u>SEC Web site</u>.

Copyright © 2004 Yahoo! Inc. All rights reserved.
<u>Privacy Policy</u> - <u>Terms of Service</u> - <u>Copyright Policy</u> - <u>Guidelines</u> - <u>Help</u> - <u>Ad Feedback</u>

 

     

Yahoo!  My Yahoo!  Mail

**YAHOO! FINANCE** Sign In
Message Boards    New User? Sign Up

Search the web    [ Search ]

Message Boards Home - Help

**I GRADUATED IN:** 

1994
1984
1974
1964

Top > Business & Finance > Investments > Sectors > Basic Materials > Non-Metallic Mining > USU (USEC Inc.)

Options - Edit Public Profile - Sign In

# Yahoo! Message Boards: USU

Add to My Yahoo

**Previous 40** | **Next 40** [ First | Last ] Msg #: [ ] [Go] 📝 **Post New Message**

| # | Subject | Author | Sentiment | Recs | Date/Time (ET) |
|---|---------|--------|-----------|------|----------------|
| 15209 | Re: Goat Entrails, Options, and Fun | dudemawn | | | 05/15/02 01:44 pm |
| 15208 | Volume is huge. | lasting21474 | | | 05/15/02 01:35 pm |
| 15207 | Re: Goat Entrails, Options, and Fun | robbievb | | | 05/15/02 01:34 pm |
| 15206 | Re: project x - crack poster | gabeh73 | | 1 | 05/15/02 01:33 pm |
| 15205 | Re: project x - crack poster | thetradingmanual | | | 05/15/02 01:30 pm |
| 15204 | Re: Goat Entrails, Options, and Fun | kentucky_milliona... | | | 05/15/02 01:28 pm |
| 15203 | Max pain level for June, looks to be | dudemawn | | | 05/15/02 01:26 pm |
| 15202 | Goat Entrails, Options, and Fun | nuclearpoombah | | | 05/15/02 01:23 pm |
| 15201 | Re: You were hoodwinked!!! | stockingur2 | | | 05/15/02 01:20 pm |
| 15200 | project x | gabeh73 | | | 05/15/02 01:20 pm |
| 15199 | Re: project x | gabeh73 | | | 05/15/02 01:19 pm |
| 15198 | Re: project x | projectxman | | | 05/15/02 01:18 pm |
| 15197 | Re: You were | osha_hoodwinking | | | 05/15/02 01:17 pm |

**Boards Search**

[ ] [ Get Msgs ]

**USU Quote**

USU 1-Jun @ 2:00pm (C)

8.00
7.95
7.90
7.85
7.80
10am    12pm    2pm

USU  7.91  +0.08  +1.0

[ ] [ Get Quotes ]

quotes delayed 20 mins
disclaimer
Symbol Lookup
Quote data provided by Re
Get Streaming Real-Time Q
with Yahoo! Finance

**USU More Info**

Chart, Financials, Historical
Prices, Industry, Insider,
Messages, News, Options, Pr
Reports, Research, SEC Filin
more...

**USU Company News**

· USEC Inc. Financials
· USEC CEO Cites Nuclear
  Nonproliferation Challenges
  Successes
· USEC Reports to Sharehold
  2003 Performance
· USEC Inc. Board of Directo
  Declares Quarterly Dividen
· USEC Inc. Earnings Call

| | | | | |
|---|---|---|---|---|
| | hoodwinked!!! | | | scheduled for 8:30 am ET to |
| 15196 | definitely safer than GE or CSCO | gabeh73 | | 05/15/02 01:17 pm |
| 15195 | project x | gabeh73 | | 05/15/02 01:16 pm |
| 15194 | Re: You were hoodwinked!!! | projectxman | | 05/15/02 01:14 pm |
| 15193 | Re: You guys should be investing in wind | gabeh73 | | 05/15/02 01:14 pm |
| 15192 | Re: USU | futuresguy2000 | | 05/15/02 01:14 pm |
| 15191 | Re: If being up $1 is a loss... | gabeh73 | | 05/15/02 01:13 pm |
| 15190 | Re: You were hoodwinked!!! | projectxman | | 05/15/02 01:12 pm |
| 15189 | me too trading manual | gabeh73 | | 05/15/02 01:12 pm |
| 15188 | Why the Jump? e-mail alert | MightyRedOak | | 05/15/02 01:11 pm |
| 15187 | You guys should be investing in wind... | pittsburgh_bankin... | | 05/15/02 01:10 pm |
| 15186 | Re: You were hoodwinked!!! | gabeh73 | 1 | 05/15/02 01:09 pm |
| 15185 | Re: If being up $1 is a loss... | backyardcook | 1 | 05/15/02 01:07 pm |
| 15184 | If being up $1 is a loss... | thetradingmanual | 1 | 05/15/02 01:06 pm |
| 15183 | Re: It was a scam! | stockingur2 | 1 | 05/15/02 01:05 pm |
| 15182 | Re: why is the message board down? | fsfssggg | 1 | 05/15/02 01:03 pm |
| 15181 | You were hoodwinked!!! | projectxman | 1 | 05/15/02 12:59 pm |
| 15180 | Re: It was a scam! | rtb_blows_clinton | 1 | 05/15/02 12:57 pm |
| 15179 | It was a scam! | cowboy456622000 | 1 | 05/15/02 12:51 pm |
| 15178 | Re: Ahh, those DOE clearances! | project_ex_man | 1 | 05/15/02 12:36 pm |
| 15177 | Re: Ahh, those DOE clearances! | project_ex_man | 1 | 05/15/02 12:28 pm |

| 15176 | Re: Ahh, those DOE clearances! | project_ex_man | 2 | 05/15/02 12:25 pm |
| 15175 | Re: Ahh, those DOE clearances! | lasting21474 | 1 | 05/15/02 12:20 pm |
| 15174 | Re: Ahh, those DOE clearances! | project_ex_man | 2 | 05/15/02 12:18 pm |
| 15173 | Re: Ahh, those DOE clearances! | project_ex_man | 1 | 05/15/02 12:16 pm |
| 15172 | Ahh, those DOE clearances! | project_ex_man | 2 | 05/15/02 12:08 pm |
| 15171 | Re: Hey where is the money? | project_ex_man | 1 | 05/15/02 11:59 am |
| 15170 | Re: Hey where is the money? | timmaytoo | 1 | 05/15/02 11:52 am |

Ignore Filter is Off [ **Turn ON** ] | Profanity Filter is Off [ **Turn ON** ] - Options – Help

**Previous 40** | **Next 40** [ First | Last ] Msg #: [____] Go 📝 **Post New Message**

[_____] Search

◉ All  ○ Subject  ○ Message Text  ○ Author

**Reminder:** This board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified by your posts. Please read our Terms of Service. For more information regarding investments and the Internet, please visit the SEC Web site.

Copyright © 2004 Yahoo! Inc. All rights reserved.
Privacy Policy - Terms of Service - Copyright Policy - Guidelines - Help - Ad Feedback

Yahoo!  My Yahoo!  Mail

Search the web    [Search]



**YAHOO!® FINANCE** Message Boards  **Sign In**
New User? Sign Up

Message Boards Home - Help





Let Per tell you why your global email is so good.    Y! MAIL



Top > Business & Finance > Investments > Sectors > Basic Materials > Non-Metallic Mining > USU (USEC Inc.)

Options - Edit Public Profile - Sign In

# Yahoo! Message Boards: USU

Add to My Yahoo

**Previous 40** | **Next 40** [ First | Last ] Msg #: [_____] [Go]   📝 **Post New Message**    Boards S

| # | Subject | Author | Sentiment | Recs | Date/Time (ET) |
|---|---------|--------|-----------|------|----------------|
| 15169 | why is the message board down? | supp0rt_level | | 1 | 05/15/02 11:48 am |
| 15168 | Need info on the following | project_ex_man | | 1 | 05/15/02 11:38 am |
| 15167 | Volume 10X normal daily average... | thetradingmanual | | 1 | 05/15/02 11:01 am |
| 15166 | Hey where is the money? | project_ex_man | | 1 | 05/15/02 10:51 am |
| 15165 | Dear Porter Stansberry: | VentureShadow | | 1 | 05/15/02 10:37 am |
| 15164 | Re: USU | heimlich_inghersn... | | | 05/15/02 10:13 am |
| 15163 | WHAT HAPPENED TO THE BOARD | rtb_blows_clinton | Buy | | 05/15/02 09:59 am |
| 15162 | To the moon! | amx3files | | | 05/15/02 09:46 am |
| 15161 | test message | wjtjdsig | Buy | | 05/15/02 08:49 am |
| 15160 | Re: www.pirateinvestor.com -- PART II | lasting21474 | | | 05/15/02 08:19 am |
| 15159 | Re: Double Your Money Email | sharp_cat18 | Buy | | 05/15/02 12:49 am |
| 15158 | Re: www.pirateinvestor.com -- PART I | samward78219 | | | 05/15/02 12:32 am |
| 15157 | nice rally | hackshark2 | Buy | 1 | 05/15/02 12:27 am |
| 15156 | Re: Attention Employees - Do not sign!!! | bienhoa70 | | | 05/14/02 11:56 pm |
| 15155 | www.pirateinvestor.com -- PART II | porterstansberry1 | | 2 | 05/14/02 11:47 pm |
| 15154 | | porterstansberry1 | | | 05/14/02 11:46 pm |

Boards S

[  ] [G

**USU Qu**

USU 1–Jun @ 2:

8.00
7.95
7.90
7.85
7.80
10am    12pm

USU  7.89  +0.

[  ] [Ge

quotes delayed
disclai
Symbol L
Quote data provid
Get Streaming Rea
with Yahoo!

**USU Mor**

Chart, Financials, F
Prices, Industry, Ins
Messages, News, O
Reports, Research,
**more...**

**USU Compa**

· USEC Inc. Financi
· USEC CEO Cites
  Nonproliferation C
  Successes
· USEC Reports to S
  2003 Performance
· USEC Inc. Board c
  Declares Quarterly
  USEC Inc. Earnin

| | www.pirateinvestor.com -- PART I | | | 1 | · scheduled for 8:30 |
|---|---|---|---|---|---|
| 15153 | The secret's out - so what? | getting_rich_slow... | | 1 | 05/14/02 11:44 pm |
| 15152 | Re: Attention Employees - Do not sign!!! | bienhoa70 | Hold | | 05/14/02 11:35 pm |
| 15151 | Re: Double Your Money Email | samward78219 | | | 05/14/02 10:00 pm |
| 15150 | Re: USU | samward78219 | Hold | | 05/14/02 09:57 pm |
| 15149 | Re: USU | ck_tropicul | | | 05/14/02 09:36 pm |
| 15148 | Salon on Yucca Mt-- humor | splanton | | | 05/14/02 08:35 pm |
| 15147 | Re: Double Your Money Email | lasting21474 | | | 05/14/02 08:23 pm |
| 15146 | Re: Double Your Money Email | samward78219 | | | 05/14/02 08:22 pm |
| 15145 | Re: USU | thetradingmanual | | | 05/14/02 08:13 pm |
| 15144 | Re: Looks like Greenpeace is here, | samward78219 | | | 05/14/02 08:12 pm |
| 15143 | Re: USU | ck_tropicul | | | 05/14/02 08:04 pm |
| 15142 | Re: Looks like Greenpeace is here, | samward78219 | Hold | | 05/14/02 07:58 pm |
| 15141 | Re: Caution to anyone willing to buy usu | ck_tropicul | | | 05/14/02 07:58 pm |
| 15140 | Re: Double Your Money Email | lasting21474 | | 1 | 05/14/02 07:57 pm |
| 15139 | Re: Price Move | nflunch | | | 05/14/02 07:54 pm |
| 15138 | Re: Double Your Money Email | ck_tropicul | | 5 | 05/14/02 07:50 pm |
| 15137 | Re: Looks like Greenpeace is here, | project_ex_man | | 1 | 05/14/02 07:45 pm |
| 15136 | Looks like Greenpeace is here, | hrcta | | 5 | 05/14/02 07:42 pm |
| 15135 | Re: Caution to anyone willing to buy usu | project_ex_man | | 1 | 05/14/02 07:40 pm |
| 15134 | Re: Caution to anyone willing to buy usu | project_ex_man | | 5 | 05/14/02 07:37 pm |
| 15133 | I find it rewarding. | project_ex_man | | 1 | 05/14/02 07:35 pm |
| 15132 | Re: Double Your Money Email | rtb_blows_clinton | | 5 | 05/14/02 07:31 pm |
| 15131 | Re: Price Move | Killjoy4u_98 | | 1 | 05/14/02 06:58 pm |
| 15130 | Re: Double Your Money Email | thetradingmanual | | | 05/14/02 06:58 pm |

Ignore Filter is Off [ **Turn ON** ] | Profanity Filter is Off [ **Turn ON** ] - Options - Help

**Previous 40** | **Next 40** [ First | Last ]  Msg #: [____] Go    📝 **Post New Message**

[_____] Search

◉ All   ○ Subject   ○ Message Text   ○ Author

**Reminder:** This board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified by your posts. Please read our Terms of Service. For more information regarding investments and the Internet, please visit the SEC Web site.

Copyright © 2004 Yahoo! Inc. All rights reserved.
Privacy Policy - Terms of Service - Copyright Policy - Guidelines - Help - Ad Feedback

# EXHIBIT F



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
SALT LAKE DISTRICT OFFICE
50 SOUTH MAIN STREET
SUITE 500
SALT LAKE CITY, UTAH 84144

In replying
please quote
SL-02368

December 2, 2002

**VIA FEDERAL EXPRESS and
FACSIMILE**

408/349-7941 (fax)
408/349-5497 (phone)
Yahoo, Inc.
Custodian of Records
701 1st Ave.
Sunnyvale, California 94089

Re:     In the Matter of PirateInvestor.com (SL-02368)

To Whom it May Concern:

The staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to Yahoo, Inc. ("Yahoo") as part of this investigation. The subpoena requires Yahoo to give us documents and provide sworn testimony.

Please read the subpoena and this letter carefully. This letter answers some questions you may have about the subpoena. You should also read the enclosed SEC Form 1662. You must comply with the subpoena. You may be subject to a fine and/or imprisonment if you do not.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires you to give us the documents described in the attachment to the subpoena. You must provide these documents by December 12, 2002. The attachment to the subpoena defines some terms (such as "document") before listing what you must provide.

Please note that if copies of a document differ in any way, they are considered separate documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

If you prefer, you may send us photocopies of the originals. The Commission cannot reimburse you for the copying costs. The copies must be identical to the originals, including even faint marks or print. If you choose to send copies, you <u>must</u> keep the originals in a safe place. The staff will accept the copies for now, but may require you to produce the originals later.

If you <u>do</u> send us photocopies, please put an identifying notation on each page of each document to indicate that it was produced by you, and number the pages of all the documents submitted. (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc.,

**SEC 02408**

December 2, 2002
Page 3

<u>Testifying</u>

*Where and when do I testify?*

    The subpoena may require you to appear and provide testimony at a later date.

<u>Other Important Information</u>

*May I have a lawyer help me respond to the subpoena?*

    Yes. You have the right to consult with and be represented by your own lawyer in this matter. Your lawyer may also advise and accompany you when you testify. We cannot give you legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

    The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

    This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

    If you have any other questions, you may call me at (801) 524-6743. If you are represented by a lawyer, you should have your lawyer contact me.

Sincerely,

Brent R. Baker
Special Counsel,
U.S. Securities and
Exchange Commission

Enclosures:    Subpoena
               SEC Form 1662

**SEC 02409**

12/2/02



## SUBPOENA
# UNITED STATES OF AMERICA
### SECURITIES AND EXCHANGE COMMISSION

### In the Matter of PirateInvestor.com (SL-02368)

To:     Yahoo, Inc.
        Custodian of Records

___**X**___   **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below.

50 South Main Street, Suite 500, Salt Lake City, Utah 84144, on **Thursday, December 12, 2002, 10:00 a.m.**

___**X**___   **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below.

The staff will contact you upon receipt of the documents.

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
Failure to comply may subject you to a fine and/or imprisonment.

By:   _____             Date: __12/2/02__
      Brent R. Baker, Special Counsel
      50 South Main Street, #500, Salt Lake City, Utah
      Phone: 801-524-5796  Fax: 801-524-3558

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933, Section 21(a) of the Securities Exchange Act of 1934, and 209(a) of the Advisers Act.

**SEC 02410**

ATTACHMENT
TO YAHOO
DOCUMENT PRODUCTION
**In the Matter of PirateInvestor.com (SL-02368)**

## I.   DEFINITIONS

A.   A.   The name **"YAHOO"**means **Yahoo, Inc.'s** parents, predecessors, successors, subsidiaries, related corporations, partnerships, professional associations, affiliates, principals, officers, directors, partners, associates, employees, agents, independent contractors, persons acting on its behalf; and **"YAHOO"** means any aliases, code names, or trade or business names used by any of the foregoing.

B.   B.   The term "document" means all tangible forms of expression whether on paper, or in any other format, including, but not limited to, hard disk, diskette, CD-ROM, DVD or other disc, microfilm, microfiche, magnetic tape, videotape, audiotape, film, or any other electronic media, magnetic media, or laser media.

C.   C.   The term "subscriber" means a person or entity to whom **YAHOO** has granted a password, user privileges, or other services including, but not limited to, the right to post or send messages using a specific user name or alias, the right to send or receive e-mail, the right to create, edit, or delete a webpage, or the right to use a shell, file transfer protocol (FTP), or other account.

## II.   INSTRUCTIONS

A.   **You should not produce any materials that are not subject to production under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq.**   Accordingly, if you are a communications service provider or remote computing service, you should not provide certain wire or electronic communications such as the contents of e-mails of your customers, subscribers, or other users unless you are either the sender or intended recipient of the communication.

B.   Produce the following:

1.   Documents sufficient to identify the subscriber's name, account number, current residential or billing address(es), telephone number(s), credit card numbers and checking account numbers, and other subscriber number or identity, including, but not limited to, the originating Internet Protocol addresses used by the subscriber(s) when registering for the user names set forth below, and creating, editing and deleting the corresponding message board postings set forth below:

SEC 02411

| User Name | Thread on Yahoo | Msg. no. | Date and Time |
|---|---|---|---|
| porterstansberry1 | USU | 16927 | June 2, 2002 12:58 a.m. |
| porterstansberry1 | USU | 16928 | June 2, 2002 12:59 a.m. |
| porterstansberryl | USU | 15447 | May. 17, 2002, 12:59 p.m. |
| porterstansberryl | USU | 15448 | May. 17, 2002, 1:11 p.m. |
| porterstansberryl | USU | 15449 | May. 17, 2002, 1:13 p.m. |
|  |  |  |  |

2.   All documents that relate to, refer to, or concern communications between **YAHOO** and the subscriber(s) who authored the posts identified in II.B.1 above where **YAHOO** was the sender or intended recipient of the communication.

3.   Documents sufficient to identify the names, addresses, phone numbers, and titles of persons at **YAHOO** who can answer questions regarding usage, security, and computerized logging of the Internet server(s) or related computer system(s) on which **YAHOO's** computer services are maintained.

**SEC 02412**

```
                         ***   TX REPORT   ***
                         ********************


        TRANSMISSION OK


        TX/RX NO              1202
        CONNECTION TEL                  84083497941
        SUBADDRESS
        CONNECTION ID         Y A H O O !
        ST. TIME              12/02 16:34
        USAGE T               04'58
        PGS.                    10
        RESULT               OK
```

**SEC 02413**

**PLEASE FOLD THIS SHIPPING DOCUMENT IN HALF AND PLACE IT IN A WAYBILL POUCH AFFIXED TO YOUR SHIPMENT SO THAT THE BAR-CODE PORTION OF THE LABEL CAN BE READ AND SCANNED. ***WARNING: USE ONLY THE PRINTED ORIGINAL LABEL FOR SHIPPING. USING A PHOTOCOPY OF THIS LABEL FOR SHIPPING PURPOSES IS FRAUDULENT AND COULD RESULT IN ADDITIONAL BILLING CHARGES, ALONG WITH THE CANCELLATION OF YOUR FEDEX ACCOUNT NUMBER.**

FROM:   Scotty Zamora (801)524-5796
        Securities & Exchange Commissic   SHIPPER'S FEDEX ACCOUNT NUMBER
        50 South Main Street
        500
        Salt Lake City, UT 84144



**FedEx**
Federal Express

TO:     Yahoo, Inc. (408)349-5497
        Custodian of Records
        701 1st Avenue

        Sunnyvale, CA 94089-

SHIP DATE: 02DEC02
MAN-WGT: 1 LBS

REF:



DELIVERY ADDRESS BARCODE (FEDEX-EDR)
CAD # 3960705

## PRIORITY OVERNIGHT

**TUE**
AA

TRK # **7906 4418 7122** FORM 0201

SJC

Deliver By:
**03DEC02**☐☐☐☐☐☐

**94089-CA-US**
DROP OFF

# WA COAA



SEC 02414

# DO YOU YAHOO!?

# fax message

**date:** 12/29/2002

**to:** Brent Baker
SEC

**Fax:** 801-524-3558

**from:** CATHY MCGOFF
YAHOO! LEGAL
COMPLIANCE MANAGER
408-349-5497
408-349-7941

**pages**  5

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply

**COMMENTS:**   Subpoena Compliance.

SEC 02402

Contact Cecilia Yoshida if you have questions concerning this fax.
Phone: 408-731-3584 ✰ cyoshida@yahoo-inc.com

12/21/02  00:10 FAX 405 349 7543      YAHOO!                    @002

# YAHOO! ACCOUNT MANAGEMENT TOOL
### NOTE: All times are Pacific Time

| | |
|---|---|
| Login Name: | **fleetstreetporter** |
| Yahoo Mail Name: | **porterstansberry1@yahoo.com** |
| (Alternate) Email Address: | **pirateinvestor@hotmail.com** |
| Other Identities: | **fleetstreetporter**<br>**porterstansberry1**<br>**disruptivepartners**<br>**jgiffordceo** |
| Full Name | **Mr Frank Porter Stansberry** |
| Address1: | **100 Harbor View Dr.** |
| Address2: | **#1708** |
| City: | **Baltimore** |
| State, territory or province: | **MD** |
| Country: | **United States** |
| Zip/Postal Code: | **21230** |
| Phone: | **410-752-0150** |
| Time Zone: | **et** |
| Business Name: | **PSIA** |
| Business Address: | **105 W. Monument Street** |
| Business City: | **Baltimore** |
| Business State: | |
| Business Country: | **us** |
| Business Zip: | |
| Business Phone: | **410-223-2648** |
| Business Email: | |
| Account Created (reg): | **Tue Mar 3 08:02:56 1998** |
| My Yahoo Configured (dora): | **Tue Mar 3 08:06:02 1998** |
| Yahoo Mail Agreed (ym_agreed): | **Tue Jan 12 10:32:15 1999** |
| Account Status | **Active** |
| User Has a Security Key: | Get more Info for fleetstreetporter |

View Account   Close

SEC 02403

**porterstansberry1**

| Date/Time | IP Address |
|---|---|
| 06/02/02 12:59 am EDT | 151.196.233.220 |
| 06/02/02 12:58 am EDT | 151.196.233.220 |

Home - Back

SEC 02404

# EXHIBIT G

09/06/02  10:21 FAX 3015643                USEC

→ Porter Stansberry                    May 2, 2002
  INVESTMENT ADVISORY
- Wants to know about production costs.
- Is in favor of nuclear power. Believes L-T is a
  growth industry.
* - This is a critical program that gov't will not let
  fail - HEU
* - We use $400 million in power/yr or 2000 MW (2 nuclear plants)
  - Negative credit watch?
     Because of how long it's taking us to sign contract
  1) we were expecting 630 million in cut in cost.
  2) Impairment of inventory
     That's why we've been put on credit watch.
* - We are not in violation w/ convenants. But we want to
  reduce it since we've been eating into our
  shareholders equity.
     We + earning less than our dividend.
  - The reason for a revolver is to take care of tight resources.
  He'll put out a new edition tomorrow.
     Though we're very attractively-priced - we can't go
     forward until gov't takes a decision.
  Specializes in investing in Technologies. We used to
  mark as price leader in R+D rather than relying
  on Russian supply.
  Has 30,000 subscribers, started in 1999.
  Lives in Dt Baltimore

GOVERNMENT
EXHIBIT
...                                    USEC 00061
                                       CONFIDENTIAL

— Before termination, need administrative review. Do they
look @ 10 yrs or just a portion? Russians expect S.A. to
terminate. We don't want to bring a case.
There's an argument as to whether investigation
October 30, 2002 — Issue preliminary determination as to
whether

May 1, 2002

✳ Paul Hanks — a Ron
  — Ask for copy of Fin. Rel. Y.D March 31 Budget

→ Finance 101 for Communications

— Porter Stansberry — 10 AM Call (His own newsletter)

— George Goudelias — Have Bonds both — also stocks personally
  Status of negotiations w/ Banks?
  Talking to a lot of institutions + banks
  still not exchanging term sheets.
  Current revolver is still good.
  Trying to be opportunistic, by replacing before gets
    to a real crunch.
  Haven't used what we've got — it's always good
    to have, prudent, but don't want to do anything
    for it.
  With so much cash, we used the revolver.
  But we did use it in Sep. 11 when couldn't access
    money market.
  → We do plan to hold onto our cash, but do not
  plan in short-term to buy the bonds back chart.
  Has benefit to bottom line, + gets rid of interest, but
  you can ask us again later to buy back your bonds
    in the future, not now.

USEC 00069
CONFIDENTIAL

Porter Stansberry                    May 2, 2002
INVESTMENT ADVISORY

- Wants to know about production costs.
- Is in favor of nuclear power. Believes L-T is a
  growth industry.
* - This is a critical program that gov't will not let
  fail - nell
* - We use 40 million in power/yr 0 - 2000 MW (2 nuclear plants)
- Negative credit watch
   Because of how long it's taking us to sign contract
   1) we were expecting $30 million in net income.
   2) Impairment of inventory
   That's why we've been put on credit watch.
* We are not in violation w/ covenants. But we want to
  explain it since we've been eating into our
  shareholders equity.
  We're earning less than our dividend.
  The reason for a dividend is to take care of tight cash
  
He'll put out a new edition tomorrow.
   Though we're very attractively priced - we can't go
   forward until gov't takes a decision.
   Specializes in investing in Technologies. We used to
   work as price leader in R+D rather than relying
   on Russian supply.
   Has 70,000 subscribers, started in 1999.
   Lives in Dt Baltimore

USEC 00070
CONFIDENTIAL

— Before termination, need administrative review. Do they look @ 10 yrs or just a portion? Russians expect S.A. to terminate. We don't want to bring a case.

There's an argument as to whether investigation

October 30, 2002 - Issue preliminary determination as to whether

USEC 00071
CONFIDENTIAL

Monday, May 6, 2002          Continuation of 101 Call
9:30                         Deborah - 503-256-7591

- Discussed the Market
- Steve more cost improvements.
   - Financial analysts :  }  Questions for Steve
   - Financial numbers :  }

Eric Whitman, Platinum   (Acquisition firm)
       310 - 712 - 1850
                    "This is a Fax number!

PWC - 2 powerpoint Pages
Who they    60% Ind   40% Retail
are    Holders of ____ in bonds
                 - Russian HEU Contract
What they're     - ____
interested     - St. ____ →
   in          - Cost Reduction Initiatives  ─ Produces sof-scom
                                              reduce overhead
               - Trade Action                + staffing
               - MPrice
               - Revenue Profile
               - Advanced Tech

USEC 00072
CONFIDENTIAL

May 7, 2002

Deborah — 3rd Conf call.

✗ Send uranium price graph ($UF_6$), Historical.

— Our costs are coming down. By end of FY03 cost
will be down to $100/kurt.

" "

Ⓧ Rossi - Bank of NY —
cell

" "

Bob Pearson — Kansas City, Mo.
Duke Energy
✗     816 - 453 - 6707

Kansas City Star about weapons grade Pu
going to S. Carolina to be converted into
nuclear fuel for —
Strubbler for a number of years.

USEC 00073
CONFIDENTIAL

schanzer-harben follows co.     May 8, 2002
✓ Set-up time to have meeting w/ management.
Jerry follows company
→ Mr. Shanzer, Van barben, Gary Sukness.
Thips that are going on w/ Co.
Wash DC hunter or deliver (w/in 2 weeks)     independent
202-955-4336  Jerry Montgomery Scott — Do research.  buy local companies

REQUEST FOR MEETING  — Old brokerage —

Tues pm / Wed all day / Thurs pm / Friday all  !!   Litho in U.S.A.

100 mill plants
10 mill swirl

Bob
240-472-4674                          May 10, 2002

⇒ Steve Korn - Lowe's Corp.
   We'll run this summer plant @ 900 mw)
   As opposed to 1900 mw during the year.
   Last summer we came down to 800 mw).
   Current contract for power is >2¢/kwh
⇒ Plans for Cade?
      - No stock buyback
      + We did buy 10% of Co. before, and fixed use then.
        Now we should/could use $110 mm over 6 yr
             period to lead Cascade.


   Rich Rowe called about a thing so as in the
   HEU deal. Wanting for long time!
   (call @ 5pm - (today))
   thinks Summit will help.

USEC 00074
CONFIDENTIAL

Stock @ $8 !!                    Russ Purchase?

May 14, 2002

Matt Desario — Desario Capital Mgmt.
        212-843-0477
    Impact of Treaty on our Earnings + Cashflow?

Lynn Lin? — Dow Jones News Wire.
        201-938-2089
        Wanted detail.

Call Back — Steve
→ No Re-purchase authorization
    Cash flow for $150m — Cap X
Cash: What to do?
What's Earnings Power of Company?
    — No earnings foreseeable
    — No Cash Flow plans
        So, why stock holding @ $8?
Has owned Stock for 2 years. Expected higher/faster
profitability.

USEC 00075
CONFIDENTIAL

Bob Pearson — Why did our price climb?
* How many traded @ $8.50 level?

    Primera Cascade = Julio Mercados   Capital   Atomic Energy Corp. Office
    Winston Camuillo — IVB             Minaton President
    53 2536 1608                       Ministry of Science.
                                       (2500 ···)   (11-14 de Agto)
→ Congreso INACA 2002  Atlantic Energia Nuclear
        Bob Van Namen · Brasilero, Int'l fuel suppliers, W, Franatome,
        Fenil Cogema, Camuello, Urenco ·
    INAC 2002 | INAC 2002 . Com br →

● → Mike Rowe - Bank of NY - Has Bonds          May 14, 2002
   Set up a meeting    - Introduced Myself -
   ✓ 973-226-4350
— ✓ Called because wants to set-up meetings

                              #

HALE                          May 15 2002
   → Trade Kind of Volume & Accumulation
                    5,000 trades
              — Take Over —
   Haven't had this issue before
   Who's buying / selling / patt

                              #

   ✓ Rich Rossi - Bank of NY
      Please Call                          **USEC 00076**
                                           **CONFIDENTIAL**

   ✓ Stan Solomon - Filler ??? (NIT)
      Specialist        Midwest Exchange on
                              buy side
      Options on USEC - Very wid up
              — CBW, LKF, Bear Stns —
                              #

● ✗ Nan "Dale Crow" has position in USEC
                      — Crow Investments —
      ( 530-836-4242 )

▼ — Wanted to know about link
   — Wanted to know that new terms would have
      better commercial terms. I said yes, because
      Price would be MR.

Tops ⊜ Form 36250                          Litho in U.S.A.

May 15, 2002

Overton Carvalho - 55

→ Have Russians + Americans bro't →
- Centrifuge -          (Lieu) # A lot of stock
- Trade Case -                       Ron.
  Mari Angeles  Major - Sosias

| 7 indices | '02 April | 01 March | 00 Feb | |
|---|---|---|---|---|
| | 92.29 | 92.29 | | |
| Nuken: | $86, $104 | 86, 100 | 78, 79 | |
| TT : | 86, 107 | 81, 97 | 79, 81 | 80.14 |
| I-T (TT) | 105 | 97 | 85 | |
| Ux. | 86 - 107 | 80 - 105 | 79 - 80 | |

Avg 7 indices over 3 yrs = 21 indices
= $89 - 90
- 13.% =   $78.22  in 2003.

If prices in 2003 stay as in 2002, then -

97.29 + 97.29 + 92.29 = Avg: 95.62
      - 13% ⇒ $83.19

**USEC 00077**
**CONFIDENTIAL**

May 16, 2002

Rand Merchant Bank — Bond Holder, Potential Investor
MARK —

But we can also sell market-based if we wish.
+ what we purchase is at a discount.

We have minimal raw materials — really only raw input is power.
The feed material is delivered by the utility (usually)

→ Our interest payments on bonds = ~30 million
→ Do not have Debt to EBITDA covenant.

Working w/ Morgan Stanley in the U.S. — getting bonds from there.

Looking for Distribution List in June.

→ Chris Sippie — Precept Capital Dallas (High Yield Indiv. Fund)

→ Send thing to Mike on the

Call Ron Roy — 10K — retail

USEC 00078
CONFIDENTIAL

⇒ Bruce Rubin  301-891-5110  Potomac
Reported in a lot of interest in USEC because
U.S.

USEC 00079
CONFIDENTIAL

→ Nesbett Burns - Vancouver Canada
Quick Rating Star Data
↳ 4.7
$200 Mm in 6.4
— Debt has been Downgraded —
- Takes a year - to sign

Book value - Steve Wright

☒ Send Package - | Ste. 1800   885 W. Georgia St.
Vancouver, B.C.
Canada
V6C 3E8.

→ John - Shareholder for a bit over a year.
Appreciate my Candidness.

→ Bill Ridder   607-937-5292
Has client who holds USU shares.
Used to work w/ Morgan Stanley.

Has yield changed since market?

Barbara Radin   361-365-7604
361-806-2647 cell
- NPR - on the news last evening -

Ivy Budgery - Stockholder 1,000 shares

USEC 00080
CONFIDENTIAL

— No sell-side coverage.
— 9 to 12 million net income.

Call: Stan Hall
      925-963-1485
— Wanted to know whether we have a deal
  w/ Russians
— If our dividend will remain
— If it will greatly affect our earnings

Ken Hoskin
    Scudder if 13G / 13F.  Appl. for resorts Plat.
      13G said had < 5%
      13F > 5.9%

USEC 00081
CONFIDENTIAL

May 17, 2002

✓ Send Packet : Florida
Herald Younger
P.O. Box 550
545 Jackonville Fla 32255

— David 619 number
: Had e-mailed Steve Wingfield
Spikes every quarter

Deanne Ross- Michael Keesie
(Washington Gas.

Eric Whitman (Platineum)

Wayne McChesney

479-855-7828

USEC 00082
CONFIDENTIAL

Litho in U.S.A.

Buy 3½ ¢/kwh !

Are stock buy-backs still possible to

**✦ USEC**
A Global Energy Company

52% cost is electricity.

What's source of reduction? Of 2 million SWU
- Not cutting production - Did not crank up.
- Reduction in purchases from Russia.

|  | '02 |  | '03 |
|---|---|---|---|
|  | ~5.0 |  | 4.6 |
| + | .3 US HEU |  | 5.5 |
|  | 5.5 Rus HEU |  | .5 |
|  | 10.8 |  | 10.6 |
| + | 12.5 sales |  | Sell 12 |
|  | ~2 million |  | cut inventory again! |

Positive → To shipping Coda

Frank Blake left to Home Depot.
was principal negotiator.

Paducah Cost Reduction:
Transfer + Shipping - $40M reduction. Still may have
additional $25M possibly.

When is inflection point? 2004?

Capital Needs NOT on diversification.
- Cash? ?

USEC 00083
CONFIDENTIAL

Use the cash —

Dave Shanger :
    Sales side Analyst
    J. Montgomery Scott., Phila .

Dividend : Bothend by NT saying that
        Board decides what to do w/ the
        dividend.

Today is down more by market rather
    ... than

Dividend Policy should be put on
    website, not on Public medium who
    can shoot the trigger.

Going to write now, not wait.

Silex — Any more progress ? Another payment. ?
        — Important demonstration —
        - No prnt in next few mostles .
        - will know what think of project by CY02 end .

NY folks want to talk to USEC w or w/o NT .

Once you cut dividend, don't believe dividend policy anymore.

USEC 00084
CONFIDENTIAL

May 20, 2002

→ Returned Call for Wayne McChesney
  9:35 am.
  "He's on the Golf Course"

→ Ed Koblebki
  Has entered a position
  60k to 5M volume — Rumor about the Company —
  — Rumor: Trotty

→ 29 May — Peter Prapp // Needham Smith
  9:30 - 11:30   Needham L. // Portfolio Mgr + Spec. V.P.
  19          (212) 705 - 0318        $197,500 cleans
                                              46th

→ Larry: Received all info from DTC
          Until ordered Tuesday bg. 15 - 17 + today
          Received — p - 1 - 7th
  DTC "Account is under suspension" for non-pmt.
          → Theresa — 212 - 855 - 5506 (Proceses equit.
  To   Joe Blake — 212 - 853 - 3627

  Including Today: Last

  Fast Day: Attract day-traders, hedge funds
  1. W2+D Jeffries Floor operations.
  2. Donald Smith
  3. Scudder
  4. Kennedy

USEC 00085
CONFIDENTIAL

  $ 175 outstanding   Invoice $100 - Current.
  Have 2 more #'s: 40884 = $75 Sept. 101 (148898)

- Jonathan Berry - wanted to know about relation

→ Paul Baskin - Bloomberg News

212-624-1822

Elizabeth: Not directly related
In big scheme of things in
good.

312 261 6412

⇒ 13D's: Has to be filed w/in 10 days of
acquisition. Then need to file
subsequent for any new
"material changes"
Office of tender offers. Exs. if
had to

- No blocks exceedingly large
900k in blocks

Larry - 900L - Kennedy, includes trading Friday.
W+D is sibling on behalf of Kennedy.
Trading arm of Jefferies.

USEC 00086
CONFIDENTIAL

Amanda Perran
→ 617-603-7984

— Corporate Profile needs to be up to date
— Shareholder Info

Stock Quote: Automatically Pops Up. Ok?
— Drop down menus should be above.

— Stock quote should be part of stock chart.
— Fundamentals: Financial Statements
— News Releases: Need e-mail alerts
        Finance would come to internet faster
        Archive points to

— Financial Reports — 10k, 10Q, etc—, Add Annual Rpt.
        Need to Group by year
— SEC Filings — be from SEC (make it a subset)

— Audio Web Cast: 12 days

— Correct Dividend Summary.
— Ck USEC Invest. Update.

— FAQ — Remove?

— Calendar of Events: Annual Mtg, Industry
                        Conferences, NEI
— E-Mail Alerts — Trade shows
— Mail Request (Contacts) "Info Request"

USEC 00087
CONFIDENTIAL

Larry: 312-261-6412
Have 25 minutes to get
any

→ Under Beaty
703-998-3303
Owns you all's stock
Wants to know what I've done w/my stock

→ Individual Investor - What to do w/ his
position ?

10th Munder Capital Mgmt Existed - 25-80k
15th Dow & Read  71,700 shares    shares -
sold leaves 20k

USEC 00088
CONFIDENTIAL

May 22, 2002

(8 what)

ILIOS - Lenny:
- All buying activity is scattered among tiny little brokers, banks etc.
- Buyers are all scattered
          Edward Jones
          Fidelity's online Rebi'd
          Charles Schwab
          Waterhouse

- Mah    858-452-8019
- Looking for press release

overMail: Dr. Morrison   ??

- Ralph Morello (called Corp. Comm.)
          (716) 377-6166
          I left message to call IR line.

- Star Solomon: All selling is ours
          → Nt Union Capital is largest seller
          → Lots other, Charles Schwab NIT was seller.

- Gary Everndon → Nate Inissler -
          603-782-824 Sounds Canadian.

- Peter Libu → 781-259-0211

USEC 00089
CONFIDENTIAL

- Bob Edwards
- Is stockholder → Philip Ferguson
- Bill Ferguson — Private Investor —
    has a bunch of investors — retail.
- Richard Singer
    — 801-770-7900

- Brett Hunter, Shareholder
- Investor in St. Louis, Mo.

USEC 00090
CONFIDENTIAL

Closed 7.75
Volume 976,700

Tuesday May 28, 2002

John Fernandez + Stockholder owns 10,000 shares.
Purchased stock - May 20th (?

# Call Back.    941 - 792 - 9843

→ England - Had a tip to invest in shares, and has been
going down. Had letter sent Tipping people
on that - A lot of people!
Says "A Company" - a lot have paid.
SEC!! Will go to SEC ?      She's Irate!

SEC!!         Wilcock ⇒ Husband/lawyers!
Company will not comment on stock. Should've called
company or looked @ releases - But she didn't know USEC.

Neil Rubin ?  805 - 687 - 3997   Ok, Steve
already called.

Ralph Clayton - Returning Call - (Not in)
336 - 227 - 7591

Harold  ? LaSalle St Securities   (LM)
Cowell   ?      (508) 695 - 2154    Spoke w/ Winifield
on Friday

USEC 00091
CONFIDENTIAL

425 - 451 - 2300  ? Volatility
Used to be with Government.  "Held Political Hostage?"
Attack - In Japan.  Could it be Political Posturing.
Evans -
- Need Political Advocates  ⇒   Susan Jennings

Andre Chaput   - Watertown, NY
315-782-2971   - Asking about announcement

Mr. Joseph O. Lahieda   - Recently Purchased
856-829-2127   (Busy)

USEC 00092
CONFIDENTIAL

Wednesday     May 28, 2002

Song Yi :   James      WMB Meeting

:   13th   12:30   (202) 955-4336.

Song Yi,
Gary Sokness   } James
Van Luxton      } Montgomery

Prefer Thursday or Friday.
#2 to 2:30 pm.

Stan Hall :  Private Investor.  (415)

Sean Quigley : Sent e-mail w/ question. Steve asked
that he call instead -

Colby reed Kellogg - Dinner Invitation .

Bruce Kinser - Wanted to know about Agmit.

Eileen La Pearl - 650-367-7841)

USEC 00093
CONFIDENTIAL

Salomon

Stor Kellogg SLK

2 biggest    Bear Sto 150 — Sold 150
             Wells Fgo 100 —
             Const — Buyers early in day only,
                              4 ~ 75 k shares

             LXE sold 100k

             NIT consistent seller too
                        repeat seller all
                                day.

Trading in narrow range

→ Not see any significant blocks.

The end of day we saw biggest trades
                  5k, one of 14k @ 7³⁰

Eileen
La Peara
650 367-7841

USEC 00094
CONFIDENTIAL

301- 651-323

May 31, 2002

— 303-256-5102 (Colorado)
$1,000   Private Investor

— brother (80$)

USEC 00095
CONFIDENTIAL

Litho in U.S.A.

June 6, 2001

- Larry Ilios
  Kennedy + Donald Smith bought back into stock.
      SA pension for Honeywell increased
          net purchased 300k

  300k shares
  purchased

  Stage Street - 141 ⇒ more like 200k

  Also Retail Selling.

USEC 00096
CONFIDENTIAL

June 7, 2002

Stan -   Opened @ $6.95
         Hit stop orders
         Wachovia was big seller
         LXE + Denver = 60K sellers now
         Gone more stops down to $6.75
         Delay was specialist - a lot of stocks selling on
              the floor today. Wanted to get right

Bloomberg - Stocks w/ names = stocks w/ initials.
           Will not include us it's moral.

USEC 00097
CONFIDENTIAL

Monday                                June 10, 2002

- Spoke w/ Jorge Albird - Cantv
                    58 212 - 563 - 6664
  Interested in L-T growth + dividends
  Got Pirate inverter memo.
  Telephone Company, Mobiles
- Rich Oramberg - Donald Smith + Co.
  Wanted to know about taxes
  Value of uranium to be cleaned up.
  Would it happen by end of this FY?

USEC 00098
CONFIDENTIAL

Tuesday                                    June 11, 2002

- Opened $6.95 / n 20k. Moved up to 7.00 in 2 minutes
  Ontario.
       7.04 at 9:33, down to 6.98 at 9:38

- 202-673-6128 *10*  — 611 202-858-7529
       917-3800
  # Writing a piece on Don Luger
       Int'l Center non-profit
       Mattison, Director

USEC 00099
CONFIDENTIAL

June 13, 2002

— Who are our large and mid-cap peers according to this? OK

☆ — 1) Look at peers in terms of "Nuclear" Companies.
2) " " " " " Energy Fuels producers.
(Supply side, not buy side)

Hal & Portsmouth worker settlement
I will have new board member July 1 — $ 600's + r Bus tier

Stuart Clark — Stock broker, holder
616-975-2024
Broker w/ 1st Union Securities, Grand Rapids MI
— Asked about spent fuel Tariff to afs/caroliner.
— Moo/Pu.

USEC 101 ⟶ Bill Fenap: Smith Moore + Co
— The Economist Article — that we should go back to gov't.

— Cost target at our plant is about $100. Buying power at 2¢
Runs as much as 1900 mw.
— 7 million SWU in inventory

— Morgan Stanley — Last Summer ⎫
— JMS — February       ⎬ Coverage
— Little contact w/ Franklin — Speaks to "Bruce" Hase.
          Mgr of Balance Sheet fund.
— Small Cap — Value : Sells research, OTC.
      Like stocks that sell below book value.

USEC 00100
CONFIDENTIAL

Rich Rosci — How are our bonds are trading?

Vladimir Spanck : 1 800 748 - 3713
violute geopolitically
Work w/ Japanese Co. Who like distribution.

Bill Crisp - Rpat : $25 Billion

⊅ William.e.crisp @ usdoj.gov ⊅

⊅ Vice Platterous - Krevinas - Dennis Blair (spoke w/ him)   [Verda]
SEC ruling: Whole meeting online.
⊅ Genesys Conference Eig ⊅ Based in France, Reston VA.
works
703 - 736 - 7137
www. genesys. com

⊅ 617 - 603 - 7500 Amanda -
⊅

⊅ Leo Dinkman Dirkman # Conseco Capital Mgmt.
Brian Hogan
Freon - Escape ³ ??

- Early - Next week :   [   ]

317 - 817 - 2694

USEC 00101
CONFIDENTIAL

⊅ Has 885 Shares of Stock - Retired guy 440 - 236 - 8369

Monday, June 17, 2002

- Opened 7.30, < 7,000
  < 30,000 at 10 am - Low Volume.

- 914 - 967 - 6087 David Kern

- Vince Cravenous - (Vendor)

- Gary Escadon
  CONSECO:

- Brian + Leo:
  What to purchased:

Power: Signed in ~~2005~~ 2000
  Retrego. in 2006
This Summer - Will be owning @ 900 mw
  and bought 600 mw in advance.
How do we entice investors to buy our stock?
* Story line during IPO:
  - Large Market share of essential product
  - Good Cash flow
  - limited growth globally (+ Jap/Taiw/Korea
  - Looking @ ways to diversify - w/in nuclea
  - L-T: Goal to be investment grade.
              Cost of capital critical for Centrifuge
* Rating Agencies: What goes do we need to meet to
  get rating back up?

Proforma Guidance: Roughly same in 03 as in 02
  $9 - 9½ million

USEC 00102
CONFIDENTIAL

Litho in U.S.A.

* → EBITDA: What do we say?

— Look @ Early July —

Process for New Bank Deal:
- We have Bank line of $50 m + in compliance w/ covenants.
- What's concept for paying dividend? What's logic?
  - Don't know what board will decide; can't speak for it.
- Bonds come due in '06
- Dev. of Centrifuge

CApx:

$\frac{8/30/01}{\text{Friday}}$ to $\frac{6/14/12}{}$

11/6/01 to   6/14/02

Bloomberg
Comp — dates
S&P 500 (SPX)
Russell 2000 } R_Y Index
NSU

Black
Yellow/Orange
Daily = Total Return

Total Return Analysis : TRA

EQY   Terr   PCT   YTD
                    — 1YR
            PCT   QTD
            PCT   MTD

USEC 00103
CONFIDENTIAL

# MJA Announcement

Tuesday, June 18, 2002

Rick Rossi ✓ Got newswire.

Bill Fenn ✓ Smith Moore & Co.

Bryan Higgins - Consus Capital Mgmt
        Revenue + warling Capital.
Gary's

→ Larry Holik - Ilios Partners.
    ⊕ No block trades
  - Some profit taking.
        Will send 312-261-6412
        Daily report as always

→ Bill Unruh : TCW
    Now: 512k shares - bought before on up.
        Sold this buying back, good cost.
        Aptite is 3x last
    Daughter lives in Nashville.
    Really looking to take large position
    ⊕ Interested in Housing facility

Alan Sprung
4760 Katamaran Circle
Boynton Beach, Fla
    33431
    → Annual Report

USEC 00104
CONFIDENTIAL

- Porter Stansbury ✓      "Risk 8"

- VR. w/ Detatedie ↔ Asset Mgmt

→ Roan Myers - Stock Broker
         Mike Mitchell

USEC 00105
CONFIDENTIAL

Wed, June 18, 2002

Conseco          317 - 817 - 2694

- Leo Dickman                    Week of July 7th
- Brian Higgins          (Tues 9th 1)
                          Need: 1 Full Given Name -
                              2. SSN -
        July 9              3. Date of Birth -
                          (4 Declaration of US Citizenship

FYOI: 900 M swu


'Peter Lieu: More expression of confidence in our
    Company would be to use our cash
    to buy back our stock.


Dave Schanger - TMS - Skeptical about GCEP in Atlas
→ Why is Atlas not Centrifuge? Tom Neff.


→ Rulli Rossi : Bonds


→ Mark Michaelis - 704 - 373 - 8244
                    Lost Certificate → go to Equiserve
                                     Our Transfer Agent
→ Tasso Cain - Peregrine (Works w/ Pugh
        612 - 343 - 7625
    Rename Doug Pugh and add -

USEC 00106
CONFIDENTIAL

Thurs. June 19, 02

Steven

Stan (Craig answered) @ SLK

SB Burnstein buying only (30k)
Sell side everywhere (electronized)

Subject: USU Trading
to: Timbers, hargents, Sheltarsh

Constastive: Bloomberg
PDF (Personal Default) Go
q) Settle date - for Equity
1) Equity Order Default

#1 choice should be "US" in order color box
F1 help twice: Phone # e-mail
1) Go

USEC 00107
CONFIDENTIAL

Open $7.72 — Down 3 $1/4 from 7.97 close   Close $8.20

Caroline Simmons — host 40k
504-874-5680
        Should

Stan Solomon — Jamsey Montgomery — Re-iterating their Hold
SLK                                 Scott  rating - out on 1st Call
  to

Rich Anderson: Overall Mkt opened low — sell off
        + Charles Schwab in as seller 50k shares
                        Working

X   212-521-2460   Steve Koon :   Longs
    Working Capital — Steve ?
    Nature of Economics of Our Business
        0.60¢ / share in 04 - 05.

Fin
Accounts Rec

Lang Ilios
DTC - on Monday (settlement) Bros Hunts Custodian
Hedge Fund @ DTC Custodial, buying shares.
This Trade takes 3 days to settle -
12th - 18 (wed - Tues)           3 weeks
  400k shares
  412,500 shares selling

Buying is scattered - Maybe Ones Size of 100k buyer.
Bear Stearns.
SLK - Sold 50k.    Mkt   Schwab
                   Sold 30k   10k

## Tuesday, June 25

rev Close : $8.20      $8.35 @ 4,700
10:46  $8.45 ,  185,700
3 Buys    Morst.   - 15K rode to buy / bought yesterday 25th
          Merryll lynn =
          Goldman Sachs -
                    #

Eric :  Eric = Cash Flow / EPS / Revenue

- See Revenue stable - not losing Market position
- Earnings to go up.
- Cash Flow is going - Reinvesting or paying it out
- Continue to explore commitment to dividend.
     Raising the dividend? But need cash for Adv. Tech.
     "Holding for a pd. of time "
- Haven't disclosed how much will be spending + when.

Meet now, grow business + pay dividend.
Have committed to steady stream of outflows.
What liquidity going forward have

Sell-side is going to require = Will have to publish
        initial. They feel "burned"
No banking, too risky, nothing to talk about.

Have great business news, But no investor news.
We had no prospective investor
"Cash puts a floor on the stock end - matters on valuation
     Have wide maintenance Cap backs.
Need to include in Cash Expense

USEC 00109
CONFIDENTIAL

Couldn't have gotten HQ w/o MDA - May get tax benefit on capitalize

Put out:

A Secondary — Not do a secondary & put a press release.
1) Get Money
1) Blitz w/ sell side on stock.
Sell side may want to do a secondary with us.

IR/PR — Pull sell-side immocyla.

If need $1 billion today — Couldn't keep control

VoiceMail — Only to Steve.

USEC 00110
CONFIDENTIAL

Wed, June 26, 2002

Prev. Close: $8.23

Hal: 240-460-7976

WorldCom - Overstated their earnings.
Could that happen @ USEC?   Counted Cost as Capital instead
of Expense.
Can Capitalize + depreciate

Operationally, 1) Not Capital Intensive
This $12M Paducah Transfer + Shipping
yr.   2) Little Capital
3) On a few visible projects
Last yr.   Sizeme work @ Paducah

They did a lot of acquisitions + mergers, not us.
- Simple accounting

Undoubtedly due mostly to the WorldCom
discovery, all markets opened down this morning.
Before 10 am, the DowJones is down about 2%
at 8950, and the Nasdaq is down close to 3%.

USEC opened down at $8.13 and is currently
trading in the $7.90-95 range. Volume is 50,000.

The Outlook is glum. But I've received no calls
from investors so far this morning -

Have a nice day,

Mari Angeles.

**USEC 00111**
**CONFIDENTIAL**

A

Bloomberg:

9

+ Keith Bossi w/ Rochelle Research Group
on Thursday.
Market Research Firm — Helping companies view from
Marketing Background.
Only aspect is reporting.
203-226-0800

closed $8.25

4

USEC 00112
CONFIDENTIAL

Litho in U.S.A.

27 June '02

⇒ A Professional Conferencing: Audiovol, Video Conf.
More than $0.17/min
Kathy 1 800 294-1193.

#

⇒ Roy Stallman, Stock in IRA
720 - 587-9978

#

⇒ Stan Solomon:
Goldman + Bear Sterns 25 ea.
Sell side scattered
Little guys

⇒ Ring Stanley - Talking Points
will have shared.
Not reported results.

"Maximum Blackout Pd"
No implications - Public Record only.
Only how it works.

⇒ Christopher L. Doucet            Andrew Wittley
UBS Paine Webber Inc.
1100 Poydras St. 9th Floor
Energy Center
New Orleans, LA  70163

End 2 Kits

USEC 00113
CONFIDENTIAL

SLK - 3pm

$8.75 HI          $2.36

Sell side - Bear Stearns - hope + float at $8.75

Bridge Securities - seller along morning

22K: Goldman     Goldman + Montgomery buyers all

@ $2.34 or buy $2.36          day, not a lot of

Very heavy volume now

Mostly through electronic system

Larry - 312 - 261 - 6412

Hold

Buyers + Sellers for the week

TCW - 710K shares (Bought 375 from

(2000) (w/ week)

Hedge Fund - 120K aggregate H.F. community

SomeOne Buying Heavily @ Bear Stearns Custodian

↳ Using to trade stock -

Shift to Rose.    Net 412, 550 sold from there

↳ were @ 1M shares

How much buy on close @ 3:45 ? That's

when Russell will be trading.

USEC 00114
CONFIDENTIAL

Blair Barnes    Craig Drill    (Capital)
212-508-5706
Interested in Plant Tours

Holds USEC for 2 yrs - 100k to 1.3 M
@ various times
than held
- Unregistered.

Craig A. Drill                    (Friend of Bill
CDrill @ CDCcorp.com              (Munchis ICW)

No Conflicts : How Many can I Control

Next time have been will give call

George : Sykes Investment (Ask Hal)
Goudelocis (Bond Guy)
6-8: 20B now to get rid of more nuclear
weapons.
901-802-2310

USEC 00115
CONFIDENTIAL

**Friday, June 28**

Prev. Close $8.71        Open $

Bill Church Message -
TCW: 600 - 700k shares of USEC Stock.

Paducah - Russ Starkey
270-441-6301        [x 6338]

InfoExchange : IX-GDP

⇒ Spoke w/ George Goudelious - Pu not involved.
⇒ Stk Risin Anderson - Does'nt look like anything on sell
3:45        side on Bell. Has stock to buy on
        Sell - maybe non-effect
4:15 Stock to buy on The Bell — but all is proceeding
        very orderly

Dow Jones: 3:41      $8.80    108,600 shares
                              final trade

        Indication Not published

                                    Small funds
                                    wanting to
                                    buy
Close of 108,600 - End of Q funds getting in/out
        of various companies. Similar buyers of USU on the
        bell - no names. Small funds getting in
Sell side - specialist may provide some from inventory.
        + some public offers wanting to sell.

USEC 00116
CONFIDENTIAL

*Initial*
# Monday, July 8 - 2002

Today's Open $8.75     *Calm*

6/28/02  close $8.80 } /40%  — Volume: 949,400
3/28/02  close $6.40 } +12.51%
6/29/01  close $8.43 }

Last Trade: _____          Volume: _____

Friday Trading - Started slow @ $8.71, hit intraday low of $8.52.
Vol. picked up in afternoon.
Block activity was heavy at the close (Instadex). ¹⁰⁸ᵏ @ Sell
Theos reporting Knight Securities trading 147k shares
SLK reporting Goldman Sachs + Pershing active at Sell.

WEEK - (Previous)
 - TCW continued building their position
 - HEDGE FUNDS 120K @ Goldman Sachs + Morgan Stan
          Buy                    Custodians
     (undesireable, aggressve) no visibility.
 - HEDGE FUNDS 412K   @ Bear Stearns custodian.
          sell      Had 635k, but aggr. selling 442K
     Expect to see  more selling here .

Stan: Bridge Trading 17,800  to  SLK  @ $8.63  @ 10:12

USEC 00117
CONFIDENTIAL

- Hal's Meeting - John Adams reporting to Hal (below dotted line) + Marshall
- On Friday settled Prop. Tax issue w/ Ohio.
  No press Release
- Cold Standby - may go only for 1 year.
- Checklist under MOA - need to leave done.
- How much '02 W71 suits are we sending?
- SMAPS I is now written off + Help desk software.
- A broker will use the floor - Accurate por
- $119 M Rev, 98 M Rev.
    $112 avg month, $107 Quarter, $105 year.
- Selected JP Morgan, sign acceptance of proposal,
    Collateralized - testing receivables accounts + inv.
        $150 million / 3 yr [mentioned in 10Q]
- Financial ⇒ Growth
    Tech Stocks ⇒ Value
- Timing of Runman ⇒ less and late ⇒ push to 83.
        $80 mill higher disbursement
        $60 mill higher in Revenue
    ∴ $100 M less cash
        Most Revenue moved to June, cash
            will be following yr.
        In July '04 will have $200 M cash.
- Laying out all assumptions in budget.

- Taxable "Loss" - Greater depreciation
    [But actual layoffs is avg ~130, not 440 employees]
    Taxability of dividends - Queue return on capital
    Depends on Company's ability to pay dividend.
    Shareholders w/ dividends in taxable accounts
    could gain.

USEC 00118
CONFIDENTIAL

- GAAO - Annual "Accountability" Office.

⇒ Chip Skinner   212 - 355 - 2626
Acrete Capital - Small Cap fund -
Doing some work on USEC
- Needs to talk through questions
Schedule time.

⇒ Michael ____ coat to the Board.   (Chris/Nunat )
Sending to Stock Exchange

Elissa di Prisco : We are ready to send a
press release. No material
impact. Positive comments
to hold up entirely.
⇒ Need to fax copy 15 min prior to News wire.

- Is Nick in? If not immaterial.

⇒ Jim Beeson   - Stockholder.
941-481-0559   LM

⇒ Hal - Need to call some people back.

⇒ Bob. 3326

① Nicolay. Information. call
Proxy P. 15   USEC v. peer group.
② Steve Korn - loews.
Called Hal.

USEC 00119
CONFIDENTIAL

Nicole Snegosky: Zachs Investments
925-370-1299
→ Vendor: asking if we need it to be outsourced?

STAN: $8.60    900 shares   No!
$8.61    (24)K on the close
2 blocks

Morgan Stanley - buy
→ (Bridge Trading) @ Bel, & selling
→ After all day > 150k
85,900

Buy side?

NYSE Databanks - all of Bump's.

1) How much sold
2) How much left in inventory?    58,016 bought
STOP 4300    37,653 Sold

Stur: Need to put story on CASH for Conf Call.

Orientation → July 9th
Board mtg. July 30th
Earnings Release July 31th

USEC 00120
CONFIDENTIAL

Terry's Fax 6761
Fax: 270-441-6798

July 2, 2002

Nuclear Reg. Affairs

— Mike Butner (Mgr. Scheduling + Production)

⊕ Jim Beeson: Stockholder/ Wants to know how we pay our
dividend if we only have cash + no earnings

⇒ Money Manager — Small = 1'30 - 434 - 0441

Directors - July 20th

≡ Pay from STP — Following up with Steve.

USEC 00121
CONFIDENTIAL

July 3, 2002

SLK: 10:35 am
- Buyer Below $8.25   Dean Witter (Morgan
  OK to buy.                    Stanley)
- (title)

→ Investor Relations News

SWU Backlog: 4327.8
U Backlog: $323.83 million Revenue.
Total: $4.65 B

USEC 00122
CONFIDENTIAL

X3369

## July 5

212-385-2636                                      202-434-0434

— Chip Skinner — Investor presentation
        Send Presentation : jskinner@accretecapital.
                                            com

Used to run Merrill Lynch Small Cap.
            $7 M ran
        Mercury Asset in London
            acquired

        In process of working in Hedge Fund.
looking @ UCTC on long side, high Yield
        Valuation v. Risk.
    Small initially
looking for undervalued
        names - start Aug 1

Int'l Geographic : Challenge Waste          #
                                    (New York)

    — Cash flow - before interest expense?

    — Gross margin targets?

USEC 00123
CONFIDENTIAL

Wachovia Securities
100 West Liberty St   Suite 100
Reno, NV 89501
    Stephanie Paulk

    UPS: 623E7W
    Ref# 01D50521173I

July 11, 2002

Avi Gable // Neil Wiseman
Chilmark 21st Century
767 3rd Avenue, 16th Flr
NY, NY 10017

Air products                        APD
Albemarle Corp                      ALB
Alcoa                               AA
Commonwealth Ind                    CMEDA
Constellation Energy
Dominion Resources
Duke Energy
Eastman Chemical Company
Exelon Corp.
Georgia Gulf
NL Industries
OM Group
PPL Corporation
Praxair, Inc
Progress Energy
Southern Company
Union Carbide
XCEL Energy

USEC 00124
CONFIDENTIAL

July 12, 2002

+ when are conference call invitations going out?
1 wk prior to Conf Call.

- Art Cable   Chilmark 21st Century
  - 212 319-6262
  - 347-451-6499        } Hedge Fund

Looking @ company - don't understand Louisiana.

Record -
4th Friday in Aug 23rd
Dividend Date?

USEC 00125
CONFIDENTIAL

690-5223
9135

July 15, 2002

Wed Nov- 6th Annual mtg
Same place. 10am -

Meeting w/ Reporters on Wednesday - Washington Post
1) - Earnings Release                          2 of them.
   - Letter to shareholders      }
   - Conf call language .         } Need to have a meaningful
   -                              }    story to which to go on need

2) Updated presentation for Wash. Post
        Meeting w/ 2 reporters on Wednesday

3) Preparing for Money Show in August

4) Market Summary last week .
      Dow Jones dropped ~ 700 pts or 7-5% for week
      USEC dropped similarly ~ 7.8% for week .

$7.75 - $7.80                          **USEC 00126**
                                       **CONFIDENTIAL**

- Boton properties leasing 9th Floor
- Chairman's Award
- Portsmouth grants expire Aug 4th nego.; Enhanced severance benefits w/ DOE
- Recommend to extend pilot of travel expenses.
- Payable on 24hr retro to July 1.; PRP for Objectives next yr.
        will schedule w/ Hal next 2 weeks.
- 2 auditors from JP Morgan; testing receivables - Touring Barkers.
A - Changes in Cash Flow Statement (Money avoid - than't changed)
- $116 M U sales; tax rate is higher; cost of variable tails array
A - Initial draft of 10-K is working on this week

1) - Would we expense stock options? (Would cost .01/share
voluntarily?

2) - Nick would certify financial statements

We examination - Do we pay directly or just due to
tax goes up or sales up.

Budget
Cash - 138M before div.
Income - $ 10.6M

a Coordinate w/ Manda to go over End-of-year numbers.
a " to see FY03 Budget (Wednesday?)

a Half day w/ PWC Wednesday morning.

USEC 00127
CONFIDENTIAL

July 15 cont'd

⇒ Private Investment Group: FC HENG Int'l Inc.
Asked about Commercial terms in the H agreed
Over 10% tomorrow)

                    941 - 929 - 0126
            call  813 - 789 - 4096

⇒ Robert Howard          ⇒ Why has American fallen?
  Proxy Statement, 10Q
  242 Hancock
  Jersey City, NJ    07307

  (212) 274 - 6235

                        July 16 cont'd

  Jack B. Cutler
  251 Laurel Ave
  New Mt. PENN          } will be
        PA 19606
  610 - 779 - 0219

      10% w/ Y.T. CHENG

USEC 00128
CONFIDENTIAL

July 17, 2002

- Inventory accounting method to change?
- FY v. CY change still under consideration?
- Richard Crienberg asks about when shipments resume, will inventory start to balloon back up, or how much inventory we can take out.
- 3Q02 "New Russian Agreement to Provide Strong Future Benefits"

(rev?)
○ Bruce Gordon ~ CC(BA): 617-603-7921
         Building - IR - Relations Website

end of day - Bank of NY sold 20k
              JP Morgan bought 50k (analysts at end of day)
(NIT ind been selling)

USEC 00129
CONFIDENTIAL

July 18, 2002

Baron Bruno // Cantor Fitzgerald   LA

Sell → stk at least        800 305 9103

Institution, individual·

Will crush the stock - to sell it all

→ Hilliard W. Paige
5163 Tilden St.
✓ Washing DC· 20016

→                July 19  2002

Smith Moore  -  Bill
- Morgan Stanley -
- utility index ↓ down lately

USEC 00130
CONFIDENTIAL

*bill from*
*Peterson on*
*Aug 6.*

## Aug 7, 2002 - Wednesday

Michelle w/ Thomson: TR channel
(on ?Steve)                    443-757-

---

## Aug 8, 2002 - Thursday

- bought stock in April  - $20,000 invested

## Aug 9, 2002

Craig Drill:
        Meeting @ 8:30
- Reconfirm Meeting
- 767 5th Av. 50th Floor B&I Building
        Enter 5th or Madison side
        Tuesday @ 3pm.
- Would like to see anyone else?
        Bill Church, Dan Smith + Rich Orenberg
                (Would like to invite them.
- Conference Table sits 10 people - so invite
        anyone else.

USEC 00131
CONFIDENTIAL

Investor    Standard ; Poors
        800 221-5277  ext 4042
        Jog - Demo   Can add Peer Groups -
                - Triple menus to 30-40k.
                     Contacts
                - 196 portfolios of > PR institutions.

The Money Show

Maureen - 800-822-1134 x 233

For HAL :

Shares of Stock from beginning - Howard
760 -
$2.89
in DW.

Dec. 15th : $0.275

TRADING

3:47 : 21,400

W.F.      50K bought late in days
& Wells Fargo - representing anyone.
Sell side : Budge / Morgan Stanley Thruy

ITS - offers of 5K all day - OTC volume
selling OTC.

Drop : No one seller.

→ 22K at the close

USEC 00132
CONFIDENTIAL

Tuesday, Aug 13, 2002

- Miss-Carries says that looking @ time + Sales stream, there are double prints where 2 prints go off @ same time, same
  - Need to get ea # buyer

SLK: • WF back again - Reagan McKenzie
  ISK buy,
  Rest of it coming through DOT System.

• SAI - don't know who (SLK) - Buying clears for other firms)
  (Much smaller - 100)

— Doubles - carry through

2 × 6,000 @ $7.05 → 1st 2 trades
and on and on.
even @ $7.25 they bought

Larry - 312-261-6412

USEC 00133
CONFIDENTIAL

World Investor Link: $725 July
  $700
= Do we get printed Material =

Investment Introductions - Printed + Electronic
  -: what did we get for it?

⇒ Provide mail out service - Send Out -

Rest of Market — what's   1:45

\* JCW
Bid 1,280,000 shares
Church

—————

\* — Power Economics Magazine
  — David Applegard.     // Steven toubler —
                                      FRIDAY
    → Nuclear Engineering Int'l.
              doing an article
          — Very critical of USEC —
    Bruston on finance
    Uranium Enrichment Section

August 15, 2002
              E-mail — Press
              REDMISTO @ Lehman.com
              Per conf w/ Charles

  → Herbert Penton — most emphasized of all
        directors, cannot say mgmt is incompetence.
Credibility is there — controlled, contained.

**USEC 00134**
**CONFIDENTIAL**

# Thoughts on IR

→ I want to put in some of my personality, my own expressions, w/o compromising our talking points + realizing also that I'll be quoted.

→ While I see that we must be very cautious not to lead investors, our job is also one of sharing the enthusiasm we have for the nuclear industry with our investors. Therefore, we should be free to express our total belief in and commitment to the long-term success of nuclear.

→ While we can't directly link our Agreement to the Arms Control treaty, it would be fairly logical to acknowledge that indeed the two governments have a committed interest in seeing that our agreement proceeds w/ success. The treaty

USEC 00135
CONFIDENTIAL

Rich Greenberg — core earnings power above $50MM

John Warmoths — Maryland State Retirement
410-625-8333
06 Bonds — $5M        analyst
USEC 101   for an hour
JWARMATH @ SRA. STATE. MD. US

Hank Rouch   Liberty Mutual — Bond side
617 574 5862        (617) 574-6910  FAX
2:30 pm — Monday   — High yield Research

Tim Hasara — Ø page him
How soon?     L+T and Spot prices today
↳ Putin-Bush?

Thinking behind signing $90.42 ?

→ Porter Standsbury — investment newsletter
410 223 2603 — set call 10am 5/2

Call Eric Lundeman @ Fresh Fuel  ✓ afternoon
5/1  about $33MM per quarter divided reference — MISTAKE!

5/1 — Sarah Rosenberg — Bank Loan Monitor
718 591-6805 — Looking for more details on
credit facility — didn't go beyond 10 Q.

5/1  Gregg. Groechel
     @ Red Sky Partners in Minneapolis

USEC 00059
CONFIDENTIAL

5/1 George Gouddias    Sen Advisors
Where do we stand on credit facility
Russian sequency; what will you do w/ the cash

5/2 Portey Stansbury - Newsletter - Discussion of
industry. Background - Not writing @ this time pusty deal
Rob Barba    Weatherly
908 272 6540
Looking @ companies with insider trading
Sales Caremark RX        CMX    manage mail order
call '01 $5.6B    73¢    $7.1B 1.04 for '02
Beaten for street estimates

Oct. 20-23        _ _ _ Palm Desert _ _ _

5/3 Merrill sold 8K - specialist took
most of it.

5/3 and 5/6 Debra Z Skim    203 226-7591
Charter Oak Partners   FAX 203 226-7596
DZISK    DZISKIN @ charteroakpartner.co
USEC 101 → e-mailed presentation

5/6 Eric Whitman -

USEC 00060
CONFIDENTIAL

617 725-7118    7288 FAX
Kevin Clougherty - Beacon Asset Mgr
CSU Insurance  $5M '06

Rich Greenberg — core earnings power
above $50 MM

John Warmoths — 410-625-8333 Maryland State Retirement
06 Bonds — $5M              analyst
USEC 101   for an hour
J WARMATH @ SRA. STATE. MD. US

        RAUCH
Hank Rauch     Liberty Mutual — Bond side
617  574  5852        (617) 574-6910  FAX
2:30 pm  Monday    High yield Research

Tim Hasara — Ø page him
How soon?    L+T and Spot prices today
↳ Putin-Bush?

Thinking behind signing $90.42?

Porter Standsbury — investment newsletter
410 223 2603 — set call 10am 5/2

5/1  Call Eric Lundeman @ Fresh Fuel   ✓ afternoon
     about $33MM per quarter divided reference — MISTAKE!
5/1  Sarah Rosenberg — Bank Loan Monitor
     718 591-6805 — looking for more details on
     credit facility — didn't go beyond 10 Q.

5/1  Gregg. Gesser  GROECHEL    USEC 00136
                                CONFIDENTIAL
         @ Red Sky Partners in Minneapolis

5/1 George Goudelias    Seix Advisors
Where do we stand on credit facility
Russian signing; what will you do w/ the cash

5/2 ⌐ Porter Stansbury — Newsletter - Discussion of
industry. Background — Not writing @ this time pending deal
    ⌐ Rob Barba      Weatherly
      908 272 6540
    Looking @ companies with insider trading
sales!  Caremark RX      CMX    manage mail order
call '01  $5.6 B    73¢    $7.1 B  1.04 for '02
    ⌐ Benton ~~tax~~ street estimates

        Oct. 20-23            Palm Desert

5/3 ⌐ Merrill sold 8K — specialist took
    most of it.

and 5/6  Debra ~~Z~~ SKIM    203 226-7591
    Charter Oak Partners   FAX 203 226-7596
    ~~DZIPSK~~ DZISKIN @ charteroakpartner
    USEC 101 → e-mailed presentation  .c

5/6  Eric Whitman —

USEC 00137
CONFIDENTIAL

              7288 FAX
    617 725-7118
                        Oot
Kevin Clougherty - Beacon Asst Mgr

5/8   Kevin @ One Beacon
      617 - 725 - 7288

Debra ZISKIN @ Charter Oaks Partners
Again! Go over model through '04

Patricia
Nat. Assoc. of Stockbrokers - 858 458 7422

5/9 / Ryan Kelly - MUZINICH ...

5/9 /           Lowe's
      Steven Korn        Skorn@Lowes.com
      (212) 521-2460      S...EN@...CWS.Com
      set for 2pm  5/10         e f

5/14 / Duetche Investment Mgmt Inc. Americas

      4,781,812  same as 12/31

SLK   30K to buy and more bids higher

5/14  Jim Langer - Advisory Research
      312  565- 1414  - Why the price spike

Rossi    973 226 4644       USEC 00138
                            CONFIDENTIAL
Find that - Stuletts article in Forbes

George Skallios Goudelias
SEX 1         Bond + Equity holder

Lyn Ling — DJ newswire 201 938-2089
Stock price, Russian treaty, agreement
and long-term status of centrifuge

Dave Sname — any news?

Bill Church — any news?

Matt DeSario — DeSario Cap. Mgmt.
Held Stock for 2 years — why hold any longer
if earnings at $10m and spending

Peter Leni — Down grade

George Mother — individual investor

Bob Pierson — individual investor

TIM Connoley — 4D Brous Lo
~~212~~   516 498-2745
TCONNOLly @ HD BROUS.COM

USEC 00139
CONFIDENTIAL

SLK — 842K @ NYSE          400 Middy aggresiv
Charles Schwab, Quick+Reilly, Big — Knight
100K overhang @ 7.85                 on 3rd
                           17.5K Market

4/15 NY      934K out of 1.5 on NYSE
ML + Charles Schwab - big buyers
on open

/ Tim Hasara - Kennedy
TVA's Brown's Ferry - any inspector USA?

/ DOW Jones - news wire -
Michelle Rama - don't comment on
stock price movement. Treaty is good
for America, we've been involved since '93

VIC Kaitan - What's up? - talked about the
13F + 13G issue. Will get back to us soon.
Dave Giannie - Houston - what to tell clients?
Have we seen the newsletter?

Steven Korn - Loewe's Corp.

Rand Merchant Bank - Mark HERSKOVITS
Sam      Bond

Mike Napic -

USEC 00140
CONFIDENTIAL

Jim Barett - IMS Securities in Houston

Chris Bezler - Morgan Stanley

Precept Capital Dallas          214 849 5848
Chris ~~Siplet~~ Sipple          3pm
          Blair Baker PM

Roy Stholman - individual

Marc Herskovits w/ Rand

MIKE Santelli - Nat. City Invest. Mgmt.
      (216) 222-9554
Former holder - sold at loss - missed this run up
and was pissed!

Robert Sacks (NNFN).
Background on 43 agreement, followed
message points, no near term impact
The "price control" mentioned in DJ story is not accurate

Harry Lang - 904-608-9859     Retail

Steve Gelsi - 212 975-4686
Don't generally comment on price movement
Provided background - Ran 11:23 very short

Michael Rowe - after the resolution he'd like
to bring 5 bond holders to Bethesda or come
to NY - Met Life, others

**USEC 00141**
**CONFIDENTIAL**

W + D Securities ⟩ both big sellers
Morgan Stanley ⟩ @ end of the day

202 412 - 4431   Ron's Cell   06

5/17   (610) 832 5274                    Bill Dawson
                            Benning Scattergood
Formerly Pennsylvania Trust — Sold firm

Wayne. Mc Chestney — retail

NIT buying 300K
W+D sold 300K , 250K @ $9 to sell

Charles LaMont — private investor

5/20

      (561)  770 - 1376     ED K      Repeatedly busy
                          Vero Beach, FA.   Left message
                                            5/21
     150 to buy before open —
SCK  Much off the floor —

      (314) 330  3617      John-Paul  Jankovich

Larry Strausser —        $13.75 dividend ?

George Colbet            941 261-5895

USEC 00142
CONFIDENTIAL

Pershing, Smith B, Bear Stearns, NTT

Sellers Goldman Sachs, 200k Bridge 200k), Janney Mont
Ernest Young

Jay Kaufman, holder since IPO - Mont. Co.
Just curious about run up

Peter Ross    (212) 319-5836
Vertical Capital
               (212) 446-0020
488 Madison Ave   8th Floor
     NY NY         10022

Charles Green   - what announcement
                    407 677 9542

Mike REISERT
Suite 307
2455 E. Sunrise Blvd.
Ft. Lauderdale, FA     33304
Including Proxy

USEC 00143
CONFIDENTIAL

Vic Khartum — Resolving 136A
What might come from Summit?
Isn't there enough material already avail?

5/21

John Andre — 281 225 9550
                    left message 5/21 8:30
L-T holder concerned about downside of
Pirate Investor — what happens if Nothing occurs 5/23

John Warmouth — Md. State Retirement
       410 625 8333           Bond holder

SLK-NIT + Schwab — selling at Stop orders
                          around $9.50
Bob Brinkley   Richmond Va.  retail

5/22 / George Priola   (917) 209-4918   GWAT Corp
Claimed that his "firm" was thinking about
buying shares, then later claimed they had already
bought many shares. Made vague threats of
taking action against company if stock price didn't go up
Appeared to be under the influence of something.

/ Peter Levi — 781 — ~~259~~ 259-0211 — Levi Capital

Brent Hunter  813  899-6761  Retail — questions
on Forbes and Net articles

Greg Steffen — Cincinnati, Ohio        USEC 00144
                                       CONFIDENTIAL

Walter Beghley — 602 272-4027 — retail

Bob Brinkley — Richmond  804 323 9765

5/22   Tim Tasara Kennedy —
Did sell 1.2 mm — will get back in
but took profits at avg. of $9.25
Could be source of loaned shares but
wouldn't know for sure; Banks have OK to loan

John Rufano — 716  745-7260
Went through 2 stop loss points today. Why so
volatile?

Roy Coons — (609) 443-
Retail — angry that there is no announcement.
"They promised."

ARI Kruger — Retail. 516-295-1465

All electronic — 75% from Charles Schwab
NIT ⇒ Jeffries         through the system

NY SE      Joe Tama   212 656-5255
Surveillance people curious about our
stock's activity over past week.
There is no material reason for
either the substantial increase last week
or the correction today. DJ + Bloomberg
articles saying there is no short-term,
mid term effect of the warheads. Been noise
on Yahoo Board connecting us to the treaty.

USEC 00145
CONFIDENTIAL

Rich Greenberg — Donald Smith

Buying at 6.50 — Sold on Thurs + Friday
Overdone at high side
   8-9 might be the right price
Still our long term

call / Fred Hayek — 251 - 928 - 8999
on

/ Potok Montgomery    bought recently — negtve or sell rating to day?
                       253 297 8632

/ Abe Linder — (718) 438 3099
   Is announcement scheduled before or
after the close? When is the ex-date

5/23   Keith Strickland      Independ investor
       905 689 0034 — read Bloomberg article

Dianna Hearn —        (620) 234 5116
500 share position — USU Board poster

Barry Haynes — Sage Assett Mgmt.
$500 MM under mgmt.

Bob Rogulf — Held since IPO and bought more @ 3.50
(954) 575 - 3199 — what's w/ the volume

David Simberson — First Union in SFO
Can we pay .55 on .20 earnings?

USEC 00146
CONFIDENTIAL

Joseph Kassar     (718) 748-2488
   IPO holder - wanted to hold on to X date, then
dropped          1100 shares

Dr. McCain            (215) 345 6888
               When's the announcement?

Fred Hayek -(251)-928-8999 - general update
          Clarity
/ Kevin ~~Feely~~ - 617 725-7118
   First Reacon

Doug Wilson     (309) 444- 2954
   Retail - comments on Internet speculation?

Aarron bollman - World Stock Exchange
Internet Investor Relations

Brett Reece     - President Club recommendation
   480 767 9460

Brit Snyder - Broker for Baird checking for
a client.

**USEC 00147**
**CONFIDENTIAL**

Lenny Rose     213  384  2638 -
   refered from e-mail - we don't comment on price / vo

Ron White - El Paso - Asset manager for others
     915- 771-8866

5/23   LEMANOWICZ
Joe Lamonovitz   (Pru)   Bond Holder
973  802  8616   Newark

5/24   John Referno — asking about update from Pirate
We don't comment — No news pending.
Pointed him toward our web site for disclosure.

Barry Haynes + Harold Ames          Sage Assett

613  228  5356          Ottawa
Roy McDonald   → Individual investor

Bruce McCauley   925-932-5899
Former NASDAQ dealer w/ a few clients

Wes Fritz —   (215)  297-0488
Benson Patrick   — do we want to issue more equity
Delayed offering common shares.

Darren Nice — 317 387 1450   — INDIVIdual
Any additional announcements coming?

Mike Horsic ?
626-821-9466   Individual — When's the
announcement coming.

USEC 00148
CONFIDENTIAL

309  444-2954  —  Doug Wolf

(906) 225 1904 -    Benjamin Montgomery

(703)    Fay + Harold Black   of Falls Church

508 695-2194 Harold Crowle

248 894 - 7100   ← Chhabra , Brij

5/28 /   Ben   LIVASAY   434-385-5169

805 - 687-3997

Neil Rubin   800 892   4772

Harold Crowell   508 695 2154 ✓

Wilcox   00 44. 11 79628630   England

Ralph Clayton -   336 227 7591   Dividend.

Daniel Wee

Frank Collins   (714) 748 - 1701   impact near term?
mike?

Bell   -   W + D
Ernst + ML

WD ⟶ Ernst + B.S.   48
QRC ⟶ ML   20

USEC 00149
CONFIDENTIAL

Tony Cillufo — any update on signing contract

Neil Rubin — confused about contract vs. treaty

6 5/8 '06 at $90.⁰⁰

Dave Van Bleek — Wisc   715-926-4987
Pd. $1000

Greg Steffen — Why is stock dropping? Bought
last week

Noah Petrucci   Bank of America
212 750-4962
Analyst —   USU 101   45 minutes

Jay Walters — St Poors   Targeting Tool
$10,000   Professional Investor Insight
17 different valuation focus
Michael Antinoro

Robert Coates — individual — where's the pop
from the treaty?   541-461-4620

Ryan Kelly — MUZINICH   212 204-0085
Bond investor   bought '   $
'09 8%   $89

5/29   Bob Brown —   615   890-5383
Why is gov't taking so long?

USEC 00150
CONFIDENTIAL

Mitch Raymond — sent e-mail on 5/28
When is the announcement coming.

SLK — Charles NIT Pershing — Sellers
Ernst + BS buying William Blair

Dan had kidney removed several
years ago
Advanced osteoscreros —
Ben Jacobson — acquired firm of
a year ago — Jacobson + Son of
experience + statuture on the floor
in past week

USEC 00151
CONFIDENTIAL

(504) 566-0205          looking for one big win
Carolyn Summers → bought $125K 2 weeks ago
w/ Retirement money. Didn't know how to research —
201  368 9212    Rich Greenberg
When will the deal get done? What is worst
case scenario if not done at end of fiscal
year? Will new auditors require write off
Will it be for whole $230 MM? Is that tax-affected?

Tim Collins    Wells Fargo Securities    San Francisco
Paul Segal      Hollis — small botique firm
→ Tim was trying to get Paul interested — Institutional Sales

Sean Quigely — traded e-mails - shareholder — will treaty
                                                                    reelp

丁       6 3/4  '09    Seller of $5 - 10

Eileen La Peara $^{sp?}$     650 367 7841 $\rightarrow$ passed to M.A.

Maureen     800 822 1134     233
@ Money Show

Matt     ~~Philo~~ Philo     Mickay Shields
PM                 212 230 3902

Saw     Bob Lang $\rightarrow$ has some clients in the stock
Thurs.   Will the Treaty help     314 - 241 - 5900

Chandu Ammini     Gainsville
Sent e-mail — Why the volatility.

May 30   Matt Philo — Mickay Shields

     877 212 5094     Steve Moore — Charles
                62454                         Schwab

     410 752 - 0150     Porter Stansbury
     Returned call w/ Tim in the room. 7 fairly straight forward questions
     JIM Kegan          651 - 295 - 6676

     Carolyn Summers          504 56 0205
     Does  Jay Mc Daniel

USEC 00152
CONFIDENTIAL

     Al Meirhoff — MS in Minn.  Red Step Review - Robbie

Eric Messing          781   802 2310 - update

- M. Nathiel Gilbert    954-979-1574
     IPO holder   - update

  John Ternak    St. Louis    (314) 351-6533
  When will agreement be segned?

  ✗ Treavor Morris -   Los Angeles
     800 366 8738  - Question on contract

  ✗ Richard Hill       203 264-3504
     Treaty questions.   Left message

  ✗ Ben Nichols  323  656-6823

  Specialist   Ben Jacobson + Sons  KRB   march 2001   Fairchild Semi Conduc
     Confortable taking positions

  William Paiigan -  in response to email questions

  Gord Lindsay - 4/6  780-2070  e-mailed q.

5/31  ✓ Jon Andre - responding to e-mail reply

  Ralph Diaz - MS   Questions on how can we
  afford to pay dividend.

  SLK - Bridge  Transs  100K  ML    buyers
  LXE - seller of 100

USEC 00153
CONFIDENTIAL

5/31   Ted   Newell          Capital Institutional Services
                                        Dallas
         Owned 3 weeks        Tommy Bahama's
   760 - 668 - 1964           LG's    on Rt 111   Palm Dessert
                              Mama Gina's - Italian

   Dave Reis       616  731-5330     — respond to
                                        e-mail

   Heike              Dave Schanzer's associate
                      introducing herself

   Flagship   Duecle   75K

   LXE  —  sold another 250K


6/6  / 30   LXE   selling to ML
       Bearsterns + LXE on both sides
       of buying + selling
       ML is the best buyer right now

       LXE     60 Bought    50 sold
       ML     —  buy order for 25K just below mkt.
       Many stop orders in place    half w/in 50¢
     / Pat Penn   858  455 7422

       Send Investor Package
       30 minutes  —  Bio

USEC 00154
CONFIDENTIAL

6/10  Bob Fitzner - Clearwater, Fl.
        727 789-2131

      10 am      at   Ritz Carlton

6/11  Tim Hasara — update on progress
confirmed he was rebuying but not
many shares available now.

     Bill Fenup     Smith Moore + Co
        800 - 264 0657

6/12 Ken Cardinelli — JP Morgan

     380-9725

   Burger 30K        Fagenson — small trading
                      arm   - small institution
                                or
CSFB   NO sellers

  Angel + Jay    at   S+P
        $10K   for service

USEC 00155
CONFIDENTIAL

    Connie Mac        301 565 4005
                       Individual investor

   Harold Ames — Suge Assett mgmt. — preparing model

6/13    Bear Stearns small seller 12K
Program selling on inflation
Buyside mostly from SLK

☆    Marlyn Clarke — Royal Expo    1/11-12    13
435 649 2946 — pd. for cruise
Sending email            $45 minute presentate
Rich Rossi —                    Sunday morning
Berg — Talking points   on MOA
Ilios —
MA→ Vladomir Spanick    1-800 748 3713  - Calf. Broker

Bill Kenney — Smith Moore + Co.
Buy side Research for institutions

Carolyn Summers, New Orleans
504 566 0205   Wanted to know our
projections for profits vis a vis the Pirate Report

Jim Roberts — salesman for on-line, real-time quotes

Duff   Buyer — most of early afternoon
WTD buying —
Smith Barney + Charles Schwab + fast money
traders

Richard Ackerman — 6K of stock
Montana

USEC 00156
CONFIDENTIAL

Joe Whitrock w/ Amerus
'06 - Bonds
Jim Penny          508 410 8816

Bill Davidson  —  Roenning Scattergood
formerly Penn Trust

Steven Korn          Lowe's  — Not currently
a holder — still doing research

Leo Kesler      212 449-7803    Bonds
Merrill Lynch      Phon Xing

George Sourdellias  —  Seix  — Bonds

Rodney Lacy      212 761 -1486
Morgan Stanley Fixed income

Call    Thompson Financial — IR Channel
Wed.    617 856 1839 -  Tanya Eman

Wed. 6/19 - Noah Petruchi      212 933 2028
Bank of Am.
Jackson Platsky - Ernest + Co.
Selling call -      212 895 3517

George Gothett —    Checking

**USEC 00157**
**CONFIDENTIAL**

W+D.          S Bernstein          Bear Stearns  (Ⓩ)
40K  8.60

Bear Stearns also   major seller

Rossi - 92 1/4    '06              $5 mill )
         87   for '09 lately

Compared to $89   3 weeks ago

Peterson    505 751 1206 - Peter Leni

Banner  Glass       3/ 913-0280
     # Refer        TRV 93842

Broker from Romney      619-665-2968

Noah Petruchi w/ Bank of America

Mike Mitchell    Rand Myers  619-665 2968

AR, 10Q 10K Proxy          **USEC 00158**
                           **CONFIDENTIAL**

Roni Kuzma    Dain Rausther
              404 N 31ST
              Suite 300
              . . . MT  59101

6/20    S Bernstein        15-20 K
selling ocatered        selling off w/the mark
John Warmoth –    State of Md.


6/21   All    Prival . to date   and 2 year to date
            Total Return
Clean current pages on institutional holders

Harold Ames  at Sage    212  521-0913

Stven Korm at Love's   212 521-2460

Frank Beale

USEC 00159
CONFIDENTIAL

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Case No. 03 CV 01042 MJG |
| AGORA, INC., PIRATE INVESTOR, LLC and FRANK PORTER STANSBERRY Defendants, | ) ) ) ) ) ) |  |

## PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO RULE 26(A)(1)

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, plaintiff Securities and Exchange Commission ("Commission") submits the following initial disclosures:[1]

### I.    Witnesses

Pursuant to Rule 26(a)(1)(A), the Commission identifies the following individuals who have information it may use to support its claims in the above-captioned matter:

> 1.          Frank Porter Stansberry. Mr. Stansberry is one of the defendants in this action. Contact through William J. Conti, Baker & Hostetler LLP, 1050 Connecticut Ave., N.W., Suite 1100, Washington D.C., 20036-5304, (202) 861-1500. Mr Stansberry has knowledge of the conversations that took place between Mr. Stansberry and employees of USEC, Inc. and has information

---

[1]    Pursuant to Rule 26(a)(1), the Commission reserves the right to supplement its disclosures within a reasonable and appropriate time of discovering that these initial disclosures are incomplete or incorrect.

regarding the allegations made by the Commission against Mr. Stansberry.

2.    Steven A. Wingfield.  Contact through Richard L. Brusca, Esq., Skadden, Arps, Slate, Megher & Flom LLP, 1440 New York Avenue N.W., Washington D.C. 20005-2111. (202) 371-7000. Mr. Wingfield is the director of investor relations for USEC, Inc. and acts as the interface between USEC, Inc. and the investment community.  Mr. Stansberry identified Mr. Wingfield as the USEC, Inc. insider who purportedly provided Mr. Stansberry with inside information.

3.    Mari Angeles Major-Sosias.  Contact through Richard L. Brusca, Esq., Skadden, Arps, Slate, Megher & Flom LLP, 1440 New York Avenue N.W., Washington D.C. 20005-2111. (202) 371-7000. Ms. Major-Sosias is the manager of investor relations for USEC, Inc.  Ms. Major-Sosias has knowledge of the discussions that took place between defendant Porter Stansberry and Steve Wingfield.

4.    Allan Lear.  Contact through Richard L. Brusca, Esq., Skadden, Arps, Slate, Megher & Flom LLP, 1440 New York Avenue N.W., Washington D.C. 20005-2111. (202) 371-7000.  Mr. Lear is the employee with USEC, Inc. who was responsible for negotiating the Tenex contract.

5.    Individuals who purchased the Agora, Inc. report on USEC, Inc. Contact information unknown.

## II.   Documents

Pursuant to Rule 26(a)(1)(B), a copy all discoverable non-privileged documents in the possession, custody or control of the Commission that the Commission may use to support its claims are available for inspection and copying at the Salt Lake District Office of the United States Securities and Exchange Commission, 50 South Main Street, Suite 500, Salt Lake City, Utah 84144.  Those documents include:

Investigative Testimony of Steven A. Wingfield, Mari Angeles Major-Sosias, and Porter Stansberry, previously provided to defendants.

Investigative Exhibits, previously provided to defendants.

Documents Produced by USEC, Inc.

Blue Sheet Reports and other trading information.

Agora message board postings and publications.

Message Board Postings

Investor complaints

Correspondence with Agora

Correspondence with Third Parties

## III.   Damages

The Commission is seeking permanent injunctions against Agora, Inc., Frank Porter Stansberry, and Pirate Investor, LLC to enjoin future violations of federal securities laws, disgorgement of defendants' ill-gotten gains, and an order directing defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

The documents contained in the Commission's investigative file, described above, supporting liability also support the relief sought by the Commission. At this time, the Commission is unable to calculate the amount of ill-gotten gains received by defendants during the period of violative conduct because the documents supporting such calculation are in the possession, custody, or control of defendants. The statements made to the Court by defense counsel in this proceeding indicate that the defendants received $1,200,000 in ill-gotten gains as a result of the conduct alleged in the Complaint.

## IV.   Insurance Agreements

Not applicable.

Dated this 15th day of March 2004.


Karen L. Martinez
Thomas M. Melton
Brent R. Baker
Attorneys for the Plaintiff
Securities and Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, UT 84144
Tele: (801) 524-5796
FAX: (801) 524-3558

# EXHIBIT I

Yahoo!  My Yahoo!  Mail

**YAHOO! FINANCE**  **Sign In**
Message Boards          New User? Sign Up

Search
the web                                    [ Search ]

Message Boards Home – Help

powered by [hp]

  

Top > Business & Finance > Investments > Sectors > Basic Materials > Non-Metallic Mining > **USU (USEC Inc.)**
Options – Edit Public Profile – Sign In

## Yahoo! Message Boards: USU

⊕ Add to My Yahoo

**< Previous | Next >** [ First | Last | **Msg List** ] Msg #: [    ] [ Go ] 📝Reply 📝Post   ADVE

Recommend this Post                              Ignore this User | Report Abuse

### Re: Shorts are same poster - not.
by: wefree1

05/22/02 11:25 am
Msg: 15965 of 39246

I just talked to IR. they would not comment on the internet posts. It is obvious
they have news to release tomorrow. But no IR person would reveal news
pertaining to the internet message boards without making it a public release.

Posted as a reply to: Msg 15960 by gotojailpumpers

**Message Thread** [ View ]

**< Previous** | Next > [ First | Last | **Msg List** ] Msg #: [   ] [ Go ] 📝Reply 📝Post

Profanity filter is Off [ Turn On ]

[                              ] [ Search ]

◉ All  ○ Subject  ○ Message Text  ○ Authors

**USU**
USU 1–Jun
8.00
7.95
7.90
7.85
7.80
10am      1

USU 7.94

quotes delayed
Symb
Quote data p

Chart, Financials, Histo
Messages, News, Optio
SEC Fi
Get Streaming
with Y

**Reminder:** This board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own
research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified by your
posts. Please read our Terms of Service. For more information regarding investments and the Internet, please visit the SEC Web site.

Copyright © 2004 Yahoo! Inc. All rights reserved.

Case 1:03-cv-01042-MJG    Document 41-3    Filed 07/02/04    Page 270 of 394

Privacy Policy - Terms of Service - Copyright Policy - Guidelines - Help - Ad Feedback

Yahoo! My Yahoo! Mail

**YAHOO! FINANCE** Sign In
Message Boards   New User? Sign Up

Search the web   [Search]

Message Boards Home - Help





Top > Business & Finance > Investments > Sectors > Basic Materials > Non-Metallic Mining > USU (USEC Inc.)

Options - Edit Public Profile - Sign In

# Yahoo! Message Boards: USU

Add to My Yahoo

< Previous | Next > [ First | Last | Msg List ] Msg #: [ ] [Go] Reply Post   ADVE

**Recommend this Post**

Ignore this User | Report Abuse

## Re: Porter Stansberry

by: jpjankovich
Long-Term Sentiment: **Buy**

05/22/02 12:32 pm
Msg: 15995 of 39246

Ne
D\

Plus, I really did call USEC's IR Director, Winfield, and spoke to him
Monday. He did not confirm or deny any of McDaniel's assertions. He was
mum, but still optimistic. He did say President Bush was not going to say
anything about USEC, and that there was going to be no grand, watershed
event this week connected with the BUsh-Putin agreement.

His statements do not conflict with McDaniel's or Porter's. In fact, they seem
to fit together quite nicely.

JP

Posted as a reply to: Msg 15991 by jpjankovich

**Message Thread** [ View ]

< Previous | Next > [ First | Last | Msg List ] Msg #: [ ] [Go] Reply Post

Profanity filter is Off [ Turn On ]

[                                          ] [ Search ]

◉ All ○ Subject ○ Message Text ○ Authors

**USU**
USU 1-Jun
8.00
7.95
7.90
7.85
7.80
10am    1

USU  7.94
[          ]
quotes delayed
Symt
Quote data pi
―――――――――――
Chart, Financials, Histo
Messages, News, Optioi
SEC Fi
Get Streamin
with Y

**Reminder:** This board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified by your posts. Please read our Terms of Service. For more information regarding investments and the Internet, please visit the SEC Web site.

Copyright © 2004 Yahoo! Inc. All rights reserved.
Privacy Policy - Terms of Service - Copyright Policy - Guidelines - Help - Ad Feedback

Yahoo!   My Yahoo!   Mail




Search the web    [ Search ]

Message Boards Home - Help

  



Top > Business & Finance > Investments > Sectors > Basic Materials > Non-Metallic Mining > USU (USEC Inc.)

Options - Edit Public Profile - Sign In

## Yahoo! Message Boards: USU

Add to My Yahoo

< Previous | Next > | [ First | Last | Msg List ]  Msg #: [____] Go  Reply  Post

**Recommend this Post**                        Ignore this User | Report Abuse

### Re: Flip-Flop                              05/22/02 04:00 pm
by: ATS_Information                            Msg: 16056 of 39246
Long-Term Sentiment: **Sell**

JP - don't feel like that. I was long also before I called IR and started banging
away with my warnings. I am glad you called man.

Posted as a reply to: Msg 16054 by jpjankovich

**Message Thread** [ View ]          **Profanity filter is Off** [ Turn On ]

< Previous | Next > | [ First | Last | **Msg List** ]  Msg #: [____] Go  Reply  Post

[_____]  [ Search ]

⦿ All   ◯ Subject   ◯ Message Text   ◯ Authors

**Reminder:** This board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own
research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified by your
posts. Please read our Terms of Service. For more information regarding investments and the Internet, please visit the SEC Web site.

Copyright © 2004 Yahoo! Inc. All rights reserved.
Privacy Policy - Terms of Service - Copyright Policy - Guidelines - Help - Ad Feedback

Yahoo!  My Yahoo!  Mail

**YAHOO! FINANCE**  **Sign In**
Message Boards        New User? Sign Up

Search
the web          [Search]

Message Boards Home - Help

powered by hp





Top > Business & Finance > Investments > Sectors > Basic Materials > Non-Metallic Mining > **USU (USEC Inc.)**
Options - Edit Public Profile - Sign In

# Yahoo! Message Boards: USU

Add to My Yahoo!

< Previous | Next > | [ First | Last | **Msg List** ] Msg #:   [Go] Reply Post

ADVE

**Recommend this Post**                      Ignore this User | Report Abuse

## USEC VP                                       05/23/02 06:55 pm
by: shzortee                                     Msg: 16346 of 39246
Long-Term Sentiment: **Hold**

Get off your butts folks!
I talked to a VP at USEC and I cannot see that the JD report was in error,
except to timing and dollar value.
The company has to be worth more than it was before the government
approval. As you all know, the stock market does not always value a stock
fully, especially when there is a controversy swirling.

regards,

shortee

Posted as a reply to: Msg 16345 by ATS_Information

**Message Thread** [ View ]

< Previous | Next > | [ First | Last | **Msg List** ] Msg #:   [Go] Reply Post

**Profanity filter is Off** [ Turn On ]

|   [Search]

◉ All   ○ Subject   ○ Message Text   ○ Authors

**USU**
USU 1-Jun
8.00
7.95
7.90
7.85
7.80
10am    1

USU  7.95

quotes delayed
Symb
Quote data p

Chart, Financials, Histo
Messages, News, Optio
SEC Fi
Get Streaming
with Y

**Reminder:** This board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified from your posts. Please read our Terms of Service. For more information regarding investments and the Internet, please visit the SEC Web site.

Copyright © 2004 Yahoo Inc. All rights reserved.
Privacy Policy - Terms of Service - Copyright Policy - Guidelines - Help - Ad Feedback

.

# EXHIBIT J



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
SALT LAKE DISTRICT OFFICE
50 SOUTH MAIN STREET
SUITE 500
SALT LAKE CITY, UTAH 84144

In replying
please quote
SL-02368

August 13, 2002

**VIA FEDERAL EXPRESS
and FACSIMILE**
410-783-8409

Agora, Inc.
c/o Matthew J. Turner, Esq.
Office of General Counsel
14 West Mount Vernon Place
Baltimore, MD 21201

Re:    In the Matter of PirateInvestor.com (SL-02368)

Dear Mr. Turner:

The staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to Agora, Inc. ("Agora") as part of this investigation. The subpoena requires Agora through its president, William Bonner, to give us documents and provide sworn testimony.

Please read the subpoena and this letter carefully. This letter answers some questions you may have about the subpoena. You should also read the enclosed SEC Form 1662. You must comply with the subpoena. You may be subject to a fine and/or imprisonment if you do not.

**Producing Documents**

*What materials do I have to produce?*

The subpoena requires you to give us the documents described in the attachment to the subpoena. You must provide these documents by August 22, 2002. The attachment to the subpoena defines some terms (such as "document") before listing what you must provide.

Please note that if copies of a document differ in any way, they are considered separate documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

If you prefer, you may send us photocopies of the originals. The Commission cannot reimburse you for the copying costs. The copies must be identical to the originals, including even faint marks or print. If you choose to send copies, you <u>must</u> keep the originals in a safe place. The staff will accept the copies for now, but may require you to produce the originals later.

**SEC 02634**

*Agora, Inc.*
August 13, 2002
Page 2

If you <u>do</u> send us photocopies, please put an identifying notation on each page of each document to indicate that it was produced by you, and number the pages of all the documents submitted. (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.) Please make sure the notation and number do not conceal any writing or marking on the document. If you send us originals, please <u>do</u> <u>not</u> add any identifying notations.

*Do I need to send anything else?*

You should enclose a list briefly describing each item you send. The list should state which paragraph(s) in the subpoena attachment each item responds to.

Please include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires you to send <u>all</u> the materials described in it. If, for any reason – including a claim of attorney-client privilege -- you do not produce something called for by the subpoena, you should submit a list of what you are not producing. The list should describe each item separately, noting:

- its author(s);
- its date;
- its subject matter;
- the name of the person who has the item now, or the last person known to have it;
- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents; and
- the reason you did not produce the item.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should also identify the attorney and client involved.

*Where should I send the materials?*

Please send the materials to:

> Brent R. Baker
> Special Counsel
> U.S. Securities and Exchange Commission
> 50 South Main Street, Suite 500
> Salt Lake City, Utah  84144-0402

**SEC 02635**

*Agora, Inc.*
August 13, 2002
Page 3

**Testifying**

*Where and when do I testify?*

The subpoena requires Mr. Bonner to come to the Offices of the United States Attorney, 6625 US Courthouse, 101 W. Lombard St, Baltimore, Maryland 21201, to testify under oath in the matter identified on the subpoena, on August 27, 2002 at 9:00 a.m.

**Other Important Information**

*May I have a lawyer help me respond to the subpoena?*

Yes. You have the right to consult with and be represented by your own lawyer in this matter. Your lawyer may also advise and accompany you when you testify. We cannot give you legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions. What should I do?*

If you have any other questions, you may call me at (801) 524-5796. If you are represented by a lawyer, you should have your lawyer contact me.

Sincerely,

Brent R. Baker
Special Counsel,
U.S. Securities and
Exchange Commission

Enclosures:    Subpoena
              SEC Form 1662

**SEC 02636**

8/13/02



## SUBPOENA
# UNITED STATES OF AMERICA
### SECURITIES AND EXCHANGE COMMISSION

### In the Matter of PirateInvestor.com (SL-02368)

To:     Agora, Inc.
        William Bonner
        14 West Mount Vernon Place
        Baltimore, MD  21201

---

__X__     **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below.

50 South Main Street, Suite 500, Salt Lake City, Utah 84144, on **Thursday, August 22, 2002, at 10:00 a.m.**

---

__X__     **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below.

The Offices of the United States Attorney, 6625 US Courthouse, 101 W. Lombard Street, Baltimore, Maryland, on **Tuesday, August 27, 2002, at 9:00 a.m.**

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By:   _Brent R. Baker_           Date:   _8-13-02_
      Brent R. Baker, Special Counsel
      50 South Main Street, #500, Salt Lake City, Utah
      Phone: 801-524-5796 Fax: 801-524-3558

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 21 of the Securities Exchange Act of 1934.

**SEC 02637**

8/13/02

---

**Subpoena Attachment**

---

Re:   <u>In the Matter of PirateInvestor.com, (SL-02368)</u>

Please refer to the instructions below and the enclosed SEC Form 1662 "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena," for guidance in compliance herewith.

## A.   **INSTRUCTIONS AND DEFINITIONS**

1.     You should produce all documents and other materials described below in your actual or constructive possession or custody or subject to your control, as further described herein.

2.     If you claim attorney-client privilege, or any other privilege or protection from production, as to any of the requests below, provide a list of the subject documents, indicating the date prepared, authors, recipients, subjects, and the privilege or protection claimed, sufficiently identifying the documents to which you claim the privilege or protection attaches, in order that the staff may determine whether to request <u>in camera</u> inspection by a federal district court judge.

3.     The term "document" means the original and each non-identical copy (whether different from the original because of marginal notes or other material inserted therein or attached thereto or otherwise) of written or graphic matter, however produced or reproduced, whether sent or received, including drafts and both sides thereof, and including, but not limited to, written, printed, typewritten, and computer printed matter, and mechanical, magnetic and electronic recordings. The term "document" also includes all "writings and recordings" as defined by Rule 1001 of the Federal Rules of Evidence.  If any tape, disk, card, wire, or other electronic or mechanical recording or transcript or any computer program is produced, you shall also produce such documents as are necessary for the decoding, playing back, printing out, and/or interpretation thereof, and any other documents which are necessary to convert such information into a useful and useable format.

4.     "Agora" means Agora, Inc., Pirate Investor, LLC, Pirateinvestor.com, Agora Publishing, Inc., or any of its subsidiaries and newsletters, including any present and former officers, directors, employees, advisors, representatives or agents, successors or predecessors in interest, subsidiaries, parent companies, and affiliates.

5.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this request all documents that might otherwise be construed to be outside the scope.

6.     The use of the singular form of any word includes the plural and vice versa.

**SEC 02638**

8/13/02

7.     "You" and "your" refer to Agora, Inc. and all entities in which it has or has had a controlling interest, all subsidiaries, affiliates, predecessors, successors, present and former officers, directors, advisors, employees, representatives, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

8.     "USEC" means USEC, Inc., or any related entity.

## B.     **PRODUCTION OF DOCUMENTS**

1.     Please produce the following:

    A.     Documents sufficient to identify all individuals or entities that assisted in any way in the preparation, organization or creation of the e-mail attached as Exhibit A.

    B.     Documents sufficient to identify all individuals or entities that assisted in any way in the preparation, organization or creation of the report attached as Exhibit B.

    C.     Documents that identify all individuals or entities that received the e-mail attached as Exhibit A to this subpoena from Agora or any related entity, including, but not limited to, The Cutting Edge, Penny Stock Advisory, The Red Zone, Taipan, Rogue Trader, The Flyinv V Lockup Trader, CSX Trader, Fleet Street Letter, Options Hotline, Outstanding Investments, Richebacher Letter, Daily Reckoning Investment Advisory, Carpathia Letter, Strategic Opportunities, Jim Davidson's Vantage Point Investing, and the Contrarian Speculator. This should include e-mail address and any other contact information available.

    D.     An organizational chart for Agora for the year 2002, including the names and titles of officers, directors or editors of each subsidiary or newsletter.

    E.     Documents sufficient to identify all bank, savings and loan or other financial institution accounts that are in the name of Agora or any related entity, or beneficially owned in whole or in part by Agora, including the name and address of the institution and the account number for each such account, during the period January 1, 2002 through the present, inclusive. In the alternative, you may provide a list containing the information required by this paragraph.

    F.     A list of the names, addresses and telephone numbers for each individual responsible for content of e-mails, reports or documents distributed on paper or over the Internet by Pirate Investor, including, but not limited to, Porter Stansberry, Steve Sjuggerud, David Lashmet and Dan Ferris.

    G.     All correspondence, notes of conversations or other documents reflecting contacts, communications or agreements involving Agora and any individual or entity affiliated with USEC or any related entity or individual.

    H.     Documents sufficient to identify any individual referred to in Exhibit A as a "high-level corporate executive" or "senior executive" inside USEC.

**SEC 02639**

8/13/02

I.      Documents sufficient to identify any individual referred to in Exhibit B as a "USEC senior executive."

J.      Documents relating to or evidencing compensation paid to Agora either directly or indirectly by any individual to purchase a copy on paper or over the Internet of the report attached as Exhibit B to this subpoena.

K.      All documents pertaining to Agora's direct, indirect or beneficial ownership of shares of the securities of USEC, Inc., the name of each person or entity whose name appears on ownership records as being the owner, along with the number of shares and date of each purchase and sale, and if deposited with a financial institution, the documents reflecting the account and deposit of those shares at the financial institution.

L.      All complaints received orally or in writing regarding Exhibits A or B.

M.      All correspondence, notes of conversations, contracts, agreements or other documents reflecting contacts, communications or agreements with any individual or entity affiliated with USEC, Inc., or any related entity or individual since January 1, 2002.

N.      All documents reflecting Agora's policies and procedures regarding the purchase and sale of stock by its officers, directors and employees in the securities of companies covered or recommended by Agora or any related entity or individual.

O.      All documents reflecting Agora's policies and procedures regarding the message board posting by officers, directors and employees.

P.      A listing of all securities brokerage accounts in Agora's name or controlled by Agora, including but not limited to any accounts containing shares of USEC or which contained shares of USEC at any time since January 2002.

**SEC 02640**

DOUBLE YOUR MONEY ON ʍAY 22ND
WITH THIS "SUPER INSIDER" TIP
****************

Dear Investor,

I've recently learned the details of a major international
agreement between the United States and Russia that will
create more than $2.5 billion in profits for one small U.S.
company.

Investors in this company are going to make a fortune - for
reasons that I can detail for you here. And, best of all,
because of my source - a senior company executive - I can
even tell you EXACTLY WHEN the deal will be finalized and
announced to the public.

The deal will close on May 22nd, only a few days from now.

The company involved is publicly traded - on the New York
Stock Exchange - and it's currently paying an 8% annual
dividend. Although the company has a billion dollars in
net assets, it has been forgotten by Wall Street and today
it's valued for less than $600 million.

Meanwhile, reasonable projections see the upcoming deal
adding at least $2.5 BILLION in profits to the company's
bottomline. Although the market value of the stock could
soar by four or five times (it's only a $7.00 stock), I'm
conservatively estimating that the shares will double.

Let me show you why.

On May 23rd the United States and the Russian government
will sign a new arms reduction agreement that will reduce
the number of nuclear warheads around the world by around
10,000. Thousands of investors watching CNN or CNBC will
see the ceremony, with all its pomp and circumstance, live
from St. Petersburg, Russia. But only a handful of
investors will have already profited on the
behind-the-scenes-maneuvering that put one company in a
position to make an outrageous profit on the new treaty.

If you follow politics closely, the upcoming U.S.-Russian
summit probably isn't news to you. Details are already
leaking out to the media. For example, on The Wall Street
Journal's May 8th front-page: "the U.S. and Russia now
appear on track to sign a nuclear arms reduction treaty at
the Bush-Putin summit." What you haven't read in the
papers yet is how this deal will mean hundreds of millions
of dollars in windfall profits for one company. In fact,
on May 22nd - the day before the summit begins - shares in
this stock should more than DOUBLE, as the new agreement
with the Russians will mean fat profits through the year
2013.

A high-level corporate executive - someone definitely in a
position to know - passed along the details to me. He
explained how the deal would benefit his company - raising
its profit margins by 20 percentage points. He even told
me the precise day the deal would be announced.

This is the kind of insider information that could make you

SEC 02641



2

In fact, the company in question is already a terrific bargain. It's valued by the stock market for around HALF of net assets. It pays an 8% dividend annually. In each of the last four years it sold over a billion dollars worth of product. This year alone it will have over $150 million in cash flow thanks to excess inventory reductions. This is a profitable business, with or without a treaty with the Russians. Despite its assets, sales and tactical strategic position, the market values the entire company at less than $600 million because this is an "old-economy" stock.

In other words, you could probably DOUBLE your money on this stock as the stock market recovers - with or without the sweetheart deal the company has negotiated as part of the upcoming nuclear arms agreement. And, with the information I'm prepared to give you, you won't have to wait for the stock market to recover. This stock will probably double - and could even triple or more - on the news I know will be announced in a few days.

Make no mistake - my plan to double your money is extremely low risk. This is a billion dollar corporation (in sales) that's currently valued at less than $600 million and that pays an 8% annual dividend. I'm not even recommending the options on this stock - just the regular shares. If you can double your money in one day on a low risk speculation, why get greedy?

But, for just a moment, forget about the blue chip description, the 8% dividend, the Russian presidential summit - I'll fill in the details as we go.

Focus on doubling your investment dollar SAFELY on the back of an insider tip. I can even tell you exactly which day the pop in the stock should happen. Like I told you, it's a Wednesday later this month - May 22nd. The news will be all over CNN. The President of the United States will be involved. And one company - just one company - stands to gain at least $250 million in income each year for the foreseeable future (at least through 2013). Considering that the stock in question is only valued at $600 million today...well, I'm conservatively estimating that the stock will double. But it could certainly go up a lot more than that...

Again - this tip is for a single stock. It trades on the New York Stock Exchange. It pays an 8% dividend. It has a virtual monopoly on its business in the U.S. And I can tell you precisely when, why and how its shares should double later this month. Downside if I'm wrong? Most likely zero. After all, the stock is already trading at less than net assets and it's paying an 8% annual dividend.

This could be the simplest, safest and easiest way you'll ever double or even triple your money. Ever. And I'm going to give you a summary of the opportunity, right here in this email.

HOW TO MAKE A LOT OF MONEY, WITHOUT RISKING ANY (HINT: POLITICS)

SEC 02642

I'm sure you're wondering - now is it possible to double your money on a safe stock in one day? How can you double or triple your money - in less than a month - without buying a speculative stock or stock options? How can you make a killing without putting much at risk?

In a word, politics.

That's right. Living in the greater Washington D.C. metropolitan area has its distinct advantages. Recessions never hit this part of the country because the government never stops growing. And, the insider tips you get at the country clubs here have nothing to do with something as risky as venture capital. Instead, I hear about the dirty, but sometimes very profitable, world of politics.

Maybe you haven't heard about it yet, but the upcoming U.S.-Russia summit is big news here in D.C. President Putin will host President Bush for three days in Russia. According to my source - and backed up by rumors that have been reported in the mainstream press - the major announcement of this summit will be an important new strategic alliance between the United States and Russia, relating to nuclear stockpiles and a new strategic defense system to protect both our countries from nuclear missiles...

The company I'm passing along to you will be a direct beneficiary of this agreement, to the tune of billions of dollars in profits.

See how this works? It's a total insider deal. Money and favors in exchange for a fat deal with the Russians. Hey, I know it's dirty. But I don't make the rules and I don't run the company or involve myself in politics. On the other hand, I see nothing wrong with profiting from my insider knowledge of this deal and I don't think you should be ashamed to do so either.

It's a great opportunity. Let me give you a few of the details now.

## THE DETAILS YOU NEED TO MAKE A QUICK (AND HUGE) PROFIT

First, the company that will profit at the expense of the Russians is well known and (obviously) well connected.

In fact, the company was spun out of the U.S. government in 1993, which helps to explain why it has so much access to the government corporate welfare trough. Let me reiterate: this is a major company, not some penny stock. On the balance sheet you'll find over $200 million in cash and over $800 million in inventory (some of which was just liquidated for over $150 million). Net assets are valued at more than $950 million. But - get this - today the stock trades for less than $600 million - despite paying an 8% dividend this year.

This is a major company that sells a critically important commodity all over the world. It has had over a billion dollars in sales for the last four years and positive earnings per share each of the last four years too.

4

**SEC 02643**

So...what's wrong with this picture?  If this is such a great company, why is the stock so undervalued?

Because without the upcoming deal with the Russians and the support it gets from the U.S. government (protective tariffs), its costs match its sales revenue.  In other words, this company - absent its upcoming deal with the Russians - would probably only breakeven this year.

So...the market is a down on the company.  But I know the deal with the Russians is about to go through...!  Once the deal with the Russians goes through, the company's net margins should exceed 20% - netting it around $250 million per year, even if you assume its market doesn't grow at all!

And guess what?  The deal with the Russians has ALREADY BEEN SIGNED.  That's right.  It's all done, locked up. Finished.  The only thing that both sides are waiting on is the proper media event to announce this commercial cooperation between the Ruskies and us.  It's a feel good thing.  It's PR for the politicians. You know how the game works. The important work is done in advance, so that when the cameras are rolling, everything comes off without a hitch.

Who is my source?  Well...I can't tell you, except to say that he is a senior executive inside the company.  He is definitely in a position to know the intimate deals of this agreement.

Wait a minute you say...isn't this insider trading?

Well, it might be except because I'm willing to give you all of the details, it's now public information.  (You don't have to wonder why I'm bringing you this information. I can't make money with this idea unless I make it public first).

Why haven't the other investment newsletter writers at www.pirateinvestor.com <http://www.pirateinvestor.com> told you about this opportunity?

Frankly, they probably wouldn't touch this stock.  They're free-market guys.  They loathe the fact that this stock has a monopoly on its commodity product in the United States. And Porter Stansberry or Dan Ferris would tell you that this company's technology isn't cutting edge.

But, to me, that hardly matters, because - right or wrong - the company operates in the United States with a VIRTUAL MONOPOLY.  It has persuaded Washington to slap a huge tariff on its foreign competition - a tariff that ensures it will operate profitably in the United States for at least the next five years.  Furthermore, the company has landed a deal with the Russians for the raw materials it needs to reduce its production cost by 20% or more.  All that's left is the government approval for the contract - which is coming on May 22nd, just in time for the Bush-Putin summit.

ARE YOU INTERESTED?  WANT TO ROLL THE (LOADED) DICE WITH ME THIS MONTH?

SEC 02644

Now...before I ask you if you're interested in this information, I have to make one thing perfectly, crystal clear. I'm not a Merrill Lynch stock analyst. I'm not hyping this thing to you because I'm trying to raise money for an IPO. No. I'm in the business of selling independent investment research...and frankly this is the best tip I've ever come across. And, because I make my living as a provider of unbiased information...I'm willing to sell you this information before I even establish a position in the stock myself. What could be fairer?

Unfortunately, there's one more thing I have to remind you about. I can't guarantee that the stock will pop. Nobody can guarantee the actions of the stock market. But, I can guarantee you (and Porter Stansberry has agreed to vouch for me and stand behind my guarantee) that everything I've told you here about the company is true and accurate. In fact, if you're interested in getting in on this deal, I'll provide you with a report IMMEDIATELY that proves everything I've said above. By that I mean:

#1. The financial position, history of the company and the balance sheet information is 100% correct.

#2. The company's future financial situation has been accurately represented here.

#3. The company has historically paid a dividend. Currently it's paying $0.1375 per quarter, which judging by the current share price of $6.50 would equal an 8% yield for investors this year. (I can't guarantee that the company will continue to pay the dividend - only the board of directors could do that - but I can show you that the company has a solid history of paying dividends and the financial resources to continue to pay them).

#4. The deal I allude to here - with a Russian company - for a new, cheaper supply of raw materials, is, according to public company documents, finalized.

#5. U.S. government officials have said in public that a deal of the nature I've represented here will be announced at the upcoming Bush-Putin summit.

******

Now, assuming for the moment that everything I'm able to guarantee is correct, how much would confirmation from a company insider be worth to you? Well, that depends on how much you have to invest, doesn't it?

Let's say that you've got a small investment portfolio. Just $10,000. Could you stake all of it on a deal like this? I don't see why not. The company is trading for less than net current assets. It has plenty of cash and is paying an 8% dividend. The stock, by the way, is trending higher, from a low of around $4. This is no penny stock either: it does over a billion a year in sales.

I'm not asking you to bet the farm on a new drug or a new widget. This is a bricks and mortar company, selling a widely used industrial commodity. This is a Warren Buffett kind of stock. Only I can tell you exactly when it should

**SEC 02645**

6

spike higher based on a maj...   ...ernational news event...

How much is information like this worth to you?

## A REPORT THAT COULD DOUBLE YOUR INVESTMENT DOLLAR IN A SINGLE DAY

I'm going to make this very easy for you. I'm not asking you to subscribe to my newsletter in exchange for this information. (I don't even write a newsletter). I'm not asking you to follow a trading system. (I don't have one). I'm not going to bother you with subsequent emails or follow-up phone calls. Nope. This is a simple, one-shot deal. I'll simply give you immediate access to a full report on the opportunity, including all of the back up information you'd need to verify everything I've told you here.

If you're interested, and you think the price is fair, all you have to do is buy one four-page report. You can verify all of the details I'll provide with documents available via public records. I'll even give you an Internet link to the company's most recent financial data.

And you can buy the report through a link at the bottom of this page. You'll have INSTANT ACCESS to the report. I can't make it any easier.

Let me repeat my offer: This blue chip, undervalued stock, which pays an 8% dividend, should double on May 22nd because of a key new commercial arrangement between the United States government and Russia. All the insiders are preparing to take profits...and you can join them.

So...what is this information worth?

Let's say you take my advice and I'm right on the money. Let's say - just for the sake of argument - that the stock hits a new all-time high. It goes to $14. You'd make 100% on your money - even after trading costs.

Now look, I know that a lot of you can afford to put a lot more than $10,000 on this kind of safe, high return play. It's not an option play. It's not a growth stock. It's not even a tech stock. Nope. It's a high dividend paying commodity company. But, even if you only have $10,000 to invest, I could help make you double that $10,000 in a few days. Heck, I can even tell you exactly which day to buy (May 21st) and sell (May 23rd). There's nothing else you'll have to do.

So...what price do you think is fair for this kind of information? How much would you pay?

Lots of people spend $10,000 or more for solid, profitable investment advice. After all, if you're making money with the information, it's worth it. But these services all require lots of trading...and lots of risk taking. With the deal I'm offering you today, all you have to do is buy one stock. And, as I've shown you, it's a low-risk stock.

Other services charge $5,000 or more for so-called "insider" connections. Conference call services, "angel"

**SEC 02646**

investment clubs and the like...and the deals always entail super high-risk bets that take YEARS to mature - if they ever do.

What I'm offering you today is far superior to both of these kinds of offers. It's low risk and it will come to fruition - one way or the other - this month. If the deal doesn't hit big, your capital won't be tied up forever and there's almost no chance you'll lose money because the company pays such a big dividend and is so undervalued relative to assets. Plus, it's just one stock. There's not all of the work required to follow an investment "system."

So...what's a fair price? Honestly, I have no idea. It really depends on how much money you have to invest. If you're going to put a million dollars on this - and you could - then the information is probably worth $50,000 or more. But I know most of you don't have that kind of money to play with (though some of you do). No matter how much you decide to invest, I'll give instant access to the information to anyone who cares to pay $1,000 for it. It's not cheap - but if we double our money this month - it's easily worth it.

And, by the way, I might not recommend stocks all that often, but I've been in and around the investment publishing business longer than Porter Stansberry, Steve Sjuggerud and Dan Ferris combined. From time to time - as you see here - I come across very solid information.

I hope you'll use this lead to your best advantage. Your friends won't understand your newfound interest in politics...and they won't know where you got the money for you new house, boat, car, and vacation either.

Sincerely,
Jay McDaniel

P.S. To buy this special INSIDER TIP report, just click here:

<http://www.pirateinvestor.com/Reports/350SSIT/DR/W350C504.cfm>

SEC 02647

# DOUBLE YOUR MONEY ON THE UPCOMING ARMS AGREEMENT: BUY USEC (NYSE: USU, $6.50)

Dear Investor,

Thank you for your interest in my special report. If you're the kind of person who likes to buy first and ask questions later, call your broker now and tell him to buy shares of **USEC (NYSE: USU, $6.50)**. The company is the leading vender of enriched uranium in the United States. Enriched uranium is the fuel required by almost all nuclear power plants around the world.

The main advantage of nuclear power is its ability to derive enormous amounts of energy from a tiny amount of fuel. One metric ton of nuclear fuel can produce the equivalent of to 2-3 million tons of fossil fuel. For example, one kilogram of coal can generate 3 kilowatt-hours of electricity. But one kilogram of nuclear fuel can generate 400,000 kilowatt-hours.

As our economy grows and becomes more energy dependent and as we seek to become less reliant on foreign oil supplies, nuclear power will undoubtedly play a role of growing importance to our economy. Today there are 107 nuclear reactors in the United States, operating at about 90% of capacity. However, there's only one U.S. vender of fuel for these reactors: USEC. And, in total, the company sells fuel to 170 nuclear reactors around the world.

Let me briefly outline the bullish case for the company.

USEC has signed long-term fuel contracts with power companies around the world. However, the cost to USEC to fulfill these contracts is variable. In the past, the company has fulfilled demand for nuclear fuel via two sources - nuclear warheads from the U.S. and Russian arsenals and USEC's own uranium enrichment process.

This is a very big business. USEC recorded well over $1 billion in sales during each of the last four years. But, like any commodity business, USEC's profits are directly linked to its costs - the market price of its commodity. Lately, do to increased production by the Western European providers - Eurodif and Urenco- the market price of uranium SWU - a Single Work Unit, the nuclear equivalent to a gallon of gasoline - has fallen while USEC's production costs have risen. The company's Russian supply of cheap uranium has been on hold for two years pending a new government-approved deal. That squeezed the company and forced it to sell SWUs at a much lower profit.

For example, back in 1999 the company was getting plenty of cheap Russian uranium. It had over $1.4 billion in SWU revenue that year and its cost of sales was a little over $1.18 billion. The company made $346 million in gross profit. (That's pretty incredible for a company valued by the market today for less than half that amount).

**SEC 02648**

GOVERNMENT EXHIBIT
B

On essentially the same demand for its product in 2001, the company had revenues of $1 billion (lower revenue total reflects the lower average sale price) but its cost of sales was $991 million. The company's margins – always thin in a commodity business – had begun to disappear. Net income was only $78.4 million.

The 2001 figures aren't terrible for a $600 million company...but they'd be a heck of a lot bigger if USEC could re-establish its cheap Russian supply of enriched uranium. And that's exactly what's going to happen on May 22nd.

Before I get to the details of the new Russian agreement, I want to go over all of the company's financial statements to justify what I told you earlier about the company.

| Period Ending | 31-Mar-02 |
|---|---|
| Current Assets | |
| Cash And Cash Equivalents | $219,300,000 |
| Net Receivables | $159,300,000 |
| Inventory | $835,500,000 |
| Other Current Assets | $20,100,000 |
| **Total Current Assets** | **$1,234,200,000** |
| | |
| Long Term Assets | |
| Property Plant And Equipment | $608,700,000 |
| Other Assets | $123,300,000 |
| Deferred Long Term Asset Charges | $48,200,000 |
| **Total Assets** | **$2,014,400,000** |
| | |
| Current Liabilities | |
| Accounts Payable | $210,100,000 |
| Other Current Liabilities | $52,700,000 |
| Total Current Liabilities | $262,800,000 |
| Long Term Debt | $500,000,000 |
| Other Liabilities | $268,200,000 |
| Long Term Liability Charges | $31,300,000 |
| **Total Liabilities** | **$1,062,300,000** |
| | |
| Stock Holders Equity | |
| Common Stock | $10,000,000 |
| Retained Earnings | $14,700,000 |
| Treasury Stock | |
| Capital Surplus | $1,066,200,000 |
| Other Stockholder Equity | |
| **Total Stockholder Equity** | **$952,100,000** |
| **Net Tangible Assets** | **$952,100,000** |

## USEC IS AN ASSET RICH COMPANY

First, here's the most recent balance sheet from the company's most recent 10K. As you can see, the company has over $1.2 billion in current assets against only $262 million in current liabilities – an extremely liquid position. It also has over $2 billion in total assets against only a billion dollars in total liabilities.

I'm not suggesting that you gamble on an Internet stock here. This company is an asset rich and cash rich company. (To see the full balance sheet, income and cash flow statements, visit, see this website: http://biz.yahoo.com/fin/l/v/usu.html)

There's only one thing about this balance sheet you should be cautious about – the inventory figures. USEC was originally a branch of the Department of energy. Then in 1993 it became United States Enrichment Corporation, wholly owned by the U.S. Government. Finally USEC went public in a July 1998 IPO, becoming a stand-alone public company. Almost all of its assets originally came from the government – including its stockpile of uranium. Recently, around $230 million worth of its uranium inventory was discovered to have elevated levels of technetium, ruining it as a fuel. This would devalue the stockpile considerably and force the company to take a charge against



SEC 02649

shareholder's equity. But, USEC and the Department of Energy have agreed on a process, including further sampling, to determine the actual amount of material that may be affected. This process is expected to be completed in the first half of 2002. After a determination is made on how much uranium is affected, the process of getting reimbursed by the Department of Energy will begin. There are legal and regulatory specifications that the government agreed to as part of the privatization process and there's good reason to expect the government can be made to reimburse the company for the defective materials, though no agreement has been reached yet. In other words, keep in mind that $230 million or so of those assets could be impaired.

### REVENUE

| Quarter | 1999 | 2000 | 2001 | 2002 |
|---------|------|------|------|------|
| SEP | 307.900 | 230.900 | 226.800 | 300.50 |
| DEC | 422.400 | 447.600 | 387.100 | 560.10 |
| MAR | 260.400 | 281.800 | 243.100 | 249.40 |
| JUN | 537.900 | 529.100 | 286.900 | |
| Totals | 1,528.600 | 1,489.400 | 1,143.900 | 1,110.00 |

Note: this is in thousands of U.S. Dollars

### EARNINGS PER SHARE

| Quarter | 1999 | 2000 | 2001 | 2002 |
|---------|------|------|------|------|
| SEP | 0.63 | 0.16 | 0.06 | -0.0 |
| DEC | 0.32 | 0.36 | 0.26 | 0.1 |
| MAR | 0.16 | 0.25 | 0.56 | 0.0 |
| JUN | 0.41 | -0.74 | 0.09 | |

Besides a robust balance sheet, USEC also has a long and successful operating history. As you can see here, the company continues to deliver over a billion dollars a year in revenues and – even with the recent challenges to its cheap Russian supply of enriched uranium – it has been posting positive earnings each year as a public company.

What could change these numbers radically in the future is a new deal with the Russians. And, in fact, such a deal has already been signed.

### THE RUSSIAN DEAL

USEC plays an import role in nuclear disarmament. It is the U.S. government's agent in the nuclear warheads to nuclear fuel program. The original Russian deal was signed in April 1997, prior to the company's public offering and has a 20-year term. Over the life of the 20-year Russian contract, USEC expects to purchase approximately 92 million SWU derived from 500 metric tons of highly enriched uranium. So far 22.4 million SWU has been purchased.

In the past this Russian supply has been very important to the company's production. Purchases from the Russian Federation represented 52% of USEC's production total in 2001. And, pending approval for a new, market-based pricing agreement, USEC expects purchases of the Russian SWU will make up approximate 60% its production total in 2002. But only if a new, market-based contract is approved. Until then the company has suspended its buying of Russian SWU.

USEC has already reached such an agreement with its Russian partner. A deal was signed in May 2000 that includes market-based pricing and runs through 2013. **But implementation of the agreement is subject to review and approval by the U.S. and Russian governments.**

SEC 02650

The uncertainty about when this deal would be approved has led to the company's stock trading in limbo – and at very cheap prices – since early 2000 when SWU prices fell. <u>A USEC senior executive has assured me that the new Russian agreement will be approved just prior to the upcoming Bush-Putin summit. In fact, as he said "watch the stock on May 22nd."</u>

The media is confirming his tip. It was reported last week that the major thrust of the summit is a new arms control deal. From *The Wall Street Journal* May 8th, page A15: *"The centerpiece of the summit, to be held May 23-26 in Moscow and St. Petersburg, is likely to be the signing of a treaty cutting offensive nuclear weapons. The accord would reduce U.S. and Russian arsenals to between 1,700 and 2,200 warheads each, down from their present level of about 6,000 to 7,000 for the U.S. and 6,000 for Russia."*

Just as importantly, the Russians <u>need</u> USEC's buying of their excess enriched uranium to continue because of the economic difficulties in Russia. As *The Wall Street Journal* noted *"an offer of contracts for [Russia's] economically distressed defense industry could help soften criticism that President Vladimir Putin has yet to gain any substantial benefits from his pro-Western policies."* The USEC deal alone could send nearly a half billion dollars to Russia each year.

And the financial benefit to USEC is substantial too. Company representatives explain that worldwide SWU prices are now between $105 and $107 per unit. With Russian enriched uranium, USEC's unit cost per SWU is around $80. Without it, their cost is roughly the current market price. Thus, the company stands to gain 20 percentage points of profit margin on around $1 billion in sales contracts – or $250 million in gross profit. <u>All it needs are the politicians to sign off on the deal!</u>

And that, according to my source, will happen – finally – on May 22nd.

With the deal in place, USEC should make between $150 and $200 million in net profits in 2003. These profits should continue too – the new deal with the Russians extends through 2013. Furthermore, demand for nuclear fuel is likely to increase during this time period. With only five global vendors of enriched uranium, it's not hard to imagine the cost of nuclear fuel rising in this period, creating growing profits over time for USEC.

Without the deal in place USEC will probably clear only $50 million or so in net profits next year. But, in either case it's hard to imagine the company cutting its current dividend of $0.1375 per quarter. The company has plenty of cash, the ability to trim inventory, operational profits and a backlog of $5.4 billion.

That's why I consider this a **safe** speculation. It's hard to imagine investors getting hurt with this stock at its current price – you're buying at roughly half of book value and you're getting paid 8% a year to wait until the Russian supply deal gets worked out.

Hopefully, if my source is right, it won't take long...

SEC 02651

00/10/01   100 10:12 FAX          US SEC SLDU                              @001

```
          *********************
     ***    TX REPORT    ***
          *********************


TRANSMISSION OK

TX/RX NO              0701
CONNECTION TEL                84107838409
SUBADDRESS
CONNECTION ID
ST. TIME             08/13 14:57
USAGE T              14'23
PGS.                  22
RESULT               OK
```

SEC 02652

**PLEASE FOLD THIS SHIPPING DOCUMENT IN HALF AND PLACE IT IN A WAYBILL POUCH AFFIXED TO YOUR SHIPMENT SO THAT THE BAR-CODE PORTION OF THE LABEL CAN BE READ AND SCANNED. ***WARNING: USE ONLY THE PRINTED ORIGINAL LABEL FOR SHIPPING. USING A PHOTOCOPY OF THIS LABEL FOR SHIPPING PURPOSES IS FRAUDULENT AND COULD RESULT IN ADDITIONAL BILLING CHARGES, ALONG WITH THE CANCELLATION OF YOUR FEDEX ACCOUNT NUMBER.**

FROM:  Scotty Zamora (801)524-5796
       Securities & Exchange Commission
       50 South Main Street
       500
       Salt Lake City, UT 84144

SHIPPER'S FEDEX ACCOUNT NUMBER

**FedEx**
Federal Express

TO:    Matthew J. Turner, Esq. (410)785-8410
       Agora, Inc.
       14 West Mount Vernon Place

       Baltimore, MD 21201-

SHIP DATE: 13AUG02
MAN-WGT: 1 LBS

REF:



DELIVERY ADDRESS BARCODE (FEDEX-EDR)

CAD # 3960705

## PRIORITY OVERNIGHT

## WED
A1

TRK # **7920 8741 8851** FORM 0201

**BWI**

Deliver By:
**14AUG02UUUU**

**21201-MD-US**
DROP OFF

# XB ODMA



SEC  02653

# EXHIBIT K

August 26, 2002

VIA FACSIMILE:
801-524-3558

Brent R. Baker
Special Counsel
U.S. Securities and Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, Utah 84144-0402

Re:   **In the Matter of PirateInvestor.com (SL-02368)**
      **Response to the subpoenas/production of document requests.**

Dear Mr. Baker:

As mentioned, I am General Counsel for Agora, Inc. and I represent its affiliate Pirate Investor and its editor Mr. Porter Stansberry.

Having reviewed the Commission's August 12, 2002 *Order Directing Private Investigation and Designating Officers to Take Testimony,* we will comply with your subpoenas with, however, a reservation. Our position is that the disclosures we are making herein along with producing Mr. Stansberry for deposition on August 27th will show no possible 10b-5 violations, and certain information requested is, as explained below, entirely unnecessary and cannot possibly lead to relevant information. More importantly from our end, such disclosures present privacy issues with our customers as well as legitimate First Amendment concerns as explained below.

Rather than go to court and move for enforcement, however, we expect you will consider this position and after taking Mr. Stansberry's deposition decide whether we are correct. And if you disagree and can demonstrate the potential relevancy of the information we have not provided herein, then we will comply. In short, there is no need to run to court for enforcement at this juncture since, as explained below, we have legitimate business as well as Constitutional concerns for withholding some of the information sought. We firmly believe all the pertinent information needed for your investigation will be provided.

Our position on this matter is relevant also to why we withhold certain information and, therefore, we explain our view. From the Commission's Order it seems you believe illegal insider information may have been illegally traded on and/or a pumping and dumping scheme was at play. Neither one of those situations occurred and all the information needed to disprove such notions is provided below.

First, no information in the subject report was based on illegal inside information, i.e. no confidential/fiduciary type information was relayed to Mr. Stansberry. Also, his information obtained from the company insider was confirmed by publicly available documents.

As for pumping and dumping, Agora (nor any affiliates) does not trade in stocks aside for one brokerage account that is attached below. As you will find, Agora does not trade in stocks that it publishes information on. Also, Mr. Stansberry's trading account is attached and he likewise does not trade in stocks he recommends, including USEC.

**Response to Request for Production of Documents.**
**This applies for all subpoenas received in this matter.**

A.    No documents. Mr. Stansberry wrote Exihibit A and will testify on August 27th.

B.    No documents.

C.    Objection. We fully appreciate that the Commission has broad subpoena power, but the Commission's investigatory power is not limitless since, if we challenge your subpoenas, the Commission must establish "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to that purpose, .." United States v. Powell, 379 U.S. 48, 57-58 (1964). In addition, the Commission's subpoena power is limited by First Amendment concerns unique to publishers as mentioned in In the Matter of an Application to Enforce Administrative Subpoena Duces Tecum of the Securities and Exchange Commission, v. Wall Street Transcript Corporation, 422 F.2d 1371 (2nd Cir. 1970).

In the *Wall Street Transcript* case the majority upheld the SEC's narrowly focused subpoenas while noting the publisher's legitimate speech concerns. The Court states, "In the first place, the subpoena does not 'go to the jugular of the Transcript as a publishing firm' merely because it asks for the production of certain correspondence and advertising materials which appear to be directly related to an investigation of the type of practices which might cause a newspaper to fall outside the Act's exclusion. No dragnet is cast for lists of all subscribers; instead, the information sought is much like that subpoenaed in *Oklahoma Press* itself. ...The alternative method by which the Commission might have attempted to investigate the commercial activities of the Transcript [publisher] would have been more likely to threaten a chilling of free expression than would compliance with the subpoena in question. The Commission might have addressed separate queries to all the securities industry institutions which supply the material the Transcript publishes, or to the investment community members likely to be among its more prominent subscribers. Such a probe could have generated rumors which might have been much more difficult to counteract, and much more damaging, than the private investigation in question." 422 F.2d., at 1380-81.

(emphasis added). *See also*, concurring opinion, "The District Judge should require that the Commission satisfy him as to what are the 'needed documents,' relevant to what purpose, and how specifically they may be pertinent to support the claim in the Commission's original order and application for the Court's aid...For the Court to yield otherwise is to ensconce 'administrative absolutism' at its unreachable zenith." Id. at 1385.

The Commission's Order is aimed at 10b-5, insider trading, pumping/dumping, kickbacks, scalping, frontrunning etc, schemes. We will work to provide you with the pertinent information relevant to your inquiry within the confines of the law which includes legitimate freedom of expression concerns. For the foregoing reasons, we object and do not provide the documents requested in part C.

D.      Objection. As noted below, Agora provides its brokerage accounts. This request, for its bank accounts (which do not allow for trading) is irrelevant and could not lead to relevant information. For the foregoing reasons, we object and do not provide the documents requested in part D.

E.      Frank Porter Stansberry. He will testify on August 27, 2002.

F.      None.

G.      None.

H.      None.

I.      Objection.  See Answer C above.

J.      None.

K.      None.

L.      None.

M.      Attached.

N.      None.

O.      Attached.

Sincerely,

Matthew J. Turner, Esq.

attachments

September 23, 2002

VIA FACSIMILE:
801-524-3558

Brent R. Baker
Special Counsel
U.S. Securities and Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, Utah 84144-0402

Re:   **In the Matter of PirateInvestor.com (SL-02368)**
      **Response to the subpoenas/production of document requests.**

Dear Mr. Baker:

My intention in writing you is not to waste Court time on misunderstandings. As mentioned before, my belief is that prior to using court time we attempt to resolve issues. I believe your threat of subpoena enforcement is hasty, and shows an unwillingness to discuss the issues. Notwithstanding an agency's broad subpoena power under the law, confronting a Publisher of 25 years with "hand over your subscriber list" does, indeed, present real and substantive legal issues. If we go to Court I will show our written communications as exhibits.

First, you mischaracterize my objections for not providing the Publisher's subscribers names to you as being based on "overly broad." I detailed in my August 26th letter to you the reasons for our objection to handing over a subscriber list and it is bewildering to me that you have consistently referred to those objections as simply "overly broad" objections. I do not think citing to a 2nd Circuit case that discusses the legitimate First Amendment concerns that come into play if a publisher's subscriber list is subpoenaed can be characterized as "overly broad" objections, nor to the cases cited in this letter that show a very legitimate problem with SEC jurisdiction to subpoena a publisher's subscriber base. In short, both First Amendment and jurisdictional issues are at play on whether the SEC can obtain a publisher's subscriber's list.

Second, you will have to state your reasons to a Court in a subpoena enforcement action as to why you are entitled to a publisher's subscriber list. I have asked you repeatedly on the phone as to why you need our subscriber list and you have only stated that you're not at liberty to discuss why. Yet you will have to state such reasons in Court so there is no rationale not to do it now, as I'm clearly not giving you that information without a sound legal basis. Naturally, we will oppose an enforcement motion and, if necessary, would move for a stay and appeal an adverse decision on this issue as it implicates undeniably very real First Amendment and jurisdictional issues. You state in

your letter, "as I suggested on the telephone, your receipt of the transcript has nothing to do with your failure to produce the documents and information called for in the subpoena" is a false assumption on your part. As mentioned to you, we will provide you anything and everything which would be needed for a scalping/pump&dump case (as we already have including all our investment accounts as well as the editors investment/trading accounts, and our company policy that forbids 10b-5 violations). As I'm sure it's apparent to you, you have no pump and dump case as no one in our organization was front running stocks. However, we will continue to work cooperatively with you on information applicable to those legal theories.

Having said that, we will not provide our subscribers names on the basis of a 10b-5 fraudulent marketing case when there is absolutely no showing of scalping/front running as we believe the SEC has no jurisdiction in such a matter. The basis for this conclusion is that, as your Order of Investigation states, that a 10b-5 case is about fraud in "connection with the sale and purchase of a security." Agora sells information. It has never sold a security. The marketing piece marketed a financial analysis on a company called USEC. Even assuming the marketing piece was fraudulent (which it was not), it would be fraud in connection with the purchase and sale of a detailed financial report, not a security. And what does a subscriber list have to do with any of this?

I'm fully aware of <u>SEC v. Park</u>, 99 F. Supp. 2d 889 (N.D. Ill. 2000) that is clearly distinguishable since in that case there was scalping, and an allegation by the SEC that "Defendants disseminated false and misleading information regarding certain stocks to its subscribers in order to inflate prices." Since there has been no showing of trading by our agents (and again, we'll give you any info. you wish on that issue) the prices of USEC going up were of no consequence. And as for the <u>Park</u> Court's tenuous leap of "fraud in the sale of investment advice **may** qualify as 'in connection' with the sale of securities when it is expected that the advisees will act on the advice." (emphasis added) <u>citing</u> <u>R&W Technical Servs. Ltd. v. CFTC</u>, 205 F.3d 165, 172-173 (5th Cir. 2000), there are several points to be made. First, the court used the word "may", and secondly the 5th Circuit <u>R&W</u> case concerns a computer software program as opposed to a financial report. More importantly, the 11th Circuit just two months ago cut the other way holding that "the CFTC could not impose its anti-fraud regulation on Advertisers" since there were no allegations that the Advertisers had "entered into or confirmed the execution of any commodities transaction." see <u>CFTC v. Mass Media Marketing, Inc.</u>, 297 F.3d 1321, 1326. (11th Cir. 2002). I believe the situation is analogous, and it certainly weakens the <u>Park</u> District court opinion's reliance on the <u>R&W</u> case.

Also, the <u>Park</u> case is in direct conflict with <u>SEC v. Wall Street Publishing Institute</u>, 664 F. Supp. 554 (D. DC 1986) which clearly held that 10b-5 "simply does not apply" to publishers. The Court did acknowledge that it had previously deemed 10b-5 to apply to publishers on the rationale that a publisher's "false and misleading statements 'touch' securities transactions because the information disseminated by Defendant may be expected to cause reasonable investors to buy or sell securities in reliance thereon."

2

The Court reasoned that post <u>Lowe</u> this rationale could no longer be applied and a publisher exempt from <u>Lowe</u> cannot make representations that are 'in connection with the purchase and sale of a security', and "therefore Defendant has not violated section 10b-5." <u>Id</u>. at 555-556.  see also <u>Ginsburg v. Agora</u>, 915 F. Supp. 733 (D. Md. 1995)

In short, in order to enforce the subpoena you will, indeed, have to state your legal theories and justifications for getting a Publisher's subscriber base. I believe there will be amicus briefs filed supporting the publishers' interests in this matter, and you will only be beginning a long legal process about jurisdiction.

On the other hand, if you write me and explain on what legal basis you are entitled to the subscribers names, then I may reconsider. At this point, however, I can see no reason or justification for handing over such an important asset of a publisher's and setting a dangerous precedent, absent a Court order affirmed on appeal.

If you go to Court and explain your position, it seems like a great waste of time, as your position stated in writing to me with legal citations for support may sway me that we're on incorrect legal grounds. Worst case, we will be able to crystallize the issues for the Court to resolve, which I believe a Court would appreciate.

I look forward to hearing from you. If you do go to Court before the transcript of Mr. Stansberry comes to us, we will request an extension from the Court to respond until that transcript is in our hands. And I'm fairly confident a Court will grant that extension as it is reasonable and goes to our defense theory of this case. (i.e., a 10b-5 case without any scalping against a publisher for solely fraudulent marketing of a financial report is a case that the SEC has no jurisdiction over, and is a matter for the Federal Trade Commission. Mr. Stansberry's transcript, we believe, shows no pumping and dumping nor any illegal "insider trading" or passing on info. that breached anyone's fiduciary duties.

## *OUR GOOD FAITH OFFER:*

As mentioned before, I'm willing to offer you the # of subscribers who bought, refunded, and the # who received the marketing report in exchange for relinquishing your demand for the subscribers names/addresses. In addition, as mentioned, we will continue to supply any and all information on a scalping/pump dump case. Having supplied you with our one trading account and the editor's trading account, I'm unclear what else you would even want.

I look forward to hearing from you.

Regards,


Matthew J. Turner


3

# EXHIBIT L

1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3    U.S. SECURITIES & EXCHANGE COM.*

4                                    *

5                                    *

6    vs.                             *      MJG 03-1042

7    AGORA, INC. Et al               *

8    Defendant                       *

9                        + + + + + + + +

10          Motions hearing was held in the above

11   referenced case on November 18, 2003 before the

12   Honorable Marvin J. Garbis.

13   A P P E A R A N C E S

14   For the Plaintiff:

15          Karen Martinez, Esquire

16          Brent R. Baker, Esquire

17   For the Defendant:

18          Bruce Sanford, Esquire

19          Lee Ellis, Jr., Esquire

20   Also Present:

21          Matt Turner, Esquire

22          William Conti, Esquire

23          Bruce Brown, Esquire

24   Reported by:

25   Barbara J. Shaulis, Court Reporter

1                    November 18, 2003

2            THE CLERK:   The matter now pending before the

3    Court is Civil Docket MJG03-104, U. S. Security

4    Exchange Commission versus Agora Inc., et al.

5            Counsel for plaintiff is Richard Baker and

6    Karen Martinez.  Counsel for defense is Bruce Sanford

7    and Lee Ellis, Matt Turner, William Conti, and Bruce

8    Brown.

9            The matter now comes before the Court for

10   motions hearing.

11           THE COURT:   All right.  Good to see you.  Be

12   seated.  We are here on a motion to dismiss, and let

13   me just comment.

14           I have read the papers.  The motion to dismiss

15   is not -- it is a queen for the daytime.  The SEC has

16   filed the complaint.  They have set forward their

17   version of the facts.  Whacko, crazy, exaggerated

18   though this may be, it is their facts, and all these

19   arguments about how the defense evidence is going to

20   run these people off the field, and how the SEC

21   foolishly chooses to believe X and not believe the

22   much more reliable body of evidence of Y, that is all

23   interesting, but that has nothing to do with

24   dismissal.  Dismissal is we must accept everything

25   they say as correct, and I have got to conclude that

1   on no conceivable version of the facts, no conceivable

2   version could they possibly have a claim, so let's

3   just clear the air.

4           I am not here to find out about the merits of

5   the defense, that time will come.  So we must start

6   off and have the argument that starts off with the

7   premise, that number one as alleged by the SEC and

8   occasionally we will have to dip down into the

9   complaint or the amended complaint.  We have to take

10  it as a fact, like it nor not, that the defendants

11  committed fraud.

12          As I gather, and I think you folks can verify

13  it, there are two kinds of fraud that are alleged.

14  Perhaps, I will make sure I have this right.  Mr.

15  Baker and Ms. Martinez who is speaking primarily for

16  your folks.

17          MS. MARTINEZ:   That will be me, Your Honor.

18          THE COURT:   All right.  The push is there are

19  two types of fraud.  Fraud number one is the

20  fraudulent statement that we have got insider

21  information from a high ranking person, and number

22  two, the inside information is that on May 22nd this

23  good stuff is going to happen.

24          MS. MARTINEZ:   That is right.

25          THE COURT:   You are alleging that both of

4

1  those statements are fraudulent.

2       MS. MARTINEZ:   That is correct.

3       THE COURT:   And I think it is important to

4  distinguish that.

5       The second thing is as we get through this

6  plethora of writing and all these other things, that

7  it occurs to me that there are, the case boils down to

8  a claim that there was fraud, and then the fraud in

9  connection with the sale of securities.  Then there is

10  two elements to this claim.  There is that element

11  that there was fraud, and then a separate element in

12  connection with it.  Is there anything as to the fraud

13  side, is there anything about a 10b5 action that would

14  lead me to say it was or was not fraud as distinct

15  from a state common law fraud action.

16      Now, I know 10b5 gives people procedural

17  rights and all that, but is there anything special

18  about fraud under the Securities Act, not in

19  connection with aspect, we will deal with that, but

20  the elements of fraud are any different.

21      MS. MARTINEZ:   No, Your Honor, although I

22  would like to mention, and make clear, this is just a

23  motion to dismiss with respect to the burden of

24  proof.  In some jurisdictions fraud should be proved

25  by clear and convincing evidence, and that's not the

1  standard under 10b.

2       THE COURT:   I appreciate that, and I think

3  that is something we will discuss when we get into

4  their constitutional defenses, and I think that is a

5  valid distinction.

6       Other than the burden of proof -- so that is

7  something that is, whatever it is, you are suing for,

8  if it is fraud, you can sue under 10b5.

9       Joe Blow who bought the stuff from these guys

10 could sue under 10b5 if it is connected with -- if I

11 would hold defendant in you would lose.  You lose in

12 connected with.  You go away, but if there is fraud

13 Joe Blow could sue in state court and whatever

14 happens --

15      MS. MARTINEZ:   Except for an individual, a

16 private litigator has needs to meet the justifiable

17 reliance, and there are some protections provided for

18 by the private security litigation and  private

19 litigants.

20      THE COURT:   Could the defense address that

21 particular question, and that is, you have got two

22 separate things.

23      As far as the fraud side is concerned as Ms.

24 Martinez mentioned the sections of the private

25 security, whatever that act is.  Do I have it right or

1    wrong?

2         MS. MARTINEZ:   I think that is correct, Your

3    Honor.

4         THE COURT:   I am asking these folks.

5         Anything different about 10b5 than a cause of

6    action --

7         MR. SANFORD:   When a 10b5 is being used by

8    the Security and Exchange Commission against a

9    disinterested publisher, which is the situation here,

10   they are alleging fraud by the publisher by somebody

11   who has no financial interest in the securities that

12   they are publishing.

13        THE COURT:   That is not the way you phrase

14   it, but that is the way you appraise it.

15        MR. SANFORD:   It seems to me Your Honor that

16   is a fair reading of the complaint. Not alleging any

17   trading or any financial interest --

18        THE COURT:   Answer what I am asking, which

19   is, we will get to whether we get to connect it with.

20   They are suing, let's assume for some reason that your

21   client, that you don't represent your client, you are

22   going to represent the Wall Street Journal, so we are

23   going to get a clean case.  They are suing the Wall

24   Street Journal because the Wall Street Journal pulled

25   a fraud on the supplier.  They defrauded them.  They

1   played fancy games with them or something and you are

2   representing the Wall Street Journal and coming in

3   here and saying it is not connected with, and we will

4   talk about that, and what I am saying to you is, okay

5   maybe --  and the paper supplier is suing under 10b5

6   and under Maryland and common law fraud.

7        Your defense --  would your defense on the

8   merits of the fraud, not on the connected with, be any

9   different in the 10b5 case than the common law case?

10       MR. SANFORD:   Maybe I don't understand your

11  question.

12       What we prepared for here is to defend the

13  elements of the 10b5, not the state fraud claim or SEC

14  claim.

15       THE COURT:   You will agree that a 10b5 claim

16  is an allegation that you committed fraud and the

17  fraud is in connection with the sale of securities.

18       Now, I am referring to the fraud side, that is

19  all.

20       MR. SANFORD:   And the way I break that down

21  Your Honor, just to try to be helpful to you, it is

22  clear that there are other remedies, beyond the 10b5.

23  That is one of the things we have said consistently

24  throughout here, that if there were fraud committed by

25  an unscrupulous publisher who deliberately falsified

8

1   some information, of course, there are remedies under

2   state, common law, there might be Federal Trade

3   Commission --

4           THE COURT:   Please Mr. Sanford, today you are

5   that person, because that is what they allege.  They

6   are alleging that you deliberately falsified.  You

7   want dismissal, and we have to concede that so let's

8   not get off that.

9           MR. SANFORD:    The element.  10b5.

10          THE COURT:   If you are referring to a

11  constitutional defense, I think we can address that as

12  a publisher, we would have to address the first

13  amendment, or Sullivan or anybody else has any

14  relationship to this.

15          All I am saying is it occurs to me the

16  government plaintiff, and, I do think -- would it make

17  any difference if Mrs. Martinez is from the SEC and

18  Mr. Baker is private litigant.  You have two

19  plaintiffs there.  One is one of your customers.

20  Would this discussion have any difference?

21          MR. SANFORD:   It is a hard question to answer

22  Your Honor because anyone of the customers at any time

23  for any reason can ask for a refund and they get the

24  refund, so it is hard for me to envision a

25  situation --

```
 1          THE COURT:   I think what has happened is the
 2  SEC would like not a total refund, but let's assume
 3  for some reason you didn't give Mr. Baker's customer a
 4  refund.  In fact, he wants to sue for fraud and go for
 5  punitive damages and legal fees.
 6          MR. SANFORD:   Assuming there was no refund
 7  and there was this --
 8          THE COURT:   Yes.
 9          MR. SANFORD:   I take it your question is, is
10  there a difference between that state common law fraud
11  claim, and a 10b5 claim.
12          THE COURT:   Yes.
13          MR. SANFORD:   And I would say yes, it is
14  permeated with constitutional considerations in every
15  single element of that 10b5 claim.
16          THE COURT:   Why doesn't your common law fraud
17  claim have the same conditions for publishers.
18          MR. SANFORD:   It does under some state common
19  laws there are first amendment considerations.  The
20  difference I think is --
21          THE COURT:   Why should you?  Why?
22          Where would you have less constitutional
23  protection from the private litigant then you have
24  from the SEC?
25          MR. SANFORD:   For one thing the government,
```

10

1  with all the full power and resources of the

2  government bringing a claim against someone which goes

3  to the very heart of the first amended consideration.

4  It is in a private action.

5       THE COURT:   You re saying in a private -- you

6  would have a greater defense on the fraud side, not on

7  the connected with site, but on the fraud side?

8       MR. SANFORD:   Yes, Your Honor.

9       THE COURT:   Against the SEC because it is the

10 SEC than you would against a private litigant.  Would

11 you say that somehow on some hypothesis, you are the

12 New York Times and you have been sued by the SEC and

13 Mr. Baker's client because of something that you

14 published, we will get to what the tort is in a

15 moment.  And you are saying you would have a better

16 defense against the SEC than against Baker?

17      MR. SANFORD:   I think the government bears a

18 higher burden when they bring a case against a

19 disinterested publisher for fraud, yes, because they

20 are the government.  Because the first amendment

21 speaks to --

22      THE COURT:   You don't have any authority.

23 You have no authority that says --  let's put it in

24 terms of less.  You mean you would have a lesser

25 defense against this greedy pig Mr. Baker and his

1   client who has assembled a host of people who claim

2   these damages.

3        He is not doing you for a thousand dollars.

4   He is suing for the hundred and fifty thousand dollars

5   he lost because he invested the million and a half.

6   You would have less defense against Baker than you do

7   against Martinez?

8        MR. SANFORD:   I think Your Honor stated

9   common laws would vary on that.  I think there would

10  be first amendment considerations --

11       THE COURT:   How would a state common law

12  affect the extent of your federal constitutional

13  protection?

14       MR. SANFORD:   I don't think -- that is not

15  what I am saying Your Honor.  There are  situations

16  that I am aware of where publishers have been sued for

17  fraud because of a negligent mistake for instance that

18  they published, and state courts talk about the

19  importance of publishing and not holding those

20  publishers to too high or unreasonable a standard in

21  the negligent publication of a mistake, and fraud is

22  what is alleged in those situations very often.

23       THE COURT:   I don't think you are answering

24  it, but that is okay.  If you don't want to, that is

25  all right.

1       MR. SANFORD:   Maybe Mr. Ellis can try.

2       THE COURT:   All I can do is ascertain that we

3   have a case in which they have alleged fraud.  They

4   have alleged in connection with.  You have a defense

5   on each of those two elements and what I am trying to

6   address, which seems to me to be perfectly obvious.

7   That a fraud claim brought by the SEC, or a fraud

8   claim brought by a private litigant should be subject

9   to the same constitutional protections on defenses.

10  No greater because they are the government, no less

11  because Baker hypothetically represents a private

12  litigant.  How in the world could it make any sense

13  for a publisher to have also protection in a private

14  suit than a government suit?  I mean you want, the

15  power of the SEC and all that.  You have dealt with

16  enough of these stripe suit lawyers who recognize that

17  they are totally uncontrolled.  The SEC presumably has

18  some controls on it.

19      MR. ELLIS:   May it please the Court, I am Lee

20  Ellis and I think when you have a fraud case it is a

21  fraud case.  I think that addresses the Court.  It is

22  a fraud case, and we from the defense side as a

23  publisher claim all of the protections of state law,

24  the constitution, the Declaration of Rights of

25  Maryland, the constitutions of individual states, and

1    the constitution of the United States in dealing with

2    that fraud case, but it is a reality that you have,

3    the government, the U. S. Government when they are

4    attempting to use a particular statute, that is a

5    higher more difficult burden even than the state

6    constitutional, the state fraud action, so it is the

7    same, I agree with that, but it is even more when you

8    are talking about the U. S. Government.  That is our

9    view I would say.

10          THE COURT:   All right.  I want to deal with

11   what is fraud, and to what extent does Sullivan relate

12   to torts other than defamation?  I just want --

13   Sullivan raises a standard, defamation.  Somebody sues

14   you.  Somebody sues your publisher client, which at

15   this point we are going to make, you pick your own

16   newspaper.  The New York times, the Journal or

17   something.  If there is --  you come back and you say,

18   whoa, whoa, you are a public figure, and at that

19   point, as I understand it, Sullivan says actual

20   malice, right?

21          MR. SANFORD:   Yes, Your Honor.

22          THE COURT:   Now, suppose you come back and

23   you say you are a public figure. There is litigation

24   on that and it turns out that the person is not a

25   public figure.  What is the posture of the case under

14

1    Sullivan, defamation, you have be sued, the guy is not

2    a public figure.  You still want your first amendment

3    rights?  What does it get you, the suit is pretty well

4    established, isn't it?

5         MR. SANFORD:   Yes, it is Your Honor.  You are

6    saying --

7         THE COURT:   An ordinary person.

8         MR. SANFORD:   Ordinarily person sues for

9    defamation.  The court finds he is not a public

10   figure?

11        THE COURT:   That is right.

12        MR. SANFORD:   Then you go to the other

13   constitutional rules of the road, in the Gertz

14   decision.  Gertz versus Robert Welsh and the progeny

15   after that including the Hepps (phonet.) case, which

16   says the plaintiff in this case has the burden of

17   proof of proving falsity.  The substantial

18   constitutionalization of common law which as Your

19   Honor remembers saying that the defendant had the

20   burden of proving the truth.

21        What the constitution did in those Supreme

22   Court decisions did was shift the burden to the

23   plaintiff, even a private person to prove falsity in

24   this case.  That is important in this case Your Honor

25   because I think it implicates and involving the

1   Court's determination of what is a false, material

2   fact.

3          The first subsequent under 10b5 claim. You

4   can't really look at what is a false material fact

5   when the SEC is bringing a case against a

6   disinterested publisher without looking at the

7   constitutional law.  And it goes beyond the definition

8   context, Your Honor.  To answer Your Honor's

9   question --

10         THE COURT:   Do we have, Ms. Martinez, as I

11  understand it you are alleging this are not a

12  disinterested publisher, is that correct?

13         MS. MARTINEZ:   That is correct.

14         That is correct, Your Honor.

15         THE COURT:   How can I now say there is no

16  possibility that they are right.  It seems to me they

17  have said that.  They have put on their pleading

18  enough that, yes, it is conceivable there could be

19  facts to establish that, or a dismissal.  They get all

20  their stuff.  They said so, that is good enough.

21         How do I find, how can I say, take it out of

22  the complaint.  You can't say this, but okay.  Now,

23  all I want to do, I want to just ask, because one

24  thing is --  now we have a different tort committed by

25  the bona fide publisher which is negligence.  They

1   print a recipe and they negligently put in certain

2   ingredients that acts and cause people harm, so

3   somebody sues for negligence, because they are a

4   alleging thing got injured and all that, plaintiff's

5   lawyer develops a case, now, what --  forgetting the

6   merits of the case, which you will get to, what

7   constitutional protection do you have from that?  You

8   have published a recipe and the recipe turns out to

9   have been harmful to X percent of the population, and

10  ultimately you got a lawsuit.  Do we have any

11  constitutional protection?  Do we have any protection

12  other than the normal defense, we weren't

13  negligent --

14        MR. SANFORD:    There are a lot of those cases

15  across the country over diet books that don't work,

16  and allegedly harm people.  Across the board the state

17  common law recognizes the constitutional implications

18  involved in cases like that, and dismiss them.  Those

19  negligent misrepresentations cases consistently go

20  down against publishers, these are not won by

21  plaintiffs and not many more are filed now adays

22  because the law is not clear on that area.

23        THE COURT:    Ms. Martinez, do  you agree with

24  that?

25        MS. MARTINEZ:    I think that is correct, Your

1   Honor except instances where the private litigant can

2   use the conduct of the publisher were knowing or

3   reckless.

4           THE COURT:   Let's just go to fraud by a bona

5   fide publisher.  The New York Times publishes an

6   article, and it is fraudulent.  It is fraudulent in

7   the following way.  The report that the city is

8   planning to, has approved a highway.  It is done

9   deliberately by a reporter who knows they damn well

10  haven't, but the reporters's uncle wants to unload

11  some land, and just to make life easy the publisher of

12  the New York Times and the Board of Directors approves

13  it so we will not worry about burying it with the

14  reporter.  They get sued.  Newspaper, it is an

15  article.  It is intentionally fraudulent, and they are

16  sued and sued because the person who buys the land

17  overpaid, so he sues for fraud.  Any defense?  What is

18  the special defense?  What is the special posture of

19  that case?  It is fraudulent.  Is there anything

20  special about that?

21          MS. MARTINEZ:   I don't think there is, Your

22  Honor.

23          THE COURT:   I am asking the defense.   Is

24  there anything special about that?  Any special

25  protection for a fraudulent statement like that?

1          MR. SANFORD:   For a deliberately fraudulent

2    statement in a paper, I may not have followed Your

3    Honor's example.

4          THE COURT:   The example is the newspaper

5    deliberately prints a false article about supposedly

6    an announcement as to where a highway is going to be

7    placed, and a person who buys or sells land based upon

8    that sues them for fraud.

9          MR. SANFORD:   And would the newspaper do that

10   Your Honor, what --

11         THE COURT:   Well, first of all, they do it

12   because in this hypothetical case the reporter has got

13   a payoff, but everybody knows that it is false, but I

14   mean you are going to motivation, and I am going to

15   fraud.   Is there any --

16         MR. SANFORD:   That is fraud.   That sounds

17   like your classic 101 fraud.   It sounds like in the

18   securities context it sounds like the Foster Winans

19   (phonet.) case.

20         THE COURT:   Let's assume you have, which I am

21   afraid you do have with the New York Times and other

22   papers.   They print an article and the article

23   purports to be the life story of X, an ex drug addict

24   and it is totally fraudulent, which the reporter made

25   it up, which unfortunately happens, and they are sued

19

 1  for fraud.

 2        Now, I don't know what the damage would be.

 3  The bottom line would be, why did they do it, the

 4  reporter did it because the reporter wanted to improve

 5  his career, and there is a fraud suit by somebody who

 6  is affected by it.  Is there any special defense to

 7  that?

 8        MR. SANFORD:   I think Your Honor in Hustler

 9  versus Falwell to say in the U. S. Supreme Court,

10  which was not a defamation fraud suit.  It was an

11  intentional infliction of emotional distress, it is

12  similar to fraud in that case --

13        THE COURT:   No, it is more similar to

14  defamation. I could understand it.  They elevated it.

15  I am talking about fraud.

16        MR. SANFORD:   I think Hustler versus Falwell

17  would say that you apply constitutional considerations

18  in addressing the fraud element and you might impose

19  some burdens on the plaintiff under the Sullivan

20  doctrine --

21        THE COURT:   What burden would you impose

22  other than clear and convincing evidence which is the

23  same burden they have against anybody.

24        MR. SANFORD:   Clear and convincing evidence.

25  They might have a higher standard with respect to

1  proving the fraud, or the intentionality of the

2  fraud --

3          THE COURT:   What could there be other than

4  clear and convincing evidence unless you are going to

5  go beyond a reasonable doubt.

6          MR. SANFORD:   What is that Your Honor?

7          THE COURT:   The fact is there is no special

8  protection for fraud, once you get to fraud, is

9  there?

10         MR. SANFORD:   I think the actual malice

11 standard has been applied Your Honor in a number of

12 situations.  Applied to fraud cases.  You can see the

13 cases cited on page 17 of our brief.

14         THE COURT:   All right.  But even our case

15 they have alleged actual malice, haven't they?  Ms.

16 Martinez, actual malice is alleged?

17         MS. MARTINEZ:   Yes, we have Your Honor.

18         MR. SANFORD:   They have not alleged that in

19 their complaint Your Honor.

20         MS. MARTINEZ:   Your Honor, we alleged knowing

21 misconduct on the part of Mr. Stansbury and that meets

22 the actual malice standard.  Whether we use those

23 terms or not.  We properly pled that element of the

24 case.

25         THE COURT:   All right.  Knowing misconduct.

1   Okay.  But assuming I would hold, and you are saying

2   Ms. Martinez on your side of this case.  You are

3   saying that reckless is good enough for you.  That is

4   what you are alleging?

5          MS. MARTINEZ:   That is correct, and reckless

6   is sufficient under the actual malice standard as well

7   Your Honor.

8          THE COURT:   All right.  We will debate that.

9   But let's --  assuming that I would agree with you

10  guys, they would still have a fraud case. I mean they

11  wouldn't have the reckless standard, but they would

12  still have their fraud case because they are alleging

13  knowing misconduct, which we have a hard time saying

14  that knowing misconduct couldn't equate to actual

15  malice.

16         MR. SANFORD:   I think the third or fourth

17  element of the 10b5 claim is scienter I think in this

18  context against a publisher.  It has to be actual

19  malice, and I don't think they have pled that, and

20  they haven't got an prayer, a possibility of proving

21  it on the uncontroverted facts.

22         THE COURT:   Mr. Sanford, is there a problem?

23  You don't represent a publisher this morning because

24  they say you are not a publisher, now, I may think you

25  are a publisher, but right now their complaint says

1   you are not a publisher, and I can't throw out their

2   case, dismiss it based on the fact you are a

3   publisher, but it is okay.  That is fine.  All right.

4         Let's deal with this reckless, Ms. Martinez.

5   Tell me how the reckless prong would get you to what

6   you need under 10b5.  What do you need under 10b5?

7         MR. SANFORD:   Your Honor, I believe they do

8   allege that we are a publisher in their complaint.  I

9   think Your Honor is mistaken about that.  They do say

10  we are a publisher and they don't dispute or

11  challenge.

12        THE COURT:   Show me what is the statement in

13  the complaint that you are relying on.

14        MR. SANFORD:   Page three of the complaint.

15  Magazines and newsletter and operates in fifteen

16  financial web cites in the U. S. and Europe.  Agora's

17  publications include, and they list them all.

18        THE COURT:   Mr. Sanford, you read the 1940

19  Act.  The 1940 Act refers to publisher of a bona fide

20  newspaper, etcetera.  You can be a publisher, it is

21  the particular item in question as to whether that is

22  a publication, but all right.  Go ahead.  That is

23  fine.

24        MR. SANFORD:   Your Honor, they have not

25  brought a 1940 Act claim.

1          THE COURT:   No, you are using it as a

2   defense.

3          MR. SANFORD:   We are not, Your Honor.

4          THE COURT:   In this case, we will take the

5   1940 Act off the table.  I thought you guys wanted to

6   put it on.

7          MR. SANFORD:   We said the Supreme Court's

8   decision in this area was under the 1940 Act and Judge

9   Robinson took notice of it in the Wall Street

10  publishing case on remanding that case, and said, the

11  rules are applied under 1940 Act, and applied to 10b5

12  claim.

13         THE COURT:   All right.  So the New York Times

14  is a publication, we all agree with that, even Ms.

15  Martinez.

16         The New York Times also has a division that

17  buys and sells stocks.  Does that division get any

18  special treatment because they are operated by a

19  publisher?  No.  Of course not.

20         You look at the activity that is at issue.

21  You don't look at whether somebody can be called a

22  publisher, it is not an immunity.

23         Let's go -- tell me about your argument that

24  you only, in this case, whether it is based on first

25  amendment or other principles that you can get by,

1   would you agree Ms. Martinez for actual malice you are

2   going to have to prove knowing falsity.  Deliberately

3   intentional, etcetera.  You understand that?

4          MS. MARTINEZ:   Well, the standard in New York

5   Times is, and I am reading from the case.  The

6   constitutional guarantee we require -- they had a rule

7   that prevents a public official from recovering

8   damages etcetera unless he proves the statement was

9   made of actual malice.  That is with knowledge it was

10  false or with reckless disregard of whether or not it

11  was false.

12         THE COURT:   This isn't a defamation case

13  though.  This is a fraud case.  So we are talking

14  about fraud.  You have to agree that you are going to

15  have to prove, you might be able to prove actual

16  fraud.  You are saying also reckless disregard under

17  fraud.

18         MS. MARTINEZ:   The 10b also has a

19  recklessness standard as well Your Honor.

20         THE COURT:   Before we get to their

21  constitutional aspects, where do you get that from?

22         MS. MARTINEZ:   The circuit that has

23  considered the issue has held that some form of

24  recklessness will satisfy requirement for 10b5

25  violation.

1          THE COURT:    What about in the context of

2    publisher.   I understand you are saying they are not a

3    publisher for this purpose and that is certainly

4    debateable.   But you are not here asking for summary

5    judgment, but assume they are a publisher.

6          MS. MARTINEZ:    I think the same standard

7    applies Your Honor.   That because the core of our case

8    is fraud, and that there are no special protections

9    for fraud, that the standards applicable generally

10   apply as well to a publisher, and that goes with

11   respect to the scienter element as well Your Honor.

12         THE COURT:    So you are giving no benefit.

13   You are giving no first amendment affect to anything,

14   because we are now hypothetically talking about a

15   publisher, and the alleged fraud is committed in a

16   publication, undebatable.   The New York Times article

17   in the regular newspapers that everybody buys, you are

18   saying reckless disregard is good enough.   The first

19   amendment doesn't give them a damn thing.

20         MS. MARTINEZ:    That is correct, Your Honor.

21         THE COURT:    All right.   Mr. Sanford, now, we

22   are assuming that you are a publisher.

23         MR. SANFORD:    Yes, Your Honor.   I think, you

24   know.   That is indicative of the SEC's position at

25   every turn here is that they just ignored the first

 1  amendment considerations, and they have done it again

 2  in the scienter requirement.

 3          The actual malice standard is a subjective

 4  state of mind standard that is applied to this case.

 5  It looks at the state of mind of the newswriter Mr.

 6  Stansbury when he prepared the publication at issue.

 7  It looks at an objective state of mind.  What was --

 8  and that's why we gave the Court the affidavit about

 9  what he was thinking, and it is the same thing he told

10  the SEC when he was deposed by the SEC prior to the

11  filing of this action.

12          What he said was that he believed in the truth

13  of everything he wrote at the time of the publication,

14  and with respect to maybe one, one prediction that he

15  made, namely that the stock, the use side stock would

16  go up on May 20th.  He still believes it to be

17  true --

18          THE COURT:   You have an affidavit to that

19  affect?

20          MR. SANFORD:   We do Your Honor.

21          THE COURT:   Ms. Martinez, don't bother filing

22  a motion for summary judgment.  You lose, got that?

23          MS. MARTINEZ:   Yes, Your Honor.

24          THE COURT:   All right.  Let's talk about

25  dismissal.  I mean I will accept it.  That is fine.

1   They can't get summary judgment.  Now, because I have

2   to believe everything you say and you are absolutely

3   right.

4         All right.  Was there anything else to be said

5   on the fraud side before we get to the in connection

6   with side?

7         What about in connection with.  Now, we

8   got -- we do have a difference between the

9   hypothetical Mr. Baker and Ms. Martinez.  No, we

10   don't.  Baker, if it is not in connection with,

11   Baker's case remains on these common law counts, but

12   Martinez is out, correct?  Okay.  Fine.  All right.

13         Now, we have two levels as I see it in this

14   argument, and I think we have things we have to debate

15   here.  I thought quite sensibly that the first element

16   could be the 1940 Act, not directly but that if this

17   is, it seems to me this is the rationale you have to

18   answer.

19         If we assume that the defendant is not an

20   investment advisor under the 1940 Act because it is,

21   or he is the publisher of a bona fide financial

22   publication of general and regular circulation, that

23   if that is a fact, either as a matter of law, or a

24   very strong indicator that that knocks out your in

25   connection with argument.  It seems to me that is what

1    the only court that has addressed this seems to have

2    said, is that if you are not -- we don't care that

3    you are not pursuing under the 1940 Act.  I believe

4    that is how we use this against you on the in

5    connection with.

6           MS. MARTINEZ:   Your Honor, I think the D.C.

7    Circuit when addressing, on appeal from the Wall

8    Street publishing case indicated that the District

9    Court read the SEC Lowe opinion too broadly and

10   suggested that that meant blank immunity for

11   securities lost for bona fide disinterested customers

12   which we don't have here.

13          THE COURT:   We are going to debate whether we

14   do or not.

15          MS. MARTINEZ:   And went on to suggest that

16   the publishers could still be liable under Section

17   17B, so I think -- so I would disagree that that is

18   the proposition that SEC Lowe, SEC versus Lowe stands

19   for.

20          More important the court in SEC versus Lowe

21   was real clear to point out that was not a case that

22   had anything to do with false statements of any kind.

23          THE COURT:   Well, that may or may not be, but

24   if I am analyzing this, and I think correctly as two

25   separate elements, and the in connection with element,

1   whether it was fraud or whether it was something else

2   in connection with doesn't, isn't affected by whether

3   it is fraudulent.

4        I don't see how the biggest fraud in the world

5   makes anything for or less in connection with a non

6   fraudulent, perhaps actionable statement.

7        MS. MARTINEZ:   That is correct, Your Honor.

8        THE COURT:   So let's get back to this -- all

9   right.

10       Mr. Sanford, how would you use the 1940 Act

11  against these people?  Yes, Mr. Ellis.

12       MR. ELLIS:   Your Honor, where we start is

13  that there is an industry, and there was the Lowe

14  case, and that dealt with the 40 Act, and it gave

15  certain protection to publishers, and so we use it as

16  precedent, a predicting where the Supreme Court would

17  go, and it gives guidance to this Court and it gives

18  guidance to the industry, and it gives guidance to the

19  SEC when they decide to go after a publisher that

20  gives guidance, and what guidance do we get out of

21  there, well, you get the four corners of the case, but

22  you get the reading of, you know, Justice Brennan and

23  how they approached this, and certainly what I think

24  is obvious to anybody is that the first amendment, it

25  is recognized that even with the power of the

1  securities laws, the 40 Act, specifically, but

2  certainly the securities laws are powerful, and

3  important to the markets in the world, but even then

4  there is an intersection.  The first amendment and the

5  power of the 40 Act and the power of the SEC.  Then

6  you still have first amendment protection.  And it is

7  strong, and in this particular case the first

8  amendment prevails.  So that is the first thing that

9  the Lowe case provides, and the 40 Act provides.

10         Then --

11         THE COURT:   Okay.  But the first amendment,

12  it seems to me, please help me with this.  The first

13  amendment protection throws up, perhaps they are

14  arguing, but throws up a high barrier in the proof of

15  fraud.  It has to be by clear and convincing

16  evidence.  I don't know what else it does for you.

17         MR. ELLIS:   The burden and those things, and

18  you have to show the falsity and things like that.

19         THE COURT:   I don't see how it affects the in

20  connected with.  It is either it is in connected with

21  or is it isn't.

22         MR. ELLIS:   It is the intent of the

23  securities laws.  In other words, it is the intent of

24  the securities laws because there is an allegation

25  that there is a violation of the securities law

1   therefore we don't pay any attention to the first

2   amendment.

3        Well, certainly that is not true, and we know

4   from Lowe when there is an intersection between the

5   securities law, and the first amendment you look to

6   deal with it.

7        THE COURT:   Mr. Ellis, you hit it.  Let me

8   ask you a question that is off the point, but it is an

9   important question.

10       It seems to me that in this case you have a

11  first amendment right.  You have first amendment

12  special protections because you are a publisher or

13  disinterested publisher as you say.  Now, Sullivan as

14  I understand what happens is plaintiff sues the New

15  York Times.  The New York Times comes back and says,

16  plaintiff you are a public figure, and plaintiff may

17  say, no, I am not.  Yes, you are.  It is an

18  affirmative defense in a sense that the New York Times

19  then has to prove he is a public figure.  If they

20  prove it, you elevate the problem for the plaintiff.

21       It seems to me in this case we got the similar

22  situation.  They are coming in and they are saying you

23  ain't no publisher, but they are suing, and you come

24  back and say, I am a publisher and I am entitled to

25  first amendment protection, and they say, no, you are

1   not, and this is going to be debated, but it is an

2   affirmative defense basically, but if you prevail on

3   it and you are a publisher then you get whatever the

4   first amendment gives you, okay.

5        Do I have it right so far?

6        MR. ELLIS:   True, but I sense that we are

7   having difficulty here, and the difficulty is number

8   one, they do say we are a publisher, so that is in the

9   complaint.

10       Number two, they do say that we never

11  purchased, owned or sold USEC (phonet.) stock.

12       THE COURT:   This thing was not a publication,

13  is that what you are saying?

14       MS. MARTINEZ:   That is correct, and in our

15  opposition we have argued.

16       THE COURT:   Forget the argument.  We are

17  worried about the complaint.  I understand the

18  complaint to be saying that you are a publisher, but

19  this thing you did is in the publication, and you say

20  that it is, and that is fine, but you have joined

21  issue on that, but --

22       MR. ELLIS:   But they attach it to the

23  complaint.  It isn't something we are asking the Court

24  to guess, B, it is there and published, and it went

25  out to a thousand people, and they say it went out to

33

 1    a thousand people, so that is in the complaint.

 2         THE COURT:   Yes, but whether that is a

 3    publication of general and regular circulation or not

 4    is a fact question.

 5         The evidence is going to have to be evaluated

 6    on that.

 7         MR. ELLIS:   That is where we differ, Your

 8    Honor, because they allege in the complaint that we

 9    are a publisher.  They allege in the complaint that we

10    published Exhibits A and B.  They allege in the

11    complaint that it went to a thousand people, and then

12    in B, that we sent them the report that went to way

13    more than a thousand people.

14         I mean they allege that it went to seventeen

15    thousand or something in the complaint.  And in fact

16    it went to way more than that, and then over a

17    thousand people bought it.  They are all allegations

18    in the complaint.  That has to be taken as true.

19         THE COURT:   If you send a single letter to

20    somebody and defamed me and you have published.  I

21    understand what they are saying.  Go ahead.

22         MR. ELLIS:   The point is their allegation is

23    gone.  That is why it is a motion to dismiss because

24    you have to take those allegations as true, and they

25    allege that, and they also say, and this is at page

1  twelve of their --

2       THE COURT:   Would you agree, maybe you don't

3  agree with anything.  But I think that the 1940 Act is

4  helpful and it gives us, it talks about a publisher of

5  a financial publication of general and regular

6  circulation.

7       First amendment protection I guess could go to

8  a person who publishes a single letter because any

9  time you send a letter to somebody without a

10 restriction, I guess it is published in that sense, in

11 a copyright sense, so -- if you are going to make the

12 word publish for first amendment purposes so broad as

13 to include anything that would legally be a

14 publication, then there would be no fraud law, because

15 every fraudulent writing is by definition published,

16 just because I sent it to you to try to get you to buy

17 my gold mine.  So I don't know where we are going with

18 this.

19      I do appreciate the fact that if you have a

20 publication either as defined in the 1940 Act or

21 defined by any common sense, then we got a first

22 amendment problem.

23      MR. ELLIS:   And under the securities law they

24 have to have a statement.  It has to be a statement.

25 That is a requirement under the securities law and

1   they are alleging that there is a statement.  What are

2   they alleging that the statement is.  It is Exhibit A

3   and B.

4          They alleging that A was sent to 17 thousand

5   people, and that B was sent to the thousand people

6   that signed up, and if that isn't publication and that

7   is their allegations, that is what we are talking

8   about and that is where, for example, with Judge

9   Nickerson --

10         THE COURT:   How would any advertisement then

11  not be a publication?

12         MR. ELLIS:   It is.  And in the National Life

13  case, in this court, Judge Northrop said that

14  advertisement is a publication, a newsletter, the

15  Phillips Newsletters.  It is entitled to the same

16  first amendment protections, the advertisement is

17  entitled to the same first amendment protection as the

18  newsletter, and that is the law.

19         And so what they allege that we are a

20  publisher of newsletters and they tell you, they tell

21  the Court what it is, then we think, well, we can move

22  to dismiss because all of this has to be taken as

23  true, and it is before the Court --

24         THE COURT:   What that gets you is first

25  amendment protection.  It doesn't get you dismissal.

1          MR. ELLIS:   But it does when you apply Lowe,
2     which is the overriding principle --

3          THE COURT:   A deliberate false statement is
4     not actionable then because it is published.

5          MR. ELLIS:   Well, again, I am not --
6     certainly I grant that generally, but I am not saying
7     that, the Court has to find that these are deliberate
8     false statements because this is before the Court, and
9     number one, but number two --

10         THE COURT:   Wait a minute.  I have a piece of
11    paper.  It went to 17 thousand people.  It says, I
12    have got insider information.  They say that is a
13    knowing false statement.  Okay.  I have to believe
14    them, so how do you get first amendment protection
15    that isolates a deliberate false statement because it

16    is quote published to 17 thousand people.

17         MR. ELLIS:   And again, in our brief, in the
18    analysis that is pages from 33 to 35 and we go all
19    through that, but the bottom line is that, I don't
20    think --   the government says there is no first
21    amendment thing implicated in this case.  That is way
22    too broad a statement.

23         THE COURT:   Fine.  Fine.

24         MR. ELLIS:   So then if there is, let's go to
25    the precedent.  What the precedent is.  You start out

 1  with Lowe because that's the intersection of the first

 2  amendment --

 3         THE COURT:   Mr. Ellis, is there precedent

 4  that says if the government can prove that something

 5  is a deliberate intentional fraud that they can't make

 6  a fraud claim because it was published?

 7         MR. ELLIS:   And that would be the Robinson's

 8  decision in the District of Columbia, Judge Briand's

 9  (phonet.) decision in the Southern District and

10  Briand's was before Lowe and had a 10b5 allegation in

11  front of him for publisher and he said, no, the

12  securities laws don't apply to this because it is not

13  in connection with.

14         THE COURT:   But that is different.   Now you

15  are talking about in connection with.   Okay.

16         MR. ELLIS:   I kind of like going there, Your

17  Honor.

18         THE COURT:   That is great.

19         MR. ELLIS:   That's my favorite.

20         THE COURT:   That is great.   Okay.  So now we

21  are talking about in connection with is a different

22  discussion than fraud.   It can't be in connection with

23  because --

24         MR. ELLIS:   It has to be in connection with.

25  It has to be.  Two district courts have ruled that

1   10b5 actions by publishers are covered by the

2   securities law, so the SEC's statement is certainly

3   way too broad for Judge Briand and way too broad for

4   Judge Robinson, and it really doesn't square with Lowe

5   either because that is the case, the Supreme Court

6   analysis of the intersection of the securities law

7   and --

8        THE COURT:   All right.  Let me ask you this

9   Mr. Ellis.  Suppose that publication that said on the

10  bottom, and if you want to buy the stock from me

11  return this coupon.  And then, of course, people sent

12  in their thousand dollars for the coupon and bought

13  the stock from the publisher, would you say that was

14  in connection with?

15       MR. ELLIS:   That is right because the case is

16  our analysis and the Court has read the analysis in

17  all of the cases, they are either buyers or sellers or

18  they are fiduciaries.

19       THE COURT:   We have to look at in connection

20  with.  But you agree if buy the stock from me or B if

21  the government alleged, which thing haven't.  The

22  publisher has a deal with a broker where they get X

23  percent of every sale, and that would be in connection

24  with.  They could do that.  They haven't done that

25  here.

1        MR. ELLIS:   And they have affirmatively said

2   the defendants never purchased, owned or sold USEC

3   (phonet.) stock.   That is what they said and the

4   allegations in the complaint.   And that is what thing

5   said at page twelve of the opposition because it is

6   obvious.   If they had known we were buying and selling

7   stock they would be saying it and they don't say that.

8        THE COURT:   But what you are saying Mr. Ellis

9   is you don't get any immunity because you are a

10  publisher sending it out, but what it is, the mere

11  fact of the publication, unless they can show a nexus

12  to the sale means they can't prove in connection with.

13       MR. ELLIS:   I will buy that.

14       THE COURT:   Fine.   Ms. Martinez can address

15  that.   All right.   I don't know that has anything you

16  take great issue with.

17       You have to prove a nexus to the sale.

18       MS. MARTINEZ:   As recently as 2002 in SEC

19  versus the Sanford.   U. S. Court reaffirmed the in

20  connection with requirement should be construed

21  broadly to effectuate the remedial purpose of the

22  securities law.

23       THE COURT:   Then again you have the first

24  amendment which should be construed broadly to help

25  the publishers -- go ahead.

1       MS. MARTINEZ:   In this case, Your Honor I
2  think what the Court needs to focus on is look at it.
3  Look at the super insider tip.  It has no other
4  purpose than to induce investors to purchase a second
5  stock.  This email, send me a thousand dollars and I
6  will set up the name of this company that I have
7  inside information about.  No other reasonable
8  expectation other than investors are going to go out

9  and purchase a second stock.

10      THE COURT:   The purpose of at least the
11 apparent purpose of it is to build up, to get the guy
12. to come back and buy the next tip.  He doesn't want to
13 poison the market.  I mean certainly I think you would
14 agree that the defendant, again as to the papers,
15 would have hoped that the stock went up.  Defendant
16 got no benefit from the stock, from the fact that the
17 stock went down.

18      MS. MARTINEZ:   That is correct.

19      THE COURT:   And he gets no benefit if the
20 stock doesn't move.  So I mean the defendant is
21 aligned in interest with his customers and wants it to
22 go up.

23      MS. MARTINEZ:   I believe that is true, yes,
24 Your Honor.

25      THE COURT:   So I mean if you are saying what

1   is the purpose.  The purpose --  they certainly have

2   an argument the purpose is to sell newsletters.

3         MS. MARTINEZ:   The plain reading of the email

4   indicates that what they want to do is sell inside

5   information, and in fact in the email itself Mr.

6   Stansbury says, you know, I am not asking you to --

7         THE COURT:   Ms. Martinez, suppose the

8   statement was truthful, and not false, and there

9   really was insider information.  Then would you have

10  them for insider information, wouldn't you?

11        MS. MARTINEZ:   Yes.

12        THE COURT:   Let me tell you about a case that

13  I had once.  Limitations have passed and I was defense

14  counsel and I am not totally ashamed shame of it.

15        MS. MARTINEZ:   I too was once defense

16  counsel, so --

17        THE COURT:   I represented a lawyer, and the

18  lawyer had his own problems, but in this particular

19  instance what had happened was there was a prosecution

20  in this court before a judge of this court named Judge

21  Kaufman which adds to the flare of it, and this lawyer

22  that I represented got to the defendant and said,

23  look, for a hundred thousand dollars I can fix the

24  case with Judge Kaufman.  That lawyer goes to his --

25  the defendant goes to his lawyer who happened to be

 1  Norman Ramsey who is a great story, and Ramsey does

 2  the right thing and goes to the prosecution and FBI

 3  and everybody is under investigation including Kaufman

 4  and it turns out that it was all nonsense.  It was all

 5  a lie, but that the brilliant lawyer who I ended up

 6  representing got the hundred grand and he was

 7  defrauding the defendant, and the feds could not find

 8  a federal crime.  You just could not find a crime.

 9  You couldn't, you just couldn't do anything with it,

10  or at least I convinced them they couldn't do anything

11  with it.

12          Perhaps that is where we are here.  The guy,

13  he said, I had insider information. He said he is

14  going to get you in on something good, but he didn't,

15  and therefore there is no federal crime, and anybody

16  who wants their money back can have their money back.

17          MR. ELLIS:    That is right where we go.

18          THE COURT:    I am asking Ms. Martinez.  But we

19  are on the connection. We are really on in connection

20  with which is the real problem.  Mr. Ellis is a person

21  known for understatement, nonetheless --  I don't buy

22  that a publisher has quote immunity or anything else,

23  but it does seem to me logical that the mere fact of

24  publication about a stock wouldn't make it in

25  connection with a stock.

1          MS. MARTINEZ:   And I agree with that, Your

2    Honor.

3          THE COURT:   Then what is it that does make it

4    in connection with?

5          MS. MARTINEZ:   The standard is --

6          THE COURT:   Let me give you this example.

7    Same case, but it is the Wall Street Journal, and the

8    guy who publishes the weekly stock tip column you say

9    deliberately defrauds people.  What if the guy goes

10   out and he wants to be a good source, and of course

11   once you build up your reputation as a source, you

12   then become a self fulfilling prophecy because once

13   everybody is looking to see what the Jones and the

14   Wall Street Journal says is a good to buy this week

15   than most of the time anything Jones says is going to

16   go up and that is good for Jones in a sense.

17         Okay, now, you have sued Jones and Jones, and

18   you are saying Jones committed a deliberate fraud

19   because he said buy X, Y, Z because I personally

20   inspected the plan and so and so, and he didn't, he

21   read a report or something and you are after them so

22   he made a fraudulent statement..

23         While I presume you could sue him.  You could

24   go after him for fraud even if the stock went up, we

25   all know that under 10b5 there is an exception for

44

1    good deals, so you only go after -- how is that

2    connected with the stock.  This is now Jones, Wall

3    Street Journal.  I mean -- tell me about how --

4    because that is what they say their guy is.  How is

5    that in connected with?

6         MS. MARTINEZ:   The standard is has the

7    defendant used a device that would cause a reasonable

8    investor to rely on and in so relying either purchase

9    or sell the security.  So I think you need to look at

10   what has Mr. Jones written.  What has Mr. Jones

11   written, you know, that he has insider information

12   about a stock, and he knows that it is sure to go up

13   and that is all completely fabricated.  I think under

14   those circumstances --

15        THE COURT:   I am going to let -- let's just

16   say he wrote exactly what the other fellow wrote

17   because otherwise we are not asking the right

18   question.  This is the New York Times.  I wrote the

19   same damn thing that is in this thousand dollar

20   missive.

21        MS. MARTINEZ:   There I think you need to

22   evaluate whether or not it was reasonable for an

23   investor to --

24        THE COURT:   But -- oh, I see.  And you say

25   that is part of the in connection with.

1       MS. MARTINEZ:   Correct.

2       THE COURT:   The mere fact, or the fact, the

3  word mere fact is a good way of putting it.  Like with

4  all due respect, here it comes. The mere fact that the

5  guy says, a potential buyer would reasonably rely on

6  it is enough to make it in connected with.  You are

7  sweeping an awful lot of stuff in there.  You are

8  sweeping in every article in the Wall Street Journal.

9       MS. MARTINEZ:   I think you need to evaluate

10  whether or not it is reasonable. For example, we have

11  the Wall Street Journal carries articles everyday that

12  is simply informational.  Company X, Y or Z is

13  doing --

14       THE COURT:   Okay.

15       MS. MARTINEZ:   Where is this super insider

16  tip email is factually different in it because it is

17  target, if you look at the language of the email that

18  it uses, I can tell you exactly when this deal is

19  going to close. I think the stock is going to double.

20  You know, I have inside information from a senior

21  company executive who is definitely in a position to

22  know.  And in addition Agora in this instance is not

23  selling a newspaper or newsletter.  What it is selling

24  is the name of a company. That is what the purpose of

25  this super inside email is and under these facts --

46

```
 1          THE COURT:    That is clever.  I am not sure I
 2   follow that.
 3          MS. MARTINEZ:   So under these facts, I think
 4   the in connection with requirement is met, and I
 5   believe you have to one, evaluate the publication to
 6   determine whether or not that requirement is met, and
 7   I am not suggesting to the Court that every
 8   informational article that appears in a newspaper
 9   would meet that requirement.  Here where you have a
10   publisher who is selling the name of a company for a
11   thousand dollars --
12          THE COURT:    Suppose the publisher is selling
13   a Joe Blow super tips.  So you don't get the come on
14   about all this stuff.  You just know if you buy my
15   super tips and here is the track record because they
16   make them public a month later, and you can see that
17   seven out of ten times they have hit.  Nine out of ten
18   times they have hit.  In fact, because we are going to
19   make them fraudulent.  Ten out of ten times they hit,
20   but all they are saying is this is my super tip.
21          MS. MARTINEZ:   And I think if the language of
22   Joe Blow's super tips is directed at inducing
23   individuals to purchase securities and he is lying
24   then he is liable under Section 10b.
25          THE COURT:    All right.  You say it is in
```

1  connection with at least in your papers based upon the
2  fact that number one, his action caused the stock to
3  go up.  What else are you -- you are saying it is his
4  action caused, would tend to cause the purchaser to
5  buy the stock.

6       MS. MARTINEZ:   And I think the --  I think
7  the fact that the price went up in volume increase and
8  volume increased, that information goes more towards
9  the materiality prong. But what it does, it
10 illustrates that investors were purchasing this report
11 and going out and buying the stock.  If I am paying a
12 thousand dollars just to learn the name of the
13 company, it stands to reason that I have to believe
14 that I am going to make at least a thousand dollars in
15 trading the security in order to make up for that
16 expense.

17      We look at all the facts together here, Your
18 Honor.  The fact that the investor, what the investor
19 is paying, the language of the email.  I think that
20 the in connection with requirement is met in this
21 particular case.

22      THE COURT:   Okay.  But you are really boiled
23 it down to the fact that the information was sold and
24 that the natural consequence of it would be to induce
25 a purchase of the stock.

1           MS. MARTINEZ:   That is correct, Your Honor.

2           THE COURT:   Is there anything else you are

3   relying on, any other argument you are making?

4           MS. MARTINEZ:   In order to make the in

5   connection with requirement?

6           THE COURT:   Yes.

7           MS. MARTINEZ:   No, I think that distills it

8   to it is essence, Your Honor.

9           THE COURT:   Yes Mr. Ellis.

10          MR. ELLIS:   What counsel read was language

11  that is cited when people are dealing with an issue

12  involving brokers, in other words, that's not language

13  that is in the cases that deal with the publishers

14  that aren't dealing in the stock, and the SEC knows

15  and has said to this Court that the defendants never

16  purchased, owned or sold USEC (phonet.) stock so we

17  are dealing with a red herring when we are talking

18  about somehow that these people are connected with the

19  stock.

20          They say, defendants never owned, purchased or

21  sold USEC (phonet.) stock.   So that is where we

22  start.   The Lowe case indicating that the court when

23  there is an intersection between the securities laws

24  and the first amendment you read the securities law

25  narrowly, not broadly.

1          We were diametrically opposed to the SEC's

2    position.  They are just ignoring Lowe. They say, oh,

3    well, that doesn't apply because this is fraud. Well,

4    that is how you judge publication, and you have to

5    read the securities act narrowly and that is the

6    teaching of Lowe.  And that is entirely consistent

7    with the law before Lowe, and when it dealt with 10b

8    because of Judge Briand's decision in the Barron's

9    case.

10         So a federal judge before Lowe dealing with a

11   10b5 case indicated, no, that doesn't, that there is

12   no in connection with when there is just a

13   publication, and you are dealing with 10b5.  Then you

14   have Lowe that says read it narrowly, not broadly.  So

15   I disagree with counsel completely on that, and then

16   finally you have Judge Robinson that says, I have seen

17   Lowe now.  I certainly know the pre Lowe law and in

18   the 10b5 case it is not in connection with.

19         If the only thing that happens here is a

20   publication, and there is no purchase or sale of

21   securities, and there is no fiduciary duty.  Now, that

22   is what the law is, and that is why we believe the in

23   connection with is actually fundamental, and it is not

24   right to say you read it broadly.  You read it

25   narrowly, and they allege, they are the one's that are

1   alleging publication.  So I guess I am excorsized

2   about that.

3        The other point I would make in counter to

4   what counsel said is that the Supreme Court and many

5   federal decisions have indicated that there has to be

6   a limiting purpose, a limiting principle of the

7   securities laws.  In other words we are not trying to

8   make every fraud case into an SEC case and the SEC

9   case and that goes to the point Your Honor made.  This

10  is not an SEC case.  It might be a federal commission

11  case.  It might be common law fraud case under

12  Maryland law or where anybody wants to say did you

13  know sir at an SEC case.

14       THE COURT:   Would you agree, a hypothetical

15  because mere loss of X dollars by investing in this

16  company, assuming they could prove the fraud and

17  everything else they would have a clean shot at you.

18       MR. ELLIS:   They would have a shot at it

19  sure, and we would claim all the constitution

20  protections but yes, they would have --  they have

21  remedies and starting with getting their money back,

22  and the other point that counsel made.

23       She says, well, look at the document and it is

24  absolutely obvious, well, frankly it is not so

25  obvious.  We are dealing with a reasonable investor

1 here.  What the government wants is the reasonable

2 investor, if it didn't trade, it didn't pop, I think

3 that is the language they use, but doesn't pop on the

4 22nd of May, that is fraud. Well, that isn't so.  You

5 look at it from a reasonable investor's standpoint,

6 and reasonable investors are not day traders, so when

7 twenty-eight days later it did pop, the treaty was

8 signed, the agreement signed.  It is all done, and it

9 is twenty eight days later and this is in the

10 complaint.  It is not something we ask the Court to

11 look at, but of course the Court can look at things.

12 You can take judicial notice of, like, you know, the

13 summit and things lake that, but I mean it just defies

14 common sense to say that the material thing is the

15 22nd of May.  That isn't what is material.  And

16 certainly when you look at Stansbury's actual report,

17 it is much more than something that is going to happen

18 on the 22nd of May.  For example, it is a good stock

19 to hold for a long time because they have a nice place

20 in the market and they will make money over time.  It

21 is a good idea that you spend uranium for warheads as

22 fuel for power, in the country's that need clean

23 power.

24          So our point is, I counter what counsel said

25 that you just read this, and it is obvious. We want

1   the Court to read the whole thing that is before the

2   Court, and to take the full modus of the facts that

3   are alleged, and the facts that the Court can take

4   from the judicial notice of, and when you put those

5   together it can't be a material misrepresentation, and

6   that is what the argument that we have in a much

7   longer form at pages 38 to 45.

8           THE COURT:   In connection with is where we

9   are trying --  material misrepresentation I can't

10  throw him out.  In connection with, we can possibly

11  throw him out.

12          MR. ELLIS:   I will take that one, Your

13  Honor.  That is a good one for me, and all we would

14  ask the Court to do is to follow Judge Briand, Judge

15  Robinson and the teaching of reading narrowly that is

16  in the Lowe case, and all the good arguments that the

17  Court made for accepting the 40 acts.  That is what

18  we -- that is the first thing we ask for, and that is

19  why the case ought to end and if it doesn't end my

20  brother Sanford here and all the first amendment

21  problems we point out which are legion, are real

22  problems.  There could be --

23          THE COURT:   I also like to ask a question of

24  Ms. Martinzez about that.

25          MR. ELLIS:   Sure.

1        THE COURT:   Ms. Martinez, to amicus filings

2  in this case.  They are thoughtful.  Blumberg was

3  thoughtful and so was the other one, Phillips, but --

4  and I recognize that what I am doing here is I am

5  deciding a motion to dismiss, at a District Court

6  level which is non prejudicial and which is not

7  binding on anybody.  But I still would like to be

8  careful, because there is a certain level of angst

9  among the publishing community, financial publishing

10  community about all this.

11        How do I articulate a standard that I am going

12  to apply that is going to say, fine, I can find in

13  connection with, with regard to this case, but

14  Blumberg, Wall Street Journal and all that, you don't

15  have to worry because in this case that is very

16  special compared to what they do or indeed what the

17  defendant does with regard to other publications.

18        So how do I articulate something so that I

19  don't state a rule that is so broad that it does have

20  the chilling and unfair affect that Mr. Ellis refers

21  to?

22        MS. MARTINEZ:   Well, I think Your Honor can

23  do that by restricting your ruling to the facts that

24  are before you. That what we have is a computer that

25  in its elements which is speaking being for itself

54

1   that is claiming to same inside information for a
2   thousand dollars.  I think what, you know, Blumberg is
3   concerned about the liability --

4            THE COURT:   Is it the fact that the company
5   is making a claim to be doing an illegal act, is that
6   the distinction?

7            MS. MARTINEZ:   No.  I don't think that is the
8   distinction.  What I think is --

9            THE COURT:   What is wrong with that
10  distinction?

11           MS. MARTINEZ:   It is a fine distinction,
12  but --

13           I would prefer the distinction is not that
14  narrow.  I think that under these circumstances, where
15  you have a publisher that is selling information, the
16  concerns of Blumberg are such that they routinely
17  publish financial information, and, you know, if you
18  believe the defendant that the SEC is going to bring
19  about the demise of the financial publishing business
20  by pursuing this lawsuit.  I don't think that is
21  correct.

22           THE COURT:   Well, Ms. Martinez, I don't say I
23  am familiar with everything, but aren't there
24  publishers which have a stock of the month or stock of
25  the week and every week or month they publish, they

55

1  feature some stock.

2       MS. MARTINEZ:   And, for example, in those

3  columns an individual is making a recommendation based

4  on the Rich and that the article is a truthful

5  expression of an opinion, not a misstatement of

6  material fact which we allege in this case.

7       THE COURT:   But what you are saying is you

8  can accuse Blumberg and the Wall Street Journal of

9  fraud and they can't dismiss it. That is what you are

10  saying. You are not giving me --  they are concerned

11  about that.

12       What they are saying is there is a price to be

13  paid for freedom, and we are legitimate publishers and

14  we shouldn't have to defend against fraudulent claims

15  when all we are doing is publishing a column for the

16  stock of the week.  That is the concern, and it makes

17  some sense.  You are trying to say, I mean if you had

18  information that the stock of the week column was

19  fraudulent on one week, you are saying you would feel

20  free to sue on that, just because it is fraudulent.

21  In which case there is no first amendment protection

22  for them.

23       Now, maybe there shouldn't be, but are you

24  saying that?  Or is there something about this case

25  that distinquishes it from the Journal, from

56

1   Blumberg?

2          MS. MARTINEZ:   Well, I think one of the

3   distinguishing factors is the publisher in this case

4   is getting a thousand dollars from each individual

5   investor to provide them with the name of the security

6   where --

7          THE COURT:   How is that any different from

8   the fact that a publisher has a special investment

9   club, and payee number, you pay a thousand dollars a

10  month and every month we will give you our special

11  secret advanced tip the best we can do.

12         MS. MARTINEZ:   I think the difference is in

13  those instances what the publisher is selling is a

14  subscription.  It is selling membership.  It is not

15  selling inside information.

16         THE COURT:   Well, neither are they actually.

17         MS. MARTINEZ:   Right, they are selling lies.

18         THE COURT:   Well --

19         MS. MARTINEZ:   From our perspective.

20         THE COURT:   You are saying they don't have

21  insider information.  All right.  But I am trying to

22  find a way that I would articulate what I am doing

23  without telling Blumberg, you know, and if the SEC,

24  they turn on you, you got the same problem.  You are

25  going to have to defend yourself too just because you

1   are fraudulent and they are say, we shouldn't have to

2   do that.  We shouldn't be a target to the SEC, the

3   government that wants to say that we are fraudulent

4   because it would be too expensive to publish

5   newspapers.

6          MS. MARTINEZ:   And I think there is a

7   distinction THAT this is not a case where what we are

8   looking at is publication, an article appearing in a

9   newspaper that somebody is buying for 75 cents.  That

10  is a significant difference.

11         When I look at the in connection with

12  requirement, I think you have to look at those

13  factors.  Is it reasonable for someone to pay 75 cents

14  for the Wall Street Journal, and then bring an action

15  against the Wall Street Journal saying I read one of

16  your articles and I bought security acts and I have

17  lost five hundred thousand dollars, now you are on the

18  hook.

19         Whereas the facts here are different, Your

20  Honor.  What Mr. Stansbury is saying to the investors,

21  I will tell you what day to buy.  I can tell you what

22  day to sell because I have inside information that I

23  got from a publisher.  There the in connection with

24  requirement is met.

25         THE COURT:   So it is the specificity of the

 1  information that you are complaining about,

 2  specifically as to time, and as to --

 3          MS. MARTINEZ:   The specificity of the

 4  information, the type of information.  I think you

 5  need to look at all of those facts.

 6          THE COURT:   Didn't Blumberg used to have a

 7  show on television in the morning, and they would say,

 8  we recommend today that you buy X, Y, Z?

 9          MS. MARTINEZ:   If they do, I am not aware of

10  it, Your Honor.

11          THE COURT:   Counsel, don't they?

12          MR. ELLIS:   Reukyser (phonet.) says something

13  like that.

14          THE COURT:   Today buy so and so.  It is

15  obviously intended to get people to buy the X, Y. Z

16  stock today because he wants a following.

17          MS. MARTINEZ:   One of the issues that we

18  haven't discussed yet that Agora raised is whether,

19  you know, the information in the super insider tip

20  email will protect defendant or puffery, or things of

21  this nature.  The protections for opinion for this

22  individual who is on the Blumberg show who is saying,

23  you know, I have looked at this, and I recommend you

24  buy is his opinion, and that opinion can get some

25  protection, but that is not what we have in this

 1  case.

 2          THE COURT:    That is a merits defense.   Okay.

 3  That would be -- that is too easy.   The --

 4          MS. MARTINEZ:    Give me some easy ones.

 5          THE COURT:    The guy that gets up in the

 6  morning and says, you know, I read, I am advised thing

 7  are going to put a highway through so and so,

 8  therefore, you should buy X, Y, Z today. They are

 9  concerned that guy is going to be sued on the basis

10  that he was -- in reckless disregard with regard to

11  the highway news because you know how after the fact

12  everything looked perfectly clear and at the time it

13  doesn't.   They don't want to have to defend that.

14  That is what they are arguing about.

15          MS. MARTINEZ:    And I think --

16          THE COURT:    I am trying to find an

17  articulation that says we can -- you can proceed here,

18  but I wouldn't say you could proceed against Blumberg

19  or the Journal for one of their published articles,

20  that is all.

21          MS. MARTINEZ:    And I think the items that I

22  mentioned, the thousand dollars for the name of one

23  company is a distinction between items that appear in

24  a newspaper of general and regular circulation,

25  and --

1         THE COURT:   How far did you go.  What is your

2    position with regard to whether this is in fact, if

3    the statement were true, it would have been an

4    illegal -- if the statement were true to what extent

5    is there a violation of law, so that the statement

6    could be looked at as an invitation to join a criminal

7    conspiracy.  Is that valid or not valid?

8         MS. MARTINEZ:   I think in the U.S. Versus

9    Carpenter case addresses that issue that when a

10   publisher abuses his position, converts property

11   belonging to the newspaper, in this case it was the

12   Wall Street Journal reporter that insider trading has

13   an element of some sort of breach of duty.

14        THE COURT:   Is it your contention that if in

15   fact the statement were truthful, then it would have

16   been a tortious or criminal act to have distributed

17   it?

18        MS. MARTINEZ:   It is possible, however, we

19   would have needed to develop additional facts that I

20   don't think have been developed in this instance.

21        THE COURT:   All right. Yes.

22        MR. ELLIS:   Counsel has articulated an

23   argument to make a distinction so we could have a

24   distinction. The legitimate people from illegitimate,

25   or Agora request, that is a fine distinction and I

1   will tell you why.  Because Justice Stevens in the

2   Lowe case when he is writing, he writes this.

3          Although three publications are involved in

4   this litigation, only one needs to be described.  A

5   typical issue of the Lowe investment and financial

6   newsletter contain general commentary, will the

7   security and bullion markets.  Reviews of his market

8   indicators and investment strategies and specific

9   recommendations for buying, selling, or holding stocks

10  and bullions.

11         The newsletter advertised the telephone

12  hotline over which subscribers to call to get current

13  information.  That sounds to me a lot like Porter

14  Stansbury is and the distinction that counsel made.

15  Justice Stevens didn't buy that.  He found in favor or

16  not he, I apologize. The court found in favor of the

17  media knowing that that is the kind of newsletters

18  that were involved in the Lowe case, and that is the

19  kind of newsletter that's involved in this case, and

20  that is why Lowe is a very important case, and it

21  debugs what counsel says is a limiting factor.  It is

22  not a limiting factor because you can bet all of the

23  people are going to be pointing to there to say, well,

24  wait a minute.

25         Justice Stevens said that, and was considering

1    a newsletter just like this, not, I wasn't considering

2    the GCPNBC or Blumberg.  He was considering something

3    that looked an awful lot like Agora.

4            THE COURT:   His holding was what? This in

5    connection with or fraud?

6            MR. ELLIS:   Under the 40 act, I certainly

7    grant that so it is a different act.  I do grant

8    that.  But my bigger point was it was consistent with

9    what Judge Briand had predicted back in 1977 I think

10   because he said, no, the publishers -- that is not in

11   connection with.  But we sell this information.  We

12   sell our opinions.  We sell those things, we are not

13   selling stock, and in this particular case, and you

14   look at the indicators, the only time that 10b5 gets

15   applied to publishers if you can find buying and

16   selling and pumping and dumping that doesn't exist

17   Your Honor on the face of the complaint. Or some

18   fiduciary relationship, and there is no fiduciary

19   relationship.  These people were paying a thousand

20   dollars to get the report.  We know what the report

21   was. The report is not some phony thing that just made

22   up.  I mean it is in detail.  It talks about why this

23   is a good investment.  It does certainly talk about

24   the geo political facts of life that are going to

25   happen, and in fact did happen within 28 days, so any

1  reasonable investor, that is why we say the Court, you

2  know, has to look on the reasonable investors

3  standard, and under those circumstances there can be

4  no violation of the securities laws or certainly the

5  in connection with part.

6      THE COURT:   All right.  Ms. Martinzez, why

7  don't you have the last word and then I want to talk

8  about scheduling possibilities.

9      MS. MARTINEZ:   I would like a few comments on

10  SEC versus Lowe.  First I want to emphasize yet again

11  this SEC versus Lowe was not a fraud case. It dealt

12  with the 1940 investment advisors Act and the

13  regulatory structure imposed by that statute is

14  different from the Exchange Act which is at issue

15  here.  In fact the Investment Advisors Act has some

16  strict liability claims, and imposed fiduciary duties

17  and that provides investment advice and that is what

18  was being interpreted by the Court, and even if this

19  Court were to adopt the SEC versus Lowe standard.   In

20  this case Agora cannot meet it.  It is not a bone fide

21  disinterested publisher, and this super insider tip

22  email.

23      THE COURT:   How do -- what do you base that

24  on.

25      MS. MARTINEZ:   First, this is the super

 1  insider tip email.  It is not something done in
 2  general or regular circulation.  The defendants in
 3  their own papers indicate that this was one time deal
 4  that was sent out to Agora subscribers.
 5          THE COURT:   It is a one time deal for this
 6  company and I am sure they do it for other things
 7  too.
 8          THE COURT:   Okay.  You are saying -- I don't
 9  know what you mean by one time deal. Everything is one
10  time deal.
11          MS. MARTINEZ:   It doesn't appear in a
12  periodical of general or regular circulation which was
13  one of the requirements that SEC had.
14          THE COURT:   It was a statement sent out and
15  solicited for a thousand dollar you get for this
16  thing, and then next week we are going to have another
17  email and solicit the thousand dollars you get that
18  thing.
19          MS. MARTINEZ:   Right.  And I think in that
20  situation what you are looking at is conduct more akin
21  to the commercial speech arena which is undeniably
22  regulated.  It is an email that will proposes a
23  commercial transaction, and --
24          THE COURT:   You wouldn't have, if they had a
25  publication for a quarterly, thousand dollars an issue

1  super stock tip, and everything that we have in this

2  case was in that, you wouldn't have a thing to say

3  then.

4          MS. MARTINEZ:   No, I think we would still

5  have something to say about it.

6          THE COURT:   Okay.  You would have to say

7  something different.

8          MS. MARTINEZ:   Well, I guess if the facts are

9  different, we would have to say something different,

10  but, you know, if in fact the quarterly email had

11  proposed this transaction, send us a thousand dollars

12  and we will sign the names --

13          THE COURT:   This is going to be, the email

14  says you will subscribe to our service for a thousand

15  dollars every quarter, we will give you the name of a

16  company as to which we have super insider information.

17          MS. MARTINEZ:   And the insider information

18  was true?

19          THE COURT:   Of course it is not true

20  otherwise we wouldn't have a case.

21          MS. MARTINEZ:   Yes, I think we still would

22  have an interest in pursuing that and looking

23  at --

24          THE COURT:   All right.

25          MS. MARTINEZ:   Looking at the particular

1        THE COURT:    That is clever.  I am not sure I
2   follow that.

3        MS. MARTINEZ:    So under these facts, I think
4   the in connection with requirement is met, and I
5   believe you have to one, evaluate the publication to
6   determine whether or not that requirement is met, and
7   I am not suggesting to the Court that every
8   informational article that appears in a newspaper
9   would meet that requirement.  Here where you have a
10  publisher who is selling the name of a company for a
11  thousand dollars --

12       THE COURT:    Suppose the publisher is selling
13  a Joe Blow super tips.  So you don't get the come on
14  about all this stuff.  You just know if you buy my
15  super tips and here is the track record because they
16  make them public a month later, and you can see that
17  seven out of ten times they have hit.  Nine out of ten
18  times they have hit.  In fact, because we are going to
19  make them fraudulent.  Ten out of ten times they hit,
20  but all they are saying is this is my super tip.

21       MS. MARTINEZ:    And I think if the language of
22  Joe Blow's super tips is directed at inducing
23  individuals to purchase securities and he is lying
24  then he is liable under Section 10b.

25       THE COURT:    All right.  You say it is in

47

1    connection with at least in your papers based upon the

2    fact that number one, his action caused the stock to

3    go up.  What else are you --  you are saying it is his

4    action caused, would tend to cause the purchaser to

5    buy the stock.

6         MS. MARTINEZ:   And I think the --  I think

7    the fact that the price went up in volume increase and

8    volume increased, that information goes more towards

9    the materiality prong. But what it does, it

10   illustrates that investors were purchasing this report

11   and going out and buying the stock.  If I am paying a

12   thousand dollars just to learn the name of the

13   company, it stands to reason that I have to believe

14   that I am going to make at least a thousand dollars in

15   trading the security in order to make up for that

16   expense.

17        We look at all the facts together here, Your

18   Honor.  The fact that the investor, what the investor

19   is paying, the language of the email.  I think that

20   the in connection with requirement is met in this

21   particular case.

22        THE COURT:   Okay.  But you are really boiled

23   it down to the fact that the information was sold and

24   that the natural consequence of it would be to induce

25   a purchase of the stock.

48

 1          MS. MARTINEZ:   That is correct, Your Honor.

 2          THE COURT:   Is there anything else you are

 3  relying on, any other argument you are making?

 4          MS. MARTINEZ:   In order to make the in

 5  connection with requirement?

 6          THE COURT:   Yes.

 7          MS. MARTINEZ:   No, I think that distills it

 8  to it is essence, Your Honor.

 9          THE COURT:   Yes Mr. Ellis.

10          MR. ELLIS:   What counsel read was language

11  that is cited when people are dealing with an issue

12  involving brokers, in other words, that's not language

13  that is in the cases that deal with the publishers

14  that aren't dealing in the stock, and the SEC knows

15  and has said to this Court that the defendants never

16  purchased, owned or sold USEC (phonet.) stock so we

17  are dealing with a red herring when we are talking

18  about somehow that these people are connected with the

19  stock.

20          They say, defendants never owned, purchased or

21  sold USEC (phonet.) stock.  So that is where we

22  start.  The Lowe case indicating that the court when

23  there is an intersection between the securities laws

24  and the first amendment you read the securities law

25  narrowly, not broadly.

1        We were diametrically opposed to the SEC's

2   position.  They are just ignoring Lowe. They say, oh,

3   well, that doesn't apply because this is fraud. Well,

4   that is how you judge publication, and you have to

5   read the securities act narrowly and that is the

6   teaching of Lowe.  And that is entirely consistent

7   with the law before Lowe, and when it dealt with 10b

8   because of Judge Briand's decision in the Barron's

9   case.

10       So a federal judge before Lowe dealing with a

11  10b5 case indicated, no, that doesn't, that there is

12  no in connection with when there is just a

13  publication, and you are dealing with 10b5.  Then you

14  have Lowe that says read it narrowly, not broadly.  So

15  I disagree with counsel completely on that, and then

16  finally you have Judge Robinson that says, I have seen

17  Lowe now.  I certainly know the pre Lowe law and in

18  the 10b5 case it is not in connection with.

19       If the only thing that happens here is a

20  publication, and there is no purchase or sale of

21  securities, and there is no fiduciary duty.  Now, that

22  is what the law is, and that is why we believe the in

23  connection with is actually fundamental, and it is not

24  right to say you read it broadly.  You read it

25  narrowly, and they allege, they are the one's that are

1    alleging publication.  So I guess I am excorsized

2    about that.

3          The other point I would make in counter to

4    what counsel said is that the Supreme Court and many

5    federal decisions have indicated that there has to be

6    a limiting purpose, a limiting principle of the

7    securities laws.  In other words we are not trying to

8    make every fraud case into an SEC case and the SEC

9    case and that goes to the point Your Honor made.  This

10   is not an SEC case.  It might be a federal commission

11   case.  It might be common law fraud case under

12   Maryland law or where anybody wants to say did you

13   know sir at an SEC case.

14         THE COURT:   Would you agree, a hypothetical

15   because mere loss of X dollars by investing in this

16   company, assuming they could prove the fraud and

17   everything else they would have a clean shot at you.

18         MR. ELLIS:   They would have a shot at it

19   sure, and we would claim all the constitution

20   protections but yes, they would have --  they have

21   remedies and starting with getting their money back,

22   and the other point that counsel made.

23         She says, well, look at the document and it is

24   absolutely obvious, well, frankly it is not so

25   obvious.  We are dealing with a reasonable investor

 1  here.  What the government wants is the reasonable

 2  investor, if it didn't trade, it didn't pop, I think

 3  that is the language they use, but doesn't pop on the

 4  22nd of May, that is fraud. Well, that isn't so.  You

 5  look at it from a reasonable investor's standpoint,

 6  and reasonable investors are not day traders, so when

 7  twenty-eight days later it did pop, the treaty was

 8  signed, the agreement signed.  It is all done, and it

 9  is twenty eight days later and this is in the

10  complaint.  It is not something we ask the Court to

11  look at, but of course the Court can look at things.

12  You can take judicial notice of, like, you know, the

13  summit and things lake that, but I mean it just defies

14  common sense to say that the material thing is the

15  22nd of May.  That isn't what is material.  And

16  certainly when you look at Stansbury's actual report,

17  it is much more than something that is going to happen

18  on the 22nd of May.  For example, it is a good stock

19  to hold for a long time because they have a nice place

20  in the market and they will make money over time.  It

21  is a good idea that you spend uranium for warheads as

22  fuel for power, in the country's that need clean

23  power.

24          So our point is, I counter what counsel said

25  that you just read this, and it is obvious. We want

1   the Court to read the whole thing that is before the

2   Court, and to take the full modus of the facts that

3   are alleged, and the facts that the Court can take

4   from the judicial notice of, and when you put those

5   together it can't be a material misrepresentation, and

6   that is what the argument that we have in a much

7   longer form at pages 38 to 45.

8          THE COURT:   In connection with is where we

9   are trying --  material misrepresentation I can't

10  throw him out.  In connection with, we can possibly

11  throw him out.

12         MR. ELLIS:   I will take that one, Your

13  Honor.  That is a good one for me, and all we would

14  ask the Court to do is to follow Judge Briand, Judge

15  Robinson and the teaching of reading narrowly that is

16  in the Lowe case, and all the good arguments that the

17  Court made for accepting the 40 acts.  That is what

18  we -- that is the first thing we ask for, and that is

19  why the case ought to end and if it doesn't end my

20  brother Sanford here and all the first amendment

21  problems we point out which are legion, are real

22  problems.  There could be --

23         THE COURT:   I also like to ask a question of

24  Ms. Martinzez about that.

25         MR. ELLIS:   Sure.

```
 1          THE COURT:   Ms. Martinez, to amicus filings
 2  in this case.  They are thoughtful.  Blumberg was
 3  thoughtful and so was the other one, Phillips, but --
 4  and I recognize that what I am doing here is I am
 5  deciding a motion to dismiss, at a District Court
 6  level which is non prejudicial and which is not
 7  binding on anybody.  But I still would like to be
 8  careful, because there is a certain level of angst
 9  among the publishing community, financial publishing
10  community about all this.
11          How do I articulate a standard that I am going
12  to apply that is going to say, fine, I can find in
13  connection with, with regard to this case, but
14  Blumberg, Wall Street Journal and all that, you don't
15  have to worry because in this case that is very
16  special compared to what they do or indeed what the
17  defendant does with regard to other publications.
18          So how do I articulate something so that I
19  don't state a rule that is so broad that it does have
20  the chilling and unfair affect that Mr. Ellis refers
21  to?
22          MS. MARTINEZ:   Well, I think Your Honor can
23  do that by restricting your ruling to the facts that
24  are before you. That what we have is a computer that
25  in its elements which is speaking being for itself
```

54

1   that is claiming to same inside information for a

2   thousand dollars.  I think what, you know, Blumberg is

3   concerned about the liability --

4           THE COURT:   Is it the fact that the company

5   is making a claim to be doing an illegal act, is that

6   the distinction?

7           MS. MARTINEZ:   No.  I don't think that is the

8   distinction.  What I think is --

9           THE COURT:   What is wrong with that

10  distinction?

11          MS. MARTINEZ:   It is a fine distinction,

12  but --

13          I would prefer the distinction is not that

14  narrow.  I think that under these circumstances, where

15  you have a publisher that is selling information, the

16  concerns of Blumberg are such that they routinely

17  publish financial information, and, you know, if you

18  believe the defendant that the SEC is going to bring

19  about the demise of the financial publishing business

20  by pursuing this lawsuit.  I don't think that is

21  correct.

22          THE COURT:   Well, Ms. Martinez, I don't say I

23  am familiar with everything, but aren't there

24  publishers which have a stock of the month or stock of

25  the week and every week or month they publish, they

1  feature some stock.

2      MS. MARTINEZ:   And, for example, in those

3  columns an individual is making a recommendation based

4  on the Rich and that the article is a truthful

5  expression of an opinion, not a misstatement of

6  material fact which we allege in this case.

7      THE COURT:   But what you are saying is you

8  can accuse Blumberg and the Wall Street Journal of

9  fraud and they can't dismiss it. That is what you are

10  saying. You are not giving me --  they are concerned

11  about that.

12      What they are saying is there is a price to be

13  paid for freedom, and we are legitimate publishers and

14  we shouldn't have to defend against fraudulent claims

15  when all we are doing is publishing a column for the

16  stock of the week.  That is the concern, and it makes

17  some sense.  You are trying to say, I mean if you had

18  information that the stock of the week column was

19  fraudulent on one week, you are saying you would feel

20  free to sue on that, just because it is fraudulent.

21  In which case there is no first amendment protection

22  for them.

23      Now, maybe there shouldn't be, but are you

24  saying that?  Or is there something about this case

25  that distinguishes it from the Journal, from

1   Blumberg?

2        MS. MARTINEZ:   Well, I think one of the

3   distinquishing factors is the publisher in this case

4   is getting a thousand dollars from each individual

5   investor to provide them with the name of the security

6   where --

7        THE COURT:   How is that any different from

8   the fact that a publisher has a special investment

9   club, and payee number, you pay a thousand dollars a

10  month and every month we will give you our special

11  secret advanced tip the best we can do.

12       MS. MARTINEZ:   I think the difference is in

13  those instances what the publisher is selling is a

14  subscription.  It is selling membership.  It is not

15  selling inside information.

16       THE COURT:   Well, neither are they actually.

17       MS. MARTINEZ:   Right, they are selling lies.

18       THE COURT:   Well --

19       MS. MARTINEZ:   From our perspective.

20       THE COURT:   You are saying they don't have

21  insider information.  All right.  But I am trying to

22  find a way that I would articulate what I am doing

23  without telling Blumberg, you know, and if the SEC,

24  they turn on you, you got the same problem.  You are

25  going to have to defend yourself too just because you

1   are fraudulent and they are say, we shouldn't have to

2   do that.  We shouldn't be a target to the SEC, the

3   government that wants to say that we are fraudulent

4   because it would be too expensive to publish

5   newspapers.

6           MS. MARTINEZ:   And I think there is a

7   distinction THAT this is not a case where what we are

8   looking at is publication, an article appearing in a

9   newspaper that somebody is buying for 75 cents.  That

10  is a significant difference.

11          When I look at the in connection with

12  requirement, I think you have to look at those

13  factors.  Is it reasonable for someone to pay 75 cents

14  for the Wall Street Journal, and then bring an action

15  against the Wall Street Journal saying I read one of

16  your articles and I bought security acts and I have

17  lost five hundred thousand dollars, now you are on the

18  hook.

19          Whereas the facts here are different, Your

20  Honor.  What Mr. Stansbury is saying to the investors,

21  I will tell you what day to buy.  I can tell you what

22  day to sell because I have inside information that I

23  got from a publisher.  There the in connection with

24  requirement is met.

25          THE COURT:   So it is the specificity of the

58

 1  information that you are complaining about,

 2  specifically as to time, and as to --

 3          MS. MARTINEZ:   The specificity of the

 4  information, the type of information.  I think you

 5  need to look at all of those facts.

 6          THE COURT:   Didn't Blumberg used to have a

 7  show on television in the morning, and they would say,

 8  we recommend today that you buy X, Y, Z?

 9          MS. MARTINEZ:   If they do, I am not aware of

10  it, Your Honor.

11          THE COURT:   Counsel, don't they?

12          MR. ELLIS:   Reukyser (phonet.) says something

13  like that.

14          THE COURT:   Today buy so and so.  It is

15  obviously intended to get people to buy the X, Y. Z

16  stock today because he wants a following.

17          MS. MARTINEZ:   One of the issues that we

18  haven't discussed yet that Agora raised is whether,

19  you know, the information in the super insider tip

20  email will protect defendant or puffery, or things of

21  this nature.  The protections for opinion for this

22  individual who is on the Blumberg show who is saying,

23  you know, I have looked at this, and I recommend you

24  buy is his opinion, and that opinion can get some

25  protection, but that is not what we have in this

59

 1  case.

 2          THE COURT:    That is a merits defense.   Okay.

 3  That would be --  that is too easy.   The --

 4          MS. MARTINEZ:    Give me some easy ones.

 5          THE COURT:    The guy that gets up in the

 6  morning and says, you know, I read, I am advised thing

 7  are going to put a highway through so and so,

 8  therefore, you should buy X, Y, Z today. They are

 9  concerned that guy is going to be sued on the basis

10  that he was -- in reckless disregard with regard to

11  the highway news because you know how after the fact

12  everything looked perfectly clear and at the time it

13  doesn't.   They don't want to have to defend that.

14  That is what they are arguing about.

15          MS. MARTINEZ:    And I think --

16          THE COURT:    I am trying to find an

17  articulation that says we can -- you can proceed here,

18  but I wouldn't say you could proceed against Blumberg

19  or the Journal for one of their published articles,

20  that is all.

21          MS. MARTINEZ:    And I think the items that I

22  mentioned, the thousand dollars for the name of one

23  company is a distinction between items that appear in

24  a newspaper of general and regular circulation,

25  and --

 1        THE COURT:   How far did you go.  What is your

 2   position with regard to whether this is in fact, if

 3   the statement were true, it would have been an

 4   illegal -- if the statement were true to what extent

 5   is there a violation of law, so that the statement

 6   could be looked at as an invitation to join a criminal

 7   conspiracy.  Is that valid or not valid?

 8        MS. MARTINEZ:   I think in the U.S. Versus

 9   Carpenter case addresses that issue that when a

10   publisher abuses his position, converts property

11   belonging to the newspaper, in this case it was the

12   Wall Street Journal reporter that insider trading has

13   an element of some sort of breach of duty.

14        THE COURT:   Is it your contention that if in

15   fact the statement were truthful, then it would have

16   been a tortious or criminal act to have distributed

17   it?

18        MS. MARTINEZ:   It is possible, however, we

19   would have needed to develop additional facts that I

20   don't think have been developed in this instance.

21        THE COURT:   All right. Yes.

22        MR. ELLIS:   Counsel has articulated an

23   argument to make a distinction so we could have a

24   distinction. The legitimate people from illegitimate,

25   or Agora request, that is a fine distinction and I

1  will tell you why.  Because Justice Stevens in the

2  Lowe case when he is writing, he writes this.

3       Although three publications are involved in

4  this litigation, only one needs to be described.  A

5  typical issue of the Lowe investment and financial

6  newsletter contain general commentary, will the

7  security and bullion markets.  Reviews of his market

8  indicators and investment strategies and specific

9  recommendations for buying, selling, or holding stocks

10  and bullions.

11       The newsletter advertised the telephone

12  hotline over which subscribers to call to get current

13  information.  That sounds to me a lot like Porter

14  Stansbury is and the distinction that counsel made.

15  Justice Stevens didn't buy that.  He found in favor or

16  not he, I apologize. The court found in favor of the

17  media knowing that that is the kind of newsletters

18  that were involved in the Lowe case, and that is the

19  kind of newsletter that's involved in this case, and

20  that is why Lowe is a very important case, and it

21  debugs what counsel says is a limiting factor.  It is

22  not a limiting factor because you can bet all of the

23  people are going to be pointing to there to say, well,

24  wait a minute.

25       Justice Stevens said that, and was considering

 1  a newsletter just like this, not, I wasn't considering

 2  the GCPNBC or Blumberg. He was considering something

 3  that looked an awful lot like Agora.

 4      THE COURT:   His holding was what? This in

 5  connection with or fraud?

 6      MR. ELLIS:   Under the 40 act, I certainly

 7  grant that so it is a different act.  I do grant

 8  that.  But my bigger point was it was consistent with

 9  what Judge Briand had predicted back in 1977 I think

10  because he said, no, the publishers -- that is not in

11  connection with.  But we sell this information.  We

12  sell our opinions.  We sell those things, we are not

13  selling stock, and in this particular case, and you

14  look at the indicators, the only time that 10b5 gets

15  applied to publishers if you can find buying and

16  selling and pumping and dumping that doesn't exist

17  Your Honor on the face of the complaint. Or some

18  fiduciary relationship, and there is no fiduciary

19  relationship.  These people were paying a thousand

20  dollars to get the report.  We know what the report

21  was. The report is not some phony thing that just made

22  up.  I mean it is in detail.  It talks about why this

23  is a good investment.  It does certainly talk about

24  the geo political facts of life that are going to

25  happen, and in fact did happen within 28 days, so any

1   reasonable investor, that is why we say the Court, you

2   know, has to look on the reasonable investors

3   standard, and under those circumstances there can be

4   no violation of the securities laws or certainly the

5   in connection with part.

6        THE COURT:   All right.  Ms. Martinzez, why

7   don't you have the last word and then I want to talk

8   about scheduling possibilities.

9        MS. MARTINEZ:   I would like a few comments on

10  SEC versus Lowe.  First I want to emphasize yet again

11  this SEC versus Lowe was not a fraud case. It dealt

12  with the 1940 investment advisors Act and the

13  regulatory structure imposed by that statute is

14  different from the Exchange Act which is at issue

15  here.  In fact the Investment Advisors Act has some

16  strict liability claims, and imposed fiduciary duties

17  and that provides investment advice and that is what

18  was being interpreted by the Court, and even if this

19  Court were to adopt the SEC versus Lowe standard.  In

20  this case Agora cannot meet it.  It is not a bone fide

21  disinterested publisher, and this super insider tip

22  email.

23        THE COURT:   How do -- what do you base that

24  on.

25        MS. MARTINEZ:   First, this is the super

1  insider tip email.  It is not something done in

2  general or regular circulation.  The defendants in

3  their own papers indicate that this was one time deal

4  that was sent out to Agora subscribers.

5            THE COURT:   It is a one time deal for this

6  company and I am sure they do it for other things

7  too.

8            THE COURT:   Okay.  You are saying --  I don't

9  know what you mean by one time deal. Everything is one

10 time deal.

11           MS. MARTINEZ:   It doesn't appear in a

12 periodical of general or regular circulation which was

13 one of the requirements that SEC had.

14           THE COURT:   It was a statement sent out and

15 solicited for a thousand dollar you get for this

16 thing, and then next week we are going to have another

17 email and solicit the thousand dollars you get that

18 thing.

19           MS. MARTINEZ:   Right.  And I think in that

20 situation what you are looking at is conduct more akin

21 to the commercial speech arena which is undeniably

22 regulated.  It is an email that will proposes a

23 commercial transaction, and --

24           THE COURT:   You wouldn't have, if they had a

25 publication for a quarterly, thousand dollars an issue

65

1   super stock tip, and everything that we have in this
2   case was in that, you wouldn't have a thing to say
3   then.

4         MS. MARTINEZ:   No, I think we would still
5   have something to say about it.

6         THE COURT:   Okay.  You would have to say
7   something different.

8         MS. MARTINEZ:   Well, I guess if the facts are
9   different, we would have to say something different,
10  but, you know, if in fact the quarterly email had
11  proposed this transaction, send us a thousand dollars
12  and we will sign the names --

13        THE COURT:   This is going to be, the email
14  says you will subscribe to our service for a thousand
15  dollars every quarter, we will give you the name of a
16  company as to which we have super insider information.

17        MS. MARTINEZ:   And the insider information
18  was true?

19        THE COURT:   Of course it is not true
20  otherwise we wouldn't have a case.

21        MS. MARTINEZ:   Yes, I think we still would
22  have an interest in pursuing that and looking
23  at --

24        THE COURT:   All right.

25        MS. MARTINEZ:   Looking at the particular

66

1  facts.

2         MR. ELLIS:    The point, I forgot --

3         THE COURT:    Just one more thing.   Which

4  commercial speech case do you think is most on point

5  here?

6         MS. MARTINEZ:    There are several commercial

7  speech cases, and just as an example we can look at

8  Novartis versus SEC which is at 223 at F. 3rd, 83.

9  Cases in the commercial context in general, the

10  government is free to regulate fraudulent speech.   It

11  requires advertisers to put warnings on products,

12  change advertisements in order to make them not

13  misleading.   They don't have the heightened scienter.

14         THE COURT:    Mr. Ellis, what is the last word

15  here.

16         MR. ELLIS:    Again, we differ greatly because

17  in Ginsberg versus Agora which Judge Nickerson was

18  dealing with what Agora does in investment inducement

19  letter.   There is considerable authority for

20  proposition in an investment newsletter are subject to

21  the same protection under the first amendment as any

22  other publication.   That is why the government's

23  position is way too broad and again Judge Nickerson's

24  is a different --  was a different publication, but

25  the print is the same.

1          The second point I want to make and I had

2     forgotten this before.  Every counsel has talked about

3     the Securities and Exchange Commission versus

4     D-A-N-D-F-R-D case in 2002, and in this case it says

5     as in Bankers Life, Wharf (phonet.) and O'Hagan

6     (phonet.) the SEC describes the fraudulent scheme in

7     which the securities transactions and breaches of

8     fiduciary duty coincide.  In other words you have to

9     have securities transactions and breaches of fiduciary

10    duty inside, have to be at the same time.  It has to

11    be that.

12         Well, that is not again, even if we were

13    stretching in connection with here, if you were

14    stretching it broadly it did doesn't exist because all

15    the people got, who gave the thousand dollars, a

16    thousand people gave a thousand dollars and got the

17    name of a company.  That is all they got.  Nobody made

18    them trade.

19         There is no evidence that they traded, and

20    there is no evidence that the securities, that there

21    were securities transactions that coincided with the

22    breach of some duty, and because number one, the duty

23    doesn't exist and it just doesn't coincide.  This is

24    separate entity and that is what Judge Briand

25    recognized and judge Robinson.  And I would submit

1   that Lowe teaches.

2        THE COURT:   All right.  Fine. I will try and

3   untangle this in due course.  We are going to go onto

4   scheduling and address two possibilities.

5        Point one is that I grant dismissal in which

6   case you folks will go to the Fourth Circuit and have

7   a wonderful time.  If I deny dismissal, what are we

8   looking at in terms of scheduling?  This does not seem

9   to be the most broad securities case around.  I mean

10  it looks, what do you need to get from the beginning

11  of the case to the trial of the case, and how long is

12  the trial of the case.

13       MS. MARTINEZ:   I understood from the previous

14  telephone conference where I was not present, that we

15  had agreed on six months of discovery.  Is that

16  correct?

17       MR. SANFORD:   That is correct.

18       THE COURT:   All right.

19       MR. ELLIS:   I did want to make clear.  Let's

20  say the Court decides you had a motion to dismiss.  We

21  might actually be filing a motion for summary judgment

22  too, and the burden is on them.

23       THE COURT:   I expect that.

24       MR. ELLIS:   And the reason is obvious because

25  there has already been discovery, so in a lot of

69

1  things that they are saying --

2        THE COURT:   Certainly does raise and change

3  the posture.  Well, do you expect you would need six

4  months more discovery after ruling, is that what you

5  are saying?

6        MS. MARTINEZ:   Yes, Your Honor.  I think that

7  is accurate, and while we do, while the Commission did

8  have an investigation, you know as Agora knows we

9  didn't have full discovery and as the Court is well

10  aware they filed the law suit against us to prevent us

11  from having some of the discovery that we believe we

12  were entitled to

13        THE COURT:   The lawsuit I think is separate

14  with this lawsuit, didn't it?

15        MS. MARTINEZ:   That is correct.

16        MR. ELLIS:   On that.  If what we are really

17  talking about is subscriber list, they are going to go

18  there.  I mean we litigated.  It was over in front of

19  Judge Hammerman in the State of Maryland and the

20  Security Commissioner tried to get those lists and we

21  fought that and we won. And the first amendment is

22  alive and well over in Circuit Court and so if that is

23  where we are going, I think there is going to be

24  fighting over that too, Your Honor.

25        MS. MARTINEZ:   And Your Honor --

 1          THE COURT:   That is fine.

 2          MS. MARTINEZ:   As counsel just indicated one

 3   of their positions is going to be there was no

 4   contemporaneous purchasing.  We can't get the

 5   identities of the people that actually purchased the

 6   stock.  How are we going to establish that although

 7   that's for another day.

 8          THE COURT:   This sounds to me you will have a

 9   discovery dispute.  If this case actually went to

10   trial, how long do you think it would take?

11          MS. MARTINEZ:  I think a week would be

12   sufficient, Your Honor.

13          THE COURT:   You mean four days or five days?

14          MR. ELLIS:   Four.  I think four, I mean we

15   start on Monday morning it could be done in four I

16   believe.

17          I think there is something -- some expert

18   testimony and things like that, but we could move

19   along. It could be a lot of stipulations and things

20   before that.

21          MS. MARTINEZ:   May I ask if you are going to

22   request a jury?

23          MR. ELLIS:   I think we will have to talk to

24   the client about that.

25          MS. MARTINEZ:   That may add some additional

1  time.

2          THE COURT:   Your answer is due after

3  resolution of dismissal, so then the jury demand time

4  is ten days after the last pleading, so you could ask

5  for a jury too if you want to.  That is fine.

6          Your remedy in this case is what?  You remedy

7  is injunctive --

8          MS. MARTINEZ:   We have asked for injunctive

9  relief as well as disgorgement of what we consider to

10  be ill gotten gains.

11                  (Off record discussion)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

72

```
 1
 2
 3
 4
 5
 6
 7                        CERTIFICATE
 8
 9          I, Barbara J. Shaulis, Official Reporter for
10   the United States District Court for the District of
11   Maryland, appointed pursuant to the provisions of
12   Title 28, United States Code, Section 753, do hereby
13   certify that the foregoing is a true and accurate
14   transcript of the proceedings made in the
15   aforementioned and numbered case on the date
16   hereinbefore set forth, and I do further certify that
17   the foregoing transcript has been prepared by me or
18   under my supervision.
19                        Barbara J. Shaulis
20
21                        Court Reporter
22
23
24
25
```