UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. MJG 03-1042 |
| AGORA, INC., PIRATE INVESTOR, LLC and FRANK PORTER STANSBERRY, | ) ) ) | |
| Defendants. | ) ) ) | |

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE TESTIMONY
OF JAMES W. BRIGGS AND OTHER, UNRELATED EVIDENCE

Defendants Agora, Inc., Pirate Investor, LLC, and Frank Porter Stansberry,

hereby move this Court to exclude the testimony of James W. Briggs and other, unrelated

evidence.  As grounds therefor, Defendants refer to the memorandum of law attached

hereto and made a part hereof.

Respectfully submitted,

BAKER & HOSTETLER LLP

By: /s/  *Lee T. Ellis, Jr.*
    Bruce W. Sanford (11928)
    Lee T. Ellis, Jr. (1372)
    Bruce D. Brown (14895)
    1050 Connecticut Ave., NW, Suite 1100
    Washington, DC 20036
    Telephone: 202-861-1500
    Facsimile: 202-861-1783

- 2 -

Matthew J. Turner (22319)
General Counsel, Agora Inc.
14 West Mt. Vernon Place
Baltimore, Maryland 21201
Telephone: 410-783-8410
Facsimile: 410-783-8409

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. MJG 03-1042 |
| AGORA, INC., PIRATE INVESTOR, LLC and FRANK PORTER STANSBERRY, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION IN LIMINE TO EXCLUDE TESTIMONY OF JAMES W. BRIGGS
AND OTHER, UNRELATED EVIDENCE

I.

Preliminary Statement

The SEC seeks to introduce testimony of James W. Briggs, a subscriber to various Agora publications, but one who did not buy or ever see the USEC report. Mr. Briggs' testimony concerns other Agora publications that bear no connection whatsoever to the USEC report, Porter Stansberry, or Pirate Investor, the indisputable focal points of this case. Defendants can rebut each of the issues that Mr. Briggs raises. However, proceeding with "mini-trials" on collateral matters completely unrelated to the USEC report will serve only to confuse the issues and lead to undue delay and waste of time.

The SEC presents Mr. Briggs and, potentially, testimony from other readers about unrelated Agora promotional material, not as proof that defendants violated Section 10(b) and Rule 10b-5, but instead to argue that defendants are engaged in "ongoing" efforts to disseminate false information to the public and must be subject to injunction. This

testimony, however, is merely a continuation of the SEC's futile campaign to drudge up evidence for the outrageous and irresponsible claim in the Amended Complaint that Agora's newsletters publish "nothing more than baseless speculation and outright lies." (Amended Complaint ¶ 16.)

In the original Complaint, the SEC launched a stinging attack against James Dale Davidson, editor of a separate Agora newsletter, falsely claiming that Davidson maintained undisclosed relationships with companies recommended in his newsletters. The groundless attack backfired, and ultimately led to this Court's consent order of October 16, 2003 that struck the offending language from the Complaint as "immaterial, impertinent, scandalous, and false." The SEC's Amended Complaint, however, continued to make broad, unsubstantiated claims regarding Agora's publications. In response to defendants' interrogatories seeking the basis for these claims, the SEC in May 2004 listed nine publications to support its allegations. But that also came up short, as not a single one of the items identified in the interrogatory response made its way on to the government's exhibit list for trial.

It was not until just three days before the September 24, 2004 discovery cut-off that the SEC submitted an amended interrogatory answer referencing, for the first time, Mr. Briggs and two newsletters published by Agora to which he subscribes. Neither publication, nor any of the others about which Mr. Briggs testified at his deposition, bear any relation to Porter Stansberry or Pirate Investor.

As shown below, Mr. Briggs' irrelevant testimony does not provide any support to the SEC's claims that Agora published "outright lies." It also does nothing to alleviate the substantial statutory and constitutional burdens that the SEC faces in obtaining an

injunction.  First, under statute, the SEC must establish a "reasonable likelihood" that

defendants will violate the securities laws in the future.  Mr. Briggs' testimony fails to

establish any such likelihood.  Second, the First Amendment prevents the SEC from

enjoining pure speech activity, which is the only activity at issue in this case, as the SEC

concedes that the defendants did not trade in securities or operate as investment advisers.

There is no reason, therefore, to waste the Court's and parties' time with Mr. Briggs'

testimony or similar evidence.

Accordingly, the Court should preclude Mr. Briggs from testifying at trial.

II.

Statement of Facts

Plaintiff's Amended Complaint alleges that Agora has engaged in ongoing efforts

to disseminate false information.  (Amended Complaint ¶¶ 36-39.)  In response to

defendants' interrogatory seeking the basis for this claim, the SEC on May 17, 2004

identified eight headlines from Agora publications that allegedly contained false

information.  (Plaintiff's Response to Defendants' First Set of Interrogatories, at 30-32,

attached as Exhibit 1.)  The response also identified a stock recommendation from a

newsletter called Superstock Investor involving a company called Teleplus and its

relationship with WalMart.  (Id. at 32.)  Superstock Investor is not published by Agora.

The SEC submitted an amended interrogatory answer on September 21, 2004, identifying

Mr. Briggs and listing documents relating to the D-Wave Investing System and the

Taipan Group's 24/7 Profits e-Dispatch, two newsletters published by Agora.  (Plaintiff's

Amended Response to Interrogatory 14, attached hereto as Exhibit 2.)  On October 5,

2004, Mr. Briggs testified at deposition on what he believed to be exaggerated or

- 3 -

fraudulent statements in Agora publications.  He specifically identified the <u>D-Wave Investing System</u>, <u>24/7 Profits e-Dispatch</u>, and <u>Penny Stock Fortunes</u>, among other newsletters.  (Deposition of James Briggs, October 5, 2004, attached as Exhibit 3.)  He also testified that he liked certain Agora publications, including the Oxford Club and its philosophy on investing.  (<u>Id</u>. at 34.)  While the SEC has identified Mr. Briggs as a witness for trial, it has not identified for trial <u>any</u> materials from its initial interrogatory response.

III.

<u>Argument</u>

A.      <u>Briggs' Testimony Concerning His Opinions About the Alleged Falsity of Other Information Published by Agora Is Irrelevant</u>.

From the outset, this case has focused on Mr. Stansberry's publication of the USEC report.  Every brief filed, every Court decision handed down, and every hearing have all centered exclusively on the defendants' USEC report.  Notwithstanding this fact, the government wishes to introduce testimony from Mr. Briggs (a person who acknowledged in his deposition that he never even saw the USEC report) that presents his view of other, entirely separate Agora promotional pieces that he personally finds false.  While Agora can show (as it does below) that Mr. Briggs is incorrect in his conclusions, because Mr. Briggs never purchased the USEC report and offers no testimony or evidence about the USEC matter, his testimony is irrelevant and should be excluded altogether.

Although not purporting to be an expert, Mr. Briggs' testimony is merely his <u>opinion</u> (based on an incomplete record) that Agora published exaggerated and fraudulent information.  It does nothing to establish that fact.  On the contrary, Agora can cite to

- 4 -

many of the government's very own deponents who do not believe that Agora or Mr.

Stansberry disseminate false information.  For example, Christian Brunnschweiler

testified that he trusted Mr. Stansberry's recommendations and did not believe, in his

opinion, that Mr. Stansberry would fabricate a story:

> Q.  Well, based on your experience in following Porter
>     Stansberry's Investment Advisory, do you trust Mr.
>     Stansberry's recommendations?
>
> A. Yes, I trust his recommendations.
>
> Q.  Again, based on your own personal experience, do you believe
>     Mr. Stansberry would fabricate a story?
>
> A. Based on my previous experience, no, I don't think so.

(Deposition of Christian Brunnshweiler, Tr. at 29-30, excerpts attached as Exhibit 4.)

Similarly, John Rufrano and John Paul Jankovich testified that they respect Agora

and believe in the company's publications:

> Q. And what made you decide to purchase the USEC report?
>
> A.  Well, through the years of reading information that I received
>     from Agora through the Oxford Club primarily and then other
>     different –other publications, I built a respect for their
>     knowledge. They seemed to be very worldly, very intelligent,
>     which I still believe is so, and I just believed in them.

(Deposition of John J. Rufrano, Tr. at 20, excerpts attached as Exhibit 5.)

> A.  Over the years I've come to have a great deal of respect for
>     what Agora has done. Like I say, I get Daily Reckoning a lot,
>     and I get some of Bill Bonner's stuff, too… As the time has
>     gone by after that, I've come to have a higher degree of respect
>     for Agora.

(Deposition of John Paul Jankovich, Tr. at 82-83, excerpts attached as Exhibit 6.)  In

addition, the SEC's own questionnaire sent to subscribers who requested (and received)

refunds for their purchase of the USEC report triggered responses such as:

> "Hi, this is Robert Lyle and I am responding to your email. I do not
> have a problem with your subject matter… I have nothing but
> respect for the Agora organization and the information that I have
> received over the years…"

(Email from Robert Lyle, December 2, 2004, produced by the SEC with bates number PI 03171, attached as Exhibit 7.)  Another refundee responded:

> "For the record, I am very satisfied with my relationship with Agora
> publishing and I do not approve of your actions."

(Email from Gilles Rouselle, November 28, 2004, produced by the SEC with bates number PI 03186, attached as Exhibit 8.)

The SEC specifically targeted these individuals because they had sought refunds from Agora for the USEC report and thus, presumably, they are the least pleased of Agora's customers.  While defendants acknowledge that there are others, such as Mr. Briggs, who have been unhappy with Agora, this type of evidence is irrelevant because it does not establish violations of Section 10(b) and Rule 10b-5, or reasonable or substantial likelihood of future violations.  Testimony of one subscriber hardly supports injunctive relief when many other subscribers – people who were the SEC's own deponents – vouch for and support Agora's publications.  Indeed, when the approval of the USEC-Tenex pricing agreement was not announced at the Bush-Putin summit in May 2002, the defendants made a full refund available to purchasers of the USEC report, approximately 90 percent of whom bought an Agora product after subscribing to the USEC report.  (See Customer Activity Chart, attached as Exhibit 9.)  Almost 75 percent of the USEC report refundees remain active Agora subscribers.  (Id.)  As Mr. Brunnschweiler testified after having made a substantial gain in one Agora-recommended investment and a loss in

another, "my attitude is you lose some and you win some."  (Brunnschweiler Dep., Tr. at 22-23 (Exhibit 4).)

B.      Briggs' Testimony Is Based on Speculation and Incomplete Information and Will Consume the Court's Time on Issues Unrelated to the SEC's Claim Against Defendants.

Mr. Briggs has identified several publications, entirely unrelated to the USEC report, in which he believes Agora disseminated false or misleading information.  He bases his opinions on his observations alone, and the SEC has not conducted independent investigations into these products as it has done with the USEC report.  The SEC easily could have done so, as Agora makes its track record information available to the public and subscribers.  Mr. Briggs' opinions on Agora's services are speculative at best and could not possibly provide a basis for injunctive relief against the defendants.  His testimony, therefore, which involves as many as four or five different publications, will consume vast amounts time with little return.  See Kramas v. Security Gas & Oil Inc., 672 F.2d 766, 772 (9th Cir. 1982) (affirming exclusion of other wrongful acts evidence under Fed. R. Evid. 404(b) where admission of the evidence would have "opened large areas of proof on collateral matters").[1]

Nevertheless, if the Court were to permit the SEC to veer off into these collateral matters, the defendants can offer substantial proof to rebut Mr. Briggs' unfounded conclusions.  First, Mr. Briggs objects to a claim by Ian Cooper, editor of Extreme Volatility Speculator and the 24/7 Profits e-Dispatch, that he had 24 winners out of 24 picks.  The Taipan Group, which is owned by Agora, publishes Extreme Volatility

---

[1]  For the same reasons, to the extent the SEC attempts to introduce documents or testimony relating to other Agora promotional materials through other witnesses, such as through the deposition of Robert Gutter, this testimony should be excluded.

Speculator.  Mr. Briggs states that when he went into the Extreme Volatility Speculator archive on the website, he could only find 21 winners, with 14 positions still open. (Briggs Dep., Tr. at 42.)  But Mr. Cooper's reference to 24 winners is true and accurate. During the months preceding the creation of Extreme Volatility Speculator, Mr. Cooper made 24 consecutive winning recommendations in other Taipan newsletters using the stock picking system employed in Extreme Volatility Speculator.  (Declaration of Ian Cooper at ¶¶ 4, 6, attached as Exhibit 10.)  This "audition" period allows the publisher to test customer feedback and track recommendations prior to committing to the cost and effort of launching a new product – in this case Extreme Volatility Speculator.  (Id. ¶ 7.) Thus, Mr. Briggs did not have the complete picture when he viewed the Extreme Volatility Speculator archives and saw 21 instead of 24 winners.

Second, the SEC states in its amended interrogatory response that Agora's D-Wave Investing System's website requires a subscription in order to access the portion of the website that contains the newsletter's track record.  This is wrong, and Mr. Briggs himself acknowledged that he could access the website without a password.  (Briggs Dep., Tr. at 82.)  Moreover, while Mr. Briggs quarrels with D-Wave's representations about its track record, he provides no testimony on the issues the SEC raises against Mr. Stansberry or Pirate Investor and which have provided this case its focus.  He makes no reference, for example, to any "secret" or "inside" information, nor does he testify that he relied on any allegedly false information in making any purchases or sales of any securities.  Indeed, the universe of evidence relied upon by Mr. Briggs and the SEC is from Agora's own websites and archives for its newsletters, which are fully open for review by the public and subscribers.

- 8 -

Third, Mr. Briggs cites a promotion he received on September 30, 2004 for the newsletter Penny Stock Fortunes involving the favorable description of an unnamed stock. (Briggs Dep. Tr. at 64-66.) As a bonus for subscribing to the newsletter, the potential subscriber would receive a free report identifying the name of the stock in the promotion. Although he did not subscribe to the newsletter at that time, Mr. Briggs claims that he knew the name of the stock – Medical Staffing Solutions (ticker symbol "MRN") – because he previously maintained a subscription. (Id. at 67.) Mr. Briggs was upset about the promotional piece referring to MRN because on July 30, 2004, the newsletter sold the stock and he is "pretty well convinced that they sold [MRN] for significant losses." (Id. at 66, 68.)

Mr. Briggs is correct that Penny Stock Fortunes editor James Boric had issued a "sell" for MRN on July 30, 2004. (Declaration of James Boric at ¶ 4, attached as Exhibit 11.) But Mr. Briggs may not have known that Mr. Boric initially recommended a buy for the stock in July 2003 (when it was under $8 a share) for no more than $9 a share. (Id. ¶ 2.) When the stock dipped as low as $5.40, however, Mr. Boric issued the sell recommendation because the stock had hit Mr. Boric's "stoploss" point of 35%. (Id. ¶¶ 3-4.) In reluctantly issuing the "sell," Mr Boric stated:

> I recommend that you sell your shares of MRN at market. But you can bet I will keep an eye on this stock in the months and years ahead. Eventually hospitals and nursing homes WILL call on MRN for temporary nurses. And when they do, MRN stock will double or triple in a hurry. But there's no use in risking any more downside action. Let's sell now and get back in later – when the industry picks up.

(Penny Stock Fortunes, July 30, 2004, attached as Exhibit 12.)

- 9 -

Although Mr. Boric initially recommended the stock at or below $9 and his stoploss policies required him to advise his subscribers to sell, he still believed strongly in the stock and would have been more than happy for new subscribers to get in at a lower price. (Boric Decl. ¶ 7.) Indeed, the closing price for MRN on September 30, 2004 – the day Mr. Briggs read the promotional piece – was $6.14. By November 26, 2004, the stock had risen to $8.75, nearly a 43% increase. (Id.) There is certainly nothing fraudulent about recommending a sell order to subscribers who purchased high, and a buy recommendation to new subscribers who can purchase low.[2]

Mr. Briggs also discusses other Agora newsletters – such as the Matrix Trader and the Contrarian Speculator – where he believes that the promotional claims by Agora lack support. Yet Mr. Briggs never connects any of these promotions with the purchase or sale of a security by him or anyone else. Nor does he state that the advice given in Agora newsletters is false or misleading. Indeed, Mr. Briggs has remained a customer of Agora and believes its publications have interesting recommendations. As he stated at his deposition:

> I don't have it in for Agora, I'm not here to – my complaint about Agora is their advertising. I still belong to Oxford Club, I support their philosophy. I still get "Taipan" which is a publication of Agora also. It's cheap and they have some interesting views on investing or recommendations. So I'm not here to pick on Agora.

(Briggs Dep., Tr. at 34.)

---

[2] In fact, investors who did purchase high could take advantage of a "wash sale" because the long term prospects for MRN remained strong. Investors could purchase new shares of MRN at the lower price and then sell the original shares for a loss after the tax code's 30 day wash sale rule period expired. Subscribers could then realize a loss and yet still maintain his or her position in the stock.

- 10 -

In sum, Mr. Briggs' testimony will require several "mini-trials" within this trial on the USEC report. Defendants can and will present evidence to contradict Mr. Briggs' claims. Multiple minitrials will cause undue delay and confusion, and the focus of the trial will be transferred to tangential matters. The Briggs testimony does not support any of the elements that the SEC must prove to establish a separate securities violation. Nor does it have anything to do with Porter Stansberry or Pirate Investor. Mr. Briggs should be excluded altogether.

C.    Briggs' Testimony Does Not Support the SEC's Claim for Injunctive Relief.

To the extent the SEC argues that the Briggs testimony would support a claim for injunctive relief, the testimony is insufficient to overcome the substantial hurdles the SEC faces as a matter of law on both statutory and constitutional grounds. Although Section 21(d)(1) of the 1934 Act authorizes injunctive relief, as Chief Justice Burger noted, "an injunction is a drastic remedy and not a mild prophylactic." Aaron v. Sec. and Exch. Comm'n, 446 U.S. 680, 703 (1980) (Burger, C.J., concurring).

The securities law provides that,

> [w]herever it shall appear to the Commission that any person is engaged or is about to engage in any acts or practices constituting a violation of [the securities laws] . . . it may in its discretion bring an action . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted . . .

Title 15 U.S.C. § 78u(d). To establish a proper showing, "the Commission must offer positive proof of the likelihood that the wrongdoing will recur." SEC v. Caterinicchia, 613 F.2d 102, 104 -105 (5th Cir. 1980) (citing SEC v. Commonwealth Securities, Inc., 574 F.2d 90, 99-100 (2d Cir. 1978).) There must be "a reasonable and substantial

likelihood that [the defendant], if not enjoined, would violate the securities laws in the future."  SEC v. Youmans, 729 F.2d 413, 415 (6th Cir.1984).  "The Commission needs to go beyond the mere fact of past violations."  Id.; SEC v. Ingoldsby, No. 88-1001-MA, 1990 WL 120731, at *5 (D. Mass. May 15, 1990) (indicating that even a "past violation by the defendant does not demonstrate a realistic likelihood of recurrence").  The likelihood of future violations is typically assessed by looking at several factors including the nature of the violation, including its egregiousness and its isolated or repeated nature, as well as whether the defendants will, owing to their occupation, be in a position to violate again. Youmans, 729 F.2d at 415; SEC v. First City Fin. Corp., 890 F.2d 1215, 1228 (D.C. Cir. 1989).

Here, the SEC has identified a single, isolated instance (involving Stansberry's publication of the USEC report) where it believes that a securities law violation has occurred.  The SEC has not alleged any violations arising from the matters raised by Mr. Briggs' testimony.  By focusing only on (refutable) complaints about various Agora publications, Mr. Briggs offers testimony that is entirely irrelevant to the SEC's case against Mr. Stansberry and Pirate Investor.  Mr. Briggs has no evidence of the marketing of inside information by Agora, Pirate, or Mr. Stansberry, whose activities as newsletter publishers hardly puts them in a unique position to violate the securities laws.

Courts have routinely rejected injunctive relief in similar or even more egregious instances.  See SEC v. Sargent,  329 F.3d 34, 39 (1st Cir. 2003) (affirming denial of injunction where it was first time violation, and violation was not particularly egregious because defendant neither traded on the information nor derived any direct personal profit); SEC v. Yun, 148 F.Supp.2d 1287, 1294 (M.D. Fla. 2001) (injunction is not

- 12 -

appropriate where the defendants' actions were isolated and they never before revealed insider information); SEC v. Brethen, 1992 WL 420867, at *24 (S.D. Ohio Oct. 15, 1992) (declining to impose injunction where corporate manager's trading on inside information was isolated and not particularly egregious considering the non-public information material at issue);  SEC v. Ingram, 694 F. Supp. 1437, 1442 (C.D. Cal. 1988) (injunction not appropriate where only one instance of insider trading and financial gain was small). Accordingly, there is nothing in Mr. Briggs' testimony that would assist the SEC in meeting the statutory standard for imposing this "drastic remedy."

An even more daunting burden for the SEC to overcome is the constitutional protections afforded pure speech activity under the First Amendment.  As the SEC recognizes, because the "First Amendment protects freedom of speech, the SEC cannot simply prohibit newsletters from recommending or touting particular stocks."[3] Permanent injunctions "that actually forbid speech activities are classic examples of prior restraints" because they impose a "true restraint on future speech."  Alexander v. United States, 509 U.S. 544, 550 (1993); Near v. Minnesota ex rel. Olson, 283 U.S. 697, 706 (1931).  A prior restraint on speech constitutes "the most serious and least tolerable infringement on First Amendment rights," Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976), and carries a "'heavy presumption' against its constitutional validity." Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971) (quoting Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 181 (1968)).

An injunction may be "sustained only under the most extraordinary circumstances."  Lowe v. SEC, 472 U.S. 181, 234 (1985) (White, J. concurring); New

---

[3]  See "Tips for Checking Out Newsletters,"  U.S. Securities And Exchange Commission website, www.sec.gov/investor/pubs/cyberfraud/newsletter.htm, a copy of which is attached hereto as Exhibit 13.

York Times Co. v. United States, 403 U.S. 714 (1971) (striking down injunction even where government sought to protect confidential information relating to national security).  The Supreme Court has "consistently rejected the proposition that such drastic prohibitions on speech may be justified by a mere possibility that the prohibited speech will be fraudulent."  Lowe, 472 U.S. at 235 (White, J. concurring) (citing cases).

Viewing the Briggs testimony in the light most favorable to the SEC, the best that can be said is that there is a "mere possibility" that defendants' future speech may be false.  But that can be said about anyone's speech at anytime about any subject.  That is clearly not sufficient to overcome the heavy statutory and constitutional presumption against the validity of a prior restraint such as the one sought by the SEC.  As there are no grounds for imposition of an injunction, Mr. Briggs' testimony should be excluded from trial.

IV.

Conclusion

For the foregoing reasons, the Court should exclude the testimony of James

Briggs as well as other testimony concerning the alleged dissemination of false

information by defendants that does not concern the USEC report.

Respectfully submitted,

BAKER & HOSTETLER LLP

By: /s/  *Lee T. Ellis, Jr.*
    Bruce W. Sanford (11928)
    Lee T. Ellis, Jr. (1372)
    Bruce D. Brown (14895)
    1050 Connecticut Ave., NW, Suite 1100
    Washington, DC 20036
    Telephone: 202-861-1500
    Facsimile: 202-861-1783

    Matthew J. Turner (22319)
    General Counsel, Agora Inc.
    14 West Mt. Vernon Place
    Baltimore, Maryland 21201
    Telephone: 410-783-8410
    Facsimile: 410-783-8409

    Attorneys for Defendants

- 15 -