# Motion To Dismiss

## THE COURT SHOULD DENY THE MOTION TO DISMISS ON THE GROUNDS OF WITHHOLDING DISCOVERY

Defendants contend that the Court should dismiss this case based on the government's withholding of discovery.  Defendants, however, failed to depose any representative of the State Department, the Department of Energy, the National Security Council or any other agency involved in the United States government approval of the USEC / Tenex market based pricing agreement.  Defendants offer nothing but pure speculation that any withheld document would have assisted in their defense in any way.

Here the Department of Energy, the State Department and the National Security Council are third parties.  Essentially, defendants argue that the failure of a third party to produce discovery warrants dismissal of this case against the Commission.  The Court considered defendants' Motion to Compel and rejected it as untimely filed.  As state by Magistrate Judge Bredar, "The motion is filed out of time, without leave of the Court, and in violation of Local Rule 104.8" Order, January 25, 2005.  Here defendants attempt to take advantage of their penurious and lackadaisical approach to discovery and only now, at the proverbial eleventh hour, request that the Court dismiss this case.  Defendants do this despite their complete lack of any legitimate or timely effort to discover information held by these third parties

# Motion To Dismiss

The Commission, itself, requested that the Department of Energy, the State Department and the National Security Council produce any additional documents to the Commission. The Department of Justice (on behalf of the Departments of Energy and State) informed the Commission that it produced all documents responsive to defendants narrowed request and that it would not produce any additional documents due to national security concerns. These entities are distinct departments of the federal government and unlike the Securities and Exchange Commission are represented by the Department of Justice and are entitled to assert any legitimate objections to defendants overly broad and burdensome discovery requests against any third party, including the Commission.

# Motion To Dismiss

The cases cited by defendants in support of dismissal do not support the relief requested. "The state secrets privilege is a common law evidentiary rule that allows the government to withhold information from discovery when disclosure would be inimical to national security." _Zuckerbraun v. General Dynamics Corp. et al._, 935 F.2d 544, 546 (2d Cir. 1991); _see also_, _In re United States of America_, 872 F.2d 472, 474 (D.C. Cir. 1989). While it is true that in some cases "an invocation of the privilege may be so drastic as to require dismissal [of the case] … if the court determines that the privilege so hampers the defendant in establishing a valid defense that the trier is likely to reach an erroneous conclusion." _Id._ at 547. However, before a dismissal of a case is warranted the court must first assess the validity of the claim of privilege. _Id._ at 547. That has not happened here. Defendants failed to bring their motion to compel in a timely manner. _See_ Order, January 25, 2005.

# Motion To Dismiss

Additionally, dismissal is only warranted if other avenues for obtaining the information are not available.  "The government may avoid the disclosure of classified information by proposing a substitute for the information, which the district court must accept if it 'will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information.'" USA v. Moussaoui, 382 F.3d 453, 477 (4th Cir. 2004).  "Thus a substitution is an appropriate remedy when it will not materially disadvantage the defendant." Id.  Here defendants have had full opportunity to discover all information regarding the timing of the government approval of the Tenex agreement from USEC, Inc.  Defendants have not claimed USEC was not responsive to their requests.  In fact, Philip Sewell testified that he was not aware of any documents in the possession of the State Department, the Department of Energy or the National Security Council that had not been produced.

# Motion To Dismiss

Defendants cite to US v. NBC, 65 F.R.D.415 (C. D. Cal. 1974) for the proposition that this case should be dismissed for the government's failure to comply with discovery requests. In US v. NBC, however, the government case was dismissed **after** the government "voluntarily and intentionally failed to comply with the Court's discovery orders." US v. NBC, 65 F.R.D.415, 418 (C.D. Ca. 1974). That is not the case here. Government lawyers have not been ordered to produce any withheld documents. Moreover, according to the cases cited by defendants, it is unlikely the Court would order the government agencies to produce documents subject to the executive privilege or withheld based on national security concerns. "[T]his Court would be inclined to sustain claims of executive privilege that would reveal the deliberative process of government officials, especially when the government was not the plaintiff or even a party to the litigation, or where the deliberating officials are not those of an agency much of whose business consists of litigating as a plaintiff, or in the case of such an agency, if the materials sought were not case specific." EEOC v. Citizens Bank & Trust Co., 117 F.R.D. 366, 366 (D. Md. 1987). Here the Departments of State and Energy and the National Security Council are not party to the litigation nor are they government agencies whose primary role is litigating as a plaintiff, like the EEOC.

# Motion To Dismiss

Quite simply, defendants failed to produce any evidence that the documents withheld by non-party government agencies would aid in their defense.  This Court has not assessed the validity of any privileges asserted by the third parties.  The Court has not assessed the allegedly withheld information to determine whether the assertion of any privilege so hampers the defendant in establishing a valid defense that the trier of fact is likely to reach an erroneous conclusion.  Thus, the requested relief is wholly inappropriate.

# Elements of a Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder

1. defendant made a material misrepresentation or omission of fact;

2. with scienter

3. in connection with the sale or purchase of a security

4. use of the means or instrumentalities of interstate commerce

   Basic Inc. v. Levinson, 485 U.S. 224 (1988)

   SEC v. Zandford, 238 F.3d 559, 563 (4th Cir. 2001)

   SEC v. Gotchey, 1992 U.S. App. LEXIS 33647, * 4 (4th Cir. December 28, 1992)

# Policy

Congress intended "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus achieve a high standard of business ethics in the securities industry." SEC v. Zandford, 535 U.S. 813, 819, 122 S.Ct. 1899, 1903 (2002)

Mr. Stansberry concedes that he is part of this business – he testified he makes recommendations to his subscribers regarding the purchase and sale of securities.

The Supreme Court has explained that Section 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purpose." Zandford, 535 U.S. at 819.

# Standard of Proof

The Standard of proof in a Commission action to enforce Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder is a preponderance of the evidence. Steadman v. SEC, 450 U.S. 91, 102, 101 S. Ct. 999, 1008 (1981) SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 355, 64 S. Ct. 120, 125 (1943)

Herman & MacLean v. Huddleston, 459 U.S. 375, 387, 103 S. Ct. 683, 690 (1983) (specifically addressing the standard of proof in a Section 10(b) case)

As noted in the Huddleston case, "historical considerations underlying imposition of a higher standard of proof have questionable pertinence" in a SEC enforcement proceeding. 459 U.S at 388. "An important purpose of the federal securities statutes was to rectify perceived deficiencies in the available common law protections by establishing higher standards conduct in the securities industry." Id. at 389.

# **Materiality**

In the Fourth Circuit information is material if:

1)  a reasonable purchaser or seller would consider the fact important in deciding whether to buy or sell a security

or

2)  a reasonable purchaser or seller would have viewed the total mix of information made available to be significantly altered by disclosure of the fact Ottman v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 343 (4th Cir. 2003)

    The information need not alter an investor's decision to purchase or sell a security.  The Court need only find that the reasonable investor would consider the information important.  Folger Adam Co. v. PMI, Indus., Inc., 938 F.2d 1529, 1535 (2d Cir. 1991); SEC v. National Student Marketing Corp., 457 F. Supp. 682, 709 (D.D.C. 1978).

# **Materiality**

Statement of law in defendants brief is not accurate. Defendants contend that the Commission must prove that a reasonable purchaser or seller would have concluded that the information in the Super Insider Tip Email or USEC Special Report altered the total mix of information.  In the Fourth Circuit, the test for materiality is whether a reason a reasonable purchaser or seller would consider the fact important in deciding whether to buy or sell a security OR a reasonable purchaser or seller would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

# **Materiality**

Statements in the Super Insider Tip Email and the USEC Special Report were important to a reasonable investor in making a decision to buy USEC stock. Investors who received the Super Insider Tip Email and bought the USEC Special Report testified that they considered the statements attributed a senior company executive were important to their decision to purchase USEC stock. A plain reading of the USEC Special Report and Super Insider Tip Email confirm the importance of the representations. Investors are told that the stock will double, triple or more on the announcement that the author knows will take place on May 22, 2002. A reasonable investor would consider this information important. Investors testified they thought the information was important.

# **Materiality**

Their view is shared by individuals who requested refunds from defendants. (Ex. 49) Plaintiffs Ex. 49 contains complaint emails in which individuals complained about the lack of an announcement from USEC on May 22, 2002 or that USEC denied the claims in the Super Insider Tip Email or USEC Special Report. The same sentiment is express by individuals who posted on defendants' message boards. Ex. 58, 59, 61, 65, 66.

# **Materiality**

Mr. Wingfield's and Ms. Major-Sosias' notes also reflect the importance of the May 22, 2002 announcement. Ex.s 47 and 48. Both Mr. Wingfield and Ms. Major-Sosias testified that they had received calls from individuals who purchased the USEC Special Report and demanded to know when the announcement was coming: the announcement that the USEC/Tenex market based pricing agreement had been approved by the government. They expressed anger that USEC had not made the promised announcement.

# **Materiality**

 The Commission's position is further supported by the dramatic increase in the price of USEC stock and the volume of shares traded after the Super Insider Tip circulated.  Mr. Wingfield testified that the average trading volume for USEC stock in the May 22, 2002 time frame was 250,000 shares. During the week of May 13, 2002 trading volume in USEC averaged over 3.5 million shares a day.  The price of USEC stock increased from $7.00 per share to over $10 per share. (See Plaintiffs Ex. 170 – stock price movement chart and Ex. 44 – memo to USEC CEO from Steve Wingfield). Defendants contend the price movement of USEC stock does not support the Commission's claim that the information in the Super Insider Tip Email and USEC Special Report are material.

# **Materiality**

Defendants' arguments that the statements in the Super Insider Tip Email and the USEC Special Report are not actionable and cannot withstand scrutiny

- No Statement of Facts—No False Statements
- Bespeaks Caution
- Puffery
- Opinion
- Did Not Alter Total Mix

# **Materiality-Statements of Fact**

- Defendants continue to characterize Stansberry's statements in the Super Insider Tip and the USEC Special Report as "speculation" that the USEC/Tenex market based pricing agreement would receive government approval on May 22, 2002.  That claim is belied by the plain language to the Super Insider Tip Email and the USEC Special Report.

  USEC Special Report, Plaintiffs Ex. 17 contains the following factual statements:

- "A USEC senior executive has assured me that the new Russian agreement will be approved just prior to the upcoming Bush-Puti summit.  In fact he said 'watch the stock of May 22nd.'"  (Wingfield and Major-Sosias testified this was a false statement of fact)

# Materiality-Statements of Fact

- "Thus, the company [USEC] stands to gain 20 percentage points of profit margin on around $1 billion in sales contracts – or $250 million in gross profit. <u>All it needs are the politicians to sign off on the deal!</u> And that, according to may source, will happen – finally – on May 22nd." (Wingfield and Major Sosias testified this was a false statement of fact)

- Similarly the Super Insider Tip Email, Plaintiffs Ex. 1, makes the following factual statements:

- "And best of all, because of my source – a senior company executive – I can tell you EXACTLY WHEN the deal will be finalized and announced to the public. The deal will close on May 22nd, only a few days from now." (Wingfield and Major Sosias testified this was a false statement of fact)

# Materiality-Statements of Fact

- "Reasonable projections see the upcoming deal adding at least $2.5 billion in profits to the company's bottomline." (Wingfield and Major Sosias testified this was a false statement of fact)

- "A high level corporate executive – someone definitely in a position to know  - passed along the details to me."  (Wingfield and Major Sosias testified this was a false statement of fact)

- "He even told me the precise day the deal would be announced." (Wingfield and Major Sosias testified this was a false statement of fact)

- "The company [USEC] I'm passing along to you will be a direct beneficiary of this agreement to the tune of billions of dollars." (Wingfield and Major Sosias testified this was a false statement of fact)

# Materiality-Statements of Fact

- "All that is left is the government approval for the contract which is coming on May 22nd, just in time for the Bush-Putin summit." (Wingfield and Major Sosias testified this was a false statement of fact)

- "Watch the stock on May 22nd" (Wingfield and Major Sosias testified this was a false statement of fact)

- "US government officials have said in public that a deal of the nature I have represented here will be announced at the upcoming Bush-Putin summit." (Wingfield and Major Sosias testified this was a false statement of fact – Stansberry could not point to anything in the evidentiary record supporting that claim)

# Materiality-Statements of Fact

- Confirmed by Wingfield note to file (Ex. 43) and Major-Sosias notes (Ex. 47). Philip Sewell the individual responsible for negotiating the Tenex agreement and the government approval thereof – indicated that USEC never had an understanding that the Tenex agreement would receive government approval on May 22, 2002 or that the agreement would receive approval at or before the Bush/Putin summit.

- "All the insiders are preparing to take profits." (Stansberry could not point to anything in the evidentiary recording supporting this statement. Instead he offered only the weak explanation that "insiders" referred to every current USEC shareholder.)

# Materiality-Statements of Fact

- Stansberry confirmed in message board postings that Mr. Wingfield had not told him that the Tenex agreement would receive government approval on May 22, 2002. Stansberry wrote: The gist of this is that a USEC senior executive confided to us during a conference call that the Russian treaty would be finalized on May 22nd. His direct quote was "watch the stock on May 22nd. He **implied** that this treaty would have a big impact on the shares that day. We **assumed** that meant the company's new Russian contract would be finalized as part of the larger agreement to destroy 10,000 warheads." (Ex. 60 – page 3795) He then concedes – that's not exactly what happened. Of course his report is not couched in terms of assumptions and implications – Stansberry worded his statements as fact. This fact was recognized by a purchaser of the USEC Report who posted on the message board (Ex. 59 page 3771) – " Not only is USU denying Pirate Investors' report, Porter himself is now calmly contradicting his report, and playing down his LIES because so many of you didn't actually read the report. . . . Now that all the REAL FACTS are out, thanks to others on the thread, Porter is now saying that they were HOPING a validating announcement by the company would have coincided with the Bush-Putin Treaty: after all "it would only have made sense" And, of course they DID NOT know exactly HOW MUCH such a deal would have improved the bottom line, and that there will probably be compromises involved before the new proposal is accepted, now with an unknown time frame."

# **Materiality-Statements of Fact**

- Why should the Court believe Mr. Wingfield and Ms. Major-Sosias and not Mr. Stansberry?
- Wingfield and Major-Sosias' testimony is consistent with the public disclosures made by USEC in the press releases, conference calls with investors and the company's fillings with the SEC. Exs. 126, 128, 129, 131, 132,149,150,151,153,154, 174,175 and 176.

- Mr. Wingfield was training Ms. Major-Sosias and testified he chose his words carefully because he was dealing with a newsletter writer and because he was training Ms. Major-Sosias.
- Mr. Wingfield provided the same information to Stansberry as he did to other investors who called him during the May 2002 time frame.  When individuals purchased the USEC Special Report called Wingfield he denied the accuracy of Stansberry's report.  Those investors quoted Wingfield on defendants' message boards.  See Ex. 58, 59, 60.

# **Materiality-Statements of Fact**

- Stansberry made inconsistent statements in his investigative testimony (Ex. 171 page 38), his affidavit (Ex. 169 – para 11) and his in court testimony and documentary evidence (Ex. 58, page 3759 – started to consider writing a report after May 8).  Stansberry stated he started drafting his report on May 9, 2002 after seeing a May 8 article in the WSJ.  In court he changed his mind because documents produced by a third party – Jody Madron indicated that he sent Madron a draft of the report on May 7, 2002 – See Ex. 29).

- Stansberry testified in his investigative testimony that Wingfield told him the Treaty of Moscow would be finalized on May 22, 2002 not the Tenex pricing agreement.  (Ex. 171 page 76-77, 111

# Materiality-Statements of Fact

- Stansberry continued to make misrepresentations in follow up reports about USEC.
- Ex. 19 – May 23 Update – "As predicted a deal with Russia and the US was finalized on May 22nd" – news was already out before the Super Insider Tip was circulated – See – Ex. 134 – White house press release and Ex. 36 ("just before we sent this promotion to our file, Bush came out and announced that an arms control deal with the Russians would be signed in Russia in a few days. Nothing was announced by USEC on whether this definitely means a cheaper supply of uranium though. Thus, officially, we're still waiting for May 22nd") Clearly, indicates that the deal referred to in the Super Insider Tip and USEC Special Report was not the signing of the Treaty but approval of the Tenex agreement.
- Ex. 20 – May 30 update – misrepresents that Wingfield "expressed regret that earlier conversations had not remained off the record" and that he spoke to Wingfield arranging a day tour for investors – Wingfield told him that would not be likely to occur because there is nothing to see. Claims that Stansberry has "assumed coverage" - he was always the person covering the situation.

# Materiality-Statements of Fact

- Ex. 23 – June 19 Update – claim that USEC had delayed its announcement – USEC received approval from Undersecretary Bolton on June 17, 2002 (Def. Ex. 56) – Wingfield and Sewell testified there was no delay.

- Ex. 24 – August 1 Update – if I didn't own the stock now I would not buy it – later Stansberry buys the stock – states bought because we had advance notice of the USEC deal – a fact he now claims is not material.

- Ex. 25 November 5 Update – multi year holding period was never part of our strategy – now claims he was right about the stock because it is trading above $14

- Through these updates, Stansberry tried to placate readers by asserting that his $14 price target would be met in the short term (a target his own expert testified was unreasonable).

- As one reader recognized, "why should you be worried about your reputation? You should because you keep leading us on that you think the stock will hit $14 in the near future.  Near future in 2005?  You never responded to earlier emails about how you think this will happen.  Potential buyout, but they you said that you think this is unlikely.  Possibly joint venture, blah, blah.  . . . Your attitude about getting a tissue is despicable.  We have all relied on you and do not need sarcasm when you have led us down this path!"  (Ex. 58 page 3700)

# **Materiality-Statements of Fact**

- <span style="color:red">**Stansberry response to his unhappy subscribers:**</span>
- "Somebody hand me a tissue" -  Ex. 58, page 3698
- "Blame everyone else, while ignoring the log in your own eye . . . where did I read that."  Ex. 58 page 3701
- "Finally, I've had enough of crybabies.  In our society and in the stock market in particular.  If you can't take the risks, for goodness sakes, don't invest your money.  Or buy mutual funds that's very low risk.  And, if you can't afford my research, or don't like my prices, don't buy it.  But whatever you do, stop complaining that other people are responsible for your decisions."  Ex. 58 page 3702
- "laughed in their face."  Ex. 62

# Materiality-Statements of Fact

**Stansberry made misrepresentations in message board postings, for example:**

- **Ex. 58 – (page 3719) references to Jay having as much integrity as Stansberry or he wouldn't work at Pirate – Jody Madron already terminated his relationship with Pirate – suggested USEC delayed its announcement to discredit his report – no basis for that statement – letter from Undersecretary Bolton indicates approval was received on June 17, 2002. Stated "anyone who took our advice made money" – blatantly false and Mr. Stansberry knew that – Pirate investor had been flooded with complaints from individuals who complained about losses sustained as a result of purchasing USEC stock**

- **Ex. 59 – (page 3752) Stansberry writes "Steve Wingfield knows all too well that we've been right on the money with our reporting. He's told me as much and he saw our report the day we originally sent it out without asking us to change a single letter." Stansberry admitted that Wingfield never told him is reporting had been "right on the money." Stansberry conceded that he did not send Wingfield the report until a day after he sent out the report and only after Wingfield requested a copy.**

# Materiality-Statements of Fact

- Ex. 59 (page 3758) "During the month of April we became aware via a confidential source inside USEC" – Stansberry now concedes that he did not have any discussions with anyone at USEC during the month of April and that Wingfield was not a confidential source.

- Ex. 59 (page 3764) "the company has said publicly that the treat will effect their bottomline positively – how much they will not yet say" - directly contrary to what USEC had said publicly – no link to the treaty – no near term impact from the treaty – Ex. 149, 150, 151.

- Ex. 60 (page 3795) – We send all of our reports to USEC before we publish them – not true

# Materiality-Statements of Fact

- Stansberry's statements regarding doubling of the USEC stock price on May 22, 2002 had no reasonable basis. His own expert, Robert Comment testified that the projection of a doubling on a date certain was not reasonable. Wingfield confirmed that position by testifying he knew of no reasonable basis to conclude that USEC's stock price would double in the short term. As Wingfield pointed and USEC April press release confirmed, USEC had agreed to continue the old pricing scheme for the remainder of fiscal year 2002 and the impact of the new Tenex agreement would not be felt until late 2003 (Ex. 129 April 24, 2002 Press Release)

- Stansberry contended that he emphasized to Jody Madron that he should not purchase USEC stock because of the unique nature of the Special Report. Mr. Madron testified that no such conversation took place.

# Materiality-Statements of Fact

**Other indications that Stansberry thought his conduct was illegal:**

- From Super Insider Tip Email (Ex. 1) "Wait a minute you say . . . isn't this insider trading?  Well, it might be except because I'm willing to give you all of the details, its now public information."  Of course this is later contradicted by Stansberry statement on the message board – Ex. 59 page 3759 – "Pricing the report was a controversial issue.  We debated selling it for $99, but we went for the higher price ($1,000) because we wanted to limit the number of people who would get our information."

- Ex. 28 – "If we're able to sell this to 250 people and it works, we'll be able to charge almost whatever we want next time.  The same is probably true if we sell it this time to 100 people for $999.  But I greatly fear the backlash if we sell this information for $999 and the idea doesn't pan out.  I think the negative effects might be hard to quantify, but I definitely think the failure to deliver on a $999 promise would bring us a lot of negative energy and possibly the kind of attention (attorney general) that we don't want."  Stansberry now takes the position he was referring to negative energy from customers not concern about illegal activity – the plain language of the email belies that assertion.

# Materiality-Statements of Fact

<span style="color:red">**Stansberry ignored warnings regarding the terminology used in the Super Insider Tip Email:**</span>

- **Stansberry was warned about the use to the term inside information by Jody Madron that the headline Super Insider should raise a "red flag" – a fact Stansberry apparently chose to ignore.**

- **Stansberry ignored other suggested changes to the text of the Super Insider Tip. David Lashmet wrote that the "bet it all thing ($10,000 of $10,000) gives me the willies." Ex. 27 – Mr. Stansberry left that statement in the Super Insider Tip Email.**

- **Ex. 30 -CeCe Lee of Agora's legal department provided changes to Stansberry to the text of the Super Insider Tip Email – Stansberry did not make her requested changes – he now claims he addressed her concerns by making changes to other parts of the text – not by making her deletions.**

# Materiality-Statements of Fact

- Stansberry continued to indicate to readers that the report was written by a third party – Jay McDaniel.

- Defendants claim forward looking statements (which these are not) are actionable only if they are worded as guarantees. Stansberry worded his representations as guarantees:

- "I can guarantee you (and Porter Stansberry has agreed to vouch for me and stand behind my guarantee) that everything I've told you here about the company is true and accurate." Plaintiffs Ex. 1

- "Now assuming for the moment that everything I'm able to guarantee is correct, how much would confirmation from a company insider be worth to you." Plaintiffs Ex. 1

# Materiality-Bespeaks Caution

The bespeaks caution doctrine is not applicable. The District of Maryland has stated that the bespeaks caution applies if Stansberry provided "detailed and meaningful cautionary language tailored to the specific risks." In re USEC Sec. Litig, 190 F. Supp. 2d 808, 825 (D. Md. 2002). Moreover, the bespeaks caution doctrine has no application to statements that refer to "then present factual conditions, or implied background factual assumptions a reasonable investor would regard the speaker as believing as true." Grossman v. Novell, Inc., 120 F.3d 1112, 1123 (10th Cir. 1997).

# Materiality-Bespeaks Caution

- The Super Insider Tip Email (Ex. 1) and the USEC Special Report (Ex. 17) contain no language that would warn the reader that a senior company executive had not provided Stansberry with an information regarding the timing of the government approval of the USEC/Tenex market based pricing agreement or any other event that was to occur on May 22, 2002.

- In addition, the statements set forth in the Super Insider Tip Email (Ex. 1) and the USEC Special Report (Ex. 17) are factual statements not subject to the bespeaks caution doctrine.

- All that is included in the Super Insider Tip Email is a simple statement that "Unfortunately, there's one more thing I have to remind you about. I can't guarantee that the stock will pop. Nobody can guarantee the actions of the stock market." Ex. 1. This disclaimer comes after five pages in which Stansberry sings the praises of the unnamed company and makes numerous claims that the stock will double, triple or more.

# Materiality-Puffery

- Defendants contend the statements in the Super Insider Tip Email (Ex. 1) and the USEC Special Report are not actionable under Section 10(b) because the language used is commercial puffery.

- "Vague statements of corporate optimism are not actionable." Grossman v. Novell, Inc., 120 F.3d 1112, 1123 (10th Cir. 1997). The Fourth Circuit has recognized that "loose predictions and non-specific information are unlikely to perpetrate a fraud on the market" and are not actionable." Raab v. Gen Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993).

- Stansberry's factual claims are not loose predictions or non-specific information. In the Super Insider Tip Email and the USEC Special Report Stansberry makes very specific claims about information he claims he received from Mr. Wingfield. Those expressions are not puffery.

# **Materiality-Opinion**

- Protected opinion includes language that is "loose, figurative, or hyperbolic language which would negate the impression that the writer was stating fact – and the context and general tenor of the article." Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 184 (4th Cir. 1998). However, words that can be described as true of false are fact, not opinion. Id. at 183.

- Again, defendants simply chose to ignore the plain language of the Super Insider Tip Email (Ex. 1) and USEC Special Report (Ex. 17). The language is not loose, figurative or hyperbolic that would suggest to the reader that the writer is not stating fact. This is confirmed by the testimony of investors who purchased the USEC Special Report and USEC stock

# **Materiality-Opinion**

- Roger Listwan testified he read the Super Insider Tip Email and the USEC Special Report and believed the author had inside information from a USEC insider.  Similarly, David Cheatham testified he thought the author of the USEC Special Report had information not available to the general public obtained from someone within USEC.  These investors are not alone.  Shirley Gober, Robert Gutter, Thomas Sauser, Carl Klotzche, and Marshall Peters drew the same conclusion from the Super Insider Tip Email and the USEC Special Report.

- Their view is shared by individuals who requested refunds from defendants.  (Ex. 49)  Plaintiffs Ex. 49 contains complaint emails in which individuals complained about the lack of an announcement from USEC on May 22, 2002 or that USEC denied the claims in the Super Insider Tip Email or USEC Special Report.  The same sentiment is express by individuals who posted on defendants' message boards.  Ex. 58, 59, 61, 65, 66

# Materiality-Opinion

- Mr. Wingfield's and Ms. Major-Sosias' notes also reflect the importance of the May 22, 2002 announcement. Ex.s 47 and 48. Both Mr. Wingfield and Ms. Major-Sosias testified that they had received calls from individuals who purchased the USEC Special Report and demanded to know when the announcement was coming. They expressed anger that USEC had not made an announcement.

- Defendants further contend that the term "insider" or "insider information" "have been stretched in the popular vernacular to concepts of virtual limitless elasticity." Despite defendants' contention, the individuals who received the Super Insider Tip Email and USEC Special Report clearly understood that the author meant he had information that was not available to the general public – the quintessential definition of insider information. Moreover, Mr. Stansberry testified he has heard the term insider information used to mean information received from someone within a company that is not available to the general public. Likewise, Mr. Wingfield defined inside information as material non-public information obtained from a corporate insider. Defendants also use the term insider to refer to persons affiliated with an issuer. Defendants promotion for the Insider Alert, one of defendants' publications, Ex.16 uses the term in the legal sense.

# Materiality-Did Not Alter the Mix

- Defendants contend that the Super Insider Tip Email and USEC Special Report did not alter the total mix of information. As stated earlier, in the Fourth Circuit the Commission need not establish that Stansberry's report altered the total mix, only that the information was important to a reasonable investor. Ottman v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 343 (4th Cir. 2003). However, even if the Commission were required to prove an alteration in the total mix of information it has sustained its burden.

- Comment contradicts the position that defendants did not alter the total mix of information. Defendants' materiality expert Robert Comment testified that in his review of the total mix of information he did not see any public documents that indicated the USEC/Tenex market based pricing agreement would receive government approval on May 22, 2002. None of the press releases or other public documents offered as exhibits in this case by either side state that the USEC/Tenex market based pricing agreement will receive government approval on May 22, 2002. All public statements made by USEC indicate that approval is pending and that the company looked forward to approval in the near term.

# Materiality-Did Not Alter the Mix

- Comment further contends that it is not the actual May 22nd approval date that is important to a reasonable investor, rather it was the purported "tie" between the summit and the approval that was important to a reasonable investor. Mr. Wingfield did not tell Stansberry that the approval of the Tenex agreement was tied to the summit. Instead, Mr. Wingfield testified he told Stansberry that the topic "might come up" and that Stansberry should check back after the conclusion of the summit. (See also Stansberry notes, Plaintiff's Ex. 43).

- Stansberry confirmed that he did not see any public documents that indicated that the Tenex agreement would receive government approval on May 22, 2202 or any documents that tied the approval to the summit.

# **Materiality-Did Not Alter the Mix**

Defendants argue that the April 29, 2002 in Nuclear Fuel indicates that the pricing agreement could be approved at the Bush Putin summit on May 23, 2002.  (Pl. Ex. 144) Not true – the document simply does not say that.  Defendants take similar liberties with other references to public documents – taking statements out of context and claiming that a documents says something it simply does not say.

# Materiality-No Differentiation

- Have not differentiated the false statements from true statements in the Super Insider Tip Email and USEC Special Report.

- Investors have differentiated between the provably false statements in the Super Insider Tip Email and USEC Special Report. Investors have testified regarding what they thought was important. Specifically, investors testified that they thought the author had inside information regarding the approval of the Tenex pricing agreement on May 22. That statement is false. Clearly, a reading of Ex. 1 and 17 demonstrate what Stansberry thought was important. From the headline "Double Your Money on May 22nd With This Super Insider Tip. (Ex. 1) – to an explanation in the Report (Ex. 17) as to why a investor should buy USEC – the uncertainty about when the deal would be approved has led to the stock trading in limbo. Stansberry statements in his updates further demonstrate what he considered material "Our advantage was that we knew the deal had been completed before other market participants." (Ex. 24 – August 1, 2002 update) – Says that twice in the Aug. 1 update.

# Scienter

**The Legal Standard in Securities enforcement actions**

Scienter is a state of mind embracing intent to deceive, manipulate or defraud

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)

May be established by recklessness

Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 344 (4th Cir. 2003)

*"We therefore agree with our sister circuits that a securities fraud plaintiff may allege scienter by pleading not intentional misconduct, but also recklessness."*

# Scienter

**Defendants deliberately or recklessly made misstatements about USEC**

**HIGH LEVEL EXECUTIVE**

- "a high level executive—someone definitely in a position to know –passed along details to me."

- "who's my source?  Well. . . I can't tell you, except to say that he is a senior executive inside the company."

- "He is definitely in a position to know the intimate details of this agreement."

- "How much would a company insider be worth to you?"

# Scienter

Wingfield denies passing any details about the USEC/Tenex agreement to Stansberry other than the standard USEC 101

Wingfield was not a senior executive---he was the Director of Investor Relations.  Reg FD does not confer Wingfield with a higher executive position in USEC—he testified that he was not involved in any policymaking role---and that he was often informed of decisions only when a public announcement was possible.

Wingfield testified that he did not have access to much of USEC's business information because he lacked the necessary security clearance.

Defendants attempt to impose the Reg FD definition on Wingfield fails.

Reg FD governs who has obligation to comply with Reg FD, but not who is a "high level executive" for all purposes .

This is simply Stansberry's verbal gymnastics to retroactively elevate the importance of the information and justify his own false statements about his putative source.

# Scienter

**DATE OF DEAL**

- "He even told me the precise date the deal would be announced"
- "I can tell you EXACTLY WHEN the deal will be finalized and announced to the public"
- "The deal will close on May 22d"
- "I can tell you exactly which day the pop in the stock will happen"
- "It's Wednesday later this month—May 22"
- "I can tell you precisely when."
- "All which is coming on May 22"
- "watch the stock on May 22."

# Scienter

- None of this was true.  Wingfield and Sosias-Major both testified that Wingfield never gave Stansberry a specific date.  Never used the date May 22.

- Wingfield and Sosias-Major both testified that they never said that the agreement would be linked to the signature of the Treaty of Moscow.

- Wingfield's testimony is credible:  he had no motive to lie to Stansberry  His job was to talk to investors and analysts---he knew that he could not give out false statements about the company.  He had told the same story hundreds of times before.

  Wingfield had consistently told individuals that USEC hoped an agreement would be reached "in the near term."

# Scienter

- Stansberry's story that he angered Wingfield and consequently Wingfield gave him "insider information" has no support other than his own self-serving statements. No notes, no contemporaneous witnesses, except other Agora employees a few days later. Both Wingfield and Sosias testified that Wingfield did not get angry, did not tell Stansberry to "watch the stock," and did not tell Stansberry the stock would double on May 22. No one told Stansberry that any agreement between USEC and Tenex would be approved on May 22.

- Stansberry's tale does not make sense in the context. Wingfield did hundreds of these cases—he did hundreds of these calls. He further testified that not everyone he spoke to wrote about USEC or buys USEC stock after he goes through USEC 101. This is not surprising—it simply wasn't a widely followed stock.

- Stansberry saw an opportunity to merge two separate events: the upcoming US/Russia summit and the pending approval of the Tenex/USEC agreement. To validate this "hunch," he re-created Wingfield as a high level company executive who was an insider.

# Scienter

- Wingfield denies passing any details about the USEC/Tenex agreement to Stansberry other than the standard USEC 101
- Wingfield was not a senior executive---he was the Director of Investor Relations.  Reg FD does not confer Wingfield with a higher executive position in USEC—he testified that he was not involved in any policymaking role---and that he was often informed of decisions only when a public announcement was possible.
- Wingfield testified that he did not have access to much of USEC's business information because he lacked the necessary security clearance.
- Defendants attempt to impose the Reg FD definition on Wingfield fails.
- Reg FD governs who has obligation to comply with Reg FD, but not who is a "high level executive" for all purposes .
- This is simply Stansberry's verbal gymnastics to retroactively elevate the importance of the information and justify his own false statements about his putative source.
- "He even told me the precise date the deal would be announced"

# Scienter

- Their own expert, Dr. Robert Comment, found Stansberry's analysis to be wanting. In order to predict a doubling of price over some unspecified period of time, Comment testified that he had to use a reduction in the SWU price of $25.

- Comment testified that the reduction would not occur in 2002. No reduction in the SWU price.

- Comment testified that the reduction would not occur in 2003, only a $10 reduction in SWU from 2002 price.

- Comment testified that Stansberry did not take into account the time value of money or USEC's effective tax rate.

- Comment testified that it was unreasonable to say the stock price would double in a day.

- Comment said it was unreasonable to say that the stock price would double on May 22, 2002.

# Scienter

**STOCK WILL DOUBLE**

- Headline: "DOUBLE YOUR MONEY ON MAY 22ND WITH THIS SUPER INSIDER TIP."

- "Make no mistake—my plan to double your money is extremely low risk".

- "Focus on doubling your investment dollar SAFELY on the back of an insider tip."

- "Double your money on the upcoming arms agreement."

- There was no basis for these statements. Stansberry simply chose a target price, $14, and extrapolated from there. He did no genuine analysis of the fundamentals of the company.

# Scienter

- Comment testified that the reduction would not occur in 2002. No reduction in the SWU price.

- Comment testified that the reduction would not occur in 2003, only a $10 reduction in SWU from 2002 price.

- Comment testified that Stansberry did not take into account the time value of money or USEC's effective tax rate.

- Comment testified that it was unreasonable to say the stock price would double in a day.

- Comment said it was unreasonable to say that the stock price would double on May 22, 2002.

# Scienter

**STANSBERRY KNEW IT WAS FALSE**

- Stansberry knew it was false and did not correct. He was reckless in not doing any further research after he released the report.

- Obviously knew he misrepresented his conversation with Wingfield and Sosias.

- Started receiving reports from investors who told him that USEC was denying any link between the Tenex agreement and the summit. Undertook no further inquiry at all.

# Scienter

**STANBERRY'S STATEMENTS MEET THE SCIENTER REQUIREMENTS**

Phillips v. LCI International, Inc., 190 F.3d 609, 621 (4th Cir. 1999)

- "The securities laws generally define recklessness as an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

- Stansberry admits that he knew that this was an aggressive and highly risky promotion.

- claims he knew it was the "most unique" tip he had ever received in his career.

# Scienter

- if one accepts his own testimony at face value, he claims he told everyone at the first meeting that this stock tip was so important that they should not trade.

- He knew there was a danger of misleading the investing public.

- Super Insider tip: "Let's say that you've got a small investment portfolio. Just $10,000. Could you stake all of it on a deal like this? I don't see why not."

- "all the insiders are preparing to take profits, and you can join them."

# Scienter

- **STANSBERRY HAD MOTIVE TO PUBLISH THE FALSE REPORT**

- Stansberry profited tremendously by the publication of the false report---the defendants netted more than $1 million from the sale of the report.

- In order to continue to retain these subscribers, the Defendants went to extraordinary lengths to continue to mislead them:  publishing regular updates that contained additional false statements, and never acknowledging the falsity of the original report.

# Scienter

- Stansberry's explanation of the pen name lacks any credibility:  first, the name Jay McDaniel had been used for promotional materials, but had never before been attached to "editorial products."   Jody Madron testified that Jay McDaniel was used to advertise other Agora publications.  Stansberry's excuse clearly does not apply to the USEC Report.

- Second, Stansberry's explanation has no application outside of the Blast database.  Subscribers to other Agora publications had no knowledge of whom or what Jay McDaniel represented---there was no reason for Stansberry to use the Jay McDaniel name on those publications.

- Stansberry's use of a pen name is consistent with this:  by publishing false statements under Jody McDaniel's name he protects the important Stansberry name.  Nelson, their expert, testified that that the protection of a brand was important in publishing.  This allowed Stansberry to boast on the stand that no one approached him about this false report.

# Scienter

**ALL DEFENDANTS HAVE SCIENTER**

- Agora's counsel reviewed and approved the Super Insider Tip email and the USEC report before they were disseminated to Pirate subscribers and other list subscribers.

- Individuals from other LLCs or publishing groups reviewed the email and the USEC report. They acted recklessly in not verifying in any way the contents of the Super Insider tip email or the USEC Report.

- Laura Davis that, when she was a group publisher, there were independent fact-checkers who reviewed all materials. She testified that she relied on this policy to send out the email to her publications. She admitted that she did not ask anyone at Pirate if the Super Insider Tip email or the USEC report had been independently verified.

- George Rayburn testified that it was Pirate's typical practice to have the editor review the accuracy and content of editorial publications. He testified that this was not done in this case because Stansberry was both the author and the editor. Thus, there was no independent verification of the facts set forth in the Super Insider Tip email or the USC report.

# Scienter

- Stansberry testified he had no idea about who he worked for in 2002. Didn't know when his LLC was formed. He is not in charge of hiring his own employees (George Rayburn testified he was hired by Julia Guth, his own payroll, and doesn't prepare his company's financial statements.

- Bill Bonner, who is the president of Agora, and its major shareholder, was apprised of the Super Insider Tip email and the Report. He requested that he be kept informed about future special reports and other company developments. (Exhibit 156)

- The cases cited by Defendants all involve independent contractors. They do not apply in this case.

- Stansberry was an agent of Agora, and his scienter may be imputed to Agora.

- Porter is an officer and director of Pirate, his scienter can be imputed to Pirate. City of Monro Emples. Ret. Sys. v. Bridgestone Corp., 387 F.3d 468, 506 (6th Cir. 2004) Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1421, 1435 (9th Cir. 1995).

# Scienter

**THE ACTUAL MALICE STANDARD IS INAPPLICABLE**

- The Antifraud provisions of the federal securities do not require "actual malice" be proved by any burden of proof.
- The cases cited by defendants only apply to libel plaintiffs. This is not a libel action.
- Cases are easily distinguishable:
- Only "overly aggressive" punishment of false speech is limited
- **Hustler, Time, Inc., and Hoffman** all involve libel claims.
- The Defendants common law fraud cases all involve "mistake," not deliberate or reckless misstatements. Those cases are inapposite to the
- There is no legal authority that the SEC must prove the Defendants acted with actual malice. Defendants' brief on actual malice can cite to no case that incorporates an "actual malice" standard into the federal securities laws.
- The Defendants mis-use the actual malice standard in order to bootstrap themselves into imposing a higher burden of proof on the Commission. This attempt fails.

# In Connection With

- Defendants' primary contention is that Section 10(b) of the Exchange Act reaches only those individuals with a fiduciary relationship with the purchasers of securities such as brokers or investment advisors or those who have a statutory duty to file information with the Commission. Section 10(b) has never been subject to such a narrow interpretation.

- First by the statutory language itself, the section applies to "any person." The statute is not limited to persons required to be registered with the Commission or to issuers required to file periodic reports with the Commission.

# In Connection With

"The in connection with requirement is satisfied when someone utilizes a device that would cause a reasonable investor to rely thereon and so relying, cause them to purchase or sell a corporation's securities."  In re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153, 156 (2d Cir. 1998); see also SEC v. Savoy Indus., 587 F.2d 1149, 1171 (D.C. Cir. 1978)("'in connection with' requirement is satisfied when it can reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities "regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator.")  The Supreme Court recently affirmed that the "in connection with" requirement should be construed broadly and flexibly to effectuate the remedial purpose of the federal securities laws.  Zandford, 535 U.S. at 819.

# In Connection With

The "in connection with requirement" is met when an advertisement makes false representations regarding securities transactions. "The intended and direct link between the advertisements and the currency trading rendered any misrepresentations in the advertising "in connection with" the suggested futures transactions." CFTC v. Vartuli, 228 F.3d 94, 101 (2d Cir. 2000) (discussing the "in connection with" requirement of analogous provision of the Commodity Exchange Act).  In the context of the CEA, three circuits have held that publishers can violate the antifraud provisions of the CEA without any contemporaneous trading and without any fiduciary duty to the purchasers of its products.  CFTC v. Vartuli, 228 F.3d 94, 101 (2d Cir. 2000); R&W Technical Services Ltd. v. CFTC, 205 F.3d 165 (5th Cir. 2000); Commodity Trend Service, Inc. v. CFTC, 233 F.3d 981 (7th Cir. 2000).  The same principles are equally applicable under the antifraud provisions of the Securities Exchange Act of 1934.

# In Connection With

Similarly in R&W Technical Services Ltd. v. CFTC, 205 F.3d 165 (5th Cir. 2000), the Court held the in connection with requirement of the CEA was met when defendants misrepresented the performance of its commodities trading program in advertisements. Id. at 172-173. In that case, the Fifth Circuit noted that "A person may buy a newspaper or magazine to read such articles with no intention to follow through on any of the recommendations. Such sources are invariably used not only for educational and research purposes, but also entertainment or leisure purposes. The same, however, cannot be said about petitioners' software." Id. at 173. Such is the case here. The subscriber in paying $1,000 for the "Special Report" to double his or her money on the Super Insider Tip had no other reason for purchasing the report. See also id. ("petitioners did not give their advice away and necessarily expected their customers to make trades. This expensive software [$2,500] had no purpose except as a device for choosing which trades to make.")

# In Connection With

**Numerous examples of cases brought for violations of Section 10(b) against individuals who do not have a fiduciary relationship with purchasers of securities.**

The classic pump and dump scenario provides a simple and prevalent example.  See e.g.  SEC v. Park, 99 F. Supp. 2d 889 (N.D. Ill. 2000); Zweig v. Heast Corp., 594 F.2d 1261, 1268 (9th Cir. 1979).  Another example is a Ponzi scheme. E.g. SEC v. Credit Bancorp (S.D.N.Y. 2000) (2000 WL 1752979, aff'd 290 F.3d 80 (2d Cir. 2002); In addition, offering frauds often involve parties with no fiduciary duties or other special relationship with purchasers or sellers.  SEC v. Autocorp Equities, Inc., (D. Utah 2004)

# In Connection With

Next defendants contend that no legislative history exists indicating that Congress explicitly intended to regulate the press when it enacted section 10(b) of the Securities Exchange Act. The plain language of the clearly encompasses the press – "any person". Moreover, when Congress wanted to exclude the press from regulation it understood how that could be accomplished – as it did when excluded a bona fide publisher from the definition of an investment adviser in the Investment Advisers Act of 1940. See 15 U.S.C. § 80b-2(a)(11)(D).

Cases defendants rely upon to claim that Section 10(b) does not apply to them offer no support. Reliance Insurance Company v. Barron's, 442 F. Supp. 1341, 1353 (S.D.N.Y. 1977) distinguished "situations where a publisher uses his First Amendment rights intentionally to effect a fraud or manipulation for his own financial gain." Id. That is exactly what happened here.

# In Connection With

In <u>Hart v. Internet Wire Inc.</u>, 2002 U.S. App. LEXIS 21310 (2d Cir. Oct. 10, 2002) the court rejected the plaintiffs Section 10(b) claim because the plaintiff failed to establish scienter – again the Commission has proven that defendants herein acted with the requisite scienter.  Defendants go on to cite various cases rejecting negligent misrepresentation cases against a publisher.  The Commission has alleged and proven intentional fraud by these defendants.  The analysis of those negligence cases is inapplicable.  Interestingly, defendants ignore the numerous cases decided against publishers under the antifraud provisions of the CEA.  Of  course, ignoring those cases is understandable because every circuit to consider the issue has ruled against the publisher. <u>CFTC v. Vartuli</u>, 228 F.3d 94, 101 (2d Cir. 2000); <u>R&W Technical Services Ltd. v. CFTC</u>, 205 F.3d 165 (5th Cir. 2000); <u>Commodity Trend Service, Inc. v. CFTC</u>, 233 F.3d 981 (7th Cir. 2000).

# In Connection With

Defendants contend a broad reading of the "in connection with" requirement would eviscerate the First Amendment and common law protections afforded publishers. This argument has soundly been rejected.   Fraud is not protected speech. <u>Illinois v. Telemarking Associates</u>, 123 S. Ct. 1829 (2003).  Moreover, the Commission can regulate the exchange of information about securities consistent with First Amendment principles.  At least one court has noted "speech relating to the purchase and sale of securities, . . ., forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech."  <u>SEC v. Wall Street Publishing</u>, 851 F.2d 365, 373 (D.C. Cir. 1988).  Commercial speech is defined by the Supreme Court as "expressions related solely to the economic interests of the speaker or its audience" or speech "proposing a commercial transaction."  <u>Central Hudson v. Public Serv. Comm'n</u>, 447 U.S. 557.  Untruthful speech, commercial or otherwise has never been protected for its own sake.  <u>Virginia State Bd of Pharmacy v. Virginia Consumer Council</u>, 425 U.S. 748, 771 (1976).  The District of Maryland has also noted that to receive First Amendment protection commercial speech must not be misleading. <u>National Life Ins. v. Philips Publishing</u>, 793 F. Supp. 627 (D. Md. 1992).

# In Connection With

The defendants shrill doomsaying has no basis in law or fact. The statutory scheme within which the Commission operates provides adequate limitations on the Commission's authority. The contours of the cause of action do not change depending on the character of the defendant. Corporations are not treated differently from individuals, regulated entities are subject to the same antifraud provisions as non-regulated entities. The Commission is bound by the same limitations in all Section 10(b) actions. The Commission must prove that defendants made a misstatement, with scienter, in connection with the purchase and sale of a security. As defendants have repeatedly pointed out, a claim that a publication contains a false statement alone will not meet the scienter burden. The Commission must prove defendants knew or were reckless in not knowing that the statement was false at the time it was made. The statement must be material – something important to a reasonable investor and made "in connection with" the purchase or sale of a security. The R&W Technical Services case demonstrates a logical limitation on the "in connection with" requirement. Noting individuals purchase newspapers for many reasons including leisure and entertainment, however, the purchase of a $2,500 computer program that details a commodity trading program has but one purpose – trading commodities. R& W Technical Services, 205 F.3d 165, 173 (5th Cir. 2000)

# Injunctive Relief

In order to issue an order enjoining defendants from future violations of the federal securities laws, the Commission must establish a past violation of Section 10(b) of the Exchange Act and a reasonable likelihood that defendants will violate the federal securities laws in the future.

SEC v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975).

In ascertaining the likelihood of future violations, the Court should look at "the totality of the circumstances and factors suggesting that the infraction might not have been an isolated occurrence."

SEC v. Fehn, 97 F.3d 1276, 1295-96 (9th Cir. 1996); SEC v. Pros Int'l, Inc., 994 F.2d 767, 769 (10th Cir. 1993); SEC v. American Realty Trust, 429 F. Supp. 1148, 1175 (D. Va. 1977).

# Injunctive Relief

The Court should consider the following factors:

1. The gravity of the harm caused by the offense
2. The isolated or recurrent nature of the infraction
3. The likelihood that defendant's customary business activities might again involve him in such transactions
4. The defendant's recognition of his own culpability
5. The defendant's sincerity of his assurances against future violations

SEC v. Suter, 732 F.2d 1294, 1301 (7th Cir. 1984); SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982); SEC v. Zale Corp., 650 F.2d 718, 720 (5th Cir. 1981); SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980); SEC v. Commonwealth Chem Sec. Litig., 574 F.2d 90, 100 (2d Cir. 1978).

# Injunctive Relief / Factors

The Court should consider these following factors in evaluating whether to impose injunctive relief :

**The gravity of the harm caused by the offense**

Defendants conduct in this case cause severe harm. Investors testified regarding their substantial losses incurred purchasing USEC stock.  Thomas Sauser alone incurred $40,000 in losses.  Other investors testified that they also sustained significant losses.

# Injunctive Relief / Factors

**The isolated or recurrent nature of the infraction**

**In addition, after the May 22 announcement failed to take place, Stansberry persisted in making misrepresentations to USEC investors. Stansberry continued to maintain his unreasonable projection that USEC shares would reach $14 per share in the near term. He misrepresented subsequent conversations with Mr. Wingfield. He made similar misrepresentations on message board and in emails to USEC purchasers. He continued to claim the Super Insider Tip Email and USEC Special Report were authored by a third party. This was not an isolated incident.**

# Injunctive Relief / Factors

**The likelihood that defendant's customary business activities might again involve him in such transactions**

**Defendants' customary business practices will again involve them in the same type of transaction at issue here.  He is a self-proclaimed investment newsletter publisher.**

**Robert Gutter and other investors testified they received other inappropriate solicitations from defendants.**

**James Briggs testified extensively regarding misrepresented performance statistics in Agora publications.**

# Injunctive Relief / Factors

Agora's counsel reviewed the Super Insider Tip Email and approved it for circulation. The email on its face makes an illegal offer of the sale of inside information. This blatant disregard for the securities laws demonstrates Agora's propensity for future violations.

The Defendants demonstrate that there is no check on the publication of information. While Laura Davis testified that she had fact-checking procedures in place, they were not employed with regard to the Insider tip Email and Special Report

George Rayburn testified that the Pirate Investor would continue to publish Special Reports

# Injunctive Relief / Factors

**The Defendants' recognition of their own culpability**

Defendants failed to recognize any culpability. Quite the opposite is true. Defendants adopted a classic blame the victim defense – USEC should have spoken up when defendants got it wrong. Stansberry testified that there have not been any changes to Agora's policies or procedures as a result of USEC Special Report. In fact, he indicated that Agora had no desire to stop any repeat performance. He was proud of what he did.

Defendant Agora also showed no remorse for its conduct. Instead, when the Commission prevailed on its Motion to Compel defendants to disclose the names of its subscribers who requested refunds, Bill Bonner the president of Agora wrote a letter to those individuals containing numerous misrepresentations and baseless assertions. (Ex. 166)

Defendant Stansberry responded with sarcasm toward investors who complained – calling them crybabies (Ex. 58 page 3702), laughing in their face (Ex. 62), asking for a tissue (Ex. 58 page 3698), telling them they "Blame everyone else, while ignoring the log in your own eye . . . where did I read that." (Ex. 58 page 3701)

# Injunctive Relief / Factors

**The defendant's sincerity of his assurances against future violations**

Far from making any sincere assurances against future violations.  Stansberry testified that Agora and Pirate had no plans to avoid a repeat performance.

George Rayburn testified that there had been at least two special reports recommending specific stocks from Pirate.

# Injunctive Relief / Factors

**THE COMMISSION HAS PROVEN DEFENDANTS VIOLATED SECTION 10(B) AND RULE 10B-5**

As discussed earlier, the Commission has established all the defendants violated the federal securities laws.

**THE COMMISSION HAS ESTABLISHED A REASONABLE LIKELIHOOD THAT DEFENDANTS WILL  VIOLATE THE FEDERAL SECURITIES LAWS IN THE FUTURE**

The Commission has established that defendants are likely to violate the federal securities laws in the future.

# Injunctive Relief/Defendants' Cases

Defendants contend that "Courts have routinely rejected injunctive relief in similar or even more egregious instances." The cases they cite for that proposition are hardly routine and certainly far less egregious than defendants conduct in this case. In SEC v. Ingram, the court weighed the relevant factors and determined that an injunction was not appropriate because the broker in that case was "genuinely contrite and repentant," had a small financial gain and the evidence of scienter, although sufficient to sustain the violation was not "overwhelming." 694 F. Supp. 1437, 1442 (C.D. Cal. 1988). Unlike the defendant in Ingram, here Agora's gain was significant over $1 million and the evidence of scienter compelling.

# Injunctive Relief/Defendants' Cases

Similarly the defendants in <u>Yun</u> expressed genuine regret.  "I will never again put myself in a position where the SEC or anyone else can question my actions."  <u>SEC v. Yun</u>, 148 F. Supp. 2d 1287, 1293-94 (M.D. Fla. 2001).  The court noted that defendants did not have ready access to insider information and, as a result, a repeat occurrence of the violations was highly unlikely.  <u>Id.</u> That is not the case here.  Defendants will continue to have access to the vehicle through which they perpetrated this fraud.  Far from offering sincere regret, these defendants have expressed pride in their conduct and have no desire to avoid repeating this offense.

# Injunctive Relief/Defendants' Cases

In SEC v. Brethen the Court considered defendants "age, occupation, and the fact that this Court has found him liable for insider trading makes him unemployable by a publicly traded company either as an officer or director." 1992 U.S. District LEXIS 20664, * 101 (S. D. Ohio Oct. 15, 1992).

The Court also recognized the isolated nature of defendant's violations and declined to issue an injunction because the Court's decision had already rendered defendant unemployable. Id. Likewise, In Sargent, the Court rejected the Commission's request for injunctive relief. The Court contended that defendant's violation was not egregious and he derived no personal benefit. Moreover, defendant's current position does not put him in a position where future violations of the federal securities laws were likely. SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003). The cases are easily distinguishable from this case. The conduct here is not isolated and defendants had significant personal benefit. They are not unemployable. In fact, their business continues to expand.

# Injunctive Relief/Defendants' Cases

Moreover, these cases hardly stand for the proposition that Courts "routinely" reject injunctions in less egregious cases. Instead, those cases stand for the unremarkable position that courts balance the factors set forth in relevant case law to reach a conclusion regarding whether an injunction is appropriate. See  SEC v. Suter, 732 F.2d 1294, 1301 (7th Cir. 1984); SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982); SEC v. Zale Corp., 650 F.2d 718, 720 (5th Cir. 1981); SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980); SEC v. Commonwealth Chem Sec. Litig., 574 F.2d 90, 100 (2d Cir. 1978).  In the exceptional circumstances described above, Courts have concluded an injunction is not appropriate.  That is not the case here.

# Injunctive Relief/Prior Restraint

**THE COMMISSION'S REQUEST FOR INJUNCTIVE RELIEF IS NOT AN UNCONSTITUTIONAL PRIOR RESTRAINT**

Defendants' assertion that an antifraud injunction amounts to an unconstitutional prior restraint suffers from the same deficiencies as all defendants arguments based on the First Amendment – a selective reading of precedent.  The Commission has successfully claimed injunctive relief passes constitutional muster. See SEC v. Wall Street Publishing Institute, 851 F.2d 365, 373 (D.C. Cir. 1988) (concluding an injunction could be fashioned against a publisher without trampling on the First Amendment).

# Injunctive Relief/Prior Restraint

Other courts have upheld the award of injunctive relief against publishers under analogous provisions of the Commodity Exchange Act. CFTC v. Vartuli, 228 F.3d 94 (2d Cir. 2000); Commodity Trend Service, Inc. v. CFTC, 233 F.3d 981 (7th Cir. 2000). Those cases support the award of injunctive relief based primarily on the realization that fraud is not protected speech. The Commission requests injunctive relief preventing the defendants from engaging in future violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. This is not an unconstitutional prior restraint. "[I]t has never been deemed an abridgement of freedom of speech or freedom of the press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced or carried out by means of language, either spoken or written." Ohralik v. Ohio State Bar, 436 U.S. 447, 453-54 (1978). Simply put, "It is not difficult to choose statements, designs and devices which will not deceive." U.S. v. 95 Barrels of Vinegar, 265 U.S. 438, 443 (1924).

# Disgorgement

Defendants should be ordered to disgorge their ill gotten gains.

SEC v. Manor Nursing Centers, 458 F.2d 1104 (2d Cir. 1972); SEC v. Gotchey, No. 91-1855, 1992 U.S. App. LEXIS 33647, *7 (4th Cir. December 28, 1992).

The amount of disgorgement should include all gains flowing from the illegal activities and "need only be a reasonable approximation of the profits causally connected to the violation."

SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1475 (2d Cir. 1996)

Defendants netted $1,005,000 from the sale of the USEC Special Report. Proposed Pretrial Order Stipulated Facts ¶ 41.

Of that $1,005,000, Defendant Pirate Investor LLC netted $626,500 from the sale of the report. Proposed Pretrial Order Stipulated Fact ¶ 42.

# Disgorgement

Defendant Agora, Inc. netted $1,005,000 - $626,500 = $378,500

Mr. Stansberry testified that he received 20% of the net profits of Pirate Investor LLC as a bonus.  (.2) * ($626,500) = $125,300

Mr. Stansberry should be ordered to disgorge $125,300

Pirate Investor LLC should be ordered to disgorge the balance received by that entity $626,500 - $125,300 = $501,200

# Prejudgment Interest

The imposition of prejudgment interest is left to the sound discretion of this Court.

SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)

"Requiring the payment of interest prevents a defendant from obtaining the benefit of 'what amounts to an interest free loan procured as a result of illegal activity.'"

SEC v. Grossman, 1997 U.S. Dist. LEXIS 6225 (S.D.N.Y. 1997)

The Court should consider the following factors in determining whether prejudgment interest is warranted

1. The need to fully compensate the wronged party for actual damages suffered;
2. Considerations of fairness and the relative equities of the award
3. The remedial purpose of the statute;
4. Any other general principles deemed relevant by the Court.

SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)

As of March 21, 2005 the amount of prejudgment interest due on $1,005,000 in disgorgement is $145,290.72.

# Third Tier Civil Penalty

A third tier civil monetary penalty is appropriate where the violations involve:

1. Fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements

And

2. Directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

   15 U.S.C. § 78u(d)(3)(B)(iii)

   The statue provides for a penalty of up to $120,000 for each such violation by a natural person and $600,000 for each such violation by an entity defendant.

# FIRST AMENDMENT COMMERCIAL SPEECH

**FUNDAMENTAL CONTRADICTION**

- Defendants cannot have it both ways.  The only coherent explanation they can forward for using a fictional name, Jay McDaniel, is that Blast subscribers would identify his name with **advertising**.  The Super Insider Tip email is nothing more than a tout for the purchase of the USEC Report.  As such, it is pure commercial speech (advertising) and enjoys a lesser protection under the First Amendment.

- Defendants erroneously contend that the First Amendment does not apply to commercial speech.  That is simply untrue.  All **true** speech is protected, to one degree or another, by the First Amendment.

# FIRST AMENDMENT COMMERCIAL SPEECH

Fraud is not subject to First Amendment Protection.  That fact was mostly recently confirmed by the United States Supreme Court in May 2003 in Illinois v. Telemarking Associates, 123 S. Ct. 1829 (2003).  In that case, the Court held that the State of Illinois could maintain a fraud action against a telemarketing firm resulting from the telemarketers affirmative misrepresentations made in the course of soliciting charitable donations.  The Court was simply reiterating the "firmly established" principle that the government has the power to protect citizens against fraud.

Telemarketing Associates, 123 S. Ct. at 1836.  The Court recognized that the intentional lie "is no essential part of any exposition of ideas."  Id.  These principles apply equally to the press.

# FIRST AMENDMENT COMMERCIAL SPEECH

A contention cannot be seriously considered which assumes freedom of the press includes a right to raise money to promote circulation by deception." <u>Id.</u>   As the Second Circuit has aptly observed "The First Amendment generally empowers a journalist with no special privilege merely for the exercise of his craft, and the securities law require of him, no less than of others, compliance therewith in the pursuit of his financial interests." **U.S. v. Carpenter, 791 F.2d 1024, 1034 (2d Cir. 1986).**

The Supreme Court has cited "numerous examples . . . of communications that are regulated without offending the First Amendment, such as the exchange of information about securities."  <u>Ohralik v. Ohio State Bar</u>, 436 U.S. 447, 453-54 (1978) (citing <u>SEC v. Texas Gulf Sulfur Co.</u>, 401 F.2d 833 (2d Cir. 1968) and <u>Mills v. Electric Autolite Co.</u>, 396 U.S. 375 (1970)); <u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749, 760 (citing cases).  The Court in <u>Ohralik</u> noted that neither of its recent First Amendment cases purported to cast doubt on the permissibility of regulation of the exchange of information about securities.  <u>Ohralik</u>, 436 U.S. at 453-54.

# FIRST AMENDMENT COMMERCIAL SPEECH

The Commission can regulate the exchange of information about securities consistent with First Amendment principles.  At least one court has noted "speech relating to the purchase and sale of securities, . . ., forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." **SEC v. Wall Street Publishing, 851 F.2d 365, 373 (D.C. Cir. 1988).**

Commercial speech is defined by the Supreme Court as "expressions related solely to the economic interests of the speaker or its audience" or speech "proposing a commercial transaction."  Central Hudson v. Public Serv. Comm'n, 447 U.S. 557.  Untruthful speech, commercial or otherwise has never been protected for its own sake. **Virginia State Bd of Pharmacy v. Virginia Consumer Council, 425 U.S. 748, 771 (1976).**  The District of Maryland has also noted that to receive First Amendment protection commercial speech must not be misleading.  **National Life Ins. v. Philips Publishing, 793 F. Supp. 627 (D. Md. 1992).**

# FIRST AMENDMENT COMMERCIAL SPEECH

Defendants' First Amendment arguments have previously been rejected by the Second and Seventh Circuits under the analogous provisions of the Commodity Exchange Act.

In Commodity Trend Service, Inc. v. CFTC, 233 F.3d 981 (7th Cir. 2000), a financial publisher published impersonal investment advice regarding commodities through publications, faxes and telephone messages.  233 F.3d at 984.  The Court noted "antifraud provisions alone, detached from the registration requirement, do not raise the grave constitutional concerns."  Id. at 991.  The Court rejected the defendant publisher's claim that the antifraud provisions cannot be applied to an impersonal speaker on a public topic such as the commodities markets."  Id. at 992.  "Laws directly punishing fraudulent speech survive constitutional scrutiny even where applied to pure, fully protected speech."  Id. at 993 (citing cases).  Moreover, the government is not limited only to explicit antifraud measures to prevent its citizens from being defrauded."  Id. at 993 (citing cases).  The Court further noted "advertising receives less protection from regulation than fully protected speech".  Misleading or deceptive advertising may be prohibited in addition to fraudulent commercial speech.  Id. at 993.  Considering, the First Amendment concerns the Court concluded that all the challenged provisions of the Commodity Exchange Act, including the antifraud provisions, passed constitutionally muster, even those provisions lacking a scienter component.  Id. at 993-94.

# FIRST AMENDMENT COMMERCIAL SPEECH

Likewise in CFTC v. Vartuli, 228 F.3d 94 (2d Cir. 2000), the Second Circuit upheld the antifraud provisions of the Commodity Exchange Act against a First Amendment challenge brought by a publisher of a commodities trading computer program.  The publisher was charged with violations of the antifraud provisions of the CEA based on false and misleading claims regarding the profitability of the trading program.  The false performance results were repeated both on the product itself and in the publisher's advertisements offering the program for sale.  228 F.3d at 97-100.  In that case, the publisher contended that the claimed misstatements made in advertisements for its trading system were not made "in connection with" with commodities trading.  Id. at 101.  The Court rejected the publisher's argument. "The intended and direct link between the advertisements and the currency trading rendered any misrepresentations in the advertising 'in connection with' the suggested futures transactions."  Id. at 101.

The Court went on to address the application of the antifraud provisions of the CEA to the publisher.  The Court recognized that the antifraud provisions applied to the publisher even if the registration requirements did not.  Id. at 103.  The Court went on to hold that the publisher's advertisement for its trading program did no more than propose a commercial transaction and was, thus, analyzed under the limited First Amendment protections afforded commercial speech.  Id.

# FIRST AMENDMENT COMMERCIAL SPEECH

In SEC v. Wall Street Publishing Institute, Inc., the D.C. Circuit considered the Constitutionality of Section 17(b) of the Securities Act which prohibits publishing a description of a security in exchange for undisclosed consideration.  851 F.2d 365 (D.C. Cir. 1988).  The Court concluded "Speech relating to the purchase and sale of securities, in our view, forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." Wall Street Publishing, 851 F.2d at 373. "Requiring disclosure of a material fact in order to prevent investor misunderstanding is the very essence of federal securities regulation." Id. at 374 n.9.

The Court concluded that section 17(b)'s compelled speech could be constitutional "even when the government has not shown that 'absent the required disclosure, [the speech would be false or deceptive] or that the disclosure requirement serves some substantial government interest other than preventing deception." Id. at 373 (quoting Zauderer, 471 U.S. at 650).  The Court distinguished Lowe on the basis that the challenged provision of the Investment Advisers Act acted as a complete prohibition on publishing. Id. at 368.  Like section 17(b) of the Securities Act, a Section 10(b) injunction in this case is not a complete prohibition on publishing, it is simply a prohibiting against publishing materially false or misleading statements.

# FIRST AMENDMENT COMMERCIAL SPEECH

**THE SUPER INSIDER TIP EMAIL AND SPECIAL REPORT ARE COMMERCIAL PRODUCTS**

- The Super Insider tip itself says that it is a one time promotion.
- "If you're interested and you think the price is fair, all you have to do is buy one four-page report."
- "You can buy the report through a link at the bottom of this page."
- "Let me repeat my **offer.**"
- "So what **price** do you think is fair for this kind of information? How much would you pay?"
- "I'll give you instant access to the information for anyone who cares to pay $1000 for it. It's not cheap—but if we double our money this month—it's easily worth it."
- PS: To buy this special INSIDER TIP report, just click here"

# FIRST AMENDMENT COMMERCIAL SPEECH

- Exhibit 28: Email from Stansberry to Madron: "If we're able to sell this to 250 people and it works, we'll be able to charge almost whatever we want next time."

- Exhibit 29: Email from Stansberry to Matt Turner, et al.: "I'm trying a new kind of sale."

- Exhibit 32: Email from George Rayburn to Stansberry: "we are going to offer a one-shot sale of a "Special Insider Tip report for our subscribers."

# FIRST AMENDMENT COMMERCIAL SPEECH

- Exhibit 34: Email from Michael Palmer to Stansberry: "New version of One Time Shot Promo."

  "This is a one-time shot sale with no follow-on revenue."

- Exhibit 38: Email from Stansberry to Jody Madron; "Without your encouragement to go for the $1000 price, I don't think I would have had the balls to do it."

- Email from Stansberry to Mark Ford, et al., "The one-time stock copy was a big seller. . . "

# FIRST AMENDMENT COMMERCIAL SPEECH

**The Defendants admit that the Special Report is an extension of the Email:**

- "The Blast Email cannot be "divorced" from the USEC report, as this Court can plainly see upon review of the two publications." Defendants' Trial Brief on the Commercial Speech Doctrine., p. 7.

    The report is a sales product.

- "If you're the kind of person who likes to buy first and ask questions later, call your broker now and tell him to buy shares of USEC."

- "Let me briefly outline the bullish case for the company."

- "The 2001 figures aren't terrible for a $600 million company. . .but they'd be a heck of a lot better if USEC could re-establish a cheap Russian supply of enriched uranium.  And that's exactly what's going to happen on May 22."

# FIRST AMENDMENT COMMERCIAL SPEECH

- A USEC senior executive has assured me that the new Russian agreement will be approved prior to the upcoming Bush-Putin summit.  In fact, he said, "watch the stock on May 22nd."

- "All it needs are the politicians to sign off on the deal!  And that, according to my source, will happen-finally—on May 22nd."

- "That's why I consider this to be a safe speculation."

- Exhibit 35:  Email from Stansberry to George Rayburn:  "the special report, the fulfillment of the sales letter above is this document."

- Exhibit 36:  Email from Stansberry to Bill Bonner, et al., "I wrote a promotion based on the information and the situation and put it out under Jody Madron's pen name - - Jay McDaniel.

# FIRST AMENDMENT COMMERCIAL SPEECH

**THE MAGISTRATE'S LETTER OPINION DOES NOT CONTROL THIS DECISION**

- **The Defendants make much of the fact that the Magistrate Judge determined at the discovery stage of this case .  Of course, the Magistrate Judge was evaluating a discrete issue, and lacked the benefit of briefing on the entire case.**

- **They misstate the Magistrate Judge's ruling who stated the unremarkable proposition that, "it has been determined that publications such as those in this case do fall under the First Amendment umbrella, *subject to limitation of course."* Letter Decision, p. 2.**

# FIRST AMENDMENT COMMERCIAL SPEECH

This Court noted in its decision on the Motion to Dismiss:

"Finally, the Court notes that where, as in the instant case, new or newly emerging legal theories are involved, "discretion dictates caution in making summary disposition on what may be an incomplete development of the full factual record." Virginia Hosp. Ass'n v. Baliles, 830 F.2d 1308, 1315 (4th Cir. 1987).

This Court is the appropriate forum for a decision on whether the Defendants' sales materials are commercial speech.

# FIRST AMENDMENT / BONA FIDE PUBLISHER

**Defendants' Trial Brief on the Disinterested or Bona Fide Publisher's Defense**

**Defendants argue that the "general and regular" circulation requirement of Lowe render the registration requirements of the Investment Advisers Act of 1940 unconstitutional. This issue is a red herring.**

The Commission has not alleged a violation of the registration requirements of the Investment Advisers Act of 1940. In fact, it has not alleged any violations of the Investment Advisers Act at all. The Court need not reach this issue at all. The Commission does not claim that defendants are required to register as Investment Advisers.

Moreover, as noted in Lowe, that case did not involve false statements. Under analogous provisions of the Commodity Exchange Act, a publisher claimed that because it was not subject to the registration requirements of the CEA it was also exempt from the antifraud provisions. The Court rejected that position. Commodity Trend Service, Inc. v. CFTC, 233 F.3d 981, 992 (7th Cir. 2000).

# FIRST AMENDMENT / BONA FIDE PUBLISHER

The Defendants themselves claimed that the Blast and the USEC Special Report were Bona Fide publications pursuant to <u>Lowe</u>.  The Commission never claimed the <u>Lowe</u> disinterested publisher defense applies in this action. The Commission simply responded to defendants claim.  However, as it became apparent in the course of this litigation that the Super Insider Tip Email and the USEC Special Report could not meet the general and regular circulation requirements of <u>Lowe</u>, defendants have changed tactics and argue that those requirements are unconstitutional.

Defendants apparently concede that the Super Insider Tip Email and USEC Special Report are not of general and regular circulation.  Never a fact truly in dispute.  The USEC Special Report was consistently described as a one shot sale on a special situation stock.  Defendants consistently testified that out the time the USEC Special Report was sold, no follow up reporting was envisioned.  The Blast email service was intermittently published during May 2002 and had no regular schedule (Exhibit 125).

# FIRST AMENDMENT / BONA FIDE PUBLISHER

Defendants argue that tipping and touting apply only to situations in which a publisher is paid by an issuer to promote the issuers. Defendants offer no analysis to support the position.

Misplaced reliance on an SEC no action letter In re Mary Lee Botsaris, 1993 SEC No – Act. LEXIS 570. In that letter the Commission defined the bona fide publisher exemption from the registration requirements of the Investment Advisers Act to require the publication be "of general and regular circulation, in that it is not timed to specific market activity or to events affecting, or having the ability to affect, the securities industry." Id. at p. 2. In that case Ms. Botsaris indicated that she intended to provide a **DAILY** stock tip on a 900 number. The letter indicates that Ms. Botsaris would qualify for the exemption from registration if she abided by the forgoing definition. This no action letter provides no support for the defendants' position. The letter indicates that Ms. Botsaris would qualify for the exemption from registration if she abided by the forgoing definition. This no action letter provides no support for the defendants' position.

# FIRST AMENDMENT / BONA FIDE PUBLISHER

Likewise Taucher v. Brown Hruska, 396 F.3d 1168 (D. D.C. 2005) lends no support to defendants in this case. That case involved a challenge to the constitutionality of the registration requirements of the CEA. The Court ultimately concluded that requiring defendants to register violated the constitution. The Court did not address whether the application of the antifraud applied to these same defendants. As noted repeatedly, Courts to address that precise issue have repeatedly held that the antifraud provisions of the CEA apply to individuals who are exempt from its registration requirements. Commodity Trend Service, Inc. v. CFTC, 233 F.3d 981 (7th Cir. 2000); CFTC v. Vartuli, 228 F.3d 94 (2d Cir. 2000).

# FIRST AMENDMENT / BONA FIDE PUBLISHER

The Super Insider Tip Email was a hit and run tip timed to specific market activity – the purported announcement of the governmental approval of the Tenex pricing agreement

Evidence to support the contention that Pirate Investor used message boards as a method to provide personalized investment advice masquerading as disinterested commentary. Ex. – 75 – Stansberry wrote "I'm not allowed to give you any individual advice. If you'll post your concerns on the message board, I'll address these issues for the entire group." This was in response to David Cheatham's email requesting that Stansberry respond to question he had regarding USEC's recent press releases. Nonetheless, Stansberry responds directly to Cheatham's inquiry writing "Typically S&P removing a company from credit watch and affirming their rating isn't a negative for a stock."

# Inside Information

Contrary to Defendants Trial brief on Inside Information, the Securities and Exchange Commission is not attempting to argue that the sale of true information is per se illegal.  The Commission's case is simple, in order to prevail on its claim that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Commission must show that defendants, directly or indirectly, in connection with the purchase and sale of securities . . . (1) employed devices, schemes or artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstance under which they were made, not misleading; or (3) engaged in acts, practice or courses of business which operated or would operate as a fraud or deceit upon other persons.  SEC v. Zanford, 238 F.3d 559, 563 (4th Cir. 2001) (cert. granted SEC v. Zanford, 535 U.S. 1015 (2001) rev'd and remanded by SEC v. Zandford 535 U.S. 813 (2002); Davis v. Cole, 999 F. Supp. 809, 811-12 (D. Va. 1998).  The evidence presented at trial clearly establishes each of these elements.

# Inside Information

Defendants argue that there is a difference between "insider information" and "inside information" and while the sale of inside information may be illegal, there is nothing illegal about publishing the insider information.  This is a distinction without a difference.  Defendants' argument that the terms connote different meaning lacks any credibility.  Numerous investors testified that they thought defendants had insider information: material information not available to the general public obtained from a company insider.  See e.g. Blau v. Lehman et al., 368 U.S. 403, 420 (1962); see  also, U.S. v. O'Hagen, 521 U.S. 642, 652 (insider trading defined as trading on the basis of material confidential information).  The plain language of the Super Insider Tip Email and USEC Special Report clearly conveyed to the readers that they had acquired such information.  Any contrary argument is simply unavailing.  The terms are indistinguishable to a reasonable investor.

# Inside Information

Defendants then suggest under <u>Dirks</u> that Stansberry's offer to sell a super insider tip did not violate the federal securities laws. Defendants read <u>Dirks v. SEC</u>, 463 U.S. 646 (1983) too broadly.  In that case the Court held that a tippee who had been the recipient of voluntarily disclosed information from a corporate insider for the purpose of disclosing corporate fraud was not liable for securities fraud when he passed along the tip to individuals who sold the corporations securities.  463 U.S. at 666.  The Court announced the basis principle that a tippee inherits a corporate insider's fiduciary duty to the corporate shareholders when the insider breaches his or her fiduciary duty to the company.  <u>Id.</u>  Thus, a tippee who knows he received information in breach of an insider's fiduciary duty to a company's shareholders must make the information public before profiting thereby.  <u>Id.</u>

# Inside Information

Here, even if the Court believed Mr. Stansberrry, he would be liable for insider trading. Stansberry testified that Mr. Wingfield got angry and told him something he shouldn't have. In a message board posting, Stansberry wrote "On the other hand, did you expect Wingfield to say to you (and the SEC), yes indeed, we've made an illegal disclosure . . . .?" Ex. 60. This evidence establishes that if Stansberry testified truthfully that he knew Wingfield had breached his duty to USEC and disclosed non-public information.

# Inside Information

Thus, based on <u>Dirks,</u> Stansberry had a duty to make the information public before profiting on such information.  463 U.S. at 666.  Stansberry recognized this fact when he wrote in the Super Insider Tip Email "Wait a minute you say . . . isn't this insider trading?  Well it might be except because I'm willing to give you all of the details, its now public information." Ex. 1 at p. 5.  However, Stansberry's sale of the information to 1,200 people is not a public disclosure.  Dr. Comment, defendants' materiality expert, stated that the sale to 1,200 individuals did not constitute a public disclosure.  Stansberry also noted that he "went for the higher price ($1,000) because he wanted to limit the number of people who would get our information."  Ex. 59 at p. 3759.  That position is patently inconsistent with a public disclosure.   Finally, simple logic dictates that the sale of the name of a company to 1,200 people is not a public disclosure.  As stated by Comment, you would want to see the disclosure on Bloomberg or the Dow Jones Wire.  Consequently, even if this Court concludes Stansberry testified truthfully he still violated Section 10(b) of the Securities Exchange Act.

# Duty To Correct

**USEC HAS NO DUTY TO CORRECT THE DEFENDANTS' FALSE STATEMENTS**

**This is the classic "blame the victim" defense**

**The focus is not on what USEC's duties or obligations were in responding to a false statement. . .the issue before the Court is whether the Defendants made false statements with the requisite intent.**

# Duty To Correct

**USEC had no duty to comment on false statements made by Defendants**

Having issued false statements about USEC, the defendants claim that they should now be exonerated for those false statements because USEC did not dignify the false information with a response.

Evidence is undisputed that USEC had a policy of not commenting on analyst reports

Wingfield and Major-Sosias testified that that policy was followed in this case. No other witness testified that USEC did not follow its own policies. Absolutely no evidence that there was an obligation to formulate a response or that USEC departed from its own policies. These policies are consistent with the National Institute of Investor Relations guidelines. Defendants Exhibit 25

# Duty To Correct

No evidence that USEC has an obligation to respond.  Not a single witness testified that USEC had any obligation to comment on the Defendants' falsehoods.

Comment admits he is not an expert on disclosure policies or USEC's obligation to disclose in this matters.  He admits he has no idea what USEC's  disclosure policies were, admits that he does not know what USEC's disclosure log was.

Nelson also admitted that he was not an expert on corporate disclosure requirements.  He also admits that he has no idea what USEC's disclosure policies were, admits that he does not know what USEC's disclosure log was.

Stansberry's testimony that he felt USEC should have issued a denial is completely self-serving.

# Duty To Correct

**No legal obligation to comment on false statements by a third party**
State Teachers Retirement Board v. Fluor Corporation, 654 F.2d 843, 850 (2d Cir. 1981):

*A company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company.*

The sole authority that the defendants cite is NYSE Rule 202.

The issue of materiality is not governed by what USEC believed at the time Stansberry, Pirate and Agora were promulgating false information in the marketplace. That USEC did not respond to an obscure newsletter that spun a web of falsehood does not equate to any acknowledgment of the rumor's truth or falsity. Rule 202.06 clearly states: "The normal publication of important public data is by means of a press release. . . .News which ought to be the subject of immediate publicity must be released by the fastest available means. Quite frankly, USEC had no news to announce.

Wingfield testified that he was aware of the rule, understood the Rule's requirements. He also testified that he regularly consulted with counsel to ensure that his disclosures complied with the Rule and that he was in contact with the NYSE throughout the process

# Duty To Correct

**USEC made disclosures:**

1. It had already announced that it expected approval of the USEC/Tenex agreement "soon." (Wingfield, Major-Sosias, Comment.)

2. There was no public announcement or information, other than the Stansberry falsehoods that there was a tie between the summit and the USEC Tenex market price pricing agreement. (Wingfield, Major-Sosias, Comment)

3. Denial of the rumor may have given it added credence----investors may have believed that USEC was hiding something (Wingfield).

4. Comment's expert opinion does not support the Defendant's position: he says a "sophisticated investor" may have drawn an inference from USEC's silence, the "reasonable investor" would not have drawn the same inference. Thus, there's nothing a reasonable investor would have taken away from USEC's silence in the face of baseless falsehoods.

# Duty To Correct

**Defendants' cases do not support its' position:**

Backman v. Polaroid Corp. 910 F.2d 10, 16 (7th Cir. 1987) stands for the unremarkable proposition that once **an issuer** makes a statement that a reasonable investor would consider material, it must reveal other information needed "so that what was revealed would not be so incomplete so as to mislead."

Flamm v. Eberstadt, 814 F.2d 1169 (7th Circ. 1987) stands for the same unremarkable proposition: "a public corporation who speaks must tell the truth about important matters. The firm may remain silent, leaving investors to take their chances, but may not lie. . .

Here what USEC was facing was a complete falsehood uttered by a third party, all other relevant information was already in the marketplace.

# Duty To Correct

**USEC did inform the public that there was no tie between the summit and the signing of a the Tenex/USEC market-based pricing agreement**

**Exhibit 149**—May 14, 2002 Wall Street Journal article:

*USEC spokesman Steven Wingfield, though, said that the government accord to reduce nuclear arsenals, announced on Monday, won't have any near-term material impact on the company-which has been the US government's exclusive agent for purchasing bomb-grade uranium stripped from Russian warheads since 1993.*

**Exhibit 150---**May 15, 2002 Wall Street Journal article:

*While USEC officials told Dow Jones Tuesday that the US-Russia deal won't directly affect USEC Inc.'s earnings in the near term, the treat may mean the US and Russia will agree to lift price controls on enriched uranium that USEC buys from its Russian partner Techsnabexport Co., thus improving USEC's earnings.*

# Duty To Correct

**Exhibit 151---**May 20, 2002 Bloomberg article: *The treaty is good for the nuclear industry as a whole," said Mari Angeles Major-Sosias, manager of investor relations at USEC. "Looking at our stock price, it's having a big effect even though we are not directly related to anything that's going on in this treaty."*

Stansberry testified that he believed Wingfield was himself engaged in selective disclosure by telling disgruntled Pirate investors the report was a lie. Of course, Stansberry is also not an expert in corporate disclosure policies and had no idea what USEC's policies were.

# Duty To Correct

There is no evidence, or any standard that this rises to a "selective disclosure." Wingfield did not tell any investor anything that was not already public;

Wingfield said that the treaty would be signed "soon."

Wingfield said he did not know when the treaty would be signed.

Wingfield said there was no connection to the treaty.

None of this was selective.