IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES SECURITIES AND      *
EXCHANGE COMMISSION
                                  *
          Plaintiff
                                  *

          vs.                     *    CIVIL ACTION NO. MJG-03-1042

AGORA, INC., et al.               *

          Defendants              *

*         *         *         *         *         *         *         *         *

MEMORANDUM OF DECISION

This case was tried before the Court without a jury.  The
Court has heard the evidence, reviewed the exhibits, considered
the materials submitted by the parties and had the benefit of the
arguments of counsel.  The Court now issues this Memorandum of
Decision as its findings of fact and conclusions of law in
compliance with Rule 52(a) of the Federal Rules of Civil
Procedure.

I.   BACKGROUND

     A.   Defendants

Defendant Agora, Inc. ("Agora") is a Maryland Corporation
engaged in the publication and distribution of books, magazines
and newsletters.  Agora's newsletters address topics ranging from
investment and health advice to travel and leisure activities.
Pirate Investor, LLC ("Pirate") is a wholly-owned subsidiary of
Agora that publishes several investment newsletters.  Defendant
Frank Porter Stansberry ("Stansberry") is the editor of two of
Agora's internet financial newsletters.

There is no doubt that each of the Defendants was engaged in the production and distribution of publications entitled to substantial First Amendment protection.  However, as discussed herein, the instant case does not relate to such publications.  Rather, the instant case relates to a fraud scheme whereby victims were induced to pay $1,000 each for a "sure thing" stock tip allegedly based upon "inside information" presented separately from Defendants' regular publications.

    B.    <u>The Scheme</u>

        1.    <u>Underlying Facts</u>

USEC, Inc. ("USEC") is the world's largest provider of uranium enrichment services.  USEC began as an arm of the U.S. government and was privatized in July 1998.  As part of a 1993 disarmament pact with Russia called "Megatons to Megawatts,"  the U.S. agreed to purchase Russian uranium for use as fuel in commercial nuclear power plants.

USEC and its Russian counterpart, OAO Techsnabexport ("Tenex"), renegotiate the price of uranium periodically.  The uranium is purchased in units called separative work units, or "SWUs."  New pricing agreements are subject to the approval of the U.S. and Russian governments.

At the end of 2001, an interim pricing agreement between USEC and Tenex expired.  In February 2002, USEC and Tenex reached a new pricing agreement, subject to approval by the U.S. and Russian governments.  As of May 2, 2002, the United States had

not announced approval for the new USEC/Tenex price agreement.

From May 24 to 25, 2002, President Bush and Russian President Vladimir Putin met in Russia for an arms summit.  A potential connection between the summit and the approval of the USEC/Tenex price agreement had been raised by USEC in discussions with Bank of America on April 16, 2002.


        2.   Stansberry's Contact

On May 1, 2002, Stansberry contacted Steven Wingfield, Director of Investor Relations for USEC.  Stansberry and Wingfield scheduled a conference call for the following day to discuss USEC's business.

The May 2, 2002, conference call between Stansberry and Wingfield lasted for approximately one hour.  Mary Angeles Major-Sosias ("Major-Sosias"), newly employed as the Manager of Investor Relations for USEC, sat in on the call to learn more about investor relations at USEC.  During the call, Major-Sosias took detailed notes.

There was, during the conference call, no communication from Wingfield to Stansberry providing "inside information" regarding USEC.  In particular, Wingfield did not tell Stansberry that the USEC/Tenex pricing agreement would be approved on May 22 or tell him to watch the stock on that date.


        3.   The Super Insider Solicitation

Following the conference call with USEC, on or about May 7,

2002, Stansberry drafted a report regarding USEC (the "Special Report") and a promotional "Super Insider Tip Email" offering the Special Report for sale (the "Super Insider Solicitation").  Both the Special Report and the Super Insider Solicitation were penned under the pseudonym "Jay McDaniel."

The Super Insider Solicitation bore the heading "DOUBLE YOUR MONEY ON MAY 22ND ON THIS SUPER INSIDER TIP."  In the Super Insider Solicitation, Pirate offered to sell, for $1,000, the Special Report which it claimed contained "insider" information purportedly obtained from a senior executive at an unnamed company concerning the impending announcement of government approval of a major international agreement.  The unnamed company was said to be involved in the nuclear energy field and would earn profit of more than $2.5 billion as a result of an arms treaty between the U.S. and Russia.

The Super Insider Solicitation stated that investors would "make a fortune" because the information was obtained from a senior company executive who was "definitely in a position to know" exactly when the deal between the two countries would be approved.  The Super Insider Solicitation also said that investors could "double [their] money on a safe stock in one day" and that Pirate could tell them "exactly which day to buy (May 21st) and sell (May 23rd)."  The Super Insider Solicitation encouraged recipients to stake their entire investment portfolios on the tip.

On May 13, 2002 at approximately 6:30 p.m., Stansberry sent

4

the Super Insider Solicitation to the Pirate Blast database, which contained approximately 20,000 e-mail addresses.[1]  By the following day, Pirate had sold approximately 107 Special Reports.

From May 14 through May 18, the Super Insider Solicitation was also sent to other lists from Agora financial newsletters and one newsletter not affiliated with Agora.  The Super Insider Solicitation was ultimately sent to approximately 800,000 individuals.  Pirate sold 1,217 copies of the Special Report.  Proceeds from the sale of the Special Report totaled approximately $1,002,000, of which Stansberry received $200,400.[2]

### 4.  The Special Report

The Special Report disclosed that the unnamed company referred to in the Super Insider Solicitation was USEC.  The Special Report stated that "[a] USEC senior executive has assured me that the new Russian agreement will be approved prior to the upcoming Bush-Putin summit.  In fact, he said 'watch the stock on May 22.'"  Pl.s' Ex. 17.

### 5.  Results

No announcement was made regarding the USEC/Tenex price

---

[1]  Also on May 13, President Bush announced that the U.S. and Russia had reached a new arms reduction agreement.

[2]  Pirate's gross receipts from the sale of the Special Report totaled $1,217,000.  Pirate refunded a total of $215,000 to 215 purchasers of the Special Report and paid Stansberry a commission of $200,400, leaving Pirate with net receipts of $801,600.

agreement on May 22, 2002.  Indeed, it was not until June 19, 2002 that the State Department and USEC announced the approval of the USEC/Tenex price agreement.

In the five months preceding the May 14, 2002 Super Insider Solicitation, trading volume in USEC common stock averaged approximately 189,000 shares a day at prices ranging from $5.78 to $7.52 a share.  From May 14 to May 23, 2002, trading volume in USEC averaged 3.3 million shares a day with a closing price ranging from $7.85 a share on May 14 to a high of $9.89 a share on May 20, 2002.  However, on May 22, 2002, the price of USEC stock fell from $9.54 to $8.20 a share.

On April 18, 2003, the United States Securities and Exchange Commission ("SEC" or "Commission") charged Defendants with securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  The SEC seeks an accounting, injunctive relief and civil penalties.


II. <u>DISCUSSION</u>

    A.   <u>Legal Framework</u>

The Commission has charged that Defendants have violated Section 10(b) of the Securities Exchange Act of 1933 (the "'33 Act") and Commission Rule 10b-5.  Section 10(b) provides:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or
> instrumentality of interstate commerce or the
> mails, or any facility of any national securities
> exchange . . . . [t]o use or employ, in connection
> with the purchase or sale of any security

registered on a national securities exchange, . . .
    Any manipulative or deceptive device or
contrivance in contravention of such rules and
regulations as the Commission may prescribe as
necessary or appropriate in the public interest or
for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated under Section 10(b), states:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or
instrumentality of interstate commerce, or the
mails or of any facility of any national securities
exchange,

    (a)  To employ any device, scheme or artifice
        to defraud, or

    (b)  To make untrue statement of a material
        fact or to omit to state a material fact
        necessary in order to make the statements
        made, in the light of the circumstances
        under which they were made, not
        misleading, or

    (c)  To engage in any act, practice, or course
        of business which operates or would
        operate as a fraud or deceit upon any
        person, in connection with the purchase
        or sale of any security.

17 C.F.R. § 240.10b-5.

In enacting Section 10(b), Congress intended "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus achieve a high standard of business ethics in the securities industry." SEC v. Zandford, 535 U.S. 813, 819 (2002). Therefore, the Supreme Court has stated that Section 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purpose." Id. at 819.

B.    Standard of Proof

The Commission bears the burden of proving each element of this civil offense by a preponderance of the evidence.  Steadman v. SEC, 450 U.S. 91, 102 (1981); SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 355 (1943).

Defendants contend that the Commission must prove that the statements at issue were false by "clear and convincing evidence" because "liability is sought on pure speech activity on a matter of public concern."  See Batson v. Shiflett, 602 A.2d 1191, 1210 (Md. 1992).  However, Batson involved allegedly defamatory statements made by a union official against a rival in a ongoing, contentious and conspicuously public campaign.  Id. at 1195-98.  The instant case involves commercial speech.

The level of protection for commercial speech "turns on the nature both of the expression and of the governmental interests served by its regulation."  Cent. Hudson v. Pub. Serv. Comm'n, 447 U.S. 557, 563 (1980).  The Defendants' statements at issue, the Super Insider Solicitation and the Special Report, were purely commercial speech, afforded lesser protection than other forms of expression.  See Edge Broad'g Co. v. United States, 5 F.3d 59, 61 (4th Cir. 1992); Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1312-13 (9th Cir. 1997) (stating that the First Amendment only protects commercial transactions that concern lawful activity).  The Court does not find it appropriate to require the Commission to prove the elements of its case by more than a preponderance of the evidence.

Nonetheless, the Court finds that the Commission has, in the

instant case, established every element of its charges against
Defendants Pirate and Stansberry[3] by clear and convincing
evidence.


   C.   <u>Elements of the Charge</u>

   To establish a violation of Section 10(b) and Rule 10b-5,
the Commission must prove:

   1.   That the Defendants made a false statement or
        omission;

   2.   Of material fact;

   3.   With scienter;

   4.   In connection with the purchase or sale of
        securities;

   5.   By using a means or instrumentality of interstate
        commerce.

<u>McConville v. SEC</u>, 465 F.3d 780, 786 (7th Cir. 2006); 15 U.S.C. §
78j(b); 17 C.F.R. § 240.10b-5; <u>see</u> <u>SEC v. SBM Inv. Certificates,</u>
<u>Inc.</u>, DKC-06-0866, slip op. at 26 (D. Md. Feb 23, 2007).


   D.   <u>Proof of Elements</u>

        1.   <u>Actionable False Statements</u>

             a.   <u>The False Statements</u>

   To satisfy the first element, the SEC must prove that
Defendants made an "untrue statement of material fact or omitted
to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which

_____

   [3] But not against Agora.

they were made, not misleading." 17 C.F.R. § 240.10b-5.  The SEC

"must point to a <u>factual</u> statement or omission – that is, one

that is demonstrable as being true or false."  <u>Ottman v. Hanger

Orthopedic Group, Inc.</u>, 353 F.3d 338, 342-43 (4th Cir. 2003);

<u>Longman v. Food Lion, Inc.</u>, 197 F.3d 672, 682 (4th Cir. 1999)

(emphasis in original).  The Commission must also then prove that

the statement was, in fact, false.  <u>See</u> <u>Ottman</u>, 353 F.3d at 343.

The Super Insider Solicitation and the Special Report

contain numerous statements that were untrue.  Some of the untrue

statements may not be actionable.[4]  However, the essential

fraudulent element - the misrepresentation that the purveyor of

the Special Report had a particular inside source for the precise

date on which the stock price would rise - is definitely

actionable.

The Super Insider Solicitation states that, for $1,000, a

customer would be given the identity of a corporate stock that

would have a substantial rise in price on a specific date.  The

Super Insider Solicitation explained that the reason why the tip

being sold had particular value was the inside information on

which it was based:

> [B]ecause of my source - a senior company executive - I
> can even tell you EXACTLY WHEN the deal will be
> finalized and accounted to the public. . . . [t]he deal
> will close on May 22nd, only a few days from now.

> * * *

A high-level corporate executive - someone definitely

---

[4]  For example, the use of the pseudonym "Jay McDaniel" or
even the predictive nature of some statements.

in a position to know - passed along the details to me.
. . . [h]e even told me the precise day the deal would
be announced.

* * *

I can even tell you exactly which day the pop in the
stock should happen.  Like I told you, it's a Wednesday
later this month - May 22nd.

* * *

I can tell you precisely when. . . . I can even tell
you exactly which day to buy (May 21st) and sell (May
23rd).

Pl.'s Ex. 1.

Some 1,217 customers were persuaded by the Super Insider

Solicitation to buy the Special Report, paying a total of more

than $1,000,000 to be advised that it was a senior executive of

USEC who had provided the inside information on which the

customers could rely to buy USEC stock on May 21 and sell at a

profit on May 23.

Both the Super Insider Solicitation and the Special Report

included the actionable false statement that a senior executive

of a company (identified in the Special Report as USEC) had told

the author of the May 22 date on which the contract would be

approved and, therefore, the stock price would rise.  The

critical statement is not categorizable as "puffery"[5] or a

---

[5] Puffery involves "forward-looking statements, or . . .
generalized statements of optimism that are not capable of
objective verification."  Grossman v. Novell, Inc., 120 F.3d
1112, 1123 (10th Cir. 1997).  Similar to statements of "soft
information," "puffery" is generally nonactionable because
reasonable persons do not rely on such assertions in making
investment decisions. Raab v. Gen. Physics Corp., 4 F.3d 286,
289-90 (4th Cir. 1993); see also Zerman v. Ball, 735 F.2d 15, 21
(2d Cir. 1984) (finding nonactionable a statement that a bond is

prediction of a future event but rather is the false statement of an alleged existing fact - that is, the asserted past receipt of inside information from a senior USEC executive who was in a position to know when the pricing agreement would be approved. Nor are the actionable false statements in the instant case merely opinion.[6]

The Court finds that the SEC has established that the Super Insider Solicitation and the Special Report include actionable false statements - to the effect that the author was basing his statement as to a May 22, 2002 rise in stock price upon statements made to him by a senior executive of USEC in a position to know when the price agreement would be approved.[7]

_____

"marvelous"); Rotstein v. Reynolds & Co., 359 F. Supp. 109, 113 (N.D. Ill. 1973) (finding a statement that a stock is so "red hot" that the investor "could not lose" to be puffery).

[6] In Biospherics, Inc. v. Forbes, Inc., the Fourth Circuit held that statements in a Forbes investment column that a certain company's stock would "sour" and that "hype and hope" had driven up its share price were not actionable, stating:
    any reasonable person reading [the article] would
    recognize, based on the tenor, language, and
    context of the article, that the challenged
    statements constitute a subjective view, not a
    factual statement. When a speaker plainly expresses
    "a subjective view, an interpretation, a theory,
    conjecture or surmise, rather than [a] claim[ ] to
    be in possession of objectively verifiable [false]
    facts, the statement is not actionable."

151 F.3d 180, 182 (4th Cir 1998) quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993).

[7] The Court is not holding that a sale of inside information is per se illegal or fraudulent.  The Court's holding is not dependent upon a finding that the alleged information from Wingfield - if it had been provided - would have been "inside

The Court does not find credible Stansberry's testimony that in the May 2, 2002 conference call, Wingfield provided him with information that there would be an announcement of approval of the USEC pricing agreement on May 22, 2002 or any other particular date. Nor was there any statement from Wingfield indicating that Stansberry should "watch the stock on May 22" or anything of the sort.

The Court finds credible the testimony of Wingfield and Major-Sosias regarding the May 2, 2002 telephone conference with Stansberry. As related in Wingfield's notes of the May 2, 2002 conference call:[8]

> I told Stansberry that we were working closely with the government and, as stated on the conference call, expected the agreement to be approved by the government in the near term. In response to questions about the Bush and Putin summit meeting in May, I said that we hoped something positive about our deal would come out of that meeting. I told him to check back with us after that meeting.

Trial Tr. 65, Mar. 21, 2005.

The Court finds no basis to believe, as Stansberry asserts, that Wingfield, USEC's Director of Investor Relations, would tell a newsletter writer nonpublic inside information that could expose Wingfield and USEC to personal and corporate liability.[9]

---

information." Rather the actionable fraud was the statement of the source of the information sold to have been a corporate executive in a position to know, when there was no such source.

[8]  Memorialized on May 14, 2002.

[9]  The Court finds preposterous Stansberry's statement that Wingfield became angry during the May 2, 2002 conference call when Stansberry indicated that he was not going to write about USEC in his newsletter and acted upon his anger by providing

In sum, the Court finds that the SEC has established that the Super Insider Solicitation and Special Report contain the actionable false statement that a USEC executive (Wingfield) had told the author that the stock price would rise on May 22, 2002.

b.   <u>Stansberry and Pirate Made the False Statements</u>

Of course, the SEC has proven that Stansberry made all of the statements in the Super Insider Solicitation and the Special Report inasmuch as he has admitted that he, using the pseudonym Jay McDaniel, was the author of the communications.

Pirate also made the statements at issue.  The Super Insider Solicitation was sent to a Pirate distribution list and contained a link where a recipient could purchase the Special Report from Pirate.  Pl.s' Ex. 1.  The Special Report included a copyright claim by Pirate.  Pl.s' Ex. 17.  Moreover, the pseudonym "Jay McDaniel" is frequently used by Pirate writer Jody Madron and was, with Pirate's consent, used by Stansberry to make the statements at issue.  Furthermore, Stansberry testified that with regard to Pirate: "there's no doubt about it, I run the show." Trial Tr. 169, Mar. 22, 2005.

The SEC has not proven that Agora - as distinct from its subsidiary Pirate - made the statement at issue.  In the instant case, the SEC asserts liability against Agora only on the basis that it could be found to have made the statement itself.  <u>See</u>

---

inside information.

Stipulated Facts, Joint Proposed Pre-Trial Order [Document 76] at 13, ¶ 2.  Accordingly, Agora is not liable for the charge at issue.

Neither the Super Insider Solicitation nor the Special Report contained any indication that it was sent by Agora or that Agora (as distinct from its subsidiary) was adopting or expressing a belief as to the truth of the statements therein.

The Commission asserts that Agora is liable for the statements made because its legal counsel reviewed the Super Insider Solicitation and the Special Report, but did not independently fact-check it.  However, Agora's legal counsel was also legal counsel for Pirate.  Trial Tr. 208-09, Mar. 22, 2005.  Thus, the Court does not find that counsel, while doing his review, was acting for Agora as distinct from Pirate.

Moreover, even if the attorney had been acting for Agora as well as Pirate, that would not establish that Agora made the false statements in the communications.  See Great Neck Capital Appreciation Inv. P'ship v. PricewaterhouseCoopers, L.L.P., 137 F. Supp. 2d 1114, 1121 (E.D. Wis. 2001) (auditor who reviewed press release and advised that it conformed to Generally Accepted Accounting Principles not liable under §10(b) as a primary violator for misstatements in the press release because there was no allegation that auditor drafted the release, publicly adopted it or allowed its name to be associated with it).

The Court does not accept the SEC's contention - if it is being pressed - that Agora is to be considered to have made the

statements in the Super Insider Solicitation and Special Report
by virtue of its ownership and ability to control Pirate.  The
Court does not find that Agora itself made the false statements
at issue.

        2.   <u>Materiality</u>

    It is not sufficient for liability under Section 10(b) or
Rule 10b-5 that Defendants made a false statement of fact; the
fact must have been material.  A fact is material if a
substantial likelihood exists "that disclosure of the omitted
fact [or statement of the untrue fact] would have been viewed by
the reasonable investor as having significantly altered the total
mix of information made available."  <u>TSC Indus., Inc. v.
Northway, Inc.</u>, 426 U.S. 438, 449 (1976).  In assessing
materiality, the Court must consider the allegedly false
statement within the context of the other information that was
publicly available to reasonable investors at the time the
alleged false statement was made. <u>See Phillips v. LCI Int'l,
Inc.</u>, 190 F.3d 609, 617 (4th Cir. 1999).

    There must be a "substantial likelihood that a reasonable
purchaser or seller of a security (1) would consider the fact
important in deciding whether to buy or sell the security or (2)
would have viewed the total mix of information available to be
significantly altered by disclosure of the fact.  <u>Ottman</u>, 353
F.3d at 343 (internal citations omitted).  The Court need not
find that the fact would alter an investor's decision to purchase

or sell the security; the Court need only find that a reasonable investor would consider the information to be important.  <u>Folger Adam Co. v. PMI Indus., Inc.</u>, 938 F.2d 1529, 1535 (2d Cir.); <u>SEC v. Nat'l Student Marketing Corp.</u>, 457 F.Supp. 682, 709 (D.D.C. 1978).  In the instant case, the SEC has proven that the actionable false statement was material.

The actionable falsity in the instant case is the lie that "Jay McDaniel" had been told by a USEC executive that government approval of the pricing agreement would be announced on May 22, 2002.  The materiality of this statement is self-evident and also supported by specific evidence.  The essence of the false information is not only that the highly beneficial pricing agreement would be announced on May 22, 2002, and that the date had been communicated by a senior USEC executive, but also that the market in general <u>does not know</u> what purchasers of the Special Report will learn for their $1,000.  As touted by the Super Insider Solicitation, access to this not-widely-known information will give tipees the opportunity to buy a stock that will "skyrocket."

Furthermore, the SEC has presented the testimony of investors that they felt that tip was important, in particular, because it allegedly came from a senior USEC executive.  <u>See</u> Trial Tr. 7, Mar. 24, 2005 (investor Roger Listwan testifying that it was important to him that the Super Insider Solicitation said that a senior company executive had said to watch the stock and that the pricing agreement would be announced on May 22,

2002); id. at 24-26 (testimony of investor David Todd Cheatham that the specific date and alleged source of the information in the Super Insider Solicitation was important in his decision to invest in USEC).

Moreover, many individuals who purchased the USEC report later requested refunds from the Defendants.  These individuals also complained about the lack of an announcement from USEC on May 22, 2002 or the denials by USEC of the claims in Defendants' Super Insider Solicitation or the USEC Special Report.  See Pl.'s Ex. 49.

In addition to the investors who requested refunds, many investors posted negative sentiments about the lack of a May 22 announcement on Defendants' message boards.  See Pl.s' Ex. 58, 59, 61, 65, 66.  Pirate had never had so many complaints about a report prior to the USEC Special Report.  Trial Tr. 31, Mar. 29, 2005 (testimony of Elyssa Yankelov, customer service for Pirate). Customers complained about the false information and the use of a pen name in the Special Report and theorized that it was just part of a fraudulent scheme, among other things.  Id. at 32-34. Employees of USEC received phone calls from individuals who had purchased the USEC Special Report and demanded to know when the pricing agreement announcement was coming.  Trial Tr. 100, 103, Mar. 21, 2005; Trial Tr. 31, Mar. 22, 2005.  Wingfield testified that callers were angry that USEC had not made the promised announcement. Trial Tr. 90, Mar 21, 2005.

Market data contemporaneous with the statements also

18

confirms the materiality of the false statements.  On May 13, 2002, the day before the Super Insider Solicitation, the trading volume of USEC's stock was 49,900 shares, and the average volume of the previous 30 days was 127,080 shares.  <u>See</u> Pl.'s Ex. 170. On May 14, before the markets closed, President Bush announced that an arms control deal would be signed with Russia in the near future.[10]  Though USEC did not make an announcement on its perception of the deal's effect on the price of Uranium, USEC's stock volume jumped to 1,446,600, an increase of 1,396,700 shares over the previous day's trading volume.  After the markets closed that evening, Stansberry and Pirate sent the Super Insider Solicitation.  The next day, May 15, trading volume in USEC jumped even more dramatically, up to 4,765,600 shares, an increase of 3,319,000 shares.  The volume continued to increase after May 14, peaking at 6,053,000 shares on May 21, the day that the Super Insider Solicitation had identified for investors to purchase USEC's stock. <u>See</u> <u>id.</u>  The May 21 volume was ten times larger than the 30-day average volume of 673,773 shares and more than two million shares greater than the previous day.  After May 21, when the May 22 approval of the pricing agreement did not

---

[10] Defendants argue that it was President Bush's speech that caused the jump in price and volume on May 14, and in that assertion they are correct.  The President's speech was in the middle of the day, leading to market reaction by at least 3:30 p.m.  The Super Insider Solicitation was not disseminated until 6:30 p.m., after U.S. markets were closed.  However, the increased jump in price and volume the next day cannot be ascribed fully to the President's speech that did not directly pertain to USEC, in contrast to Defendants' false statements that related <u>specifically</u> to USEC.

take place, trading in the stock decreased steadily over the next few days.  See id.  On May 22, trading volume in USEC dropped by 3,677,600 shares, and on May 23, the volume dropped by another 1,137,400 shares.

The price of USEC's stock had made an ascent, from $7.85 on May 14 (the day the Super Insider Solicitation came out after hours) to $8.95 on May 15, the first trading day after the Super Insider Solicitation.  The price continued to climb, reaching $9.54 on May 21.  On May 22, the share price abruptly dropped by $1.34 per share.

The sudden and drastic increase in trading, beginning the first trading day after the Super Insider Solicitation, and climaxing on the date the Super Insider Solicitation and Special Report instructed tipees to purchase USEC's stock, confirms that the market found May 21 to be a significant buy date for USEC. Defendants have presented no evidence that any other newsletter writer, journalist or investment advisor had pegged May 21 as an important buy day for USEC.

Defendants argue that their statements have not "altered the mix" of information because it is not "substantially likely" that a reasonable investor would believe that disclosure of the untrue fact and nothing but the untrue fact would "alter the 'total mix' of information available."  Phillips v. LCI, Int'l, Inc., 190 F.3d 609, 619 (4th. Cir 1999); Defs.' Tr. Brief [Document 100] at 14 (arguing that "[t]he evidence in the record simply does not support the SEC's theory that it was the USEC report that altered

the mix of information in the stock market on or about May 14, 2002.").

Defendants seek to paint a picture of a market with positive information about USEC and speculation as to whether and when it will agree to a new contract that will provide USEC with additional profitability and return to shareholders.  However, the Super Insider Solicitation and Special Report altered the mix of information.  These communications falsely represented that tipees would receive not generally known information as to the specific day on which the generally anticipated good corporate news would be made public based upon a particularly reliable alleged source.  The mix of information made available to the buying tipees - who paid $1,000 to get the false information - most certainly altered the mix of information available to them.

The Court well recognizes that statements as to future events are nonactionable under Rule 10b-5 if accompanied by "detailed and meaningful cautionary language tailored to the specific risks" that sufficiently "bespeaks caution" to the reasonable investor.  <u>Raab v. Gen. Physics Corp.</u>, 4 F.3d 286, 290 (4th Cir. 1993).  Such statements of opinion, predictions, forecasts, projections, and other subjective analysis or extrapolation constitute "soft information" and are generally nonactionable because reasonable investors and market observers typically discount or disregard such statements.  <u>Id.</u>; <u>In re Verifone Sec. Litig.</u>, 784 F. Supp. 1471, 1482 (N.D. Cal. 1992), <u>aff'd</u>, 11 F.3d 865 (9th Cir. 1993) (observing that investors know

the "inaccuracy inherent in forecasting"). The "bespeaks
caution" doctrine has been employed by various courts to dismiss
claims of securities fraud if cautionary language sufficiently
negates the materiality of the alleged misrepresentations or
omissions. Gasner v. Board of Sup'rs, 103 F.3d 351, 358 (4th
Cir. 1996); In re Donald J. Trump Casino Sec. Lit., 7 F.3d 357,
371 (3d Cir. 1993), cert. denied sub nom Gollomp v. Trump, 510
U.S. 1178, (1994); see also Sinay v. Lamson & Sessions Co., 948
F.2d 1037, 1040 (6th Cir. 1991); I. Meyer Pincus & Assocs. v.
Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir. 1991); Romani v.
Shearson Lehman Hutton, 929 F.2d 875, 879 (1st Cir. 1991); Luce
v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986); Polin v.
Constructron Corp., 552 F.2d 797, 806 n.28 (8th Cir. 1977), cert.
denied, 434 U.S. 857, (1977).

     Predictions and general expressions of opinion about future
events are not actionable under Section 10(b) and Rule 10b-5 if
(i) the speaker truly believes the statement, (ii) there is a
reasonable basis for the belief, and (iii) the speaker is not
aware of any undisclosed facts that would seriously undermine the
accuracy of the statement. In re Apple Computer Sec. Litig., 886
F.2d 1109, 1113 (9th Cir. 1989); see also Va. Bankshares, Inc. v.
Sandberg, 501 U.S. 1083, 1093-94 (1991).

     Defendants attempt to categorize the language in the Super
Insider Solicitation and Special Report as cautionary. However,
they point to no "detailed and meaningful cautionary language
tailored to the specific risks" of investing in USEC on the basis

22

of Defendants' representation that they had been informed by a
senior USEC executive that the pricing agreement would be
announced on May 22.  <u>See</u> <u>Raab</u>, 4 F.3d at 290.  To the contrary,
Defendants' false statements are precise, with no warnings or
articulation of the dangers or uncertainties of investing in this
stock based on the information presented.  The first three
paragraphs in Defendants' Super Insider Solicitation set the
tone:

> I've recently learned the details of a major
> international agreement between the United States
> and Russia that will create more than $2.5 billion
> for one small U.S. company.
>
> Investors in this company are going to make a
> fortune - for reasons that I can detail for you
> here. And, best of all, because of my source - a
> senior company executive - I can even tell you
> EXACTLY WHEN the deal will be finalized and
> announced to the public.
>
> The deal will close on May 22nd, only a few days
> from now.

Pl.'s Ex. 1 (capitalization in original).

No cautionary language accompanies the false statements in
the Super Insider Solicitation or the Special Report.  <u>See</u> <u>id.</u>
Furthermore, the Court finds that Defendants' false statements
were made knowingly.  The "bespeaks caution" defense is not
available for the defense.

### 3.   <u>Scienter</u>

Scienter is a state of mind embracing intent to deceive,
manipulate or defraud.  <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185,
193 (1976); <u>Svezzese v. Duratek, Inc.</u>, No. 02-1587, slip op. at 4

(4th Cir. June 12, 2003).  It requires a showing that defendant acted "other than in good faith," Hochfelder, 425 U.S. at 206, or that the defendant "lacked a 'genuine belief that the information disclosed was accurate and complete in all material respects.'" In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989) (citation omitted).

Defendant Stansberry did not have, indeed, could not possibly have had a belief that the information he provided in the Super Insider Solicitation and Special Report was correct in all material respects.  In particular, Stansberry knew full well that Wingfield had not told him that the pricing agreement would be announced on May 22.  Furthermore, Stansberry intentionally made false statements about the company (USEC) to induce the recipients of the Super Insider Solicitation to pay $1,000 for the Special Report that completed the intentionally false statements.  See Spier v. Erber, 759 F. Supp. 1024, 1030 (S.D.N.Y. 1991) (finding that defendant "knew that [their] representations were false, and intentionally made such false representations in order to induce" plaintiff to take an action gave rise to the "strong inference of scienter") (internal citations omitted).

The Court finds that Stansberry's scienter is imputed to Pirate because he effectively controlled Pirate and made the statements at issue on behalf of Pirate as an agent of Pirate, within the scope of his agency.

Even if Stansberry's scienter were not imputed to Pirate,

24

the SEC has proven Pirate's scienter nonetheless.  A statement
may be actionable if it is made with "reckless disregard for its
truth or falsity." <u>Eisenberg v. Gagnon</u>, 766 F.2d 770, 776 (3d
Cir. 1985)  (citations omitted). "The securities laws generally
define recklessness as an act 'so highly unreasonable and such an
extreme departure from the standard of ordinary care as to
present a danger of misleading the plaintiff to the extent that
the danger was either known to the defendant or so obvious that
the defendant must have been aware of it.'"  <u>Phillips</u>, 190 F.3d
at 621.

     The evidence established that Pirate acted with "reckless
disregard for [the] truth or falsity" of the statements.
<u>Eisenberg</u>, 766 F.2d at 776.  George Rayburn testified that it was
Pirate's usual practice to have an editor review and confirm the
accuracy of the content of all editorial publications.  Trial Tr.
5, Mar. 29, 2005  However, that procedure was not followed in
regard to the Super Insider Solicitation and Special Report
because Stansberry was both author and editor.  As a result,
there was no independent verification of the facts in the Super
Insider Solicitation or the Special Report.  <u>Id.</u>

     Simply allowing one person to author, edit, and publish
information without editorial or other review to authenticate its
claims eviscerates the editing procedures of Pirate and evidence
a reckless disregard for the truth of the statement.
Furthermore, the nature of the bombastic claims in the Super
Insider Solicitation and the Special Report should have caused a

reasonable editor or manager at Pirate to inquire about the source.  After all, Stansberry was claiming to have inside information from a USEC senior executive and was telling customers to buy and sell on specific days.  Any reasonable editor or manager would have realized the potential legal and financial exposure to Pirate should that information have been incorrect, or as it turned out, fabricated.  Abdicating all editorial authority to the proponent of such a statement evidences a reckless disregard for the truth by Pirate.

Accordingly, even if Stansberry's statements were not attributable to Pirate, the Court would find Pirate to have acted with scienter in regard to the false statements at issue.

### 4.   In Connection With the Purchase or Sale of a Security

A fraudulent action is "in connection with" the sale of a security when someone utilizes a device "that would cause reasonable investors to rely thereon" and "so relying, cause them to purchase or sell a corporation's securities." In re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153, 156 (2d Cir. 1998) (citation omitted); SEC v. Savoy Indus., 587 F.2d 1149, 1171 (D.C. Cir. 1978)(the "in connection with" requirement is satisfied when it "may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon, regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator").

This element of Section 10(b) and Rule 10b-5 is to be construed broadly and flexibly to effectuate its remedial purpose. SEC v. Zandford, 535 U.S. 813, 819 (2002).  Section 10(b) and Rule 10b-5 are flexible enough to encompass many varieties of fraudulent schemes, not simply the "garden type variety of fraud."  742 F.2d 592, 596 (11th Cir. 1984). Defendants need not have a fiduciary responsibility to the recipients of the false statements; it is enough if Defendants' actions affected the price of the stock or induced others to purchase the stock.  See United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd., 210 F.3d 1207, 1221 (10th Cir. 2000) (finding the "in connection with" requirement satisfied where a defendant used knowingly false statements to induce another to purchase a security); In re Cascade Int'l Sec. Litig., 894 F. Supp. 437, 444 (S.D. Fl. 1995) (stating that the "in connection with" requirement can be met if the plaintiff alleges that the statements of defendant affected the price of the stock); SEC v. Terry's Tips, Inc., 409 F. Supp. 2d 526, 533 (D. Vt. 2006) (finding that a newsletter publisher who deceived customers through promises of unreasonable returns if they invested in the market could satisfy the "in connection with" requirement).

Defendants argue that "[n]o court has ever imposed liability under Section 10(b) and Rule 10b-5 based on nothing more than commentary or predictions concerning recommended stocks."  Defs.' Trial Br. [Document 93] at 3 (emphasis in original).  Even if accurately stated, this prohibition would not render the false

statements at issue immune from Rule 10b-5.  The Super Insider
Solicitation and Special Report did more, significantly more,
than provide a commentary or prediction. These documents provided
the false statement that purchasers of the Special Report would
obtain information not generally available from USEC as to the
precise date on which a specific event would cause the corporate
stock to "skyrocket."

Defendants further argue that should they be held liable,
the government and private litigants would be free to file
Section 10(b) or Rule 10b-5 actions against "any and all
publishers of financial information."  Id.  However, the
statements at issue were not made in a "publication" of the type
accorded special protection from suit. In this case, Stansberry
and Pirate - although they may have been otherwise engaged in
producing publications entitled to heightened protection - were
not so engaged in regard to the fraudulent scheme at issue.

The defense also urges the Court to conclude that Carter-
Wallace stands for the proposition that a defendant must have a
fiduciary duty to those to whom it speaks to be held liable for
securities fraud.  Defs.' Trial Br. [Document 98] at 5.  The
Court does not read Carter-Wallace to so hold.

The very essence of the fraudulent scheme was to induce its
victims to purchase USEC stock prior to May 22, 2002 and, of
course, to pay some $1,000 for the privilege of being misled to
believe that there was a particular plausible specific reason to
do so.  The Court concludes that the SEC has proven that the

28

false statements at issue were made in connection with the
purchase or sale of a security.

#### 5.  Use of an Instrumentality of Interstate Commerce

To establish a violation of Section 10(b) and Rule 10b-5,
the SEC had to prove that Defendants used "any means or
instrumentality of interstate commerce" to engage in the
fraudulent conduct.  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5; SEC
v. Solucorp Indus., Ltd., 274 F. Supp. 2d 379, 418-19 (S.D.N.Y.
2003).

There is no doubt as to the interstate commerce nexus of the
scheme at issue here.  The Super Insider Solicitation was sent
by email, undoubtedly an instrumentality of interstate commerce.
United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997); see
United States v. Thomas, 74 F.3d 701, 706-09 (6th Cir. 1996).

#### E.  Asserted Defenses

#### 1.  Proof of Malice Not Required

Defendants argue that the false statements at issue were
made in the course of a "pure speech activity," so that they
cannot be liable for a violation of Rule 10b-5 unless there is
clear and convincing proof of actual malice.

In New York Times v. Sullivan, the Supreme Court considered
the affirmation by the Alabama Supreme Court of a jury verdict
finding the New York Times liable for libel per se because of a
private advertisement in the Times that contained false

statements about a public official, one of the City Commissioners
of Montgomery, Alabama.  376 U.S. 254, 262-64 (1964).

The United States Supreme Court reversed on the basis that
the "rule of law applied by the Alabama courts is
constitutionally deficient for failure to provide the safeguards
for freedom of speech and of the press that are required by the
First and Fourteenth Amendments in a libel action brought by a
public official against critics of his official conduct." Id.
Under the proper safeguards, the Court continued, "the evidence
presented in this case is constitutionally insufficient to
support the judgment for respondent." Id at 265.

The Supreme Court noted that although the statement in
question had been published in a paid space in the Times, "[i]t
communicated information, expressed opinion, recited grievances,
protested claimed abuses, and sought financial support on behalf
of a movement whose existence and objectives are matters of the
highest public interest and concern." Id. at 266.  To hold
otherwise, the Supreme Court noted, would discourage newspapers
from carrying "editorial advertisements" and "shut off an
important outlet for the promulgation of information and ideas by
persons who do not themselves have access to publishing
facilities - who wish to exercise their freedom of speech even
though they are not members of the press." Id.  With regard to
the commercial nature of the statements, the Court held that
"allegedly libelous statements [which] would otherwise be
constitutionally protected from the present judgment, they do not

forfeit that protection because they were published in the form
of a paid advertisement."   Id.   After a lengthy discussion of the
importance of free discussion of political ideas, the Supreme
Court stated:

> The constitutional guarantees require, we think, a
> federal rule that prohibits a public official from
> recovering damages for a defamatory falsehood
> relating to his official conduct unless he proves
> that the statement was made with "actual malice" --
> that is, with knowledge that it was false or with
> reckless disregard of whether it was false or not.

Id. at 279-80.

Defendants assert that their statements are "pure speech" in
the same character as the political speech at issue in Sullivan.
This Court disagrees.

The Super Insider Solicitation and Special Report are
commercial speech entitled to lesser protection under the First
Amendment than the pure speech involved in Sullivan.   The Super
Insider Solicitation to purchase the Special Report was a
communication with no purpose other than to "propos[e] a
commercial transaction."   Cent. Hudson v. Pub. Serv. Comm'n, 447
U.S. 557, 562 (1980).

"The protection available for particular commercial
expression turns on the nature both of the expression and of the
governmental interests served by its regulation."   Id. at 563.
The government may "ban forms of communication more likely to
deceive the public than to inform it."   Id.; see Va. State Bd. of
Pharmacy v. Va. Consumer Council, 425 U.S. 748, 771 (1976)
(stating that "[u]ntruthful speech, commercial or otherwise, has

never been protected for its own sake"); Nat'l Life Ins. v.
Philips Publ'g, 793 F. Supp. 627, 646 (D. Md. 1992) (stating that
in order to receive First Amendment protection, commercial speech
"must be neither misleading nor related to unlawful activity.")
(citing Cent. Hudson, 447 U.S. at 654).  Specifically, the
government may regulate communications with regard to the
"exchange of information about securities" without offending the
First Amendment.  Ohralik v. Ohio State Bar, 436 U.S. 447, 453-54
(1978) (citing SEC v. Tex. Gulf Sulfur Co., 401 F.2d 833 (2d.
Cir. 1968)).  This is because communications concerning the sale
and purchase of securities form "a distinct category of
communications in which the government's power to regulate is at
least as broad as with respect to the general rubric of
commercial speech." SEC v. Wall Street Publ'g, 851 F.2d 365,.
373 (D.C. Cir. 1988).

Most importantly, "the First Amendment does not shield
fraud." Illinois v. Telemarketing Assoc., 538 U.S. 600, 612
(2003).  The government's power to protect the people from fraud
is "firmly established." Id. The intentional lie is "no
essential part of any exposition of ideas" Gertz v. Robert Welch,
Inc., 418 U.S. 323, 340 (1974); see Telemarketing Assoc., 538
U.S. at 612.

Defendants do not challenge the ability of Congress to enact
Section 10(b) or the Commission to promulgate Rule 10b-5, but
rather seek to color their statements with the hue of political
discourse, as in Sullivan.  However, the communications at issue

are not pure speech and the SEC does not bear the burden of
proving actual malice in Defendants' statements by clear and
convincing evidence, as was necessary on the facts in <u>Sullivan</u>.

The communications at issue were not within publications
addressing matters of political, social or intellectual interest.
The Super Insider Solicitation was a fraudulent commercial
solicitation to purchase a product.  The Court does not find such
a communication entitled to the First Amendment protection
provided by <u>Sullivan</u>.

The SEC has proven scienter on the part of Stansberry and
Pirate.  It was not required to prove malice.


            2.   <u>The "Disinterested Publisher" Defense</u>

In actions brought under the Investment Adviser Act of 1940
("Advisers Act"), there is a defense available for "the publisher
of [a] bona fide newspaper, news magazine or business or
financial publication of general and regular circulation." 15
U.S.C. § 80b-2(a)(11)(D)(2003); <u>Lowe v. SEC</u>, 472 U.S. 181, 204
(1985).  There is an unresolved question of whether the
"disinterested publisher" defense would be available in a Section
10(b) or Rule 10b-5 charge.

A judge of the District Court for the District of Columbia
has held that the "disinterested publisher" defense is applicable
to Section 10(b) or Rule 10b-5 actions.  In <u>SEC v. Wall St. Publ.
Inst., Inc.</u>, 591 F. Supp. 1070 (D.D.C. 1984), the SEC brought a
civil action against the publisher of Stock Market Magazine,

alleging violations of the Advisers Act and sections 17(b) and
10(b) of the Exchange Act.  The district court initially held for
the SEC, finding that because the magazine's statements were
false and misleading, the "in connection with" element was met.

During the pendency of the defense's appeal, the Supreme
Court decided Lowe v. SEC, which, as discussed above, recognized
a "disinterested publisher" defense in a case involving the
Exchange Act.  472 U.S. 181 (1985).  The District of Columbia
Circuit remanded Wall Street for further proceedings in light of
Lowe.  On remand, the Wall Street district court reversed its
position and held that the representations made in the
publication in question were not "in connection with the purchase
or sale of a security" because the actionable statements were
made in a bona fide publication with general and regular
circulation.  SEC v. Wall St. Publ. Inst., Inc., 664 F. Supp. 554
(D.D.C. 1986).

Although the SEC appealed from the second Wall Street
district court decision, it did not present an issue as to the
dismissal of the Rule 10b-5 claim on appeal.  SEC v. Wall St.
Publ. Inst., Inc., 851 F.2d 365, 368 (D.C. Cir. 1988).
Therefore, there is no appellate decision with regard to a
"disinterested publisher" defense in a Rule 10b-5 case.  Hence, a
question of first impression would be presented if Stansberry and
Pirate were "disinterested publishers."

In order for Stansberry and Pirate to be "disinterested
publishers" of the publications at issue (the Super Insider

34

Solicitation and Special Report), two conditions must be met: (1) the publication must be "bona fide," and (2) it must be "of regular and general circulation." Lowe, 472 U.S. at 206. These "two qualifications precisely differentiate 'hit and run tipsters' and 'touts' from genuine publishers." Id. The focus is on the nature of the publication, and not the general character of the publisher. Id. at 208.

A bona fide publication is one that contains disinterested commentary and analysis as opposed to promotional material disseminated by a "tout." Id. at 206. Of course, the "mere fact that a publication contains advice and comment about specific securities does not give it the personalized character that identifies a professional investment adviser." Id. at 208.

A publication with a "general and regular" circulation is one that is offered to the general public on a regular schedule. Id. at 206. Stated in the converse, publishing a newsletter of "general and regular" circulation does not include the issuance of "bulletins from time to time on the advisability of buying and selling stocks . . . or 'hit and run tipsters.'" Id. (citation omitted).

In Lowe, the Court described the publication before it as "a public forum in which typically anyone may express his views." Id. The "bona fide" requirement can best be translated as "genuine." Id. at 209. With regard to the specific publication, the Lowe Court noted that "there is no suggestion that [the publication] contained any false or misleading information . . .

. [or] that they have been timed to specific market activity, or to events affecting or having the ability to affect the securities industry." Id.  The Lowe Court was convinced that "[t]o the extent that the chart service contains factual information about past transactions and market trends, and the newsletters contain commentary on general market conditions, there can be no doubt of the protected character." Id. at 209-10.

As to the communications at issue, Stansberry and Pirate are not "disinterested publishers" because the Super Insider Solicitation and Special Report are not "of regular and general circulation."  The Special Report was not, by any standard, "of general and regular circulation."  The Special Report was only provided to the recipients of the Super Insider Solicitation who paid $1,000 to get the name of the company stock touted in the Super Insider Solicitation.

The defense contends that the Super Insider Solicitation was part of a series called "The Blast," which had been sent on an almost daily basis since February 2000.  Even if the Super Insider Solicitation had been part of a semi-regular series of email circulations, if those other emails were of the same character, the frequency of issuance would not make them publications of general and regular circulation.  At most, the series would be akin to regular mailings from a retailer sending alerts of sales and special deals to potential customers.

Finally, it must be noted that in the scheme at issue, the

Super Insider Solicitation had no value without the Special
Report.  That is, after all, why the Super Insider Solicitation
was distributed to hundreds of thousands of recipients for free.
It was only upon payment of $1,000 and receipt of the by no means
generally available Special Report, that the message was
delivered - that is that it was a USEC employee, in a position to
know who had provided the precise date on which the corporate
stock price would "skyrocket."

Accordingly, Stansberry and Pirate would not be entitled to
the "disinterested publisher" defense even if it were available
in a Rule 10b-5 case.


### 3.   USEC's Failure to Correct False Rumors

According to Defendants, USEC "has affirmative duties
imposed upon it by the NYSE to correct false rumors about the
corporation that cause unusual market activity.  Def.s' Trial Br.
[Document 94] at 1.  Defendants assert that the New York Stock
Exchange, on which USEC is listed, requires listed companies to
correct false rumors in the marketplace.  The NYSE's Listed
Company Manual states that:

> The market activity of a company's securities
> should be closely watched at a time when
> consideration is being given to significant
> corporate matters. If rumors or unusual market
> activity indicate that information on impending
> developments has leaked out, a frank and explicit
> announcement is clearly required. If rumors are in
> fact false or inaccurate, they should be promptly
> denied or clarified.

NYSE Rule 202.03.  Even if USEC did have a duty to correct the

rumor[11] and breached that duty, Defendants would not be absolved of liability.  Defendants made false statements that influenced tipees' decisions to purchase the stock of USEC.

Defendants also argue that USEC's failure to correct the rumor is evidence that Stansberry's statement was, in fact, true.  Such "evidence" - if it is evidence at all - would be, in any event, nonpersuasive.

### F.   Remedial Action

#### 1.   Injunctive Relief

The Commission has requested that the Court enter an injunction, pursuant to Federal Rule of Civil Procedure 65(d), enjoining Defendants from violating Section 10(b) or Rule 10b-5 in the future.  Where a violation of securities law has been found, a court is vested with broad discretion in deciding whether to grant injunctive relief.  SEC v. Am. Realty Trust, 429 F. Supp. 1148, 1175 (E.D. Va. 1977)

Defendants attempt to avoid an injunction by characterizing it as an unconstitutional prior restraint of speech.  While Defendants are correct that there is a "heavy presumption" against the constitutional validity of a restraint of communication, such a presumption does not apply when a Court enjoins activity not protected by the First Amendment.  See Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971).  The Commission does not seek to enjoin Defendants from engaging in

---

[11]   The Court by no means so holds.

protected speech, but from engaging in fraud in commercial speech, an activity that is not protected by the First Amendment. See Telemarketing Assoc., 538 U.S. at 612.

Defendants contend that Courts have "routinely rejected" injunctive relief when faced with instances of similar or even more egregious conduct. Def.s' Trial Br. [Document 106] at 5. The Court does not find there to have been any such "routine" rejection or even that the decisions referred to by the defense are particularly pertinent to the instant case. E.g. SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003) (consultant gave inside information to his dentist); SEC v. Ingram, 694 F. Supp. 1437, 1442 (C.D. Cal. 1988) ("genuinely contrite and repentant" defendant with small financial gain and evidence of scienter, though sufficient to sustain the violation, not overwhelming); SEC v. Yun, 148 F. Supp. 2d 1287, 1294 (M.D. Fla. 2001) (defendant was contrite and would no longer have access to insider information).

In stark contrast, Stansberry and Pirate made substantial profit, scienter has been overwhelmingly established, and there would be ample future opportunities for Stansberry and Pirate to engage in fraudulent schemes of the type established herein.  Nor is there any evidence of contrition.[12]

---

[12] Indeed, on June 18, 2002, Jody Madron (a writer for Pirate) emailed Stansberry that he overheard a man in an airport line discussing USEC, saying:
    Yeah, but I don't know if the price will go up because a bunch of Internet assholes drove it up a few weeks ago before everything could fall into place . . . some idiot named McDaniel . . . yeah, I saved all of the

In order to obtain the requested injunction, the SEC must establish a "reasonable and substantial likelihood" that the Defendants will violate securities laws in the future.  <u>SEC v. Youmans</u>, 729 F.2d 413, 415 (6th Cir. 1984); <u>SEC v. Fehn</u>, 97 F.3d 1276, 1295 (9th Cir. 1996).  In ascertaining the likelihood of future violations, no single factor is determinative; the Court should look at "the totality of the circumstances and factors suggesting that the infraction might not have been an isolated occurrence."  <u>Fehn</u>, 97 F.3d at 1295-96; <u>Youmans</u>, 729 F.2d at 415. The Court should consider the:

1.   Gravity of the harm caused by the offense;

2.   Extent of the defendant's participation and his degree of scienter;

3.   Isolated or recurrent nature of the infraction;

4.   Likelihood that the defendant's customary business activities might again involve him in such transactions;

5.   Defendant's recognition of his own culpability; and

6.   Sincerity of his assurances against future violations.

<u>Fehn</u>, 97 F.3d at 1295-96; <u>Youmans</u>, 729 F.2d at 415; <u>SEC v. Suter</u>, 732 F.2d 1294, 1301 (7th Cir. 1984); <u>see</u> <u>SEC v. Holschuh</u>, 694,

---

e-mails . . . bunch of assholes who shouldn't be shooting their mouths off.

Pl.'s Ex. 62.  In response to Madron's e-mail, Stansberry wrote: Bro . . . . that's fucking unbelievable.  I would have walked right up to the guy and said, yep, that was me and then laughed in his face.
<u>Id.</u>  (punctuation in original).

F.2d 130, 144 (7th Cir. 1982); SEC v. Zale Corp., 605 F.2d 718,
720 (5th Cir. 1981).  Because "an injunction is a drastic remedy
and not a mild prophylactic," the SEC must meet a high burden to
obtain an injunction.  Aaron v. SEC, 446 U.S. 680, 703 (1980)
(Burger, C.J., concurring).


     a.   The Gravity of the Harm

     The gravity of the harm in this case is not limited to the
amount of money each purchaser spent for the Special Report.
Approximately 1,217 investors bought the Special Report with the
expectation, as promised by the Super Insider Solicitation, that
they would double their investment dollars if they just followed
the "insider" information contained within the Special Report.

     At least one investor lost approximately 20 to 25% of his
investment portfolio after purchasing USEC stock and options
between May 13 and 22.  See Trial Tr. 8-9, Mar. 24, 2005.  That
investor finally sold his stock, after May 22 came and went
without the anticipated announcement, in August of 2002 when
Stansberry indicated in a new special report to investors that
USEC stock was no longer a good long-term investment.  Id. at 9;
see also Pl.'s Ex. 24.[13]  The investor lost about $28,000.  Trial

---

[13] To be sure, Stansberry also advised in an August 1, 2002
special report that those who already owned USEC shares should
hold them until the end of the year, but cautioned that his
recommendation would be to sell any USEC stocks held at the end
of the year if certain events did not materialize.  Given
Stansberry's poor track record on predicting events that would
favorably impact USEC's stock, it is not surprising that
investors jumped ship after receiving Stansberry's poor long-term
prognosis for the stock.

Tr. 9, Mar. 24, 2005.  Although the investor eventually received
a refund of the $1,000 Special Report purchase price, that refund
was not offered to him by Defendants.  Rather, he learned that
other purchasers of the Special Report had been offered refunds
after reading about the SEC action against Defendants on the
Internet.  It was then that he contacted Pirate and requested and
received a refund of the $1,000 purchase price.  Id. at 10.

Another investor who purchased the USEC Report for $1,000
testified that he sold other investments and borrowed money on a
credit card in order to purchase 7,500 shares of USEC stock with
the expectation that he would double his money after May 22.  Id.
at 26.  That investor lost approximately $7,200 when he
eventually sold the stock, two months after the approval of the
new pricing agreement was supposed to have been announced.  Id.
He was never offered a refund of the purchase price of the USEC
Report.  Id. at 29.  Although that investor tried on a number of
occasions to get answers to specific questions about the status
of USEC stock and the non-existent May 22 announcement,
Stansberry merely responded that he could not give individualized
investment advice.  Trial Tr. 28, Mar. 24, 2005.

Investors certainly lost more than the $1,000 purchase price
of the USEC Report.  While Defendants reaped approximately $1
million in revenue from the sale of 1,217 copies of the Special
Report, the losses to investors no doubt greatly exceeded that
amount.

42

b.   <u>Degree of Participation and Scienter</u>

Both Stansberry and Pirate were integral participants in the fraudulent scheme.  Indeed, their culpability and participation are intertwined.  Though Stansberry fabricated the false statements, Pirate also had a high level of participation in the communication of the false statements.  Defendants targeted potential purchasers of the Special Report through the Pirate database.  It was a Pirate email that advertised the Special Report, and both the Super Insider Solicitation and the Special Report were ascribed to a commonly-used Pirate pseudonym, "Jay McDaniel."  Stansberry testified at trial that he bears the ultimate responsibility for Pirate publications – "there's no doubt about it, I run the show."  Trial Tr. 169, Mar. 22, 2005.  Insofar as the Court has found that Stansberry acted with scienter because he knew that the statements he attributed to USEC were false, the scienter element is established.

c.   <u>The Isolated or Recurrent Nature of the Infraction</u>

Since the USEC Special Report was issued in May of 2002, Pirate has issued many other "special reports."  Trial Tr. 173, Mar. 30, 2005.  Stansberry testified that one such report, which he authored, sold for $250 in 2003 and another that he authored with assistance of others in 2004 was free with a subscription to Stansberry's newsletter.  <u>Id.</u> at 183.  There is no evidence that there was another fraudulent scheme, however.

43

### d. Defendants' Likely Involvement in Future Transactions

Defendants continue to distribute investment newsletters offering stock tips and advice.

### e. Defendants' Recognition of Culpability

The Court does not, of course, fault the defense for raising the legal contentions presented in the instant case.  However, the Court does not find that Stansberry recognizes his factual culpability and, indeed, finds that he testified falsely at trial.

### f. Sincerity of Defendants' Assurances Against Future Violations

Defendants have not admitted the current fraudulent scheme. If Stansberry were to provide an assurance, that there would be no future violations, the Court would not find him particularly credible.  The existence of an injunction against future fraudulent schemes of the type involved here will provide a needed measure of security against recidivism.

The Court finds, after weighing the relevant factors, that there is ample evidence of a "reasonable and substantial likelihood" that Defendants will violate securities laws in the future, absent an injunction.  See Am. Realty Trust, 429 F. Supp. at 1175.  Therefore, the Court shall enjoin Stansberry and Pirate from future violations of the securities laws or regulations by the SEC.

2.   <u>Disgorgement</u>

The Commission has requested that the Defendants be ordered to disgorge their gains as a result of their fraudulent activity. Disgorgement is appropriate when a district court has found a violation of the securities laws, so that the defendant must relinquish the unjust enrichment of his illegal activities.  <u>See</u>, <u>e.g.</u> <u>SEC v. Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 95-96 (2d Cir. 1978).

The disgorgement amount "need only be a reasonable approximation of the profits casually connected to the violation."  <u>SEC v. First Jersey Sec., Inc.</u> 101 F.3d 1450, 1475 (2d Cir. 1996).  In the instant case, it does not appear that there was any substantial marginal cost to Stansberry or Pirate attributable to the receipts generated from the sales of the Special Report.  Accordingly, the receipts from the sale of the Special Report, net of refunds paid, would fairly approximate the profit "causally connected to the violation."

Pirate sold 1,217 copies of the Special Report at $1,000 per report, and reimbursed 215 purchasers of the Special Report, refunding a total of $215,000.  Thus, Pirate's net receipts for the sale was $1,002,000.[14]  Stansberry testified that he received

---

[14] Although Pirate also offered purchasers of the Special Report who did not request a refund a complimentary subscription to its Extreme Value newsletter (a $1,000 value), the Court does not find that this offer actually cost Pirate anything or diminished the profit on the Special Report.  Accordingly, the cost of the Extreme Value newsletter for 395 Special Report purchasers does not reduce Pirate's profit from sales of the

a commission from Pirate for the Special Report sale in the amount of $200,400.  Trial Tr. 172-73, Mar. 22, 2005.  Therefore, the profit "causally connected to the violation" was $200,400 for Stansberry and $801,600 for Pirate.

It is within the Court's discretion to hold wrongdoers joint and severally liable in securities cases when "two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct."  SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997); see First Jersey Sec., Inc., 101 F.3d at 1475.

In the instant case, the Court finds it appropriate to hold Stansberry and Pirate jointly and severally liable for disgorgement of the entire amount of $1,002,000.

Stansberry testified that he ran "the show" and was the "person in charge" or Pirate.  Trial Tr. 169, 171, Mar. 22, 2005.  Stansberry and Pirate were was intimately involved in perpetrating the fraud at issue.  Stansberry drafted the Super Insider Solicitation using a Pirate author's pseudonym, utilized Pirate's mailing list and newsletter, had sales of the Special Report, had Pirate receive the proceeds and keep the majority for itself.  Furthermore, Stansberry testified that he received a bonus that was a percentage of Pirate's net income, and that in 2002, the year of this fraud, he "made substantially more."  Id. at 169.  He was unable to recall his specific bonus in 2002, estimating that it ranged from between $200,000 and $400,000.

─────────────────────────

Special Report.

Stansberry profited handsomely from Pirate's gain from the fraudulent scheme.  Accordingly, the Court concludes that Stansberry and Pirate; therefore are to be jointly and severally liable for the entire $1,002,000 to be disgorged.

The Court finds it appropriate to exercise its discretion to award prejudgment interest with regard to the disgorgement.  See Imgarten v. Bellboy Corp., 383 F. Supp. 2d 825, 846-47 (D. Md. 2005).  The Court will borrow from Maryland law to fix the rate for prejudgment interest at 6% (simple) per annum.  First Va. Bank v. Settles, 588 A.2d 803, 808 (Md. 1991).  Prejudgment interest shall commence on May 21, 2002[15] and shall be calculated through July 21, 2007, the end of the last full month prior to the entry of Judgement.  Thus, there shall be prejudgment interest of 6% per annum (simple) for five years and two months, that is, 62 months at .5% per month for a total of 31%.

Accordingly, with regard to disgorgement, Defendants Stansberry and Pirate are jointly and severally liable to pay the Clerk of Court the sum of $1,312,620[16] for disbursement pursuant to further Order.

### 3.   Civil Penalty

The Commission has requested a third-tier civil monetary penalty be assessed against Defendants under 15 U.S.C. §

---

[15]   The last day on which the Special Report could have been sold.

[16]   Consisting of principal of $1,002,000 and prejudgment interest of $310,620.

78u(d)(3)(B)(iii).  Such a penalty is appropriate where
violations involve: 1) "fraud, deceit, manipulation, or
deliberate and reckless disregard of regulatory requirements";
and 2) the violation "resulted in substantial losses or created a
significant risk of substantial loss to other persons."  Id.  For
a third-tier penalty, the Court may assess up to $120,000 for
each violation by an individual and $600,000 for each violation
by an entity.  Id.; 17 C.F.R. § 201.1002 (inflationary adjustment
raising maximum penalty to $120,000).

Stansberry's conduct undoubtedly involved deliberate fraud,
making statements that he knew to be false; Pirate acted in
reckless disregard of regulations when it published Stansberry's
unbelievable claims without a shred of confirmation.  The
violation plainly involved the <u>risk</u> of substantial loss to those
who bought the Special Report and relied upon Stansberry's false
statements in their stock purchase decisions.

The Court finds it appropriate to impose on Stansberry the
maximum civil penalty, $120,000.  As to Pirate, the Court finds
that the SEC has not proven that any individual associated with
the entity, other than Stansberry, had actual knowledge of the
fraudulent scheme.  Nor is there evidence that Pirate engaged in
a pattern of fraudulent activity.  Accordingly, the Court finds
it appropriate to limit the civil penalty imposed on Pirate to
$120,000 in recognition of the fact that its culpability is based
primarily upon the intentional conduct of one individual albeit
aided and abetted by others.

IV.   <u>Conclusion</u>

For the foregoing reasons:

1.   The Court finds that Plaintiff Securities and
     Exchange Commission has proven by clear and
     convincing evidence that Defendants Pirate
     Investor, LLC and Frank Porter Stansberry violated
     Section 10(b) of the Securities and Exchange Act
     of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5
     thereunder, 17 C.F.R. § 240.10b-5.

2.   The Court finds that Plaintiff Securities and
     Exchange Commission has not proven that Defendant
     Agora, Inc. itself (as distinct from its
     subsidiary) violated Section 10(b) of the
     Securities and Exchange Act of 1934, 15 U.S.C. §
     78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §
     240.10b-5.

3.   The Court concludes that:

     a.   Defendants Pirate Investor, LLC and Frank
          Porter Stansberry are jointly and severally
          liable to pay the Clerk of Court the sum of
          $1,312,620 as disgorgement of profits.

     b.   A penalty be assessed under 15 U.S.C. §
          78u(d)(3)(B)(iii) against Defendant Pirate
          Investor, LLC in the amount of $120,000.

     c.   A penalty be assessed under 15 U.S.C. §
          78u(d)(3)(B)(iii) against Defendant Frank
          Porter Stansberry in the amount of $120,000.

4.   Judgment shall be entered by separate Order.


SO DECIDED, on <u>Wednesday, August 1, 2007</u>.



                         _____/ s /_____
                             Marvin J. Garbis
                         United States District Judge