UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      PLAINTIFF,<br>v.<br><br>AGORA, INC., *et al.*,<br><br>      DEFENDANTS. | NO. 1:03-CV-1042-MJG |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PIRATE INVESTOR'S UNOPPOSED MOTION TO VACATE PERMANENT INJUNCTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)**

Ada Fernandez Johnson,
Bar No. 20566
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave., NW
Washington, D.C. 20004
T: (202) 383-8000
F: (202) 383-8118
afjohnson@debevoise.com

Andrew J. Ceresney (*pro hac vice* application pending)
Sarah B. Hoefle (*pro hac vice* application pending)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
T: (212) 909-6000
F: (212) 909-6836
aceresney@debevoise.com
shoefle@debevoise.com

*Counsel to Defendant Pirate Investor, LLC*

Dated: January 31, 2020

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ................................................................................................................................ 4

I.     THE COURT SHOULD VACATE THE INJUNCTION BECAUSE APPLYING IT PROSPECTIVELY IS NO LONGER EQUITABLE. .................................................... 6

    A.     The Company Has Substantially Changed Since The Injunction Was Entered. ............................................................................................................... 7

    B.     Over 12 Years Have Passed Since The Entry Of The Injunction Without A Violation. ....................................................................................................... 10

    C.     The Conduct Was Of Limited Duration And Was Not Repeated. ........................ 11

    D.     The Company Has Implemented Robust Compliance Programs To Ensure Compliance With Securities Laws And Other Applicable Regulations. ............... 12

    E.     There Is No Indication That The Company Will Repeat The Enjoined Conduct. ................................................................................................................ 14

    F.     The Objective Of The Injunction Has Been Achieved. ........................................ 14

CONCLUSION ........................................................................................................................... 17

i

# **TABLE OF AUTHORITIES**

**CASES**

*Brennan v. Thor, Inc.*, 516 F.2d 999 (4th Cir. 1975) ................................................. 6, 7, 11, 12, 15

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ............................................................................. 1, 14

*MicroStrategy, Inc. v. Bus. Objects, S.A.*, 661 F. Supp. 2d 548 (E.D. Va. 2009) ....................... 5, 12

*N. Carolina All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 713 F. Supp. 2d 491
    (M.D.N.C. 2010) ................................................................................................................. 5

*Pirate Investor LLC v. Sec. & Exch. Comm'n*, 561 U.S. 1026 (2010) ............................................ 4

*Sec. & Exch. Comm'n v. Crofters, Inc.*, No. C-2-70-351, 1982 WL 1362 (S.D. Ohio Aug.
    23, 1982) ......................................................................................................... 6, 10, 11, 15

*Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549 (3d Cir. 2019) .................................................. 14

*Sec. & Exch. Comm'n v. Ingoldsby*, No. 88-CV-1001, 1990 WL 120731 (D. Mass. May
    15, 1990) .......................................................................................................................... 11

*Sec. & Exch. Comm'n v. Pirate Investor LLC*, 580 F.3d 233
    (4th Cir. 2009) ..................................................................................................................... 4

*Sec. & Exch. Comm'n v. Thermodynamics, Inc.*, 464 F.2d 457 (10th Cir. 1972) ......................... 10

*Sec. & Exch. Comm'n v. Tsao,* 671 F. App'x 157 (4th Cir. 2016) ................................................. 5

*Sec. & Exch. Comm'n v. Warren*, 583 F.2d 115 (3d Cir. 1978) ....................................... 6, 10, 11

*Tobin v. Alma Mills*, 192 F.2d 133 (4th Cir. 1951) ............................................... 1, 4, 5, 7, 10, 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 60(b)(5) ........................................................................................................... 4

Pursuant to Federal Rule of Civil Procedure 60(b)(5), Defendant Pirate Investor, LLC ("Pirate Investor") (currently doing business as Stansberry & Associates Investment Research, LLC ("Stansberry Research" or the "Company")), moves this Court to vacate the injunction issued against it in this matter (the "Injunction"). The Plaintiff, the U.S. Securities and Exchange Commission (the "Commission"), does not oppose Pirate Investor's motion (the "Motion").

## PRELIMINARY STATEMENT

The purpose of an injunction is not to punish, but to guard against possible future violations. *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Where the facts and circumstances demonstrate that there is a reasonable assurance of future compliance with the law, courts have determined that it is inequitable to continue an injunction. *Tobin v. Alma Mills*, 192 F.2d 133, 135-36 (4th Cir. 1951).

The "obey-the-law" injunction issued **over 12 years** ago against Pirate Investor concerned actions taken over 17 years ago by the 29-year-old CEO of a start-up publishing enterprise with approximately 15 employees. That company bears no resemblance to its current incarnation, Stansberry Research — a leading publisher of financial and investment information that is the successor company to Pirate Investor. Stansberry Research now has a drastically different executive leadership team with extensive business, publishing, legal and compliance experience. The Company is a model corporate citizen of Baltimore and has been consistently recognized by the *Baltimore Sun* as one of the "Top Workplaces" in its region. More importantly, since the Injunction, the Company has implemented comprehensive compliance procedures relating to the review of its marketing and editorial content to ensure that the conduct at issue in the *Pirate Investor* case cannot recur. As a result, over the last 17 years, Stansberry Research has not engaged in, or been accused of engaging in, the type of misconduct that the Injunction was

1

intended to prevent. In fact, the Company has unquestionably demonstrated through its actions since the entry of the Injunction there is no likelihood it would violate the law.

In sum, the Injunction has achieved its remedial objective, the deterrent effect of which has caused Stansberry Research to change its ways and implement robust compliance mechanisms designed to prevent future violations. There is absolutely no indication that the Company will engage in the wrongdoing the Injunction was initially entered to deter. To maintain the Injunction more than 17 years after the offense in question took place would merely continue to harshly punish a company that has clearly learned its lesson. The Commission has informed the Company that it will not oppose this Motion. Accordingly, the Injunction should be vacated as to the Company.

## BACKGROUND

In May 2002, Pirate Investor issued a promotional email (the "Email") to its distribution list of subscriber email addresses, which offered for sale an investment report (the "Report"). *See* Declaration of Ada Fernandez Johnson ("Fernandez Johnson Decl.") Ex. 1 at 3–5 (*Sec. & Exch. Comm'n v. Agora, Inc., et al.*, No. MJG-03-1042 (D. Md. Aug. 3, 2007) (Memorandum of Decision) ("Mem.")). Both the Email and the Report were authored and edited by Frank Porter Stansberry, a then 29-year-old editor who essentially bore sole responsibility for the day-to-day operations of Pirate Investor. *Id.* at 24–25 (finding that Mr. Stansberry "effectively controlled Pirate [Investor]" and "was both author and editor" of the Report). Mr. Stansberry served Pirate Investor in multiple and diverse roles, including copywriter, researcher, analyst, editor, publisher and chief executive officer. *See id.* at 46 (citing Mr. Stansberry's trial testimony that he ran "the show" and was the "person in charge" of Pirate Investor). He performed editorial and marketing duties that, in a more mature and fully staffed business, would normally be delegated to specialized employees in various departments. *Compare* Mem. at 25 (noting that Mr. Stansberry

2

was the "one person to author, edit, and publish information without editorial or other review to authenticate its claims") *with* Fernandez Johnson Decl. Ex. 3 (Declaration of Mark Arnold ("Arnold Decl.")) ¶ 8 ("Since the Injunction's entry, growth has allowed the Company to properly staff the compliance, editorial and marketing functions, each of which is now a separate and independent function with multiple layers of controls that did not exist at the time of the Pirate Investor case."). At the time, however, Pirate Investor was a start-up publishing enterprise with only approximately 15 employees. Arnold Decl. ¶ 14.

The Email asserted that the Report provided special insight from a senior executive at an unnamed company concerning the imminent announcement of governmental approval of a major international agreement. Mem. at 4. The Email also told prospective investors they could earn a substantial return on their investment if they bought the Report and used this "super insider" tip. *Id.* Customers who ultimately purchased the Report learned that the unnamed company was USEC, Inc., a provider of uranium-enrichment services. *Id.* at 5. In the Report, Mr. Stansberry engaged in a financial analysis of USEC's fundamentals and discussed its role as the United States' agent in a disarmament pact with Russia. *Id.* at 5, 11–12. Mr. Stansberry predicted that a pending international agreement between the United States and Russia would benefit USEC, and stated that an unnamed USEC senior executive had assured him that the agreement would soon be approved and had said to "watch the stock on May 22." *Id.* at 5.

As it turned out, the U.S.-Russia agreement was not announced until three weeks later, on June 19, 2002, and some individuals who traded on the basis of the Report lost money on their investments. *Id.* at 5–6. Nearly one year later, the U.S. Securities and Commission (the "Commission") filed a civil complaint on April 18, 2003 charging Agora (Pirate Investor's parent company), Pirate Investor, and Mr. Stansberry with securities fraud under § 10(b) and

Rule 10b-5 of the Securities Exchange Act of 1934, claiming that statements in the Email and Report were false. *Id.* at 6. The Court concluded the conduct violated § 10(b) because it found that statements in the promotional Email and Report concerning discussions with the USEC senior executive were false. *Id.* at 9–14, 49. Pirate Investor and Mr. Stansberry were held liable for disgorgement of the profits from the Report and civil penalties. The Court declined to impose the maximum civil penalty on Pirate Investor, finding there was "*[no] evidence that Pirate engaged in a pattern of fraudulent activity*." *Id.* at 48 (emphasis added).

The Court — at the Commission's request — also entered a permanent "obey-the-law" injunction enjoining Pirate Investor and Mr. Stansberry from further violations of § 10(b). Fernandez Johnson Decl. Ex. 2 (*Sec. & Exch. Comm'n v. Agora, Inc., et al.*, No. MJG-03-1042 (D. Md. Oct. 3, 2007) (Injunction)).

The Company subsequently appealed the Court's decision. The United States Court of Appeals for the Fourth Circuit affirmed the decision in September 2009. *Sec. & Exch. Comm'n v. Pirate Investor LLC*, 580 F.3d 233 (4th Cir. 2009). The Company then petitioned the United States Supreme Court for a writ of certiorari in March 2010. The petition was ultimately denied. *Pirate Investor LLC v. Sec. & Exch. Comm'n*, 561 U.S. 1026 (2010).

## ARGUMENT

In the Fourth Circuit, a district court may vacate an injunction for a number of reasons, including where "conditions have so changed that it is no longer needed" and "applying it prospectively is no longer equitable." *Tobin*, 192 F.2d at 136; Fed. R. Civ. P. 60(b)(5). In engaging in this analysis, courts consider a variety of factors including, but not limited to:

- *changes in factual circumstances* or the law;
- the *length of time* since entry of the injunction;
- the *circumstances* leading to entry of the injunction;

4

- whether the party has *complied in good faith* with the injunction;
- the likelihood that the conduct sought to be prevented *will recur absent the injunction*; and
- whether the *objective of the injunction has been achieved* and continued enforcement would be detrimental to the public interest.

*See N. Carolina All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 713 F. Supp. 2d 491, 512 (M.D.N.C. 2010) (emphasis added) (discussing "non-exhaustive list of factors"); *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 661 F. Supp. 2d 548, 553 (E.D. Va. 2009) (listing same factors).

The leading Fourth Circuit case on this issue supports lifting the Injunction. In *Tobin*, the Fourth Circuit considered an injunction against a cotton textile manufacturing corporation, agreed to by consent decree,[1] enjoining violations of the Fair Labor Standards Act. Nine years later, the defendant applied for dissolution of the injunction in connection with a potential sale. The court concluded that injunctions against future violations should not live on forever, explaining:

> Under the probation and parole laws, there is a limit to the time that persons who have committed even serious crimes are held under threat of punishment. Certainly there should be some limit to the time when an employer who has been guilty of nothing more than violation of a mere regulatory statute should be held to good behavior under threat of fine or imprisonment for contempt of court if he again offends.

*Tobin*, 192 F.2d at 136.

The *Tobin* court went on to vacate the injunction after considering that the enjoined party had, by the time of the decision, complied with the law in good faith over a period of 10 years, and the government could not demonstrate "any reason to apprehend violation of the statute." *Id.* at 136–37.

---

[1] Courts generally impose a more rigorous standard in assessing these equitable factors when considering the dissolution of an injunction agreed to as part of a consent decree, *see, e.g.*, *Sec. & Exch. Comm'n v. Tsao*, 671 F. App'x 157, 158 (4th Cir. 2016) (per curiam), but that heightened standard is not applicable here.

5

Other courts also have affirmed motions to dissolve injunctions under similar circumstances, particularly where the underlying conduct was not repeated and years had passed since the violation. *See Brennan v. Thor, Inc.*, 516 F.2d 999, 1000 (4th Cir. 1975) (affirming dissolution of injunction after three years where new owner initiated compliance mechanisms and no subsequent violations of law had occurred); *Sec. & Exch. Comm'n v. Warren*, 583 F.2d 115, 122 (3d Cir. 1978) (affirming dissolution of injunction where defendants had complied with injunction for five years and had not committed any other violations in 10 years since initial violation, and injunction was causing undue hardship); *Sec. & Exch. Comm'n v. Crofters, Inc.*, No. C-2-70-351, 1982 WL 1362, at *5 (S.D. Ohio Aug. 23, 1982) (dissolving injunction where there was low risk to public, low likelihood of future violations, no difficulty in enforcing against future violations, 10 years had passed, and injunction imposed real stigma).

## I. THE COURT SHOULD VACATE THE INJUNCTION BECAUSE APPLYING IT PROSPECTIVELY IS NO LONGER EQUITABLE.

An analysis of each of the equitable considerations articulated in the Fourth Circuit's *Tobin* case weighs heavily in favor of lifting the Injunction against Stansberry Research. **Over 17 years** have transpired since the conduct at issue. As the successor to Pirate Investor, Stansberry Research is a completely different company today with new executive leadership that emphasizes a culture of compliance. To that end, the Company has implemented a robust compliance program that scrutinizes marketing and editorial content to ensure there will be no future securities laws violations. Accordingly, the deterrent purpose of the Injunction has been served, and it is time for the Company to be freed from the continued stigma of the Injunction.

A. **The Company Has Substantially Changed Since The Injunction Was Entered.**

Changes in factual circumstances — particularly the changed nature of a company — are a primary factor in determining whether to lift an injunction. *See Tobin*, 192 F.2d at 136. In *Tobin*, the Fourth Circuit emphasized the importance of a demonstrable shift in corporate culture evidenced since the entry of the injunction:

> The whole business atmosphere of most corporations as well as their ownership and management have undergone radical changes after the lapse of [a period of 10 years]; and there is no reason to hold them subject to such an injunctive order when changes of this sort have occurred . . . .

*Id.*; *see also Brennan*, 516 F.2d at 1000 (change in management is substantial factor in assessing potential dissolution of injunction).

Like the business released from the injunction in *Tobin*, Stansberry Research has evolved for the better, implemented substantial compliance-related improvements and drastically changed its executive leadership such that it bears little resemblance to Pirate Investor circa 2002.

In 2002, when the promotional Email and Report publication in the *Pirate Investor* case were distributed, the Company was still in its start-up stage. It published just a few newsletters and had less than 50,000 subscribers. Arnold Decl. ¶ 14. There were fewer than 20 employees on staff. *Id.* Mr. Stansberry — then a 29-year-old financial journalist trying to run a small investment publishing company almost singlehandedly — frequently served as analyst, writer, editor and marketer. Mem. at 24-25, 46. He personally authored and edited both the Email and Report. *Id.* at 25.

The Company has professionally evolved in the 17 years since the event in question. The Company today has approximately 1.3 million subscribers worldwide who receive one or more of the Company's 34 newsletters and other investment research products. Arnold Decl. ¶ 14.

The success of Stansberry Research has been built by establishing long-term relationships with its customers based on professional integrity and through the provision of impartial investment recommendations and strategies.  *Id.* ¶ 18.

The Company has grown to a staff of over 230 employees and support staff handling research and analysis, content writing, editing, sales, marketing, customer service, business development, human resources, information technology, operations, finance and legal functions. *Id.* ¶ 14.  The editorial content of Stansberry Research publications has changed over time.  Today, it issues detailed, heavily researched investment publications that do not rely primarily on a single source, in contrast to the Report at issue in the *Pirate Investor* case.  *Id.* ¶ 15.

Unlike in 2002, editorial and marketing are now discrete functions, each with multiple layers of controls that did not exist at the time of the offense.  *Id.* ¶ 8.  On the editorial content side, dozens of analysts research companies and market trends and draft investment reports, each of which is required to contain footnoted citations to materials supporting all factual assertions made therein.  *Id.* ¶ 10.  For example, if a reference is made to a conversation with a company representative, then a verifiable source or recorded conversation is required — a compliance rule that was not in place in the *Pirate Investor* days.  *Id.*  Moreover, today, investment reports are reviewed by multiple editors for the various publications.  *Id.*  Once a publication's editor has signed off on drafts, reports are then reviewed and approved by one of the Company's six managing editors.  *Id.*  The managing editors — who are the guardians of the Company's brand and are intensely focused on quality — ensure that the arguments are sound and factually supported.  *Id.*  Another level of fact-checking review is then provided by an assistant managing editor and proofreader to ensure the content meets Stansberry Research's rigorous standards.  *Id.*

The marketing copy that promotes the editorial content is handled by a separate copywriting team. *Id.* ¶ 11. All marketing content they generate is initially reviewed and approved by a publication's editor and the copy chief. *Id.* The draft marketing copy then undergoes another level of scrutiny: legal review by an experienced team extensively trained in the relevant compliance areas. *Id.* This robust compliance structure is discussed in greater detail below.

The Company's management team, which runs the Company's day-to-day operations, has undergone significant changes. Chief Executive Officer Mark Arnold and his executive management team — none of whom were present when the conduct at issue occurred in 2002 — are dynamic and innovative leaders, heavily focused on the quality and reliability of the Company's publications. *Id.* ¶¶ 2, 6. Mr. Arnold is an experienced attorney, and under his leadership the Company has established a clear "tone at the top" that stresses the importance of compliance. *Id.* ¶¶ 2–3, 6–7. He regularly meets with staff in small groups and emphasizes the importance of doing things the right way. *Id.* ¶ 7. Stansberry Research also has hired a General Counsel, Gary Anderson, who, with a substantial background in compliance, regulatory matters and litigation, provides the Company day-to-day guidance and has built a highly skilled legal and compliance team. *Id.*

In addition, Mr. Stansberry's current role at the Company is different than the all-encompassing role in which he previously served. He has handed the reins of operating the business over to a highly competent and experienced executive team that is tasked with the responsibility for the Company's operations and growth. *Id.* ¶¶ 3, 6–7. Mr. Stansberry now serves in a more limited role and does not participate in the day-to-day management of the Company. *Id.* ¶ 6. Mr. Stansberry does not have any direct reports, no longer serves as an editor

of the Company's publications, and appears on behalf of the Company on limited occasions throughout the year.  *Id.*  He is not employed by, nor does he hold a position with, the Company's majority shareholder.  *Id.*  Mr. Stansberry has never held a controlling ownership interest in the Company, and his interest has been reduced because of interest grants to Company employees and will be further reduced when the Company makes additional equity grants in the future.  *Id.*

In sum, the Pirate Investor business that was enjoined for the act it committed in 2002 is not the same as the Stansberry Research that operates today.  Given these substantial changes in factual circumstances, this factor weighs heavily in favor of lifting the Injunction as to the Company.

### B. Over 12 Years Have Passed Since The Entry Of The Injunction Without A Violation.

Multiple courts have recognized that the passage of time without another violation is a key consideration in determining whether to lift an obey-the-law injunction.  *See Tobin*, 192 F.2d at 136 ("It is little short of absurd to contend that . . . consent decrees that the various administrative agencies have been obtaining should be extended in perpetuo against people who have been obeying the law over long periods and show no intention of doing otherwise."); *see also Sec. & Exch. Comm'n. v. Thermodynamics, Inc.*, 464 F.2d 457, 461 (10th Cir. 1972) (where defendant is an individual, "the passage of a substantial period of time with full compliance and with no other violations . . . is about all an individual can show"); *Crofters*, 1982 WL 1362, at *5 (period of non-violation of injunction is "significant factor which bears on the necessity of dissolving the injunction because of a change in circumstances").  It is generally accepted that the passage of 10 years is sufficient time after which an injunction likely is no longer necessary.

*See, e.g.*, *Tobin*, 192 F.2d at 136; *Warren*, 583 F.2d at 122 (vacating injunction where 10 years had passed since commission of violation and five years since injunction was entered with no evidence of recurrence of violation, and violation was of very limited duration); *Crofters*, 1982 WL 1362, at *5 (dissolving injunction and finding "low degree of necessity to continue the injunction" where nearly 10 years had passed without violation). Indeed, the Fourth Circuit has found even a period as short as four years as sufficient to vacate an obey-the-law injunction. *Brennan*, 516 F.2d at 1000.

It has been ***over 17 years*** since the conduct at issue in the *Pirate Investor* case and ***over 12 years*** since this Court issued the Injunction. Stansberry Research has not committed, nor been accused of committing, another securities law violation. This lengthy passage of time without further incident weighs heavily in favor of vacating the Injunction as to the Company.

      **C.**     **The Conduct Was Of Limited Duration And Was Not Repeated.**

One past incident "does not demonstrate a realistic likelihood of recurrence" and therefore does not justify a perpetual injunction. *Sec. & Exch. Comm'n v. Ingoldsby*, No. 88-CV-1001, 1990 WL 120731, at *2 (D. Mass. May 15, 1990) (declining to impose post-trial injunctive relief); *see Tobin*, 192 F.2d at 136 (analogizing an injunction to parole); *Warren*, 583 F.2d at 121–22 (vacating injunction that involved "a single isolated offense in an esoteric area of the law" and involved violation "of very limited duration").

Here, the 17-year-old offense in question was committed by a 29-year-old editor and unfolded over less than one month. Indeed, this Court explicitly found that there was "***[no] evidence that Pirate engaged in a pattern of fraudulent activity***." Mem. at 48 (emphasis added). Given this finding and the extremely limited duration of time over which it occurred, this factor weighs in favor of lifting the perpetual Injunction as to the Company.

11

### D. The Company Has Implemented Robust Compliance Programs To Ensure Compliance With Securities Laws And Other Applicable Regulations.

Implementation of compliance programs and procedures designed to prevent future violations may strongly support dissolution of an injunction. *See Brennan*, 516 F.2d at 1000 (in affirming dissolution of injunction, noting that new principal stockholder, upon assumption of control and supervision of company, "initiated procedures designed to maintain appropriate records and monitor the corporate activities in such a manner as to insure that no violation of the Act would occur"); *MicroStrategy*, 661 F. Supp. 2d at 556 (considering compliance with injunction and likelihood of repeat violations).

As a result of the events in 2002 and the Commission's action against the Company, Stansberry Research implemented a robust compliance program to ensure that every piece of investment research and marketing copy that the Company issues is accurate and in compliance with securities and other relevant laws. Arnold Decl. ¶¶ 8–9. These actions show both that the Company has attempted to comply with the law in good faith and that it is unlikely to be a repeat offender.

Today, as noted, the Company's investment research and marketing content undergo multiple levels of review, and all marketing content undergoes a rigorous compliance review by an experienced and well-trained legal team. *Id.* ¶ 11. Part of the compliance review process entails verifying and documenting backup sources for all material factual statements, including citations to public materials. *Id.* The legal team also ensures that statements regarding future events are appropriately qualified. *Id.* The legal team that conducts the compliance review receives extensive training sessions and continuing education on securities laws, FTC regulations, applicable state laws and other relevant compliance considerations. *Id.* ¶ 13. In fact,

those training sessions discuss the *Pirate Investor* case as a "lessons learned" example, specifically to ensure that the Company does not repeat the same mistakes. *Id.* In addition, incoming team members review over 20 "model" versions of previously approved copy and are tested thoroughly to ensure that they understand — and can implement — the Company's rigorous review standards. *Id.* ¶ 12. Once they complete an initial three-month training period, they are prepared to review "live" copy; even then, their review and progress remain closely monitored by supervisors in the legal department. *Id.*

Stansberry Research has taken other steps to ensure that it remains compliant with securities laws. For example, the Company has implemented policies to ensure that its reporting remains neutral and disinterested, including a strict trading policy applicable to all employees (including copywriters, editors, writers and analysts) and independent contractors of the Company. *Id.* ¶ 16. Under that policy, Stansberry Research employees and contractors may not participate in the selection of a security recommendation for publication in which they have a direct or indirect interest and may not purchase a security while it is an open recommendation if they participated in the selection of that security recommendation. *Id.* Employees who do not participate in the selection of a recommendation must still wait 24 hours after publication of a recommendation to trade in that security in order to allow readers the first opportunity to trade. *Id.* The Company's trading policy and practices are more stringent than those in place at its competitors and reflect its guiding principle of putting its readers first. *Id.* ¶ 17.

These policies and procedures demonstrate that Stansberry Research has attempted in good faith to comply with securities laws and ensure that the Email and Report at issue in the *Pirate Investor* case would never be approved today and thus weigh in favor of lifting the Injunction as to the Company.

E.   **There Is No Indication That The Company Will Repeat The Enjoined Conduct.**

As discussed above, the nature of the violation and the substantial changes in the Company since the conduct giving rise to the Injunction demonstrate that a repeat violation is extremely unlikely. The Company has evolved from a start-up operation into a large, corporate enterprise with hundreds of staff and over one million subscribers. *Id.* ¶ 14. Stansberry Research's business model relies on repeat customers willing to subscribe to its publications for the long term. *Id.* ¶ 18. In order to maintain its extensive subscriber base, the Company prioritizes treating its customers with the greatest respect and ensuring that its engagement with its subscribers is beyond reproach. *Id.* The same is true for hiring and retaining staff. *Id.*

Because of the lessons learned from the *Pirate Investor* case, it is clear that Stansberry Research is in fact much less likely to engage in misconduct than other companies. That experience permanently shaped the Company for the better and has instructed its current culture of compliance. Many of the Company's present-day policies and practices were implemented in response to the action and ensure that employees refrain from engaging in misconduct.

F.   **The Objective Of The Injunction Has Been Achieved.**

The Injunction should be lifted because it has completely fulfilled its purpose of ensuring that the Company was deterred from future violations of the securities laws. *See* Mem. at 44. The Supreme Court has held that the essential purpose of an injunction is not to punish, but to deter possible future violations. *See Hecht*, 321 U.S. at 329. Consistent therewith, in finding that an obey-the-law injunction was not a penalty, the Third Circuit recently emphasized that SEC injunctions are only appropriate where a real threat of future harm exists and must be "carefully tailored to enjoin only that conduct necessary to prevent a future harm." *Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 565 (3d Cir. 2019). For the reasons stated above, along with

the Company's significantly improved compliance structure, it is clear that the remedial nature of the Injunction has been achieved and its presence is no longer necessary.

Absent any deterrent effect, the Injunction serves only to stigmatize and punish the Company, and at this point, it is not a deterrent necessary to protect the public. In determining whether dissolution of an injunction is warranted, courts additionally consider the public interest by weighing the benefit of a continued injunction against the hardship on the enjoined company or other public interest and, in doing so, regularly consider the stigma an injunction can have and consequently the impact on the company's business relationships. *See, e.g.*, *Brennan*, 516 F.2d at 1000 (considering continued embarrassment and interference with orderly conduct of business as factors in dissolving injunction); *Sec. & Exch. Comm'n v. Wong*, 369 F. Supp. 646, 647 (D.P.R. 1974) (releasing defendant from court-approved consent decree with SEC that affected development of his business affairs and psychological well-being).

While the Company has continued to develop its business, the detrimental effect of the Injunction continues to burden its growth. Even today, over a decade since its issuance, the Injunction and the underlying case is one of the top Google search results for the Company, despite that Stansberry Research today is considered to be one of the leading financial and investment information companies. Arnold Decl. ¶ 20.

The Injunction continues to stigmatize Stansberry Research and negatively impact its operations. *Id.* ¶¶ 19, 21. As the Company attempts to hire staff, recruit subscribers and explore business partnerships, it must each time try to overcome the negative stigma of the Injunction. *Id.* ¶ 21. The Injunction has thwarted prospective business dealings with potential partners and investors. *Id.*; *see Crofters*, 1982 WL 1362, at *5 (dissolving injunction in part because "[t]he

15

stigma [from the injunction] is real and affects not only [the company's] public image, but also has some effect on their attractiveness to potential investors").

In addition to the professional impact lifting the Injunction would have, its removal would send a strong (and accurate) message that the Company has changed and is not likely to violate securities laws.  Stansberry Research would be able to point to that new fact to demonstrate to prospective subscribers, business partners and employees that it is a different company than the one on which the Injunction was imposed.  It will also assure those who deal with the Company that there is no reason to fear additional violations.  The Company will still have to contend with the ramifications of the *Pirate Investor* decision, but they will be armed with the fact that the Injunction has since been lifted.

## CONCLUSION

The purpose of the Injunction entered over 12 years ago against Pirate Investor has been accomplished and its necessity has passed. The Commission has informed the Company that it does not oppose the Motion. For the foregoing reasons, and given that the Commission does not oppose the Motion, the Court should vacate the Injunction as to the Company.

Dated: January 31, 2020   Respectfully submitted,

/s/ *Ada Fernandez Johnson*
Ada Fernandez Johnson,
Bar No. 20566
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave., NW
Washington, D.C.20004
T: (202) 383-8000
F: (202) 383-8118
afjohnson@debevoise.com

Andrew J. Ceresney, *pro hac vice* application pending
Sarah B. Hoefle, *pro hac vice* application pending
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
T: (212) 909-6000
F: (212) 909-6836
aceresney@debevoise.com
shoefle@debevoise.com

*Counsel to Defendant Pirate Investor, LLC*