## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | * | |
| | * | |
| **v.** | * | **Case No.: 1:03-cv-1042-MJG** |
| | * | |
| **AGORA, INC., et al.** | * | |
| | * | |

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FRANK PORTER STANSBERRY'S MOTION TO VACATE  PERMANENT INJUNCTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)

Charles N. Curlett, Jr. (Bar No. 28246)
CURLETT LLC
517 W. Joppa Rd.
Towson, Maryland 21204
917-667-0861
ccurlett@curlettlaw.com

Dated: May 26, 2022                    *Counsel to Frank Porter Stansberry*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND ........................................................................................3

ARGUMENT.........................................................................…...6

I.  THE COURT SHOULD VACATE THE INJUNCTION BECAUSE APPLYING
    IT PROSPECTIVELY IS NO LONGER EQUITABLE. ......................................8

   A.  Mr. Stansberry Has Substantially Changed His Business Since The
       Injunction Was Entered....................................................................9

   B.  Over 14 Years Have Passed Since The Entry Of The Injunction Without A
       Violation. ....................................................................................12

   C.  The Conduct Was Of Limited Duration And Was Not Repeated...................13

   D.  Mr. Stansberry has Overseen the Implementation of Robust Compliance
       Programs To Ensure Compliance With Securities Laws And Other Applicable
       Regulations....................................................................................14

   E.  There Is No Indication That Mr. Stansberry Will Repeat The Enjoined
       Conduct. ..................................................................................... 15

   F.  The Objective Of The Injunction Has Been Achieved. ................................ 16

## TABLE OF AUTHORITIES

Cases

*Brennan v. Thor, Inc.,* 516 F.2d 999 (4th Cir. 1975)..............................7, 9, 13, 14, 17

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ...........................................................1, 16

*MicroStrategy, Inc. v. Bus. Objects, S.A.,* 661 F. Supp. 2d 548 (E.D. Va. 2009)....6, 14

*N. Carolina All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.,* 713 F. Supp. 2d 491 (M.D.N.C. 2010)..............................................................................................6

*Pirate Investor LLC v. Sec. & Exch. Comm'n,* 561 U.S. 1026 (2010) .........................5

*Sec. & Exch. Comm'n v. Crofters, Inc.*, No. C-2-70-351, 1982 WL 1362 (S.D. Ohio Aug. 23, 1982) ..................................................................................................8, 12, 17

*Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549 (3d Cir. 2019)...................................16

*Sec. & Exch. Comm'n v. Ingoldsby*, No. 88-CV-1001, 1990 WL 120731 (D. Mass. May 15, 1990) ...............................................................................................................13

*Sec. & Exch. Comm'n v. Pirate Investor LLC*, 580 F.3d 233 (4th Cir. 2009)...................................................................................................................5

*Sec. & Exch. Comm'n v. Thermodynamics, Inc.,* 464 F.2d 457 (10th Cir. 1972).......12

*Sec. & Exch. Comm'n v. Tsao*, 671 F. App'x 157 (4th Cir. 2016) ................................7

*Sec. & Exch. Comm'n v. Warren*, 583 F.2d 115 (3d Cir. 1978) .......................7, 12, 13

*Sec. & Exch. Comm'n v. Wong*, 369 F. Supp. 646 (D.P.R. 1974)…………..………17

*Tobin v. Alma Mills*, 192 F.2d 133 (4th Cir. 1951)...........................1, 6, 7, 8, 9, 12, 13

OTHER AUTHORITIES

Fed. R. Civ. P. 60(b)(5)..................................................................................................6

## PRELIMINARY STATEMENT

The purpose of an injunction is not to punish, but to guard against possible future violations. *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Where the facts and circumstances demonstrate that there is a reasonable assurance of future compliance with the law, courts have determined that it is inequitable to continue an injunction. *Tobin v. Alma Mills*, 192 F.2d 133, 135-36 (4th Cir. 1951).

The "obey-the-law" injunction issued over 14 years ago against Mr. Stansberry and his company, Pirate Investor, concerned actions taken 20 years ago by Mr. Stansberry, who was then a 29-year-old CEO of a start-up publishing enterprise with approximately 15 employees. Following entry of the injunction, Mr. Stansberry oversaw the implementation of robust compliance procedures as the company grew, which effectively prevented so much as a single additional infraction. As a result, that company bears no resemblance to its current incarnation, Stansberry Research ("Company") — a leading publisher of financial and investment information that is the successor company to Pirate Investor.

Stansberry Research is now a wholly owned subsidiary of MarketWise, Inc., a multi-brand subscription services platform, which trades on the NASDAQ under ticker symbol MKTW. In February 2020, before the merger that took Stansberry Research's parent company public, this Court vacated the injunction that had been in place for over 12 years. Vacatur of the injunction was warranted for a company that, under Mr. Stansberry's leadership, implemented an executive leadership team with extensive business, publishing, legal and compliance experience. The Company

1

became a model corporate citizen of Baltimore and was consistently recognized by the Baltimore Sun as one of the "Top Workplaces" in its region. More importantly, after the Injunction, the Company implemented comprehensive compliance procedures relating to the review of its marketing and editorial content to ensure that the conduct at issue in the Pirate Investor case cannot recur. As a result, over the last 20 years, neither Mr. Stansberry nor Stansberry Research has engaged in, or been accused of engaging in, securities fraud, which is the type of misconduct that the Injunction was intended to prevent. In fact, Mr. Stansberry and the Company have unquestionably demonstrated through their actions since the entry of the Injunction there is no likelihood they would violate the law.

In sum, the Injunction has achieved its remedial objective, the deterrent effect of which caused Mr. Stansberry and Stansberry Research to change their ways and implement robust compliance mechanisms designed to prevent future violations. There is absolutely no indication that Mr. Stansberry will engage in the wrongdoing the Injunction was initially entered to deter. To maintain the Injunction more than 20 years after the offense in question took place would merely continue to harshly punish a company founder that has clearly learned his lesson. This Court recognized as much when it granted the Company's Motion to vacate the injunction as it applied to the Company on February 5, 2020 (ECF 251).  Mr. Stansberry, who has just launched a new financial publishing start-up, Porter & Co., now askes this Honorable Court to grant him the same relief.

## BACKGROUND

*Twenty years ago*, in May 2002, Pirate Investor issued a promotional email (the "Email") to its distribution list of subscriber email addresses, which offered for sale an investment report (the "Report"). See Declaration of Charles N. Curlett, Jr. ("Curlett Decl.") Ex. 1 at 3–5 (*Sec. & Exch. Comm'n v. Agora, Inc., et al.*, No. MJG-03-1042 (D. Md. Aug. 3, 2007) (Memorandum of Decision) ("Mem.")). Both the Email and the Report were authored and edited by Mr. Stansberry, a then 29-year-old editor who essentially bore sole responsibility for the day-to-day operations of Pirate Investor. *Id.* at 24–25 (finding that Mr. Stansberry "effectively controlled Pirate [Investor]" and "was both author and editor" of the Report). Mr. Stansberry served Pirate Investor in multiple and diverse roles, including copywriter, researcher, analyst, editor, publisher, and chief executive officer. *See id.* at 46 (citing Mr. Stansberry's trial testimony that he ran "the show" and was the "person in charge" of Pirate Investor). He performed editorial and marketing duties that, in a more mature business, would normally be delegated to specialized employees. Compare Mem. at 25 (noting that Mr. Stansberry was the "one person to author, edit, and publish information without editorial or other review to authenticate its claims") with Curlett Decl. Ex. 3 (Declaration of F. Porter Stansberry ("Stansberry Decl.")) ¶ 4 ("Stansberry Research became one of the largest providers of independent financial research in the world.  We grew from 15 employees at the time of the Pirate Investor case to a staff of over 230 employees and support staff to handle researching, marketing, editing, reviewing, and publishing of promotional copy and newsletters.")   At the time,

3

however, Pirate Investor was a start-up publishing enterprise with only approximately 15 employees. *Id.*

The Email asserted that the Report provided special insight from a senior executive at an unnamed company concerning the imminent announcement of governmental approval of a major international agreement. Mem. at 4. The Email also told prospective investors they could earn a substantial return on their investment if they bought the Report and used this "super insider" tip. *Id.* Customers who ultimately purchased the Report learned that the unnamed company was USEC, Inc., a provider of uranium-enrichment services. *Id.* at 5. In the Report, Mr. Stansberry engaged in a financial analysis of USEC's fundamentals and discussed its role as the United States' agent in a disarmament pact with Russia. *Id.* at 5, 11–12. Mr. Stansberry predicted that a pending international agreement between the United States and Russia would benefit USEC and stated that an unnamed USEC senior executive had assured him that the agreement would soon be approved and had said to "watch the stock on May 22." *Id.* at 5.

As it turned out, the U.S.-Russia agreement was not announced until three weeks later, on June 19, 2002, and some individuals who traded on the basis of the Report lost money on their investments. *Id.* at 5–6. Nearly one year later, the U.S. Securities and Commission (the "Commission") filed a civil complaint on April 18, 2003 charging Agora (Pirate Investor's parent company), Pirate Investor, and Mr. Stansberry with securities fraud under § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, claiming that statements in the Email and Report were false.

*Id.* at 6. The Court concluded the conduct violated § 10(b) because it found that statements in the promotional Email and Report concerning discussions with the USEC senior executive were false. *Id.* at 9–14, 49. Pirate Investor and Mr. Stansberry were held liable for disgorgement of the profits from the Report and civil penalties.

The Court — at the Commission's request — also entered a permanent "obey-the-law" injunction enjoining Pirate Investor and Mr. Stansberry from further violations of § 10(b). Curlett Decl. Ex. 2 (*Sec. & Exch. Comm'n v. Agora, Inc., et al.*, No. MJG-03-1042 (D. Md. Oct. 3, 2007) (Injunction)).

The Company subsequently appealed the Court's decision. The United States Court of Appeals for the Fourth Circuit affirmed the decision in September 2009. *Sec. & Exch. Comm'n v. Pirate Investor LLC*, 580 F.3d 233 (4th Cir. 2009). The Company then petitioned the United States Supreme Court for a writ of certiorari in March 2010, which was denied. *Pirate Investor LLC v. Sec. & Exch. Comm'n*, 561 U.S. 1026 (2010).

## THIS COURT VACATES THE INJUNCTION AS APPLIED TO THE COMPANY

On February 5, 2020, Pirate Investor filed an Unopposed Motion to Vacate Permanent Injunction Pursuant to Federal Rule of Civil Procedure 60(b)(5).  (ECF 250).  The Company moved this Court to vacate the injunction as applied to the Company but did not move for the same relief as to Mr. Stansberry.  This Court granted the Motion.  For nearly 15 years, the permanent injunction has remained in force against Mr. Stansberry.  It has been 20 years since the conduct that gave rise to the Injunction occurred.  The Injunction should be vacated for Mr. Stansberry for

5

precisely the same reasons that it was appropriate to vacate the Injunction for the corporate entity that bears his name.

## LEGAL ARGUMENT

In the Fourth Circuit, a district court may vacate an injunction for several reasons, including where "conditions have so changed that it is no longer needed" and "applying it prospectively is no longer equitable." *Tobin*, 192 F.2d at 136; Fed. R. Civ. P. 60(b)(5). In engaging in this analysis, courts consider a variety of factors including, but not limited to:

- changes in factual circumstances or the law;

- the length of time since entry of the injunction;

- the circumstances leading to entry of the injunction;

- whether the party has complied in good faith with the injunction;

- the likelihood that the conduct sought to be prevented will recur absent the injunction;                                                                   and

- whether the objective of the injunction has been achieved and continued enforcement would be detrimental to the public interest.

*See N. Carolina All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 713 F. Supp. 2d 491, 512 (M.D.N.C. 2010) (emphasis added) (discussing "non-exhaustive list of factors"); *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 661 F. Supp. 2d 548, 553 (E.D. Va. 2009) (listing same factors).

The leading Fourth Circuit case on this issue supports lifting the Injunction. In *Tobin*, the Fourth Circuit considered an injunction against a cotton textile

manufacturing corporation, agreed to by consent decree,[1] enjoining violations of the Fair Labor Standards Act. Nine years later, the defendant applied for dissolution of the injunction in connection with a potential sale. The court concluded that injunctions against future violations should not live on forever, explaining:

> Under the probation and parole laws, there is a limit to the time that persons who have committed even serious crimes are held under threat of punishment. Certainly there should be some limit to the time when an employer who has been guilty of nothing more than violation of a mere regulatory statute should be held to good behavior under threat of fine or imprisonment for contempt of court if he again offends.

*Tobin*, 192 F.2d at 136.

The *Tobin* court went on to vacate the injunction after considering that the enjoined party had, by the time of the decision, complied with the law in good faith over a period of 10 years, and the government could not demonstrate "any reason to apprehend violation of the statute." *Id.* at 136–37.

Other courts also have affirmed motions to dissolve injunctions under similar circumstances, particularly where the underlying conduct was not repeated and years had passed since the violation. *See Brennan v. Thor, Inc.,* 516 F.2d 999, 1000 (4th Cir. 1975) (affirming dissolution of injunction after three years where new owner initiated compliance mechanisms and no subsequent violations of law had occurred); *Sec. & Exch. Comm'n v. Warren*, 583 F.2d 115, 122 (3d Cir. 1978) (affirming dissolution of

---

[1] Courts generally impose a more rigorous standard in assessing these equitable factors when considering the dissolution of an injunction agreed to as part of a consent decree, see, e.g., *Sec. & Exch. Comm'n v. Tsao*, 671 F. App'x 157, 158 (4th Cir. 2016) (per curiam), but that heightened standard does not apply here.

injunction where defendants had complied with injunction for five years and had not committed any other violations in 10 years since initial violation, and injunction was causing undue hardship); *Sec. & Exch. Comm'n v. Crofters, Inc.,* No. C-2-70-351, 1982 WL 1362, at *5 (S.D. Ohio Aug. 23, 1982) (dissolving injunction where there was low risk to public, low likelihood of future violations, no difficulty in enforcing against future violations, 10 years had passed, and injunction imposed real stigma).

## I.   THE COURT SHOULD VACATE THE INJUNCTION BECAUSE APPLYING IT PROSPECTIVELY IS NO LONGER EQUITABLE.

An analysis of each of the equitable considerations articulated in the Fourth Circuit's *Tobin* case weighs heavily in favor of lifting the Injunction against Mr. Stansberry. Over 20 years have transpired since the conduct at issue.  Mr. Stansberry is older and wiser.  Following the issuance of the injunction, Mr. Stansberry presided over the reform and maturation of Stansberry Research.  Under his leadership, the Company implemented a robust compliance program that scrutinizes marketing and editorial content to ensure there would be no future securities laws violations.

Mr. Stansberry was actively involved in the Company's operations until 2018. In 2020, the Beacon Street Group, the parent company of Stansberry Research, went public with a $3 billion SPAC merger with Ascendant Digital Acquisition Corp.  While Mr. Stansberry is no longer part of the management team of Stansberry Research, he has recently launched a new business, Porter & Company, LLC ("Porter & Co."), which will compete in the same market.  Accordingly, the deterrent purpose of the Injunction has been served, and it is time for Mr. Stansberry to be freed from the continued stigma of the Injunction.

**A.      Mr. Stansberry Substantially Changed The Company After The Injunction Was Entered.**

Changes in factual circumstances — particularly the changed nature of a company — are a primary factor in determining whether to lift an injunction. *See Tobin*, 192 F.2d at 136. In *Tobin*, the Fourth Circuit emphasized the importance of a demonstrable shift in corporate culture evidenced since the entry of the injunction:

> The whole business atmosphere of most corporations as well as their ownership and management have undergone radical changes after the lapse of [a period of 10 years]; and there is no reason to hold them subject to such an injunctive order when changes of this sort have occurred . . ..

*Id*.; see also *Brennan*, 516 F.2d at 1000 (change in management is substantial factor in assessing potential dissolution of injunction).

Like the business released from the injunction in *Tobin*, Stansberry Research, led by Mr. Stansberry, evolved for the better, implemented substantial compliance-related improvements and changed its executive leadership.

In 2002, when the promotional Email and Report publication in the Pirate Investor case were distributed, the Company was still in its start-up stage. It published just a few newsletters and had less than 50,000 subscribers. Stansberry Decl. ¶ 4. There were fewer than 20 employees on staff. *Id*. Mr. Stansberry — then a 29-year-old financial journalist trying to run a small investment publishing company almost singlehandedly — frequently served as analyst, writer, editor, and marketer. Mem. at 24-25, 46. He personally authored and edited both the Email and Report. *Id*. at 25.

The Company evolved in the 20 years since the event in question under Mr. Stansberry's leadership. The client base of Stansberry Research grew from fewer than 50,000 subscribers at the time of the Pirate Investor case to millions of readers worldwide of the more than 30 newsletters and other investment research products. Stansberry Decl. ¶ 4. The Company grew from 15 employees at the time of the Pirate Investor case to a staff of over 230 employees and support staff to handle researching, marketing, editing, reviewing, and publishing of promotional copy and newsletters. *Id*.

The editorial content of Stansberry Research publications changed over time. *Id*. at ¶ 5. The company came to issue detailed, heavily researched investment publications that do not rely primarily on a single source, in contrast to the Report at issue in the Pirate Investor case. *Id*. Unlike in 2002, editorial and marketing became discrete functions, each with multiple layers of controls that did not exist at the time of the offense. *Id*. On the editorial content side, dozens of analysts research companies and market trends and draft investment reports, each of which is required to contain footnoted citations to materials supporting all factual assertions made therein. *Id*. For example, if a reference is made to a conversation with a company representative, then a verifiable source or recorded conversation is required — a compliance rule that was not in place in the Pirate Investor days. *Id*. Moreover, investment reports are reviewed by multiple editors for the various publications. *Id*. Once a publication's editor has signed off on drafts, reports are then reviewed and approved by one of the Company's managing editors. *Id*. The managing editors —

who are the guardians of the Company's brand and are intensely focused on quality — ensure that the arguments are sound and factually supported. *Id*. Another level of fact-checking review is then provided by an assistant managing editor and proofreader to ensure the content meets Stansberry Research's rigorous standards. *Id*. The marketing copy that promotes the editorial content is handled by a separate copywriting team. All marketing content they generate is initially reviewed and approved by a publication's editor and the copy chief. *Id*. The draft marketing copy then undergoes another level of scrutiny: legal review by an experienced team extensively trained in the relevant compliance areas. *Id*.

All of this information was presented by the Company when it successfully petitioned this Court to lift the Injunction as applied to the Company. And indeed, it was Mr. Stansberry who either oversaw or was intimately involved in all of these changes that occurred during the Company's substantial growth over more than 15 years.

As noted above, Mr. Stansberry is launching a new start-up business – Porter & Co. – that will compete with Stansberry Research following a similar business model. To ensure a commitment to compliance from day 1, Mr. Stansberry has hired undersigned counsel, Charles N. Curlett, Jr. of Curlett LLC to serve as Porter & Co.'s *full time* outside General Counsel. *Id*. at ¶ 8. Mr. Curlett has a substantial background in compliance, regulatory matters, and litigation, and will provide the Company with day-to-day guidance. Porter & Co. is also staffed with professionals from the publishing industry with decades of experience. The sophistication of the

Porter & Co. start-up picks up where Stansberry Research left off, more than 20 years after the violation at issue.  Given these substantial changes in factual circumstances, this factor weighs heavily in favor of lifting the Injunction as applied to Mr. Stansberry.

**B.  Over 14 Years Have Passed Since Entry Of The Injunction Without A Violation.**

Multiple courts have recognized that the passage of time without another violation is a key consideration in determining whether to lift an obey-the-law injunction. *See Tobin*, 192 F.2d at 136 ("It is little short of absurd to contend that . . . consent decrees that the various administrative agencies have been obtaining should be extended in perpetuo against people who have been obeying the law over long periods and show no intention of doing otherwise."); *see also Sec. & Exch. Comm'n. v. Thermodynamics, Inc.,* 464 F.2d 457, 461 (10th Cir. 1972) (where defendant is an individual, "the passage of a substantial period of time with full compliance and with no other violations . . . is about all an individual can show"); *Crofters*, 1982 WL 1362, at *5 (period of non-violation of injunction is "significant factor which bears on the necessity of dissolving the injunction because of a change in circumstances"). It is generally accepted that the passage of 10 years is sufficient time after which an injunction likely is no longer necessary. *See, e.g., Tobin*, 192 F.2d at 136; *Warren*, 583 F.2d at 122 (vacating injunction where 10 years had passed since commission of violation and five years since injunction was entered with no evidence of recurrence of violation, and violation was of very limited duration); *Crofters*, 1982 WL 1362, at *5 (dissolving injunction and finding "low degree of necessity to continue the

injunction" where nearly 10 years had passed without violation). Indeed, the Fourth Circuit has found even a period as short as four years as sufficient to vacate an obey-the-law injunction. *Brennan*, 516 F.2d at 1000.

It has been over 20 years since the conduct at issue in the Pirate Investor case and over 14 years since this Court issued the Injunction. Mr. Stansberry has not committed, nor been accused of committing, another violation of any kind. This lengthy passage of time without further incident weighs heavily in favor of vacating the Injunction.

### C. The Conduct Was Of Limited Duration And Was Not Repeated.

One past incident "does not demonstrate a realistic likelihood of recurrence" and therefore does not justify a perpetual injunction. *Sec. & Exch. Comm'n v. Ingoldsby,* No. 88- CV-1001, 1990 WL 120731, at *2 (D. Mass. May 15, 1990) (declining to impose post-trial injunctive relief); *see Tobin,* 192 F.2d at 136 (analogizing an injunction to parole); *Warren*, 583 F.2d at 121–22 (vacating injunction that involved "a single isolated offense in an esoteric area of the law" and involved violation "of very limited duration").

Here, the 20-year-old offense in question was committed by Mr. Stansberry when he was a 29-year-old editor and unfolded over less than one month. Given the extremely limited duration of time over which it occurred, this factor weighs in favor of lifting the perpetual Injunction.

13

### D. Mr. Stansberry Has Implemented Robust Compliance Programs To Ensure Compliance With Securities Laws And Other Applicable Regulations.

Implementation of compliance programs and procedures designed to prevent future violations may strongly support dissolution of an injunction. *See Brennan*, 516 F.2d at 1000 (in affirming dissolution of injunction, noting that new principal stockholder, upon assumption of control and supervision of company, "initiated procedures designed to maintain appropriate records and monitor the corporate activities in such a manner as to insure that no violation of the Act would occur"); *MicroStrategy*, 661 F. Supp. 2d at 556 (considering compliance with injunction and likelihood of repeat violations).

As a result of the events in 2002 and the Commission's action, Mr. Stansberry implemented a robust compliance program at the Company to ensure that every piece of investment research and marketing copy that the Company issues is accurate and in compliance with securities and other relevant laws. Stansberry Decl. ¶ 5. These actions show both that Mr. Stansberry has attempted to comply with the law in good faith and that he is unlikely to be a repeat offender.

At Porter & Co., investment research and marketing content will undergo multiple levels of review, and all marketing content will undergo a rigorous compliance review by experienced staff and counsel. *Id*. ¶ 10. Part of the compliance review process will entail verifying and documenting backup sources for all material factual statements, including citations to public materials. *Id*. Counsel will also ensure that statements regarding future events are appropriately qualified. *Id*.

14

1.     Porter & Co. will take other steps to ensure that it remains compliant with securities laws. *Id.* at ¶ 11.  This will include a strict trading policy that has two components, one for all those involved in selecting the securities for reporting (such as editors and analysts), and one for all other employees and contractors.  *Id.*  The policy will prohibit the former category from ever owning a security that is selected for publication as long as they are affiliated with the company, and the remaining employees and contractors cannot purchase a recommended security for 48 hours following publication.  *Id.*  This policy ensures, first, that those selecting securities for publication are completely disinterested and, second, that those who are able to purchase must allow customers the first opportunity to trade on the information.  *Id.*

These policies and procedures demonstrate that Mr. Stansberry has attempted in good faith to comply with securities laws and ensure that the Email and Report at issue in the Pirate Investor case would never be approved today and thus weigh in favor of lifting the Injunction.

**E. There Is No Indication That Mr. Stansberry Will Repeat The Enjoined Conduct.**

As discussed above, the nature of the violation and the substantial changes Mr. Stansberry brought to the Company since the conduct giving rise to the Injunction demonstrate that a repeat violation is extremely unlikely. Stansberry Research evolved from a start-up operation into a large, corporate enterprise with hundreds of staff and millions of readers. *Id.* ¶ 4. Mr. Stansberry was integral to that evolution.  Porter & Co.'s business model, like that of Stansberry Research,  will rely on repeat customers willing to subscribe to its publications for the long term. *Id.* ¶

15

13. In order to maintain its extensive subscriber base, Mr. Stansberry prioritizes treating his customers with the greatest respect and ensuring that his company's engagement with its subscribers is beyond reproach. *Id*. The same will be true for hiring and retaining staff. *Id*.

Because of the lessons learned from the Pirate Investor case, it is clear that Mr. Stansberry is extremely unlikely to engage in any form of misconduct. That experience permanently shaped Mr. Stansberry's views towards compliance for the better and will inform Porter & Co.'s culture of compliance.

### F. The Objective Of The Injunction Has Been Achieved.

The Injunction should be lifted because it has completely fulfilled its purpose of ensuring that Mr. Stansberry was deterred from future violations of the securities laws. See Mem. at 44. The Supreme Court has held that the essential purpose of an injunction is not to punish, but to deter possible future violations. *See Hecht*, 321 U.S. at 329. Consistent therewith, in finding that an obey-the-law injunction was not a penalty, the Third Circuit recently emphasized that SEC injunctions are only appropriate where a real threat of future harm exists and must be "carefully tailored to enjoin only that conduct necessary to prevent a future harm." *Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 565 (3d Cir. 2019). For the reasons stated above, it is clear that the remedial nature of the Injunction has been achieved and its presence is no longer necessary.

Absent any deterrent effect, the Injunction serves only to stigmatize and punish Mr. Stansberry and his business, and at this point, it is not a deterrent

necessary to protect the public. In determining whether dissolution of an injunction is warranted, courts additionally consider the public interest by weighing the benefit of a continued injunction against the hardship on the enjoined party or other public interest and, in doing so, regularly consider the stigma an injunction can have and consequently the impact on the party's business relationships. See, e.g., *Brennan*, 516 F.2d at 1000 (considering continued embarrassment and interference with orderly conduct of business as factors in dissolving injunction); *Sec. & Exch. Comm'n v. Wong*, 369 F. Supp. 646, 647 (D.P.R. 1974) (releasing defendant from court-approved consent decree with SEC that affected development of his business affairs and psychological well-being).

The detrimental effect of the Injunction, should it continue in force, will be a substantial burden to Porter & Co.  The success of Stansberry Research was built by establishing long-term relationships with subscribers based on professional integrity and through the provision of impartial, thoroughly researched investment recommendations and strategies. Stansberry Decl. at ¶  13.  Until it was lifted, the Injunction continued to stigmatize Stansberry Research and negatively impact its operations. *Id*. at ¶ 14. As the Company attempted to hire staff, recruit subscribers, and explore business partnerships, it was forced each time try to overcome the negative stigma of the Injunction. *Id*. The Injunction thwarted prospective business dealings with potential partners and investors. *Id*.; *see Crofters*, 1982 WL 1362, at *5 (dissolving injunction in part because "[t]he stigma [from the injunction] is real and

affects not only [the company's] public image, but also has some effect on their attractiveness to potential investors").

In addition to the professional impact lifting the Injunction would have, its removal would send a strong (and accurate) message that Mr. Stansberry has changed and is not likely to violate securities laws. Porter & Co. will launch with a clean slate and be able to point to that new fact to demonstrate to prospective subscribers, business partners and employees that it is a different company than the one on which the Injunction was imposed. It will also assure those who deal with Porter & Co. that there is no reason to fear additional violations. Mr. Stansberry will still have to contend with the ramifications of the Pirate Investor decision, but he will be armed with the fact that the Injunction has since been lifted.

WHEREFORE, Defendant Frank Porter Stansberry hereby requests that this Honorable Court vacate the permanent injunction entered in this matter.

Respectfully submitted,

_____
Charles N. Curlett, Jr. (Bar No. 28246)
CURLETT LLC
517 W. Joppa Rd.
Towson, Maryland 21204
Tel: 917-667-0861
ccurlett@curlettlaw.com

*Attorney for Frank Porter Stansberry*

18